**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| GEORGE MOORE, and JAMES JILEK on behalf of themselves and all others similarly situated, | ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. 4:18-cv-01962-SEP |
| vs. | ) ) | JURY TRIAL DEMANDED |
| COMPASS GROUP USA, INC., D/B/A Canteen | ) ) ) | |
| Defendant. | ) | |

**COMPASS GROUP USA, INC.'S RESPONSE IN OPPOSITION TO PLAINTIFF'S**
**MOTION FOR CLASS CERTIFICATION**

# TABLE OF CONTENTS

Page

I.   INTRODUCTION ................................................................................................ 1

II.  FACTUAL BACKGROUND ............................................................................. 2

    A.   Canteen's Operations ................................................................................ 2

    B.   Class Members' Purchases ....................................................................... 4

        1.   Plaintiff George Moore ................................................................. 4

        2.   Former Plaintiff Virginia Carter .................................................. 5

        3.   Plaintiff James Jilek ...................................................................... 6

        4.   Former Plaintiff Frances J. Ivery ................................................. 8

        5.   Brian Baldwin, Plaintiff in Case No. 4:23-cv-00568-JAR ....................... 9

        6.   Andres Borrero, Plaintiff in Case No. 4:23-cv-00586-SRW ................. 10

        7.   Jason Pemberton, Plaintiff in Case No. 2022LA001328,
            (Madison Co. Cir. Ct., Ill.) ......................................................... 10

        8.   Joseph Whitaker, Plaintiff in Case No. 22-CVS-2576 (N.C. Sup.
            Ct.) ............................................................................................... 11

    C.   Expert Reports ......................................................................................... 11

        1.   Dr. Brian Kriegler ....................................................................... 11

        2.   David Kalat .................................................................................. 12

III. LEGAL STANDARD ...................................................................................... 13

IV.  ARGUMENT ................................................................................................... 14

    A.   The Class is Not Ascertainable Because There is No Objective
        Criteria by Which the Court Can Identify Class Members ....................... 15

    B.   Common Questions Do Not Predominate over Individual Ones ................ 20

        1.   The Voluntary Payment Doctrine Requires Individual Inquiries ........... 21

        2.   Members of the Proposed Class Lack Standing under *TransUnion* ........ 24

3.    Common Questions of Damages Do Not Predominate over Individual Ones .................................................................................... 26

4.    Individual Questions Arising from Plaintiff's *Prima Facie* Proof of Liability Overwhelm Common Ones .................................. 28

5.    Variations in the Law Governing Breach Of Contract Preclude Certification of Nationwide Class ............................................. 31

      a.    *The Statutes of Limitations is not Consistent across the 33 States* ............................................................................ 32

      b.    *Compass's Affirmative Defenses are Not Commonly Applied Among The 33 States at Issue* .......................... 33

      c.    *The Allowance or Allocation of Pre-Judgment Interest Varies From State to State* ............................................ 34

**C.**    **Plaintiff Proposes no Administratively Feasible Plan to Manage the Class** ................................................................................................ 35

**D.**    **Plaintiff Inexplicably Alleges His Claims Are Not Typical Of The Class** ................................................................................................ 38

**V.**    **CONCLUSION** ................................................................................ 39

ii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Affordable Communities of Missouri v. Fed. Nat. Mortg. Ass'n*,
   815 F.3d 1130 (8th Cir. 2016) ................................................21

*Ault v. JM Smucker Co.*,
   310 F.R.D. 59 (S.D.N.Y. 2015) ................................................35

*Avritt v. Reliastar Life Ins.*,
   615 F.3d 1023 (8th Cir 2010) ................................................24, 26

*Barfield v. Sho-Me Power Elec. Co-Op*,
   11-cv-04321-NKL, 2013 WL 3872181 (W.D. Mo. July 25, 2013)........................19

*Barfield v. Sho-Me Power Elec. Coop.*,
   852 F.3d 795 (8th Cir. 2017) ................................................18, 19

*Blades v. Monsanto Co.*,
   400 F.3d 562 (8th Cir. 2005) ................................................14

*In re BPA*, *In re Bisphenol-A (BPA) Polycarbonate Plastic Products*,
   276 F.R.D. 336 (W.D. Mo. 2011) ................................................25, 30

*Cody v. City of St. Louis*,
   4:17-CV-2707 AGF, 2021 WL 6112480 (E.D. Mo. Dec. 27, 2021) ...................13, 14, 15, 20

*Comcast Corp. v. Behrend*,
   569 U.S. 27 (2013) ................................................ *passim*

*In re Dollar General Corp Motor Oil Marketing and Sales Practices Litigation*,
   16-02709-MD-W-GAF, 2019 WL 1418292 (W.D. Mo. Mar. 21, 2019) ...................18, 19, 20

*Douglas Philip Brust, D.C., P.C. v. Opensided MRI of St. Louis, LLC*,
   343 F.R.D. 581 (E.D. Mo. 2023) ................................................16

*Dumas v. Albers Med., Inc.*,
   No. 03-0640-CV-W-GAF, 2005 WL 2172030 (W.D. Mo. Sept. 7, 2005)................... *passim*

*Ebert v. Gen. Mills, Inc.*,
   823 F.3d 472 (8th Cir. 2016) ................................................14, 20

*In re Emerson Electric Co. Wet/Dry Vac Mktg. & Sales Litig.*,
   No. 4:12MD2382 HEA, 2022 WL 670131 (E.D. Mo. Mar. 7, 2022) ....................26

*Hale v. Emerson Electric Company*,
942 F.3d 401 (8th Cir. 2019) ............................................................32

*Hall v. Marriott Int'l, Inc.*,
344 F.R.D. 247 (S.D. Cal. 2023) ...................................................27, 28

*Halvorson v. Auto-Owners Ins.*,
718 F.3d 773 (8th Cir. 2013) ............................................................25

*Harris v. Brownlee*,
477 F.3d 1043 (8th Cir. 2007) ...........................................................27

*Henke v. Arco Midcon, L.L.C.*,
4:10-CV-86 HEA, 2014 WL 982777 (E.D. Mo. March 12, 2014)........................22

*Herskowitz v. Apple, Inc.*,
301 F.R.D. 460 (N.D. Cal. 2014)................................................20, 22, 30

*Johannessohn v. Polaris Industries, Inc.*,
9 F.4th 981 (8th Cir. 2021) ............................................................36

*Lee v. ITT Corp.*,
275 F.R.D. 318 (W.D. Wash. 2011) ......................................................34

*Macormic v. Vi-Jon, LLC*,
4:20-cv-1267 HEA, 2023 WL 1100378 (E.D. Mo. Jan. 30, 2023)........................39

*Meek v. Kansas City Life Ins. Co.*,
19-00472-CV-W-BP, 2022 WL 499049 (W.D. Mo. Feb. 7, 2022)....................31, 32

*Nelson v. Conduent Business Services, LLC*,
2020 WL 5587450 (N.D. Ga. Sept. 18, 2020) ...........................................23

*Pansiera v. Home City Ice Company*,
341 F.R.D. 223 (S.D. Ohio 2022) ........................................................16

*Pini USA, Inc. v. NB Glob. Commodities, LLC*,
No. 217CV04763ODWPLA, 2018 WL 1393776 (C.D. Cal. Mar. 19, 2018) ........................29

*Randolph v. JM Smucker*,
303 F.R.D. 679 (S.D. Fla. 2014) ........................................................18

*Rapp v. Green Tree Servicing, LLC*,
302 F.R.D. 505 (D. Minn 2014)..................................................32, 33, 34

*Reliance Ins. Co. in Liquidation v. Chitwood*,
433 F.3d 660 (8th Cir. 2006) ...........................................................34

*Sacred Heart Health Sys., Inc. v. Humana Mil. Healthcare Servs., Inc.*,
  601 F.3d 1159 (11th Cir. 2010) ............................................................................31, 33

*Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc.*,
  821 F.3d 992 (8th Cir. 2016) .....................................................................................15, 25

*Sateriale v. R.J. Reynolds Tobacco Co.*,
  697 F.3d 777 (9th Cir. 2012) .............................................................................................28

*Schertzer v. Bank of America, N.A.*,
  19cv264 JM(MSB), 2022 WL 1004559 (S.D. Cal. April, 4, 2022)......................................30

*Schnall v. AT&T Wireless Services, Inc.*,
  259 P.3d 129 (Sup. Ct. Wash. 2011)..................................................................................31

*SIM Surgical, LLC v. SpineFrontier, LLC*,
  No. 4:20-CV-01060-JAR, 2022 WL 407141 (E.D. Mo. Feb. 10, 2022) ..............................29

*Smith v. Chase Manhattan Mortg. Corp.*,
  222 F. App'x 533 (8th Cir. 2007) .......................................................................................21

*SouthTrust Bank v. Williams*,
  775 So. 2d 184 (Ala. 2000)...............................................................................................28

*Spagnola v. Chubb Corp.*,
  264 F.R.D. 76 (S.D.N.Y. 2010) .........................................................................................22

*St. Louis Heart Center, Inc. v. Vein Centers for Excellence, Inc.*,
  No. 4:12-CV-174 CDP, 2017 WL 2861878 (E.D. Mo. July 5, 2017) .......................15, 16, 17

*Stuart v. Global Tel*Link Corp.*,
  956 F.3d 555 (8th Cir. 2020) .....................................................................................21, 22

*TransUnion LLC v. Ramirez*,
  141 S. Ct. 2190 (2021)...................................................................................................24

*Tucker v. Ford Motor Co.*,
  No. 4:22-CV-00430-AGF, 2023 WL 2662887 (E.D. Mo. Mar. 28, 2023).............................14

*Tyson Foods, Inc. v. Bouaphakeo*,
  577 U.S. 442 (2016)................................................................................................23, 24

*U.S. Bank Nat'l Ass'n v. Indian Harbor Ins. Co.*,
  No. 12-CV-3175, 2015 WL 12778848 (D. Minn. Mar. 19, 2015) ..........................................34

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011)...............................................................................................20, 23

*White v. Just Born, Inc.*,
   No. 2:17-CV-04025-NKL, 2018 WL 3748405 (W.D. Mo. Aug. 7, 2018).......................24, 25

*Xavier v. Philip Morris USA Inc.*,
   787 F. Supp. 2d 1075 (N.D. Cal. 2011) ...........................................................................20, 35

**Statutes**

28 U.S.C. § 2072(b) ...................................................................................................................23

**Other Authorities**

Rule 23 ................................................................................................................... *passim*

Defendant Compass Group USA, Inc. d/b/a Canteen ("Compass") submits this Response in Opposition to Plaintiff James Jilek's Motion for Class Certification (the "Motion" and "Mem."):

## I. INTRODUCTION

Plaintiff's proposed class cannot be certified. First, there is no objective evidence from which to identify the members of the class, as is required by the Eighth Circuit. And even if there was, there is no way to determine the amount of damages that the proposed class suffered in the aggregate, much less any individual potential class member, because the claims are subject to the voluntary payment doctrine. This doctrine adopts the commonsense notion that a customer who made a purchase knowing what they would actually be charged has not suffered damages. Plaintiff continued to make purchases after he discovered the price differential and does not seek to recover for those later purchases—or, at least, did not include them in any iteration of his complaint. Though Plaintiff's complaint acknowledges this distinction, his damages theory does not. His damages theory claims to calculate "the extra money (the sum of all the dimes) that he or she paid for purchases with a card" (Mem. at 18-19), a theory that ignores the doctrine and does not calculate the *actionable* amount of purported damages that the class has purportedly suffered.

Plaintiff acknowledges these issues in the Memorandum. But his proffered "solution," self-certification requiring the submission of "credit card or banking records or . . . self-identifying affidavits" (Mem. at 2) is no solution at all because verifying these claims would impermissibly devolve into a series of mini trials. Plaintiff concedes that at least some verification of each claim is required, to determine whether any individual claimant made purchases at a location that had an unlabeled machine. (Mem. at 25.) Beyond that, Plaintiff's proposal contains no mechanism to verify whether any claimant is in fact a class member, how many purchases the claimant made, or whether the claimant made any of their purchases with knowledge of the price differential. This

raises the potential for fraud, but an even more likely potential for error: the claims may date back 10 years or more, generating the reliability issues associated with long-ago purchases. Plaintiff sweeps this under the rug by arguing that because the total amount of damages is subject to class-wide proof, in his view, Compass has no due-process interest in challenging claims. This is not only incorrect, it fails to address the fact that damages cannot be calculated on a class-wide basis.

These issues are not hypothetical. Nearly every known purchaser has some issue requiring individualized inquiry. Jaye withdrew her claim after realizing, after years of litigation, that she did not make a purchase at a Compass machine. Jilek, Carter, and one parallel plaintiff, Baldwin, continued to make purchases after they discovered the pricing differential, and Baldwin's location had a mix of labeled and unlabeled machines (thereby making it impossible to know the number of actionable purchases that were made). And there is no evidence of any unlabeled machines at the locations of the remaining parallel plaintiffs; either there were no unlabeled machines at the locations, or their locations featured a mix of labeled and unlabeled machines. And Moore, who wants to withdraw, has at best an uncertain memory of what he purchased, when, and where he made those purchases, and what he knew when he made them. These are individuals who have been willing to act as class representatives and have been represented by counsel. If their claims are this individualized, imagine what it would take to unravel the claims of absent class members.

This case is not one appropriately resolved as a class, and Plaintiff has not met his burden to show otherwise. The Motion should be denied.

## II.  FACTUAL BACKGROUND

### A.  Canteen's Operations

Canteen is a division of Compass, providing clients across the country with offerings for its markets, dining, coffee, and vending lines of business. It is the largest vending company in the

nation, and operates vending machines in 33 states. (Deposition transcript of David Goldring dated June 9, 2021, attached hereto as Exhibit A, at 10:14-11:7, 14:8-13; Dkt. No. 193 (Answer to Cons. Amd. Compl.) at ¶¶ 8-10.) In 2014, Compass began installing cashless readers on some of its vending machines, which allow consumers to make purchases from its vending machines with a credit or debit card. (Pl.'s Ex. C, Declaration of Martha Morgan dated June 27, 2023 ("Morgan Decl.") at ¶ 2.) Compass enabled "two-tier pricing" to offset the expense of credit and debit card fees and the costs of maintaining the cashless readers by charging different prices for credit and cash transactions for some machines that had cashless readers installed. (*Id.* at ¶ 3.) Compass's policy was and is to label its cashless machines in order to inform the consumer of the pricing differential. (Ex. A, D. Goldring Dep. Tr. at 30:8-17.) On rare occasions, Compass received consumer complaints regarding the signage or labeling of Compass's vending machines. However, these complaints did not suggest to Compass that there was more than incidental noncompliance with Compass's two-tier price labeling policy. (*Id.* at 40:1-5, 49:17-23, 50:15-51:5.)

Plaintiff George Moore filed his first complaint against Compass in St. Louis Circuit Court on October 23, 2018. (Dkt. No. 4.) Compass subsequently performed a nationwide audit between March 2019 and February 2020 (the "Remediation Period"), during which it surveyed two-tier enabled vending machines to ensure that each was affixed with a label that notified consumers of the price differential between purchases made with cash versus those made with credit or debit cards (a "Label"). (Pl.'s Ex. C, Morgan Decl. at ¶¶ 4, 5.) Surveyors in the field collected certain information regarding the surveyed machines, including whether the machine had a Label at the time of the Survey, and its cost center and machine number, which are used to identify specific machines. (*Id.* at ¶¶ 7, 8.) Surveyors were instructed to photograph each machine, apply new

Labels to both machines that previously had a Label affixed to the machines and those that did not, and finally photograph the machine with the newly affixed Label. (*Id.* at ¶ 11.)

Following the Remediation Period, Compass instituted a policy in which it surveys all two-tier revenue enabled machines before the machines leaves a Compass warehouse to be placed and used in the field or upon installation at a customer's location. (*Id.* at ¶ 14.) This process is ongoing. (*Id.* at ¶ 15.)

During discovery, Compass created and produced multiple iterations of a report that attempts to summarize the survey results, including identifying the dates that machines were surveyed, the results of the survey, and the two-tier revenue collected by each machine, broken down by month for all times relevant to this lawsuit. (*Id.* at ¶ ¶17, 18.)

### B. Class Members' Purchases

#### 1. Plaintiff George Moore

Plaintiff George Moore purchased items from Compass's vending machines located at his place of work, which, at the time, was the same office building as Plaintiffs' counsel. (Deposition transcript of George Moore dated Sept. 8, 2023, attached hereto as Exhibit B, at 10:23-11:8, 13:22-14:18, 16:17-23.) Moore does not know whether he made purchases at vending machines outside his office that were owned by Compass. (*Id.* at 15:5-16:9.) Moore discovered that he was being charged ten cents for using his prepaid card from an assistant in Plaintiff's counsel's office in 2017 or 2018. (*Id.* at 18:5-19:10.) Moore is unable to recall how many purchases he made prior to learning of the ten-cent price differential. (*Id.* at 24:3-9.) Counsel's assistant told Moore that counsel sought to bring a lawsuit for this "overcharge." (*Id.* at 19:14-20:15.)

Moore alleges he was "overcharged" for only three transactions which took place in March and April 2018. (Dkt. No. 126 at ¶¶ 33-38.) Moore knew about the "overcharge" for all three of

these transactions because the first transaction, on March 18, 2018, was made after counsel's assistant told him to use his card in order to see that he was being "overcharge[d]." (Ex. B at 23:8-20.) Moore does not know how many purchases he made from the machines before counsel's assistant informed him of the "overcharge," and he never checked his bank statements so he does not know whether he was in fact "overcharge[d]" prior to March 2018. (*Id.* at 24:3-9; 54:16-21.) After learning about the "overcharge" from counsel's assistant, Moore did not attempt to report the issue to Compass. (*Id.* at 40:9-14.)

Moore announced his intention to withdraw his claims in May 2023, after Compass issued a Notice for his deposition. (*Id.* at 56:18-25; May 18, 2023 e-mail from R. Cornfeld, attached to the declaration of Nicole C. Mueller dated November 10, 2023 (the "Mueller Decl.") as Exhibit 1.) The request to withdraw was submitted to the Court in a filing dated June 23, 2023. (Dkt. No. 240.) While Moore remains a party to this litigation, he did not join the Motion.

## 2. Former Plaintiff Virginia Carter

Virginia Carter joined as a named Plaintiff in an amended complaint filed on December 18, 2018. (Dkt. No. 15.) Carter allegedly made purchases from Compass's vending machines at the same office building where Plaintiff Moore and Plaintiffs' counsel worked. (Deposition transcript of Virginia Carter dated Aug. 3, 2023, attached hereto as Exhibit C, at 30:20-31:2.) Carter made purchases from vending machines in other locations, but does not know if those vending machines were owned by Compass. (*Id.* at 32:21-33:10.) Carter discovered the ten-cent price differential when a woman in her office building told her about the charge—prior to that, she "never paid attention" to her bank statements. (*Id.* at 35:20-36:21.) Carter is unable to recall approximately how many purchases she made from a Compass vending machine, when she learned about the ten-cent price differential, or how often she used a credit or debit card, as she could not retrieve all of

her bank statements and no other records exist to identify purchases. (*Id.* at 33:22-34:19, 35-20-36:5, 36-22-37:22, 50:24-51:6, 62:8-12.) She also cannot recall when the Label was affixed to the vending machines. (*Id.* at 57:3-58:3.) After learning about the ten-cent differential and deciding to become a plaintiff in this lawsuit, Carter continued to make purchases from Compass vending machines, but did not include these subsequent purchases in her complaint. (*Id.* at 49:6-9, 50:21-51:6.) Carter is only able to guess when she made her last purchase. (*Id.* at 49:25-50:20.) Compass noticed Carter's deposition on February 14, 2023 and, in response, counsel for Carter moved to withdraw her claims. (Dkt. No. 202.)

### 3. Plaintiff James Jilek

Plaintiff James Jilek is the only remaining named plaintiff who seeks to represent the putative class. Jilek made purchases from Compass's vending machines at his office, which is a shared office space. (Deposition transcript of James Jilek dated March 21, 2023, attached hereto as Exhibit D, at 25:9-27:4.) An officemate, Justin Regus, informed him that Jilek was being charged ten cents more than the display price for using a credit card.[1] (Ex. D at 25:9-27:4.) After Regus told Jilek about the ten-cent differential and after Regus referred Jilek to Plaintiffs' counsel, Jilek conducted "test" purchases on July 26, 2019 and August 14, 2019 to determine if he was in fact charged ten cents more than the display price. (*Id.* at 35:3-36:7, 54:5-55:7.) He testified that, at the time he conducted this "test," he in fact knew that he would be charged ten cents more than the display price. (*Id.* at 84:18-86:6.) Despite the fact that Jilek made purchases at the vending machine both before and after the "test" purchases, these "test" purchases are the only purchases

---

[1] Justin Regus has worked with Plaintiffs' counsel as an expert witness and was assisting Plaintiffs' counsel with soliciting plaintiffs for this lawsuit. (Deposition transcript of Justin Regus dated Sept. 13, 2023, attached hereto as Exhibit E, at 7:23-8:17, 21:6-22:13.) Regus testified that he discovered the price differential on his own, not from Plaintiffs' counsel. (*Id.* at 23:3-23.) Regus informed numerous individuals at the location about the pricing practice. (*Id.* at 29:18-24.)

alleged in his original complaint, the consolidated class action complaint, and the amended class action consolidated complaint. (Complaint, *Jilek v. Compass Group USA, Inc. et al*., Case No. 4ST-cv-38382 (Sup. Ct. Cal. *filed* Oct. 25, 2019) at ¶ 16, attached as Ex. 2 to the Mueller Decl.; *see also* Dkt. No. 91 at ¶ 35; Dkt. No. 126 at ¶ 43; Ex. D at 50:17-51:18, 56:18-57:13.)[2] Jilek can only guess as to how many purchases he made before learning about the charge, and he can only estimate the year in which he made his first purchase. (*Id.* at 47:9-48:4.) He does not recall what he purchased, or how many purchases he made in total. (*Id.* at 46:12-47:2.) Jilek took an extended amount of time to collect his bank statements—he did not produce his complete set of bank statements until March 17, 2023, two business days before his deposition, and over one year after Compass requested their production. (*See* e-mail from A. Jenkins dated March 17, 2023, attached as Ex. 3 to the Mueller Decl.) After learning about the ten-cent differential, he told officemates about it, but he doesn't recall whom he told, or how many people he spoke to. (Ex. D at 90:6-20.)

Jilek believes that "ten cents was not a large number" and paying ten cents more for the ability to use his credit card did not dissuade him from using the vending machines. (*Id.* at 71:19-72:1.) Jilek continued to use the vending machines after he learned about the charge. (*Id.*) Jilek estimates that he made ten purchases from his office vending machine after conducting the "test" purchases, but these post-"test" purchases are not included in the Complaint. (*Id.* at 67:3-16, 93:23-94:3.) Prior to filing his lawsuit, Jilek did not attempt to report the ten-cent differential to Compass. (*Id.* at 92:20-93:12.)

---

[2] Plaintiffs have sought leave to amend the Cons. Amd. Complaint (Dkt. No. 126.) in order to add Jilek's purchases from 2017 to approximately the summer of 2019, for which he was allegedly unaware of the ten-cent charge. (Dkt. No. 250.) Compass opposes the motion, in part, because these additional purchases should have been included in prior complaints, as they were known to Plaintiff since initiating this case. (Dkt. No. 253.) The motion remains pending.

4. Former Plaintiff Frances J. Ivery[3]

Frances J. Ivery ("Jaye") filed her complaint against Compass on May 13, 2019 in the Texas District Court, Dallas County (Cause No. DC-19-06786). In her complaint, Jaye alleged that she made a purchase on March 14, 2019, and other purchases (without alleging a time period) throughout the City of Dallas, including Dallas Love Field Airport, from Compass-owned vending machines. (Complaint at ¶¶ 18-19, attached as Ex. 4 to the Mueller Decl.) The lawsuit was consolidated into this action on August 31, 2020. (Dkt. No. 63) Following consolidation, Jaye's allegations remained the same. (*See* Dkt. No. 126 at ¶ 49.)

However, Jaye did not make *any* purchases from a Compass-owned vending machine, a fact that neither she nor her counsel were aware of until her March 28, 2023 deposition. (Deposition transcript of Frances J. Ivery dated March 28, 2023 at 69:25-70:2, attached hereto as Exhibit F; e-mail from R. Cornfeld dated April 14, 2023, attached as Ex. 5 to the Mueller Decl.) Jaye admitted that she has no way of knowing whether a particular vending machine is owned by Compass. (Ex. F at 55:1-10, 61:13-16.) She further testified that she never investigated whether the March 14, 2019 transaction was at a Compass vending machine. (*Id.* at 69:13-70:2.) Jaye also could not recall what the correct price for the single vending machine charge on her bank statement should have been, or whether there were any labels on the vending machine. (*Id.* at 69:10-12, 73:16-18.) Jaye testified that she had difficulty obtaining her bank statements because she no longer had access to closed accounts and had to go into a bank branch, which took an extended amount of time. (*Id.* at 20:19-21:1, 119:1-10.) Jaye moved to dismiss her claims against Compass on April 26, 2023. (Dkt. No. 223.)

---

[3] Ms. Ivery was misnamed in her various complaints and the filings for this case and was referred to throughout her involvement in this case as "Frances Jaye." For consistency, she is referred to herein as "Jaye."

5.    Brian Baldwin, Plaintiff in Case No. 4:23-cv-00568-JAR

Brian Baldwin filed a complaint against Compass on October 20, 2022 in the United States District Court for the District of South Carolina (Case No. 5:22-cv-03644-MGL), which was subsequently transferred to the Eastern District of Missouri (Case No. 4:23-cv-00568-JAR). The agreed motion to consolidate Baldwin's action into this action is pending. (Dkt. No. 228.) Baldwin's deposition was noticed for October 3, 2023, a date proposed by counsel for Baldwin. Less than a week before the deposition, on September 28, 2023, counsel informed Compass that Baldwin intended to dismiss his claims. (Mueller Decl. at ¶ 9 and Ex. 6 thereto, e-mail from A. Jenkins.) The following day, counsel for Baldwin informed Compass that Baldwin was refusing to appear at his noticed deposition. (Mueller Decl. Ex. 6.) As of the date of this filing, Baldwin had not moved to withdraw his claims.

Baldwin's complaint alleges that he made purchases three times per day, every work day, since 2010 from unlabeled vending machines at two locations in Orangeburg, South Carolina. (*See* Complaint at ¶¶ 16-20, attached as Ex. 7 to the Mueller Decl.) Reports produced by Compass in discovery in this matter show that there were both labeled and unlabeled vending machines at these locations during the time that Baldwin allegedly made his purchases.[4] Baldwin purportedly learned about the ten cent differential approximately three to four months after his first purchases at each of the two locations, and discovery produced by Baldwin shows that he continued to make purchases at Compass's vending machines after he learned about the ten-cent differential.

---

[4] *See* Mueller Decl. ¶ 18 (citing CG-0022195 at rows 2993-94, 3358, 3733, 3737, 3738, 3754-56, 3979, 4001, 4477, 4803-05, 4807, 4810-12, 4884, 4897, 4975, 5268, 5298, 5943-49, 5975, 5976, 5977-79, 6703, and 7040). This report was produced to Plaintiffs on July 19, 2022, three months before Baldwin filed his complaint. (*Id.* at 10, 18.)

9

(Baldwin's Response to Compass's First Set of Interrogatories at No. 3, attached as Ex. 8 to the Mueller Decl.)

6. <u>Andres Borrero, Plaintiff in Case No. 4:23-cv-00586-SRW</u>

Andres Borrero filed a complaint against Compass on October 20, 2022 in the United States District Court for the Middle District of Florida (Case No. 8:22-cv-2407-WFJ-MRM), which was subsequently transferred to the Eastern District of Missouri. (Case No. 4:23-cv-00586-SRW.) The agreed motion to consolidate Baldwin's action into this action is pending (Dkt. No. 228.) Borrero alleges he made purchases from unlabeled Compass vending machines located at his place of work 1-2 times per day, every day. (Complaint at ¶¶ 16-18, attached as Ex. 9 to the Mueller Decl.) However, reports produced by Compass in discovery show that of the six machines located there, four were surveyed and found to have Labels; the other two were not surveyed. (Mueller Decl. at ¶ 19.)

Requests for production and interrogatories were served on counsel for Borrero on June 16, 2023. Borrero has not served responses to any of the discovery, produced any documents, or provided a date by which he can sit for deposition, despite the two extensions of time that Compass agreed to and that have now expired. Counsel for Borrero informed Compass on October 25, 2023 that Borrero has been unable to obtain any documents from his banking institution to verify his purchases and that the institution will need to be subpoenaed. (*See* e-mails exchanged with Plaintiffs' counsel from June 14, 2023 through October, 25, 2023, attached as Ex. 10 to the Mueller Decl.)

7. <u>Jason Pemberton, Plaintiff in Case No. 2022LA001328, (Madison Co. Cir. Ct., Ill.)</u>

Jason Pemberton is a putative class member of the proposed breach of contract class and brought similar claims as a named plaintiff in state court in Madison County, Illinois. (Case No.

2022LA001328.) Pemberton alleged he made purchases from machines with no Label in East Peoria, Illinois. (Complaint filed on 10/20/2022 at ¶¶ 13-16, attached as Ex. 11 to the Mueller Decl.) However, reports produced by Compass in discovery show that 24 of the 32 vending machines located there were found to have Labels. (Mueller Decl. ¶ 20.)[5] An agreed motion to stay this action is pending.

8. Joseph Whitaker, Plaintiff in Case No. 22-CVS-2576 (N.C. Sup. Ct.)

Joseph Whitaker is a putative class member of the proposed breach of contract class and brought similar claims in North Carolina, County of Davidson, Superior Court (Case No. 22-CVS-2576) on December 16, 2022, which have been stayed pending the conclusion of this case. (Order dated Aug. 3, 2023, attached as Ex. 13 to the Mueller Decl.) Whitaker alleges he made purchases from unlabeled Compass machines four days a week, every week during the years 2019 and 2020. (Complaint at ¶¶ 17-18, attached as Ex. 12 to the Mueller Decl.) However, reports produced by Compass in discovery show that of the three machines located where his purchases were made, two were surveyed and found to have a Label; the other was not surveyed. (Mueller Decl. at ¶ 21.)

C. **Expert Reports**

1. Dr. Brian Kriegler

In Kriegler's opening report, he presented a methodology by which he proposed to analyze a random sample of Compass's two-tier survey data in order to extrapolate purported class-wide damages and prejudgment interest. (Pl.'s Ex. E, Report of Dr. Brian Kriegler dated August 7, 2023 (the "Opening Report"), at ¶ 7.) According to his methodology, all revenue generated from

---

[5] The Declaration reviews the document Bates-stamped CG-0022218 at rows 2099, 2144, 2200, 2371, 2479, 2497, 2498, 2585, 2592, 2644, 2683, 2718, 2724, 2729, 2733, 2785, 2818, 2825, 2846, 2856, 2858, 3068, 3126, 3270, 3271, 3328, 3336, 3346, 3364, 3419, 3421, and 3459. (*Id.*) This document was produced to Plaintiffs' counsel on July 19, 2022. (*Id.*)

cashless devices with no Label amounted to potential damages and totaled $14.7 million. (*Id.* at ¶¶ 38, 43.) Kriegler admitted that, in calculating this amount, he: (1) did not consider whether consumers knew about the price differential even if there was no Label; (2) did not estimate damages for any individuals or provide a methodology for doing so; and (3) did not perform the sampling and analysis he deemed necessary to calculate an actual estimate of damages. (*Id.*; Deposition of Dr. Brian Kriegler dated Aug. 23, 2023, attached hereto as Exhibit G, at 9:24-11:22, 17:15-22:19.) Kriegler's prejudgment interest calculations are based on his principal damage calculations. (Pl.'s Ex. E at ¶ 40.)

Plaintiffs served Kriegler's first Supplemental Report on August 11, 2023 (the "First Supplemental Report"). The First Supplemental Report merely applies the same methodologies presented in the Opening Report to a California sample of machines in order to calculate potential principal damages and pre-judgment interest pertaining to the California machines. (Pl.'s Ex. N, Kriegler First Supplemental Report, at ¶ 13.) Plaintiffs served Kriegler's second Supplemental Report on October 13, 2023, which purports to apply the methodologies described in his Opening Report to data that Plaintiffs requested from Compass after issuing the Opening Report, on August 9, 2023 and August 15, 2023 (the "Second Supplemental Report"). (*See* Pl.'s Ex. P.) This resulted in a *lower* principal damages estimate of $9,890,345. (*Id.* at ¶ 22.)[6]

2.   David Kalat

Compass's expert, David Kalat, noted several significant problems with Kriegler's methodology. Namely, Kreigler's methodology assumes that all two-tier revenue collected by a machine with no Label is recoverable, without considering whether consumers in fact knew about

---

[6] The First and Second Supplemental Reports, which were served after the parties' agreed-to deadline for Plaintiffs' expert reports, are the subject of a motion to strike that is being filed concurrently with this Opposition.

the price differential. (Pl.'s Ex. F, Kalat Expert Report, at ¶ 25.) Kalat examined the same records and data available to Kriegler and replicated Kriegler's methodology to calculate potential damages. (*Id.* at ¶ 78.) Kalat concluded that, using Kriegler's methodology and correcting for errors found within, the maximum amount of two-tier revenue at machines without Labels is $9,997,193 (excluding prejudgment interest). (*Id.* at ¶ 5.)

## III.    LEGAL STANDARD

"The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (citation omitted). "To come within that exception, a party seeking to maintain a class action 'must affirmatively demonstrate his compliance' with Rule 23." *Id.* (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)). Rule 23 requires a plaintiff to "be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, typicality of claims or defenses, and adequacy of representation as required by Rule 23(a)." *Id.* Such an analysis will frequently entail "overlap with the merits of the plaintiff's underlying claim . . . because the class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Id.* at 33-34 (quotations omitted).

Plaintiff must "also satisfy through evidentiary proof at least one of the provisions of Rule 23(b)." *Id.* at 33 (quoting *Wal-Mart*, 564 U.S. at 350). Where, as here, a plaintiff seeks certification under Rule 23(b)(3), he or she must show that "the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues.'" *Cody v. City of St. Louis*, 4:17-CV-2707 AGF, 2021 WL 6112480, at *3 (E.D. Mo. Dec. 27, 2021) (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016)). "An individual question is one where members of a proposed class will need to present evidence that varies from

member to member, while a common question is one where the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof." *Ebert v. Gen. Mills, Inc.*, 823 F.3d 472, 479 (8th Cir. 2016) (quotations omitted). "If anything, Rule 23(b)(3)'s predominance criterion is even more demanding than Rule 23(a)." *Comcast*, 569 U.S. at 34 (citation omitted). In short, plaintiffs must "prove classwide injury with proof common to the class." *Blades v. Monsanto Co.*, 400 F.3d 562, 572 (8th Cir. 2005). Moreover, the calculation of damages must be based on a model applicable to all members of the class. *Cody*, 2021 WL 6112480 at *4 (citing *Comcast*, 569 U.S. at 35). In addition to Rule 23's explicit requirements, the Court must be satisfied that the proposed class is ascertainable. *Tucker v. Ford Motor Co.*, No. 4:22-CV-00430-AGF, 2023 WL 2662887, at *7 (E.D. Mo. Mar. 28, 2023) (citing *Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc.*, 821 F.3d 992, 995 (8th Cir. 2016)).

## IV.     ARGUMENT

The class proposed in the Motion seeks certification on a single breach of contract claim. Plaintiff now limits his case to Compass' alleged breaches of "unilateral contracts," contending a class can be ascertained and that liability and damages can be established across the class through the use of common evidence, *i.e.*, Kriegler's report(s). (Mem. at 12.) That claim ignores the fact that some unknowable percent of the purchases made at unlabeled vending machines were made by consumers with *actual knowledge* of the price differential, including some number of purchases made by plaintiffs themselves.

This creates a number of inter-related problems for certification under Rule 23 of the Federal Rules of Civil Procedure. First, it makes the class unascertainable. There is no objective evidence from which to identify purchasers from unlabeled machines. Even if there was, there is no objective evidence to separate purchases made with or without knowledge of the price

differential. Plaintiff's self-certification proposal does not satisfy Rule 23's requirement that the class be ascertainable through the use of objective criteria. Moreover, the Motion fails to propose an administratively feasible method to manage the class and proposes a class that contains an unknown number of members who lack standing, a separate and fatal defect under *TransUnion*. Self-certification presents an administratively impossible task, inviting "mini-hearings on the merits of each case to identify class members" (*St. Louis Heart Center, Inc. v. Vein Centers for Excellence, Inc.*, Case No. 4:12-CV-174 CDP, 2017 WL 2861878, at *4 (E.D. Mo. July 5, 2017))—with each hearing requiring credibility determinations hindered by the fog of memory. The testimony of the current and former Plaintiffs demonstrates these problems clearly, showing that liability can only be assessed and damages awarded (if any), after individualized investigation. The proposed class and sub-class are not viable, and the Motion should be denied.

### A.    The Class is Not Ascertainable Because There is No Objective Criteria by Which the Court Can Identify Class Members

The lack of an ascertainable class, on its own, prevents certification without the need to reach any other considerations under Rule 23(a) or (b). The Eighth Circuit "adheres to a rigorous analysis of the Rule 23 requirements, which includes that a class must be adequately defined and clearly ascertainable." *Sandusky*, 821 F.3d at 996; *see also Cody*, 2021 WL 6112480, at *4 ("Before considering the explicit requirements set forth in Rule 23, the Court must also be satisfied that the proposed class is ascertainable.").[7] "Ascertainability is especially important in Rule 23(b)(3) classes because of the need to notify absent class members and allow those members an opportunity to opt out." *Cody*, 2021 WL 6112480 at *4.[8] "Without identifiable class members, there is no opportunity for putative class members to opt out, thereby unknowingly releasing their

---

[7] Plaintiff acknowledges that ascertainability of class membership is a requirement of Rule 23. (*See* Mem. at 25.)

[8] The Motion does not indicate how Plaintiff proposes to notify absent class members.

due process rights. Their claims for money damages 'would be rendered *res judicata* by a judgment or a settlement. In other words, ascertainability protects important rights.'" *Pansiera v. Home City Ice Company*, 341 F.R.D. 223, 230 (S.D. Ohio 2022) (citing *Wal-Mart*, 564 U.S. at 363).

A "class may be ascertainable when its members may be identified by reference to objective criteria." *McKeage*, 847 F.3d at 998; *St. Louis Heart Ctr., Inc.*, 2017 WL 2861878, at *4. Where identifying class members through some objective basis is not possible, the class is not ascertainable. *Id*. For example, for a class consisting of fax recipients, "fax logs showing the numbers that received each fax" were found to be "objective criteria that make the recipient clearly ascertainable" (*Douglas Philip Brust, D.C., P.C. v. Opensided MRI of St. Louis, LLC*, 343 F.R.D. 581, 594 (E.D. Mo. 2023)) but where the fax logs did not distinguish between successful and unsuccessful transmittal attempts, the class was not ascertainable. *St. Louis Heart Ctr., Inc.*, 2017 WL 2861878, at *4. In sum, both the *class definition* and the *evidence probative of membership* must be objective to satisfy the "objective criteria" standard. *Comp. McKeage*, 847 F.3d at 999 (a review of sales records during discovery to determine which customers' contracts contained a Missouri choice-of-law provision resulted in objective criteria that could determine class eligibility) *with Dumas v. Albers Med., Inc.*, No. 03-0640-CV-W-GAF, 2005 WL 2172030, at *5 (W.D. Mo. Sept. 7, 2005) (class was not ascertainable where no end date for class period could be derived and holding that "[t]he requirement that there be an identifiable class demands more than just an objective definition").

Plaintiff's claim that "whether a consumer purchased an item with a card from one of Compass' machines that did not disclose the extra charge is clearly objective" (Mem. at 25) does not meet this standard because an objective class *definition*, standing alone, does not satisfy ascertainability. *McKeage*, 847 F.3d at 998. Here, there are no lists of consumers who made

purchases from Compass vending machines and no records that would allow the parties to identify any class members beyond those who have already filed lawsuits.

In lieu of such objective criteria, Plaintiff proposes that the Court allow claimants to self-identify through the notice and claim process, but this is not a practicable substitution for objective evidence in this case.[9] *Dumas* is instructive on this point. There, the court rejected plaintiffs' attempt to certify a class of individuals who purchased counterfeit Lipitor distributed by defendant. *Dumas*, 2005 WL 2172030. The trial court held that although the proposed class was defined objectively, the class was not ascertainable or manageable because there were no records regarding who purchased the counterfeit product, and affidavits were an inappropriate substitution where the class representative did not know for certain whether he purchased counterfeit pills. *Id.* at *6. The trial court noted that the "class must not only be theoretically identifiable, but [plaintiff] must also demonstrate that the aggrieved class can be readily *identified* without resort to intensive, individualized factual inquiries." *Id.* at *5 (emphasis in original) (citing *Simer v. Rios*, 661 F.2d 655, 669 (7th Cir. 1981) (denying class certification because it would have been a 'Sisyphean task' to identify class members with viable claims)). Similarly, in *St. Louis Heart Center*, 2017 WL 2861878, the Court rejected the use of claim forms or affidavits because "there [wa]s no objective way to determine [who received a fax] on a class-wide basis." *Id.* at *2, *4. Specifically, the Court noted that "[w]hether someone can actually remember receiving a specific junk fax sent many years earlier raises credibility issues best determined by a trier of fact after testimony subject to cross-examination. This is an appropriate issue for trial, but not for a claim form or affidavit." *Id.*

---

[9] The requirements of ascertainability and manageability (or administrative feasibility) are intertwined. "Whether addressed under the heading of "ascertainability" or "manageability," the fact remains that in order for a class to be certified, the proposed class must be both ascertainable in theory and readily identifiable (thus, administratively manageable) in fact." *Dumas*, 2005 WL 2172030, at *7.

The proposed class here suffers the same defects present in *St. Louis Heart Center* and *Dumas*. Any potential class member would be required to accurately recall, for each individual purchase, in some cases nearly a decade after the fact, (a) that they made a purchase (b) with a credit or debit card (c) from a Compass vending machine (d) that charged a different price than the displayed price (e) that was unlabeled at the time of purchase and (f) for which they were unaware that the charge to their card differed from the display price. This is not a hypothetical problem. Jaye incorrectly claimed to have made a purchase at a Compass vending machine, and there are significant questions as to whether Borrero or Whitaker made purchases at unlabeled machines given that all surveyed machines at those locations were found to have Labels. Neither of these plaintiffs even plead that they made purchases without knowledge of the price differential. (*See* Mueller Decl. Ex. 9 at ¶¶ 16-20; Mueller Decl. Ex. 12 at ¶¶ 15-18); *cf. Dumas,* 2005 WL 2172030 at *6.

While courts within this Circuit have on occasion allowed the use of self-identification in limited circumstances, this process is often rejected because courts within and beyond this Circuit find the practice unlikely to produce reliable results and require subsequent individualized inquiries to be made into each claimant. *See Randolph v. JM Smucker*, 303 F.R.D. 679, 689 (S.D. Fla. 2014) (putative class was not ascertainable and self-identification inappropriate where the plaintiff's own testimony suggested that it would be unlikely a consumer would recall specifics necessary to identify themselves as a class member or the damages they would be entitled to). The cases cited by Plaintiff on this point, *Barfield v. Sho-Me Power Elec. Coop.*, 852 F.3d 795 (8th Cir. 2017) and *In re Dollar General Corp Motor Oil Marketing and Sales Practices Litigation*, 16-02709-MD-W-GAF, 2019 WL 1418292 (W.D. Mo. Mar. 21, 2019), are distinguishable. First, the Court found class members in *Barfield* to be "readily identifiable private landowners located

in a defined geographic area." *Barfield v. Sho-Me Power Elec. Co-Op*, 11-cv-04321-NKL, 2013 WL 3872181, at *15 (W.D. Mo. July 25, 2013).[10] The trial court distinguished this important factor from other cases where courts have denied certification on manageability grounds, finding that *Barfield* "is not a case where the class spans multiple states and involves multiple issues of state law, where the class members are nearly impossible to ascertain or notify, where the proposed class action contains 'what are, in reality, a myriad of individualized claims,' or where the class members can only be identified via 'an individualized inquiry into the facts and circumstances' of the case." *Id.* (distinguishing cases where the courts found the putative classes too unmanageable to certify, including *Dumas*, 2005 WL 2172030, at *7). In stark contrast to *Barfield*, the putative class here spans 33 different states with multiple issues of state law, class members are nearly impossible to ascertain or notify,[11] and the identity of class members can only be ascertained by individualized inquiries into what each member knew about the ten cent charge at the time of each purchase.

Plaintiff also relies upon *In re Dollar Gen. Corp. Motor Oil Mktg. & Sales Pracs. Litig.*, 2019 WL 1418292. In an unreported and unpersuasive decision, the court in that case ignored clear Eighth Circuit precedent that ascertainability requires objective evidence, and swept aside (as does Plaintiff) any concerns about the reliability or feasibility of self-certification. *Id.* at *12. The *Dollar General* court also based its decision on the lack of subjective considerations in the self-

---

[10] Plaintiff also suggests that the Court need not be concerned with inaccurate or inactionable claims being submitted though self-identification affidavits because any damages would be taken from an aggregate damages amount. (Mem. at 28.) This assumes that there is in fact an aggregate damages amount, an assumption that, as discussed *infra*, is demonstrably incorrect.

[11] Unlike the Plaintiff in this case, the plaintiff in *Barfield* proposed a detailed process for notifying the putative class members, which included direct notification to the properties' tax billing addresses and required the submission of a property deed along with the claim form, which provided objective proof of ownership, and thus confirmation of membership in the class. *Barfield*, 852 F.3d at 806; *Barfield*, 2013 WL 3872181 at *15.

certification process (*id.* at \*16); but as discussed *seriatim*, a key element of both class membership and damages in this case is the subjective knowledge of each individual class member.

The circumstances of current and former Plaintiffs reveals that a typical consumer cannot identify the number of purchases they made from a Compass machine, whether they used a credit or debit card for the purchase, whether the machine was labeled, the dates of alleged purchases, or even whether they in fact made a purchase from a Compass machine. In similar circumstances courts have recognized that allowing plaintiffs to substitute self-identification through the claims process for meeting their burden to prove that the class is ascertainable is "not . . . proper or just." *See Xavier v. Philip Morris USA Inc.*, 787 F. Supp. 2d 1075, 1090 (N.D. Cal. 2011). The Motion should be denied.

### B. Common Questions Do Not Predominate over Individual Ones

Plaintiff cannot establish "through evidentiary proof" that questions common to class members "*in fact*" predominate over individualized questions. *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). This "analysis entails identifying the substantive issues that will control the outcome, assessing which issues will predominate, and then determining whether the issues are common to the class, a process that ultimately prevents the class from degenerating into a series of individual trials." *Herskowitz v. Apple, Inc*., 301 F.R.D. 460, 469 (N.D. Cal. 2014) (quotation omitted).[12] Certification is proper only if this proof withstands a "rigorous analysis" that

---

[12] "Predominance subsumes the commonality requirement, so both can be analyzed through the lens of predominance. The predominance inquiry 'asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues.'" *Cody*, 2021 WL 6112489, at \*4 (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016)). "[C]ommonality requires the plaintiff to demonstrate that the class members 'have suffered the *same injury*.'" *Wal-Mart Stores*, 564 U.S. at 349-350 (citation omitted, emphasis added). The predominance criterion is "far more demanding" than commonality, and will not be satisfied if "individual questions . . . overwhelm the questions common to the class." *Ebert*, 823 F.3d at 478-479 (citations omitted).

"frequently entail[s] overlap with the merits of the plaintiff's underlying claim." *Comcast*, 569 U.S. at 33 (citations omitted). Here, the questions integral to establishing both liability and damages for a claim of breach of contract—such as the number of purchases they made from a machine, the dates of the alleged purchases, whether the individual used a credit or debit card for the purchase, whether the machine was labeled, the dates of alleged purchases, or even whether they in fact made a purchase from a Canteen machine—overwhelmingly depend on evidence that can only be established through individualized inquiry.

1.    The Voluntary Payment Doctrine Requires Individual Inquiries

"The [voluntary payment doctrine] provides that 'a person who voluntarily pays money with full knowledge of all the facts in the case, and in the absence of fraud and duress, cannot recover it back, though the payment is made without a sufficient consideration, and under protest.'" *Affordable Communities of Missouri v. Fed. Nat. Mortg. Ass'n*, 815 F.3d 1130, 1134 (8th Cir. 2016) (citation omitted); *Smith v. Chase Manhattan Mortg. Corp.*, 222 F. App'x 533, 534 (8th Cir. 2007) (voluntary payment doctrine barred borrower's claims against commercial lender for breach of mortgage agreement where borrower's agent knowingly incurred fax fee where undisputed facts showed that the plaintiff was aware of fax fee, paid it, and did not protest).

In the Eighth Circuit and elsewhere, the voluntary payment doctrine has served as a bar to class certification. The Eighth Circuit recently affirmed a trial court's decision to decertify a class on the ground that "the 'voluntary payment doctrine' would require substantial individualized inquiry and that common questions thus would not predominate" in a case where the plaintiff challenged fees charged to place calls to or from prisoners. *Stuart v. Global Tel*Link Corp.,* 956 F.3d 555, 561 (8th Cir. 2020) (considering decertification order entered in *Mojica v. Securus Techs., Inc.*, No. 5:14-CV-5258, 2018 WL 3212037, at *7 (W.D. Ark. June 29, 2018)). The trial

court had observed that the voluntary payment doctrine made it "impossible to know whether a class member's use of [the phone service] on that occasion was voluntary or the product of, *e.g.*, duress, without examining the particular circumstances surrounding that call, including the contents of the call itself" and noted further that this was not only an inquiry that would have to be made in connection with every *class member* but also for *every call*. *Mojica*, 2018 WL 3212037, at *7; *see also Spagnola v. Chubb Corp.*, 264 F.R.D. 76 (S.D.N.Y. 2010) (individualized nature of the contracts and a concern relating to the potential defense of voluntary payment by class members weighed against predominance requirement in putative class action by insureds alleging breach of contract).

Plaintiff does not address the doctrine directly but instead contends that the Court need not consider affirmative defenses when conducting a predominance analysis. (Mem. at 35-36.) This is incorrect. As part of the rigorous predominance analysis, the Court must balance all common issues versus individualized issues, which includes affirmative defenses. *See Herskowitz*, 360 F.R.D. at 470 ("The Court's inquiry is not whether common questions predominate with respect to individual elements or affirmative defenses; rather, the inquiry is a holistic one, in which the Court considers whether overall, considering the issues to be litigated, common issues will predominate") (internal citations omitted). Individual issues raised by affirmative defenses can— and often do—preclude certification. *See Henke v. Arco Midcon, L.L.C.*, 4:10-CV-86 HEA, 2014 WL 982777, at *19 (E.D. Mo. March 12, 2014) (individual issues of knowledge, as well as other issues for each affirmative defense, "would be complex and require an individual assessment for each and every putative class member."); *Stuart,* 956 F.3d at 560 (voluntary payment doctrine defense presents a "particularly troubling obstacle to class adjudication" because it would "require

an individualized inquiry into the subjective thinking of each [plaintiff] every time he or she" utilized the telephone services at issue).

The Supreme Court has emphasized that a failure to consider affirmative defenses in a predominance analysis would violate a defendant's due process rights. "Because the Rules Enabling Act forbids interpreting Rule 23 to 'abridge, enlarge or modify any substantive right,' . . . a class cannot be certified on the premise that [defendant] will not be entitled to litigate its statutory defenses to individual claims." *Wal-Mart*, 564 U.S. at 367. "The potential affirmative defenses here will involve the submission of significant individualized evidence by Defendants regarding the merits of the putative class members' claims in those states. And to ostensibly assume Defendant's' liability by preventing them from litigating these affirmative defenses would be to violate the Rules Enabling Act. 28 U.S.C. § 2072(b)." *Nelson v. Conduent Business Services, LLC*, 2020 WL 5587450 (N.D. Ga. Sept. 18, 2020) (citing *Wal-Mart*, 564 U.S. at 367). If Compass is not entitled to investigate and assert the applicability of the voluntary payment doctrine to individual claims, its due process rights would be violated.

Plaintiff's reliance on *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442 (2016), is misplaced. In that wage-and-hour case, the Supreme Court allowed a class of workers to rely on common "representative" evidence: a sampling of employees' activities to estimate uncompensated time for each individual class member. The key to the holding in *Tyson* was that in that case, "representative evidence is relevant in proving a plaintiff's individual claim." *Id.* at 455. Put another way, the Supreme Court concluded that "[r]ather than absolving the employees from proving individual injury, the representative evidence here was a permissible means of making that very showing." *Id.* at 457. Moreover, *Tyson* relied heavily on prior Supreme Court precedent that shifted the burden of proof to a defendant in wage-and-hour cases where the defendant violates

a statutory record-keeping obligation. *Id.* at 456. Here, in contrast, Kriegler admitted that nothing in his report could be used to estimate damages for any individual claimant. (Ex. G at 11:7-12.) Because no individual claimant could rely on Kriegler's opinion to establish the existence or extent of their own individual claim, *Tyson* does not resolve the underlying infringement on Compass's due process rights posed by ignoring the voluntary payment doctrine or the other individualized issues presented here.[13]

### 2.   Members of the Proposed Class Lack Standing under *TransUnion*

"Only those plaintiffs who have been *concretely harmed* by a defendant's statutory violation may sue that private defendant over that violation in federal court." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2205 (2021). In short, "[n]o concrete harm, no standing." *Id.* at 2200, 2214; *see also Avritt v. Reliastar Life Ins.*, 615 F.3d 1023, 1034 (8th Cir 2010) (it is fundamental that a class must be "defined in such a way that anyone within it would have standing.") (citation omitted). The Motion's proposed definitions fail this basic test and cannot be certified because they include individuals who have not suffered an injury in fact: purchasers who made all purchases with knowledge of the price differential. *See White v. Just Born, Inc.,* No. 2:17-CV-04025-NKL, 2018 WL 3748405, *6 (W.D. Mo. Aug. 7, 2018) ("consumers who would continue to purchase Diet Coke despite knowledge of an allegedly misleading marketing practice 'suffered no injury.'"). In *White*, plaintiffs sought certification of a class for unjust enrichment and violation of consumer protection laws due to slack space in a candy box. *Id.* at *4. In that case, the Court noted that, "[k]nowledge is an important aspect of each class members' claim. *Id.* Without establishing that they were unaware of the amount of slack-fill in [the] candy boxes, or that they

---

[13] None of the remaining cases cited by Plaintiff (Mem. at 36-37 & n.16.) support the position that the existence of affirmative defenses requiring individual inquiry cannot defeat certification.

ceased purchasing the candy after discovering it, class members will not be able to show injury. Therefore, the proposed classes could include individuals who purchased dozens of boxes of the candy in the past five years despite knowing how much slack-fill was in the packaging." *Id.* at *6. For this reason, the Court denied class certification holding that the named plaintiff "cannot represent a class that includes persons who purchased the candy despite knowing how much slack-fill would be in each box. Yet, the classes as defined would include such persons. Class certification therefore would be inappropriate." *Id.*

Plaintiff appears to contend that *McKeague* holds that "the presence in the Class of subscribers who were not injured did not preclude certification." (Mem. at 25.) That is not an accurate reading of the case, as the parties in *McKeague* undertook an extensive review of defendant's files to ascertain which individuals' contracts included the choice of law provision that identified them as members of the class (and purportedly injured by the challenged fee-assessing practice). 847 F.3d at 999. Neither it nor the case it was discussing, *Sandusky Wellness Ctr. v. Medtox Sci., Inc.*, 821 F.3d 992, 995 (8th Cir. 2016), implicated standing concerns. But most critically, both of these cases are superseded by *TransUnion*.

This case involves alleged contracts to purchase vending machine items for the displayed price. Where individuals made purchases knowing about the existence of the ten cent price differential prior to purchasing from Compass's vending machines, that class member does not have "an injury in fact that is traceable to the defendant and likely to be redressed in a favorable decision." *Halvorson v. Auto-Owners Ins.*, 718 F.3d 773, 778 (8th Cir. 2013) (reversing class certification where some members were not injured); *In re Bisphenol-A (BPA) Polycarbonate Plastic Products*, 276 F.R.D. 336, 345 (W.D. Mo. 2011) ("A consumer who knew about the controversy and also knew that the bottle s/he purchased contained BPA would have all the

knowledge Plaintiffs allege should have been disclosed."). "A class cannot be certified if it contains members who lack standing" (*Avritt*, 615 F.3d at 1034), as both the nationwide class and California sub-class do.

> 3. Common Questions of Damages Do Not Predominate over Individual Ones

A finding that common issues predominate over individual ones requires that any damages resulting from the injury be measurable on a class-wide basis through use of a "common methodology." *Comcast*, 569 U.S. at 30 (internal citation and quotation omitted). "[A] model purporting to serve as evidence of damages in this class action must measure only those damages attributable to theory. If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." *Id.* The Supreme Court has instructed lower courts to conduct a "rigorous analysis" to determine whether the purported damages model fits the liability case. *Id.* at 35; *see also In re Emerson Electric Co. Wet/Dry Vac Mktg. & Sales Litig.*, No. 4:12MD2382 HEA, 2022 WL 670131, at *3 (E.D. Mo. Mar. 7, 2022) ("Calculations need not be exact . . . but at the class-certification stage (as at trial), any model supporting 'plaintiff's damages case must be consistent with its liability case.'") (citations omitted).

Because of the voluntary payment doctrine, the correct measure of damages for any particular class member is the total price differential paid *without knowledge*, not simply the total price differential.[14] By extension, the correct measure of damages is the sum of class-wide purchases made *without knowledge*. Despite this, Plaintiff seeks to certify a class that will recover

---

[14] Despite Plaintiff's gloss, this is analytically distinct from the question of whether a class member has standing. The standing question is binary: either the purchaser had knowledge or not with respect to at least one purchase. The damages questions is quantitative: how many purchases were made without knowledge.

"the extra money (the sum of all the dimes) that he or she paid for purchases with a card." (Mem. at 18-19.) To calculate this amount, Kriegler aggregated *all* two-tier revenue collected at each unlabeled vending machine. (Pl.'s Ex. E at ¶ 38.) In doing so, Kriegler did not account for those consumers who knew about the charge at the time of purchase and agreed to pay that price. (*Id.*; Ex. G at 9:24-11:22 (Kriegler testified that taking class member's knowledge of the price differential into account "was not part of [his] assignment.").) This is inconsistent with the proper theory of damages here. *Harris v. Brownlee*, 477 F.3d 1043, 1048 (8th Cir. 2007) (holding defendant did not breach agreement with plaintiff, who received the benefit of the bargain that he expected when he entered into it; thus, plaintiff was not entitled to relief).

*Hall v. Marriott Int'l, Inc.* is instructive. 344 F.R.D. 247, 277 (S.D. Cal. 2023). In *Hall*, the plaintiffs proposed a class of all consumers who paid Marriott Hotel's resort fees, but they failed to distinguish between those who did so knowing about the resort fees and those who were deceived and harmed. *Id.* Like Dr. Kriegler, the expert in *Hall* measured damages by calculating the total amount of fees paid by consumers during the class period, notwithstanding the possibility that a significant portion of consumers were aware of the fee when they made their reservations. *Id.* The Court found that predominance could not be established because the damages model made no attempt to distinguish the consumers who were deceived by the allegedly inadequate resort fee disclosures from consumers who were aware of and willingly paid the fee (and thus were not harmed). *Id.*

This is not a minor or hypothetical concern. Plaintiff, as well as Carter and Baldwin, acknowledge that they made purchases with knowledge. In fact, Baldwin admits he learned about the price differential within a short time after beginning to make purchases at each location, and claims to have made three purchases a day thereafter. Jilek and Regus both told multiple people

about the price differential; there is no way to quantify how many purchases at that location were subsequently made with knowledge. It is unclear whether Borrero, Pemberton, or Whitaker made any purchases with knowledge, but the presence of machines with Labels at their locations strongly suggests that, like Baldwin, they discovered the practice (if, in fact, there were *any* unlabeled machines at that location, given the lack of any evidence demonstrating that there were). To assume otherwise with respect to those individuals would violate Compass's due process right to investigate and assert affirmative defenses.

To put this into starker terms: Plaintiff's expert's damages calculation contains some unknown but non-trivial number of purchases that are not recoverable as damages in this action. Plaintiff concedes as much (Mem. at 36-37), and has therefore conceded that there is no way of calculating damages on a class-wide basis.[15] Such a damages model is not viable and precludes class certification. *Hall*, 344 F.R.D. at 277-78 (citing *Comcast*, 569 U.S. at 35).

### 4. Individual Questions Arising from Plaintiff's *Prima Facie* Proof of Liability Overwhelm Common Ones

The basic questions necessary to establish liability under Plaintiff's breach of contract theory[16] cannot be answered through the presentation of common evidence. The terms of the

---

[15] Should Compass's motion to strike the supplemental expert reports as untimely be granted, then Plaintiff will have no expert opinion purporting to calculate damages. Kriegler conceded that damages could not be estimated without performing the sampling and manual review proposed but not performed in his initial report. (Ex. G at 17:15-22:19; Pl.'s Ex. E at ¶ 38.) Thus, based on Kriegler's own admission, the calculation set forth in his initial report is not based on the methodology Kriegler himself claims is necessary.

[16] Unilateral contracts do not typically apply in the context of the purchase of goods or products. In fact, none of the cases listed on Plaintiff's Exhibit H, which purports to reflect the definition of unilateral contracts in each jurisdiction, involves the sale of goods. Instead, each relates to promises for payment in exchange for an act, such as employment or rewards offers. To the contrary, whether a unilateral contract theory would apply to the sale of goods is unique to each of the 33 jurisdictions at issue. *Comp. SouthTrust Bank v. Williams*, 775 So. 2d 184, 188 (Ala. 2000) ("Contracts for the purchase and sale of goods are essentially bilateral and executory in nature.") *with Sateriale v. R.J. Reynolds Tobacco Co.*, 697 F.3d 777, 790 (9th Cir. 2012) (consumers

contract (*i.e.*, what price did each consumer agree to pay for each purchase), whether each purchase was made from a Compass vending machine, whether the vending machine had a Label at the time of purchase, and whether the purchase was made with knowledge are all inherently individualized. Each transaction from a vending machine at the agreed upon price is its own distinct contract. *See, e.g.*, *SIM Surgical, LLC v. SpineFrontier, LLC*, No. 4:20-CV-01060-JAR, 2022 WL 407141, at *4 (E.D. Mo. Feb. 10, 2022) (holding under Missouri law that purchase orders constitute separate contracts and "it is clear that the breach of one contract does not operate as a breach of other, similar contracts"); *Pini USA, Inc. v. NB Glob. Commodities, LLC*, No. 217CV04763ODWPLA, 2018 WL 1393776, at *3 (C.D. Cal. Mar. 19, 2018) ("the Court is concerned that [Plaintiff] claims there are multiple purchase orders in 'one contract' . . . . each purchase order—when accompanied with a subsequent invoice and acceptance—creates a separate contract.").

The known class members amply illustrate the individualized issues. First, as former plaintiff Jaye evidenced, even the central, primary question of whether a purchase was made at a Compass machine cannot be answered without individual inquiry. (Ex. F at 55:1-10, 61:13-16.) Jaye, with the assistance of counsel, erroneously pursued claims against the wrong defendant for more than three years. It was not until specific and individualized inquiries *made by Compass* during Jaye's deposition in March 2023 that Jaye and her attorneys realized that her claims, if any, would be against a non-party unaffiliated with Compass. (*Id.* at 91:11-25; Dkt. No. 223 (Mot. for Voluntary Dismissal of Plaintiff Jaye).)

Second, whether a purchase was made at an unlabeled machine cannot be resolved without individualized inquiry. As Plaintiff already concedes, claims should be screened against the list of

---

adequately alleged that a tobacco company's customer-rewards program was an offer to enter into a unilateral contract under California law).

Compass machines in order to determine if there were unlabeled Compass machines at the indicated location.[17] But even this is not sufficient. Consider Baldwin, Borrero, and Whitaker. Baldwin made purchases at locations with both labeled and unlabeled machines. Without more discovery from Baldwin, there is no way of knowing how many purchases were made at labeled machines and how many at unlabeled machines. Similarly, Borrero and Whitaker made purchases at locations where all surveyed machines had Labels. The question of whether they made purchases at unlabeled machines (and, if so, how many purchases) is, at best, uncertain and requires additional individual investigation.

This critical, and fundamental, question of assent or non-assent turns on an individualized inquiry for each customer. *Herskowitz*, 460 F.R.D. at 471. "One [p]laintiff's actions, decisions, knowledge, and thought processes are unique to that [p]laintiff." *In re Bisphenol-A (BPA) Polycarbonate Plastic Products*, 276 F.R.D. 336, 344 (W.D. Mo. 2011) (denying class certification where plaintiffs failed to demonstrate that common issues predominated). "Numerous courts have denied certification where individualized inquiries are necessary to determine a class member's intent and/or consent." *Schertzer v. Bank of America, N.A.*, 19cv264 JM(MSB), 2022 WL 1004559, at *18 (S.D. Cal. April, 4, 2022) (citing *In Re TD Bank, N.A. Debit Card Overdraft Fee Litig.*, 325 F.R.D. 136 (D.S.C. 2018)). Several class members have admitted that they made purchases using a credit or debit card *after* being aware that they would be charged the ten cent surcharge. (Ex. C, V. Carter Dep. Tr. at 49:6-9, 50:21-51:6; Ex. D, J. Jilek Dep. Tr. at 71:19-72:1; Mueller Decl. Ex. 8 (Baldwin's interrogatory responses) at Interrog. No. 3.) Yet they all voluntarily

---

[17] Plaintiffs do not explain how this process would work, or how it would be feasible. Plaintiffs also do not account for the fact that the Compass records against which claims would be screened are subject to human error, and may not accurately reflect whether a given machine had a Label or not. Indeed, this was the entire reason Kriegler proposed the sampling methodology laid out in his report. (Pl.'s Ex. E, at ¶ 11.)

elected to purchase items with a debit or credit card despite knowing that they would be charged more than the display price.

5.   Variations in the Law Governing Breach Of Contract Preclude Certification of Nationwide Class

Plaintiff's nationwide common law breach of contract claim would implicate the laws of 33 different states. "Plaintiff, as the party seeking class certification, has the burden to show that the states' bodies of law are similar enough that common issues predominate." *Meek v. Kansas City Life Ins. Co.*, 19-00472-CV-W-BP, 2022 WL 499049, at \*12 (W.D. Mo. Feb. 7, 2022). "Notably, in cases implicating the law of all fifty states, '[t]he party seeking certification . . . must . . . provide an *extensive analysis* of state law variations to reveal whether these pose insuperable obstacles.'" *Sacred Heart Health Sys., Inc. v. Humana Mil. Healthcare Servs., Inc*., 601 F.3d 1159, 1180 (11th Cir. 2010) (citing *Cole v. Gen. Motors Corp*., 484 F.3d 717, 724 (5th Cir. 2007)). In *Sacred Heart*, only the laws of six different states were implicated, yet the Eleventh Circuit held that "[i]t is 'the court's duty to determine whether the plaintiffs have borne their burden where a class will involve multiple jurisdictions and variations in state law" and that "more than a perfunctory analysis is required" even when less than all fifty states are at issue. *Id.* The lack of "serious analysis of the variations in applicable state law relative to [Defendant's] affirmative defenses" resulted in a "procedural error" that established a "critical legal deficiency—insufficient evidence of predominant common legal issues," sufficient to rise to the level of an abuse of discretion. *Id.* (citations omitted).

This is a high burden. "[Ba]sed primarily on the burden of applying multiple states' laws, an *overwhelming number* of federal courts have denied certification of nationwide state-law class actions." *Schnall v. AT&T Wireless Services, Inc.*, 259 P.3d 129, 271 (Sup. Ct. Wash. 2011) (collecting dozens of federal cases denying certification of nationwide state-law class actions)

(emphasis in original). This is because "'[v]ariations in state law may swamp any common issues' and defeat class certification under Rule 23(b)(3)." *Hale v. Emerson Electric Company,* 942 F.3d 401, 403 (8th Cir. 2019).

Here, Plaintiff attempts to meet his burden by submitting a chart identifying the general elements of breach of contract and unilateral contracts, but this perfunctory effort does not address the substantial distinctions among the various states' laws, and includes cases that are inapplicable to the present circumstances. Further, and as discussed below, Plaintiff makes no reasonable effort to address the application of those elements to the claims, defenses, and facts of the case at bar.

a. *The Statutes of Limitations is not Consistent across the 33 States*

The proposed class is limited to those persons or entities who made purchases "within the applicable statute of limitations preceding the filing of this lawsuit . . ." (Mem. at 23.)[18] However, "different states apply different statutes of limitations, and those differences may affect whether putative class members have viable claims." *Meek*, 2022 WL 499049, at *12 (finding that individual issues predominated because "[a]pplying 49 separate statutes of limitations—and the various doctrines associated therewith—would be unmanageable"). Statutes of limitations differ not only as to their length, but also as to when each begins to run. As the *Meek* Court noted, in Kansas "a breach of contract action accrues when the contract is violated and not at the time when the plaintiff learns that it has been violated . . . whereas in Missouri, a cause of action accrues only when the damage is actually sustained and capable of ascertainment." *Id.* Similarly, the Court in *Rapp v. Green Tree Servicing, LLC*, noted that, in Minnesota and Delaware "a breach of contract action accrues at the time of the breach, and thus the statute of limitations begins to run even if the

---

[18] Kriegler did not take any statutes of limitations into account in preparing his damages calculations.

injured party does not know of the breach and could not possibly have discovered the breach." 302 F.R.D. 505, 511 (D. Minn 2014) (citations omitted). "But other states apply a discovery rule, meaning that the 'breach of contract action accrues not on the date of the breach, but rather on the date the aggrieved party either discovered the breach, or could or should have discovered the breach through the exercise of reasonable diligence.'" *Id.* (citation omitted). "For class members governed by the discovery rule, a jury would need to conduct a case-by-case examination of when each class member discovered or reasonably should have discovered the breach." *Id.* at 511.

> b. *Compass's Affirmative Defenses are Not Commonly Applied Among The 33 States at Issue*

Compass has asserted a waiver defense: putative class members who continued to make credit or debit card purchases after learning of the ten cent charge without asserting a cause of action or even notifying Compass, may be deemed to have waived their claim. "Most jurisdictions define waiver as the voluntary or intentional relinquishment of a known right. This uniformity, however, unravels beyond the definition." *Sacred Heart v. Humana Military*, 601 F.3d 1159, 1180 (8th Cir. 2010). Jurisdictions differ on the extent to which conduct alone may be deemed a waiver of known rights. *Id.* at 1180-81. For example, in Florida, "'[w]here a party fails to declare a breach of contract, and continues to perform under the contract after learning of the breach, it may be deemed to have acquiesced in an alteration of the terms of the contract, thereby barring its enforcement.'" *Id.* at 1181 (citation omitted). On the other hand, "the Louisiana courts could hardly be more explicit in pronouncing that '[w]aiver . . . is not favored in Louisiana law, . . . such [that] claims [of waiver] must be examined carefully and strictly.'" *Id.* (citation omitted). A finding as to whether any particular class member waived his or her right to assert a claim for breach of contract "would require both a legal determination of the scope of the waiver doctrine in the relevant state and a factual determination as to whether that class member's conduct constitutes

waiver." *Rapp*, 302 F.R.D. at 513. Defendant's waiver defense, therefore, will require individual inquiries and defeats predominance.[19]

>c.      *The Allowance or Allocation of Pre-Judgment Interest Varies From State to State*

Though Plaintiff seeks pre-judgment interest, he presents no methodology for how the pre-judgment interest will be distributed amongst class members. (Pl.'s Ex. E, Kriegler's Opening Report, at ¶ 40.) State laws vary as to whether and how to assess prejudgment interest when applying common law. In Missouri, for example, "courts have allowed the recovery of prejudgment interest on oral contracts." *Reliance Ins. Co. in Liquidation v. Chitwood*, 433 F.3d 660, 665 (8th Cir. 2006). However, interest is computed from the earlier of the date of demand or the date of the filing of the complaint. *Id.* at 665-666. Washington, on the other hand, calculates prejudgment interest from the date the party was entitled to the money. *Lee v. ITT Corp.*, 275 F.R.D. 318, 323 (W.D. Wash. 2011) (application of varying state laws destroys predominance where Washington law conflicted with other laws which could potentially apply to the award of double damages, availability and amount of prejudgment interest, and award of attorney fees); *see also U.S. Bank Nat'l Ass'n v. Indian Harbor Ins. Co.,* No. 12-CV-3175 (PAM/JSM), 2015 WL 12778848, at *2 (D. Minn. Mar. 19, 2015) (noting that states have "disparate interest rates" and comparing the different procedures utilized by Minnesota with Delaware). Resolving issues regarding Plaintiff's demand for pre-judgment interest creates the necessity for further individualized inquiries into each claimant's state laws and destroys predominance.[20]

---

[19] As noted by Plaintiff and as discussed above, Compass also asserted a voluntary payment doctrine defense and the putative class members' varying understandings regarding the price differential are key to this issue.

[20] Prejudgment interest must also be reduced to take account for the purchases that are not applicable as a result of the voluntary payment doctrine.

### C. Plaintiff Proposes no Administratively Feasible Plan to Manage the Class

Plaintiff does not present any plan to manage the class, instead stating that he "does not anticipate management difficulties" because "[t]his case is the ideal class action, with a well-defined Class and Subclass, as well as a defendant with thorough records of the machines at issue." (Mem. at 39-40.) As detailed above, there is no evidence that would identify even a single member of the class, let alone sufficient common evidence capable of verifying membership within the class, or establishing liability or damages. To the extent that Plaintiff's plan is to seek self-identifying affidavits from putative class members, testimony from former and current plaintiffs have established reason to doubt the efficacy and reliability of this method. *See Ault v. JM Smucker Co.*, 310 F.R.D. 59, 66 (S.D.N.Y. 2015) (self-identification not feasible due to, *inter alia*, the number of defendant's brands at issue); *Xavier v. Philip Morris USA Inc.*, 787 F. Supp.2d 1075, 1090 (N.D. Cal. 2011) (rejecting self-identification affidavits without some verification process being set in place, holding that "if absent class members are permitted to testify to their smoking histories by way of affidavit, on the other hand, [defendant] would be forced to accept their estimates without the benefit of cross-examination. Such a procedure would not be proper or just."). Forcing Compass to simply accept claims at face value would be to abrogate its right to test claims and assert affirmative defenses.

The unreliability of a consumer's recollection of his purchasing habits poses a unique difficulty in this case. Some properly-labeled machines may have sat side-by-side with machines that were not properly labeled, as was the case with Baldwin. (*See e.g.,* Mueller Decl. at ¶ 18.) Similarly, a machine that was unlabeled in 2017 would have been subsequently remediated through Compass' year-long audit process (*See* Sec. II.A, *supra*) and a purchaser would have to

accurately recall the date of their purchases in order to determine which, if any, were made at a time when the machine was unlabeled, something that multiple plaintiffs were unable to do.[21]

Plaintiff even concedes that *some* verification process is required to weed out those claimants who identify purchases at locations where no actionable machines were located. (Mem. at 25-26.) Plaintiff has not explained how that would work, and has not included any expert testimony to that effect. *Johannessohn v. Polaris Industries, Inc.*, 9 F.4th 981, 986 (8th Cir. 2021) (affirming denial of class certification because class action was not a superior means of adjudication due, in part, to "monumental manageability concerns."). As noted above, this verification is necessary, but not sufficient. Even if a claimant identifies a location with unlabeled machines, a further inquiry would be necessary to determine (a) whether all or only some machines were unlabeled; (b) how many purchases were made at unlabeled machines; and (c) how many purchases were made with knowledge (which is more likely where a claimant was on notice that at least some machines at the location were charging different prices). There is no way to automate this process, as is evident from the known class members.

---

[21] In the Motion, Plaintiff also suggests that class membership can be established with credit card or banking records, along with self-identifying affidavits. But, as established by the current and former named plaintiffs, these records are frequently difficult to obtain, especially in light of the time that has elapsed. (Ex. C, V. Carter Dep. Tr. at 11:17-21 (located some but not all of her bank statements); *id.* at 51:1-6 (did not include certain purchases in complaint because could not locate bank statements); *id.* at 60:10-22 (could not get to a bank to get bank statements); *id.* at 61:6-20 (bank statements not available online); *id.* at 62:8-12 (other than bank statements, no other records exist to show purchases); Ex. F, F. Jaye Dep. Tr. at 20:19-25, 119:1-10 (no longer had access to closed account records and had to go into bank branch, which took extended time because of limited time availability); Mueller Decl. Ex. 3 (despite requesting James Jilek's bank statements on February 28, 2022, he did not produce his complete set of statements until March 17, 2023, two business days before his deposition); Mueller Decl. Ex. 10 (Borrero will have to subpoena his own bank in order to obtain his bank statements)). Those records, even if they could be located, would only serve at most to verify a purchase at a Compass machine, and would not be sufficient, standing alone, to establish liability, that the individual is a member of the class, or to establish any quantum of damages.

Consider Plaintiff Jilek. Investigation (in this case, document discovery and a deposition) uncovered that he made some purchases without knowledge and some with knowledge. And there is, at best, only a rough estimate of how many purchases he made with and without knowledge. Similarly, Baldwin's discovery responses indicate that he learned of the pricing differential at two different locations, each of which had both labeled and unlabeled machines, yet he continued to make purchases. His purchases therefore fall into three separate potential categories: purchases made at labeled machines (and therefore excluded from damages), purchases made at unlabeled machines but with knowledge (again excluded from damages), and purchases made at unlabeled machines without knowledge. Without a deposition, or something very close to it, there is no way to value his claim. Borrero, Pemberton, and Whitaker either have *only* purchases at labeled machines, or belong in one of the same three categories as Baldwin. In other words, verification would require a mini-trial on each claim.[22]

Finally, the process of calculating each class member's total number of purchases requires individualized inquiry. None of the plaintiffs in any of the related cases (assisted by counsel) have been able to estimate their total purchases with any accuracy. The same is likely to be true of absent class members, and is compounded by the fact that whether a machine was labeled or not changed over time, requiring an inquiry into not only how many purchases were made, but when.

---

[22] In the event that Plaintiff argues on reply that a *cy pres* award can cure these issues of manageability, courts within this Circuit have acknowledged that a *cy pres* award cannot be granted "as a means of rendering manageable—by rendering unnecessary any proof of damages to individual class members—an otherwise unmanageable class action." *Dumas v. Albers Med., Inc.*, No. 03-0640-CV-W-GAF, 2005 WL 2172030, at *7 (W.D. Mo. Sept. 7, 2005). Where "[a plaintiff] asks the Court to assess the damages of the class, not only without requiring proof of the amount of individual damages, but without even requiring any of the potential class members to demonstrate that they were harmed whatsoever by [defendant's] conduct [] [*c*]*y pres* relief is [] not appropriate." *Id.*

Case 3:23-cv-00818-JAG-DCK    Document 260    Filed 11/10/23    Page 44 of 48

Even if this process were viable, it would not correct Plaintiff's failure (discussed above) to present a way to calculate class-wide damages. While this process might distinguish actionable and non-actionable purchases for claimants, it would provide no information at all to distinguish actionable and non-actionable purchases for those class members who do not submit a claim. Accordingly, class-wide damages would remain unknowable, or in the alternative, would simply assume away Compass's affirmative defenses with respect to purchases not tied to a claim.

### D.    Plaintiff Inexplicably Alleges His Claims Are Not Typical Of The Class

As part of his argument that the Court should not consider whether the voluntary payment doctrine bars certain claims at this stage of the proceedings, Plaintiff contends that the fact that he and other former plaintiffs continued to make purchases at unlabeled vending machines after they learned about the ten cent charge is *atypical* of the rest of the rest of the class. (Mem. at 15 ("None of those examples of knowing purchases would be typical of class members who did not join this lawsuit.").) The implication (unsupported as it may be) is that had it not been for the involvement of counsel, Jilek would never have learned of the charge and therefore the remainder of the putative class—who were not contacted by counsel—must have remained unaware of the charge.

Compass disagrees that the manner in which Plaintiff learned of the price differential has any bearing on whether absent class members made purchases with knowledge. Both Baldwin and Regus admitted that they discovered the price differential on their own, and Baldwin continued to make purchases after that discovery.  (Mueller Decl. Ex. 8 at Interrog. No. 3; Ex. E, J. Regus Dep. Tr. at 23:3-23.) If there were any unlabeled machines at Pemberton's, Borrero's, or Whitaker's work locations, there is a strong chance that they ultimately discovered the price differential and continued to make purchases.

However, if Jilek believes his experience is atypical, then he cannot serve as a class representative. "[T]he claims of the representative parties [must] be typical of the claims of the class. In other words, class representatives should have the same interests and seek a remedy for the same injuries as other class members." *Macormic v. Vi-Jon, LLC*, 4:20-cv-1267 HEA, 2023 WL 1100378, at *4 (E.D. Mo. Jan. 30, 2023). This requirement dictates that class representatives have the same or similar grievances as the other class members.

Plaintiff cannot have it both ways. If he wants to claim, as he must, that his continued purchases with knowledge are typical of absent members (which Compass believes is supported by the record), then individualized issues predominate. If his claims are not typical, he cannot represent the class.

## V.     CONCLUSION

There is no ascertainable class. There is no calculation of class-wide damages tethered to the legal theories at issue in this case. There is no manageable claims process unless Compass's due process right to challenge claims and assert its affirmative defenses are ignored. What Plaintiff proposes is to take from Compass a sum of money that he acknowledges, as he must, exceeds the damages actually suffered by class members and do something with that sum (without explaining what that something is). Accordingly, Compass respectfully requests that the Court deny Plaintiff James Jilek's Motion for Class Certification.

Dated: November 10, 2023                     Respectfully submitted,

                                             By: */s/ Joseph C. Wylie II*
                                             Joseph C. Wylie II, 6270852IL
                                             Nicole C. Mueller, 6309735IL
                                             (*Pro Hac Vice*)
                                             Kenn Brotman, 6236771IL
                                             (*Pro Hac Vice*)

**K&L GATES LLP**
70 West Madison Street, Suite 3300
Chicago, IL 60602-4207
Tel:     (312) 372-1121
Fax:     (312) 827-8000
joseph.wylie@klgates.com

Paul W. Sweeney Jr., 112511CA
*(Pro Hac Vice)*
**K&L GATES LLP**
10100 Santa Monica Blvd., 8th Floor
Los Angeles, CA 90067
paul.sweeney@klgates.com
Secondary:
litigation.docketing@klgates.com

*Attorneys for Compass Group USA, Inc.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was electronically filed with the Clerk of Court via the Court's CM/ECF system on November 10, 2023, which will serve all counsel of record.

*/s/ Joseph C. Wylie II*