# Exhibit D

1        IN THE UNITED STATES DISTRICT COURT

2        FOR THE EASTERN DISTRICT OF MISSOURI

3                EASTERN DIVISION

4 _____

                                   )

5 GEORGE MOORE, VIRGINIA CARTER,    )

  JAMES JILEK, FRANCIS JAYE, and    )

6 SEAN MADELMAYER, on behalf of     )

  themselves and all others         )

7 similarly situated,               )No. 4:18-cv-01962-SEP

                                    )

8        Plaintiffs,                )

                                    )

9     vs.                           )

                                    )

10 COMPASS GROUP USA, INC., D/B/A    )

   CANTEEN,                         )

11                                  )

            Defendant.              )

12 _____)

13

14

15      VIDEOTAPED DEPOSITION OF JAMES JILEK

16            Los Angeles, California

17            Tuesday, March 21, 2023

18                  Volume I

19

20

21 Reported by:

   JILL GLANTZ

22 CSR No. 11341

23 Job No. 5781012

24

25

Case 3.25-cv-00818-JAG-DCK    Document 260-4    Filed 11/10/23    Page 2 of 28

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE EASTERN DISTRICT OF MISSOURI

3                   EASTERN DIVISION

4
                                          )
GEORGE MOORE, VIRGINIA CARTER,     )
5  JAMES JILEK, FRANCIS JAYE, and   )
6  SEAN MADELMAYER, on behalf of     )
   themselves and all others         )
7  similarly situated,               )No. 4:18-cv-01962-SEP
                                      )
8          Plaintiffs,               )
                                      )
9      vs.                           )
                                      )
10 COMPASS GROUP USA, INC., D/B/A    )
   CANTEEN,                          )
11                                    )
           Defendant.                )
12 _____)

13

14

15       Videotaped deposition of JAMES JILEK,

16  Volume I, taken on behalf of Defendants, at 10100

17  Santa Monica Boulevard, Los Angeles, California,

18  beginning at 2:01 p.m. and ending at 4:48 p.m. on

19  Tuesday, March 21, 2023, before JILL GLANTZ,

20  Certified Shorthand Reporter No. 11341.

21

22

23

24

25

1  connection with this case?

2      A    I was referred to the Counsel by an office

3  mate, Justin.

4      Q    Is that "Justin Regus"?

5      A    Correct.

6      Q    Can you spell Mr. Regus's last name?

7      A    I don't know the correct spelling of his last

8  name.

9      Q    What did Mr. Regus tell you when he referred

10  you to Counsel?

11     A    He informed me, one, that the machine was

12  adding fees without advertising them.  And he just

13  told me -- then he referred me to his lawyers.

14     Q    Was Mr. Regus -- and by the "lawyers," do you

15  mean Mr. Jenkins?

16     A    At that time, the first person would have

17  been Richard Cornfeld.

18     Q    So Mr. Regus gave you the contact information

19  for Mr. Cornfeld?

20     A    Yes.  Or his office.

21     Q    Do you know if Mr. Regus was a client of

22  Mr. Cornfeld?

23     A    No.

24     Q    So you said that Mr. Regus informed you that

25  the machine was adding fees without advertising

1    them.   Are you referring to the vending machines in

2    your office?

3        A    Yes.

4        Q    What do you recall -- what else do you recall

5    about Mr. Regus telling you this information?

6        A    I don't recall anything else.

7        Q    Do you recall when Mr. Regus told you about

8    the fees?

9        A    I recall it would have been before mid-2019.

10       Q    So before mid-2019.   You think in the first

11   quarter of 2019?

12       A    It could have been first quarter or second

13   quarter.

14       Q    First or second quarter.   Do you know if

15   Mr. Regus was using the vending machines in your

16   office in the first or second quarter of 2019?

17       A    I don't know anything about his usage of the

18   vending machines.

19       Q    How did the conversation come up with

20   Mr. Regus of the vending machine fees?

21       A    He brought it up to me while I was in my

22   office.

23       Q    So you're in your office.   Can you kind of

24   describe the scene or paint the picture for me?

25       A    The physical layout of the office?

1    Q    Sure.

2    A    Okay.  It's an open office space.  I'm

3    sitting at my desk.  He points out that the machine

4    is charging fees that are not advertised.

5    Q    Does he walk over to your desk, or does he

6    have a desk nearby yours?

7    A    He has a desk nearby, but he walked by my

8    desk.

9    Q    And Mr. Regus is someone -- did you see him

10   most days in the office?

11   A    I don't know if I would say "most days."  I

12   would -- I would see him from time to time.  Say,

13   weekly.

14   Q    Okay.  And so you -- would you say you had

15   conversations with him weekly?

16   A    Not deep conversations, no.

17   Q    Was this the first time that the two of you

18   had discussed the vending machines?

19   A    Yes.

20   Q    Was it the only time you two discussed the

21   vending machines?

22   A    No.

23   Q    When -- well --

24   A    It was the first time, and he would bring it

25   up again.

1  it should be.  This proved to me that it was
2  charging more than it should be.
3      Q    So, I'm sorry, so Mr. Regus told you that the
4  machines were charging more than the display?
5      A    Yes.
6      Q    Is that right?  And you decided to test it
7  for yourself?
8      A    This was after I was in contact with my
9  lawyers.
10     Q    Okay.  I just want to make sure I understand
11 the timeline.
12     A    So it wasn't purely for myself.
13     Q    I'm sorry?
14     A    Okay.
15     Q    Can you repeat -- I just didn't hear you.
16 Can you repeat what you said?
17     A    I just want to be clear, it wasn't purely for
18 myself because I was already in contact with the
19 lawyers.  So it was for myself and for my lawyers.
20     Q    Understood.  Okay.  I just want to make sure
21 I'm getting the timeline clear.  So you spoke to
22 Mr. Regus in June, you think, or July of 2019?
23     A    Yes, I spoke to Mr. Regus.  I spoke to the
24 lawyers.  Then we did the test case.
25     Q    And the test case was the -- was a purchase

Veritext Legal Solutions
www.veritext.com                                          888-391-3376
Case 3:23-cv-00818-JAG-DCK   Document 260-4   Filed 11/10/23   Page 7 of 28

1  when?

2     A    That would have been mid-2019 again, probably

3  July.

4     Q    Probably July.  Was it the July 26th purchase

5  that's described in the Complaint?

6     A    Again, I don't recall the exact date.  But to

7  the best of my knowledge, yes.

8     Q    Okay.  And we'll look at the Complaint again

9  in a little bit.  Sorry.  I got sidetracked.  We

10  were talking about your responsibilities as a class

11  representative.  Other than preparing for this

12  deposition, did you meet with your lawyers ever in

13  connection with this case?

14     A    Could you repeat that?

15     Q    Sure.  Other than your deposition prep that

16  you've been doing for the past couple of weeks, did

17  you ever meet with your lawyers to discuss this

18  case?

19     A    No.  There was the initial discussion in

20  2019, and then there was pre-deposition meetings.

21     Q    Prior to the deposition preparation, did you

22  review any filings related to this case?

23     A    Can you repeat the question again?

24     Q    Sure.  So other than your deposition meeting

25  and your deposition prep sessions, did you ever

1    Q   And at that address, there are two vending

2  machines; right?

3    A   Yes.

4    Q   One for snacks and one for beverages?

5    A   Yes.

6    Q   Which one did you make purchases from?

7    A   I would have used both.

8    Q   Other than the machines at your office, do

9  you know whether you've made purchases from any

10  other Compass vending machines?

11    A   No.

12    Q   Can you approximate how many purchases you

13  made from these two machines at your work?

14    A   A number, no.

15    Q   Would you say you made more than 50 purchases

16  since you started working there?

17    A   I couldn't give a total number.

18    Q   Can you estimate, give me a ballpark, more or

19  less than 100?

20    A   Less than 100.

21    Q   Less than 50?

22    A   That would be too fine grain for me to be

23  comfortable.

24    Q   Okay.  And what did you typically purchase

25  when you made purchases from those vending machines?

1    A    Could be cookies.  Could be water.  Either

2    kind of things.

3    Q    Okay.  How did you typically pay for those

4    purchases?

5    A    By credit card.

6    Q    Why use a credit card instead of cash?

7    A    It's much more convenient, and I don't always

8    carry cash.

9    Q    Me neither.  Fair enough.  Let's talk about

10   the credit card purchases, since that's what we're

11   here to talk about.  You're not sure when exactly

12   you made your first purchase from these machines;

13   right?

14   A    Yeah, not an exact date.

15   Q    Was it in 2017?

16   A    My estimate is yes.

17   Q    Typically, would you make a purchase once a

18   week from the vending machines?

19   A    My best guess of cadence would be I would

20   purchase it at least, say, per month --

21   Q    Once per month?

22   A    It could be once per month.  I can't -- I

23   might have bought in clusters as well.  So, again,

24   this is my best estimate of cadence.

25   Q    Sorry.  Your best estimate is that it was

1  once a month, or that it might have been different

2  depending on the month?

3      A    It might have been different depending on the

4  month, but average would be one month, estimate.

5      Q    Okay.  After Mr. Regus told you about the

6  fees -- actually, back up.  Did Mr. Regus tell you

7  how much more you were paying for a product over the

8  display price when he told you about fees in 2019?

9      A    I don't recall him giving me the amount that

10 I was paying over the display price.  I just

11 remember he said I was paying over.

12     Q    Do you know today how much you were being

13 charged over the display price?

14     A    Yes, ten cents.

15     Q    And do you recall generally when you learned

16 that it was ten cents more than the display price?

17     A    Yeah, the test case.

18     Q    The test case.  Okay.  And so after you

19 performed the test case, did you go back and talk to

20 Justin about what had happened?

21     A    I don't recall.

22     Q    Did you ever have any additional discussions

23 with Justin about the vending machines?

24     A    Justin asked, "How is the case going?"

25     Q    When did he do that?

1  the test case?

2      A    No.

3      Q    Did you help prepare any of the Complaints

4  that have been filed in your name against Compass?

5      A    No.  I provided information, like, bank

6  records.

7      Q    What bank records did you provide?

8      A    My own.

9      Q    Your own.  And when did you provide your bank

10  records to Counsel?

11      A    Mid-2019, and recently I provided further

12  records going back to 2017.

13      Q    So you provided a subset of records in 2019?

14      A    Yes.

15      Q    And do you know generally what the time range

16  of those records that you provided in 2019 were for?

17      A    I provided records for the test case, and I

18  provided an example, I think it would be early 2019,

19  where it was being charged before I even talked to

20  my lawyers or knew I was being overcharged.

21      Q    Okay.  So you provided records from prior to

22  finding out about the fee being charged and also the

23  records relating to your test case?

24      A    Yes.

25      Q    And those were the documents that you

1    provided in 2019?

2       A   Yes.

3       Q   And more recently, you provided additional

4    documents?

5       A   Yes.

6       Q   And those documents go back to how long?

7       A   2017.

8       Q   And to your knowledge, have you provided bank

9    records for all of your credit card purchases of --

10   from the vending machines?

11      A   No.  Because there could have been cases -- I

12   provided 2017 to 2019.  There could be purchases

13   after.

14      Q   Have you made a purchase from either of these

15   machines after August 2019?

16      A   Yes.

17      Q   You have?

18      A   Yes.

19      Q   Okay.  And were you asked to obtain the

20   documents from later purchases?

21      A   No.

22      Q   Could you get those bank records if you were

23   asked?

24      A   Yes.

25      Q   I am going to request those bank records.

Case 3:23-cv-00818-JAG-DCK   Document 260-4   Filed 11/10/23   Page 13 of 28

1    Q   But you recognize this as the initial

2   Complaint that was filed in 2019 on your behalf?

3    A   Yes.  I recognize the evidence I provided,

4   and I remember my lawyers showing me the Complaint.

5    Q   And so let's go to Paragraph 16.  Read that

6   paragraph to yourself and then let me know when I

7   can ask you a question.

8    A   Okay.  "On or about July 26, 2000- --

9    Q   Sorry.  You don't have to read it aloud.  I

10  was unclear.  I apologize.  Read it to yourself, and

11  let me know when I can ask you a question about its

12  contents.

13   A   Okay.  Okay.

14   Q   Okay.  So this paragraph discusses two

15  purchases that you made from the vending machines at

16  your work; right?

17   A   Yes.

18   Q   Are these the test purchases that you were

19  referring to earlier?

20   A   Yes.

21   Q   Okay.  And so at the time that you made these

22  purchases, you had already spoken to Justin Regus

23  about fees that were being applied to purchases made

24  with credit cards above the display price?

25   A   Yes.  I had already talked to him.

1    Q    So he had told you that additional fees were

2    being charged when you made a purchase with a credit

3    card from the vending machines?

4    A    Yes.

5    Q    And at the time that you made these test

6    purchases, you had already spoken with Mr. Cornfeld?

7    A    Yes.

8    Q    But you're not sure whether or not you had

9    signed an Agreement for Mr. Cornfeld to represent

10   you at the time of this test -- of these test

11   purchases?

12   A    Yeah.  I don't know the specifics on the

13   dates of when I signed the Agreement.

14   Q    So you don't know if the Agreement was signed

15   before you made these test purchases?

16   A    Correct.

17   Q    And do you see a reference to "1739 East

18   Holly"?

19   A    Yes.

20   Q    Did you provide that address to your lawyers?

21   A    Not that I know of.

22   Q    Did you provide them any address of -- that

23   related to where you were making purchases from

24   vending machines?

25   A    Not that I know of.

1     Q    Do you know where this address came from?

2     A    No.

3     Q    Okay.  Do you know if this is, in fact, the

4    address of your business, of your place of work?  I

5    apologize.

6     A    Yeah.  I know the place of work is on East

7    Holly.

8     Q    But do you know if 1739 is the number of the

9    address?

10    A    I know that in my pre-deposition, there was

11   an error on the address number.  So I believe it's

12   1730.

13    Q    Got it.  So 1739 East Holly is not the

14   correct address, and you know that it's 1730 East

15   Holly?

16    A    Yes.  I believe that was simply a typo.

17    Q    Okay.  Do you know why -- strike that.

18         This Complaint only discusses two purchases

19   that you made from the vending machines; right?

20         MR. JENKINS:  Objection.  Legal contention.

21         Go ahead.

22         THE WITNESS:  Can you repeat the question?

23   Sorry.

24         MS. MUELLER:  Sorry.  Can you repeat the

25   question?

1          (The record was read as follows:

2              "Question:   This Complaint only

3          discusses two purchases that you

4          made from the vending machines;

5          right?")

6          THE WITNESS:   I haven't read the full

7     Complaint, but within the context of this paragraph,

8     yes.

9     BY MS. MUELLER:

10        Q     Do you know why the purchases that you made

11    earlier in 2017, 2018, 2019 aren't included in this

12    Complaint?

13        A     No.   I didn't write the Complaint.

14        Q     And if you want to flip the page and take a

15    look at Paragraph 17 for me.

16        A     Okay.

17        Q     Paragraph 17 also describes the test

18    purchases; right?

19        A     Yes, to the best of my knowledge.

20        Q     And there's a box underneath Paragraph 17.

21    Do you know what that is, what the image is?

22        A     Yes.   Those are selections from my credit

23    card records.

24        Q     And so the first line in that image says

25    "August 14, 2019, Canteen L.A." and then has a phone

1    Q    Those are the test purchases?

2    A    Yes.

3    Q    This Complaint does not mention purchases

4  that you made prior to your discussion with Justin

5  Regus; right?

6         MR. JENKINS:  Objection.  Legal contention.

7         Go ahead.

8         THE WITNESS:  I don't know the full scope of

9  the Complaint.  I only -- I recognize this area.

10 But there's other areas of this Complaint --

11 BY MS. MUELLER:

12    Q    I'm asking about these paragraphs.

13    A    Okay.  Yeah, it doesn't include those.

14    Q    And it doesn't include any information about

15 purchases you made after August 14th, 2019; right?

16    A    Not that I see.

17    Q    Okay.  Do you know what remedies are being

18 sought in this Complaint?

19    A    No.

20    Q    Do you know if Defendants have filed any

21 motions in this litigation?

22    A    No.

23    Q    Do you know if Defendants filed one or more

24 motions to dismiss this action?

25    A    No.

1       THE WITNESS:  When you say -- owed to me

2  personally?  Or --

3  BY MS. MUELLER:

4       Q    Let's start there.

5       A    Okay.  I would say at minimum, I'm owed the

6  misrepresentation.  I think, you know, this is for a

7  judge to decide what would be the additional damages

8  to discourage this kind of behavior in the future.

9  But I would say at minimum, it's the monetary -- the

10  misrepresented amount, the ten cents per purchase.

11  But I would say there's more damages that are due.

12       Q    And what are those additional or "more

13  damages" that are due?

14       A    I would say it should be proportional to, you

15  know, the amount that the company made, and a judge

16  can look at that.  I don't know the numbers of how

17  much the company was able to make from these

18  misrepresentations.

19       Q    Would knowing that you were paying ten cents

20  more for the ability to use your credit card

21  dissuade you from using the vending machines?

22       A    No.  The ten cents was not a large number.

23       Q    And you said you did continue to make

24  purchases from the vending machines after you knew

25  about the charge?

1    A    Correct.

2    Q    Let's look at another document.  This is

3    Jilek Exhibit 9.

4         (Exhibit 9 was marked for

5         identification.)

6    BY MS. MUELLER:

7    Q    And I will represent to you that it is a

8    document that was produced by the Plaintiffs in

9    connection with this lawsuit.

10        Do you see about two-thirds of the way down

11   the picture, there is a sticker that says,

12        "The prices displayed on this machine are ten

13        cents lower than the retail price and are

14        available on cash purchases only"?

15   A    Yes.

16   Q    Do you recall seeing a sticker like that on

17   the machines at your workplace?

18        MR. JENKINS:  Objection.  Vague.

19        Go ahead.

20        THE WITNESS:  Can you clarify when?

21   BY MS. MUELLER:

22   Q    Well, let's start with ever.  Have you ever

23   seen a sticker like that at the vending machines at

24   your workplace?

25   A    Okay.  I don't recall ever seeing a sticker

1    Q   Did he ever tell you whether he was

2  considering filing a Complaint?

3    A   No.

4    Q   Why do you think Mr. Regus gave you his

5  contact information for Mr. Cornfeld?

6    A   I do not know.  I know that he told me about

7  the -- that I was -- that -- the mistake in

8  advertising the charges or the intentional error.

9  And I know he gave me Mr. Cornfeld's reference, and

10  that's it.

11    Q   Do you know if Mr. Regus spoke to

12  Mr. Cornfeld?

13    A   I don't know.

14    Q   Why did you tell your two coworkers about the

15  ten cent charge?

16    A   Simply to make them aware of the charge.

17    Q   Okay.  Let's flip to Jilek 15.

18       Okay.  This is -- this reflects a purchase

19  that you made from the vending machines on July 26,

20  2019.  Is that right?

21    A   Yes.

22    Q   This is one of the test purchases?

23    A   Yes, I believe so.

24    Q   And this purchase was made after you were

25  told by Mr. Regus that the machines were charging

1  ten cents for the privilege of using a credit card?

2    A   Yes.

3    Q   Okay.  So at the time you made this purchase,

4  you knew that you were going to be charged ten cents

5  more than the price listed?

6    A   Correct.

7    Q   Let's take a look at Jilek 16.

8       What is shown on this page?

9    A   This could just be a regular purchase, not

10  related to the test case.

11    Q   Previously, you told me that you made two

12  test purchases; right?  One on July 26th and the

13  other on August 14th?

14    A   Yes.

15    Q   And so this is a bank record from

16  August 14th --

17    A   Yes, yes.  Sorry.

18       MR. JENKINS:  Let her finish.  Sorry to

19  interrupt you.

20       THE WITNESS:  Okay.

21  BY MS. MUELLER:

22    Q   So it's really difficult.  I totally

23  understand.  So this is a -- this document reflects

24  the purchase that you made at the vending machine on

25  August 14th; right?

Case 3:23-cv-00818-JAG-DCK   Document 260-4   Filed 11/10/23   Page 22 of 28

1     A   Yes.   So August 14th, yes.   That was one of

2   the test cases.   So this would be test-case related.

3   Sorry.

4     Q   And you knew on August 14th when you made

5   this purchase that you would be charged ten cents

6   for using your credit card?

7     A   Yes.

8     Q   I could ask you about every purchase in this

9   document, or I can ask you this question:   Do the

10  first 18 pages of this document reflect only

11  purchases made from the vending machine at your

12  place of work from the period of December 31st, 2018

13  through August 14th, 2019?

14    A   Yeah.

15    Q   But it doesn't reflect all of the purchases

16  that you've made from the vending machine ever;

17  right?

18    A   Correct.

19    Q   And you have since produced records dating

20  back to 2017?

21    A   Yes.

22    Q   But you have additional records that you have

23  not yet produced that post-date August 2019;

24  correct?

25    A   Yes.

1  identification of people.  I know people would use

2  it.

3     Q   You know people use it.  Do you know whether

4  anyone -- do you know -- sorry.  Let me try that

5  again.

6        After you saw anyone use the machine since

7  you learned about the ten cents charge, did you

8  alert anyone that you saw using the machine about

9  the charge?

10     A   I alerted people in the office space about

11  the charge.

12     Q   Which people?

13     A   They could be coworkers or just office mates.

14  Again, this was a co-working space, so I had people

15  from my job here to a general cohort of people.

16     Q   Do you have an estimate as to how many people

17  you have told?

18     A   Less than ten.

19     Q   But more than two?

20     A   More than two.  Five is a guess.

21     Q   And generally, what would you tell them?

22     A   I would -- it would be very simple.  I would

23  just tell them "the machine is overcharging."

24     Q   Did anyone -- or what were the reactions of

25  people that you would tell this information to?

```
 1      A    Very rough estimate, 50, say.
 2      Q    And you think that you've told or spoken to
 3    approximately ten of those 50 people about the
 4    charge?
 5      A    Closer to five.
 6      Q    Closer to five.  Sorry.  Okay.  Once you
 7    learned of the credit card ten cent charge, did you
 8    report it to anyone in your co-working space, the
 9    owner of the space or anyone else?
10      A    No.
11      Q    Take a look at Jilek 22, please.  It's the
12    last page in this document.  Do you see the -- in
13    the picture, it says "World Wide Vending, For
14    Service Call," and it lists a number there?
15      A    Uh-huh.
16      Q    Sorry.  "Yes" or -- we have to -- it's really
17    tough to remember, but we have to try to say "yes"
18    or "no" best we can.
19      A    "Yes."
20      Q    Did you ever call that number to inquire
21    about the ten cent charge?
22      A    No.
23      Q    Did you ever try to contact Compass any other
24    way about the charge?
25      A    No.
```

1    Q    And you see that there's an e-mail below that

2    number; right?

3    A    Yes.

4    Q    Did you ever send an e-mail to that e-mail

5    address?

6    A    No.

7    Q    Were you -- why didn't you reach out to

8    Compass?

9    A    One, I have never reached out to a vending

10   machine phone number, ever.  I've been mischarged

11   before, and I never reach out.  And, of course, I

12   knew the lawsuit was ongoing.

13   Q    You said you have been mischarged before.

14   What do you mean by that?

15   A    So nothing to do with Compass, but, for

16   example, there's vending machines in an old

17   apartment I had, and I put money in, didn't get an

18   item and didn't report it.

19   Q    Understood.  Are you aware of any other

20   vending machines that charged you an extra amount to

21   use your credit card?

22   A    No.

23   Q    Okay.  If you had to provide an estimate, how

24   many purchases do you think you made after the test

25   purchases to present day, from the vending machines

1   at your co-working space?

2       A    Difficult to estimate, because it wouldn't

3   have been continuous.    But ten.

4       Q    And do you think those purchases are

5   episodic, like, you -- I think you told me your

6   early purchases were?   Some months you would make

7   more purchases and other months you would make none?

8       A    Yes.

9       Q    Okay.   I'm going to introduce another

10  document.   This one is Jilek Exhibit 6.

11          (Exhibit 6 was marked for

12          identification.)

13  BY MS. MUELLER:

14      Q    And I will represent to you that it is the

15  first Supplemental Answers and Objections to

16  interrogatories that Compass directed to you.

17          So take a look at this document.   These are

18  the "First Supplemental Answers and Objections to

19  Defendant's First Interrogatories" that were

20  submitted on your behalf.   And if you look at

21  Page 6, you will see that it's dated "April 13,

22  2022."

23      A    Okay.

24      Q    Mr. Jilek, are you familiar with the term

25  "interrogatory"?

1      I, the undersigned, a Certified Shorthand

2  Reporter of the State of California, do hereby

3  certify:

4      That the foregoing proceedings were taken

5  before me at the time and place herein set forth;

6  that any witnesses in the foregoing proceedings,

7  prior to testifying, were administered an oath; that

8  a record of the proceedings was made by me using

9  machine shorthand which was thereafter transcribed

10  under my direction; that the foregoing transcript is

11  a true record of the testimony given.

12      Further, that if the foregoing pertains to

13  the original transcript of a deposition in a Federal

14  Case, before completion of the proceedings, review

15  of the transcript {X} was { } was not requested.

16      I further certify I am neither financially

17  interested in the action nor a relative or employee

18  of any attorney or party to this action.

19      IN WITNESS WHEREOF, I have this date

20  subscribed my name.

21  Dated:  Mary 25, 2023

22

23

JILL GLANTZ

24  CSR No. 11341

25