# Exhibit E

1                UNITED STATES DISTRICT COURT

2                  EASTERN DISTRICT OF MISSOURI

3                      EASTERN DIVISION

4

5    GEORGE MOORE, VIRGINIA

     CARTER, JAMES JILEK, FRANCIS

6    JAYE, and SEAN MADELMAYER,

     etc.,

7

         Plaintiffs,

8

     vs.                        No. 4:18-CV-01962-SEP

9

     COMPASS GROUP USA, INC., dba

10   CANTEEN,

11       Defendant.

     _____/

12

13

14        Videotaped Videoconference Deposition of

15                   JUSTIN REGUS

16            Wednesday, September 13, 2023

17

18

19

20   Reported via videoconference by:

     JODIE BARRINGER MYERS, CSR No. 3820

21   No.:  6095937

22

23

24

25

1    Q.      Do you know the name of the company that

2    operates the co-working space?

3    A.      The co-working space is called Bizhaus, which

4    is spelled Bizhaus.

5    Q.      Mr. Regus, before we get started, I know          01:07

6    you're an old hand at depositions, but I'd like to

7    remind you of some ground rules.

8           As you know, the court reporter is making a

9    stenographic record of the proceeding.  To make her

10   life easier, if I could ask you to speak clearly and    01:08

11   to let everyone finish their answer or their questions

12   and objections before you speak.

13          Also, I ask that you answer verbally rather

14   than with nods or hand gestures.

15          Do you understand?                                01:08

16   A.      I understand.

17   Q.      Mr. Regus, are you represented by counsel in

18   connection with this deposition?

19   A.      I am not.

20   Q.      Are you -- prior to this deposition, were you    01:08

21   acquainted with Rick Cornfeld?

22   A.      Yes.

23   Q.      And how long have you known Mr. Cornfeld?

24   A.      I think I may have known him since maybe

25   around 2017.  Sometime prior to COVID for sure.         01:08

Case 3:23-cv-00818-JAG-DCK    Document 260-5    Filed 11/10/23    Page 3 of 11

1  Q.      And in what context did you become acquainted

2  with Mr. Cornfeld?

3  A.      I was an expert witness hired by Mr. Cornfeld

4  for one of his cases.

5  Q.      And which case was that?                          01:09

6  A.      That would have been the Hertz, Hertz case.

7  Q.      Do you remember the plaintiff's name in that

8  case?

9  A.      I don't remember.

10  Q.      What was that case about?                         01:09

11  A.      That was a case that had to do with some fees

12  charged by Hertz, rental car fees.

13  Q.      And what was the nature of your engagement in

14  that case?

15  A.      So I performed some analyses to quantify the     01:10

16  amount of the fees that consumers had paid to Hertz

17  over some period of time.

18  Q.      And did you provide testimony in that case?

19  A.      I did.

20  Q.      Deposition testimony?                             01:10

21  A.      That's right.

22  Q.      Any evidentiary hearing testimony?

23  A.      Can you clarify what you mean by that?

24  Q.      Trial testimony?

25  A.      No.                                               01:10

1    and better prices.  So I would generally just walk

2    over there.

3    Q.      Okay.  And the occasions when you would use

4    the vending machine, how would you pay?

5    A.      Yeah.  So I think that would vary, depending        01:19

6    on the time.  But there were certainly times where I

7    would use cash, and certain times where I would use a

8    credit card.

9    Q.      Any particular reason why you would use one

10   or the other?                                              01:20

11   A.      Yeah.  The machines didn't always work in

12   both methods.  Sometimes one or the other method would

13   not -- would be down.  And then once I had observed

14   that I was getting charged a fee for using my credit

15   card, I would try to avoid ever doing that again.          01:20

16   Q.      And you said try to avoid.  Have you made

17   purchases at the credit -- or at the vending machines

18   with a credit card after discovering that it would

19   charge more for a credit card transaction?

20   A.      I know that I did on at least one occasion,        01:20

21   when I was trying to -- trying to kind of -- what is

22   it called -- recreate that process, so I could

23   describe it to Mr. Cornfeld's colleague.

24   Q.      And who are you referring to as

25   Mr. Cornfeld's colleague?                                  01:21

Case 3:23-cv-00818-JAG-DCK    Document 260-5    Filed 11/10/23    Page 5 of 11

1    A.        His first name is Daniel.

2    Q.        Go ahead.

3    A.        Oh, I was going to say, he was the recipient

4    of the emails, in the exchange I sent over to you.

5    Q.        Okay.  You're about a couple questions ahead        01:21

6    of me.  But we'll get there shortly.

7              Other than the one occasion you said you were

8    trying to recreate the process, have you used a credit

9    card at the vending machines at that location, after

10   the time at which you learned that it would charge        01:21

11   more for credit cards than for a cash transaction?

12   A.        I don't recall if I did or not.  I know my

13   daughter would come in here asking for things, and I

14   would look for cash, or I would try to dissuade her

15   from using it.  I am not sure.  I can't remember a        01:22

16   specific time where I used my credit card after that.

17   Q.        Prior to that recreated process transaction,

18   are you able to quantify how many times you used the

19   credit card or used the vending machines, paying with

20   a credit card?        01:22

21   A.        No.

22   Q.        Do you regularly -- or strike that.

23              Do you make it a practice to review credit

24   card statements to check prices?

25   A.        I do typically review my credit card        01:23

1  oh, yeah, I just paid one of those fees.  Or I just --

2  that just happened to me.  And so I knew exactly what

3  he was talking about.

4      And I explained that the machine here, at

5  Bizhaus, did exactly what he was describing.                01:29

6  Q.      Okay.  And what else did the two of you

7  discuss on this topic at that time?

8  A.      Yeah.  So probably what is reflected in this

9  email here.  That, you know, that I would check for

10 signs and see if anyone else -- see if anyone in the         01:29

11 building would be -- or who had been charged extra

12 would be open to talking with us, with them, about

13 that.

14 Q.      And you agreed to do that?

15 A.      That's right.                                        01:30

16 Q.      Why did you agree to do that?

17 A.      Yeah.  I guess when I paid that extra fee or

18 when I was charged more than what the posted price

19 was, you know, I thought that was kind of wrong.  And

20 so when Mr. Cornfeld said he was working on a case          01:30

21 involving that, I thought the right thing to do would

22 be to help out, if I could.

23 Q.      And prior to speaking with Mr. Cornfeld about

24 this issue, had you spoken with anybody at Bizhaus

25 about it?                                                    01:30

1   A.        I'm not sure, not that I can recall.  I guess

2   I really don't recall one way or the other on that.

3   Q.        So it's possible, but you don't remember?

4   A.        That's right.

5   Q.        So was the idea that you would be trying to          01:31

6   find individuals for Mr. Cornfeld who would be willing

7   to serve as plaintiffs in a potential action?

8   A.        Can you repeat that?

9             MR. WYLIE:  Can the court reporter read it

10  back?                                                          01:32

11                  (Record read.)

12            THE WITNESS:  Yeah.  I guess that would be my

13  understanding.

14        If you look at what Mr. Levy says, it doesn't

15  go as far as to say potential plaintiffs.  It just             01:32

16  says, people who are willing to talk with them.

17        But yeah, you know, I think from my, you

18  know, non-attorney understanding, that was generally

19  the idea.

20  Q.        MR. WYLIE:  And at the time you had your              01:32

21  initial discussion with Mr. Cornfeld, did you know

22  what company operated the vending machines at Bizhaus?

23  A.        No.

24  Q.        You didn't recall what the credit card

25  statement said in terms of the price -- or excuse me          01:32

1   -- in terms of the vendor?

2   A.      No.

3   Q.      But you do recall that you discovered this by

4   looking at your credit card statement?

5   A.      No.  I discovered it by looking at the          01:32

6   machine.  When I had -- when I had made my purchase,

7   you know, I used my credit card, and I was watching

8   the machine as it said, you know, something like

9   "Processing."

10         And then -- and I was waiting to see, first      01:33

11  of all, would the charge go through; and secondly,

12  would the item actually drop off the coil and down

13  into the basket where I could get it.

14         And as I was watching, you know -- and I

15  don't -- I don't know what it is that I bought at this  01:33

16  time.  But let's say it was -- the price was a dollar

17  50.  When it came to the end of the transaction, it

18  said 'You've been charged a dollar 60,' or a dollar

19  65, or whatever it was.  And so that -- so it was

20  actually on the machine itself.                         01:33

21         It wasn't on the credit card statement, that

22  I learned that I had been charged more than what the

23  price was on the item.

24  Q.      Um, did Mr. Cornfeld ask you if you would be

25  willing to serve as a plaintiff in an action over this  01:34

1  Q.      Do you recall anything else about your

2  conversation with him?

3  A.      I am not sure.  I don't recall specifically.

4  No.

5  Q.      Scroll up to I believe the next email.  This      01:42

6  is on page 14 of Exhibit 1.  It's an email from

7  Mr. Levy to you, also on June 20th, 2019.  I want to

8  just ask you about the second paragraph.

9          It says, "In terms of moving forward, if

10 you're able to ask around in your building and find      01:42

11 others who this happened to, could you then let us

12 know of anyone who is open to talking with us about it

13 / potentially bringing a lawsuit?  Then, after we have

14 any specific individuals to talk to, we can coordinate

15 setting up calls with them.                              01:42

16          "Thanks again for your help.  We really

17 appreciate it."

18          After this email, did you speak with anyone

19 at your office about the credit card pricing issue at

20 the vending machines?                                    01:43

21 A.      I did.

22 Q.      How many people did you speak with?

23 A.      At least three.  Potentially more.  I'm not

24 sure.

25 Q.      And when you say potentially more, do you       01:43

1                    REPORTER'S CERTIFICATE

2

3       I certify that the foregoing proceedings in the

4   within-entitled cause were reported at the time and place

5   therein named; that said proceedings were reported by me,

6   a duly Certified Shorthand Reporter of the State of

7   California, and were thereafter transcribed into

8   typewriting.

9       I further certify that I am not of counsel or

10  attorney for either or any of the parties to said cause

11  of action, nor in any way interested in the outcome of

12  the cause named in said cause of action.

13      IN WITNESS WHEREOF, I have hereunto set my hand this

14  22nd day of September, 2023.

15

16

    _____

17      JODIE BARRINGER MYERS

        California CSR No. 3820

18

19

20

21

22

23

24

25

Veritext Legal Solutions
www.veritext.com                                                   888-391-3376
Case 3:23-cv-00818-JAG-DCK    Document 260-5    Filed 11/10/23    Page 11 of 11