**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | | |
|---|---|---|
| JAMES JILEK, et al., on behalf of himself and all others similarly situated, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 3:23-cv-00818-RJC DCK |
| COMPASS GROUP USA, INC., d/b/a CANTEEN, | ) ) ) | |
| Defendant. | ) ) | |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

# TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................ 1

II.    STATEMENT OF PROCEEDINGS .................................................................. 3

III.   STATEMENT OF FACTS .................................................................................. 9

   A.   Compass' Survey of Machines ...................................................................... 9

   B.   Plaintiffs' Prima Facie Case ........................................................................ 12

      1.   Existence of a contract .......................................................................... 12

      2.   The Purchasers' Performance of the Contract ...................................... 14

      3.   Compass' Breach of the Contract .......................................................... 14

      4.   Damage Resulting from the Breach ....................................................... 15

   C.   "Voluntary Payment" Evidence ................................................................... 15

      1.   James Jilek ............................................................................................. 16

      2.   Virginia Carter ...................................................................................... 16

      3.   George Moore ........................................................................................ 17

      4.   Justin Regus ........................................................................................... 17

      5.   Brian Baldwin ........................................................................................ 18

      6.   Andres Borrero ...................................................................................... 18

   D.   Classwide Damages ..................................................................................... 18

      1.   Brian Kriegler's Initial Reports ............................................................ 19

      2.   David Kalat's Report ............................................................................. 20

      3.   Dr. Kriegler's Second Supplemental Report ......................................... 21

IV.    CLASS DEFINITIONS .................................................................................... 23

V.     LEGAL STANDARD ....................................................................................... 23

VI.    ARGUMENT .................................................................................................... 24

A.    The Class is Ascertainable ................................................................................ 24

B.    Rule 23(a) Requirements Are Satisfied ........................................................... 29

    1.    Numerosity ................................................................................................. 29

    2.    Commonality ............................................................................................... 29

        a.    Common Legal Questions ................................................................... 30

        b.    Common Factual Questions ................................................................ 30

        c.    California, Florida and South Carolina Subclasses............................. 31

    3.    Typicality ................................................................................................... 31

    4.    Adequacy of Representation ...................................................................... 32

C.    The Requirements of Rule 23(b)(3) Are Satisfied .......................................... 33

    1.    Predominance ............................................................................................. 33

        a.    Affirmative defenses ......................................................................... 33

            i.    Voluntary Payment Doctrine ................................................... 33

            ii.    Statute of Limitations ............................................................... 35

        b.    Damages ............................................................................................. 36

    2.    Superiority .................................................................................................. 38

D.    Plaintiffs Should be Appointed Class Representatives and Plaintiffs' Counsel Should Be Appointed Class Counsel .................................................................... 39

VII.    CONCLUSION ................................................................................................. 40

## **TABLE OF AUTHORITIES**

**Cases**

*1988 Tr. for Allen Children v. Banner Life Ins. Co.*,
    28 F.4th 513 (4th Cir. 2022) ......................................................................... 32

*Ackerman v. Coca-Cola Co.*,
    2013 U.S. Dist. LEXIS 184232 (E.D.N.Y. July 17, 2013*)* ....................................... 35

*Amchem Prod., Inc. v. Windsor*,
    521 U.S. 591(1997)......................................................................................... 32

*Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*,
    568 U.S. 455 (2013).................................................................................. 24, 31

*Bakov v. Consol. World Travel, Inc.*,
    2019 U.S. Dist. LEXIS 46510 (N.D. Ill. Mar. 21, 2019)......................................... 27

*Briseno v. ConAgra Foods, Inc.*,
    844 F.3d 1121 (9th Cir. 2017) ............................................................................ 28

*Carnegie v. Household Int'l, Inc.*,
    376 F.3d 656 (7th Cir. 2004) .............................................................................. 38

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013)........................................................................... 31, 37, 38

*Cox v. Porsche Fin. Servs.*,
    330 F.R.D. 322 (S.D. Fla. 2019)......................................................................... 35

*Deiter v. Microsoft Corp.*,
    436 F.3d 461 (4th Cir. 2006) ............................................................................. 32

*Donovan v. Philip Morris USA, Inc.*,
    2012 U.S. Dist. LEXIS 37974 (D. Mass. Mar. 21, 2012).......................................... 27

*Dupler v. Costco Wholesale Corp.*,
    249 F.R.D. 29 (E.D.N.Y. 2008) .......................................................................... 35

*Edwards v. CSXT Transp., Inc.*,
    338 F.R.D. 590 (E.D.N.C. 2021) ........................................................................ 13

*EQT Prod. Co. v. Adair*,
    764 F.3d 347 (4th Cir. 2014) .................................................................. 23, 25, 29

Case 3:23-cv-00818-JAG-DCK    Document 293-1    Filed 03/08/24    Page 4 of 50

*Erica P. John Fund, Inc. v. Halliburton Co.*,
    563 U.S. 804 (2011) ................................................................ 33

*Gen. Tel. Co. v. Falcon*,
    457 U.S. 147 (1982) ................................................................ 32

*Glover v. EQT Corp.*,
    2023 U.S. Dist. LEXIS 154309 (N.D.W. Va. Aug. 31, 2023) ................................ 38

*Goldemberg v. Johnson & Johnson Consumer Cos.*,
    317 F.R.D. 374 (S.D.N.Y. 2016) ................................................ 27

*Gunnells v. Healthplan Servs., Inc.*,
    348 F.3d 417 (4th Cir. 2003) .............................................. 34, 37

*Hasemann v. Gerber Prods. Co.*,
    331 F.R.D. 239 (E.D.N.Y. 2019) ................................................ 27

*Head v. Citibank, N.A.*,
    340 F.R.D. 145 (D. Ariz. 2022) ................................................ 27

*In re Bank of Am. Corp. Sec. Litig.*,
    2015 U.S. Dist. LEXIS 69550 (E.D. Mo. May 29, 2015) ................................ 40

*In re Delta/AirTran Baggage Fee Antitrust Litig.*,
    317 F.R.D. 675 (N.D. Ga. 2016) ................................................ 26

*In re Dial Complete Mktg. & Sales Practices Litig.*,
    312 F.R.D. 36 (D.N.H. 2016) ................................................ 27

*In re Dollar General Corp. Motor Oil Mktg. & Sales Practices Litig.*,
    2019 U.S. Dist. LEXIS 58082 (W.D. Mo. Mar. 21, 2019) ................................ 26

*In re Marriott Int'l Customer Data Sec. Breach Litig.*,
    345 F.R.D. 137 (D. Md. 2023) ................................................ 24

*In re Marriott Int'l, Inc.*,
    341 F.R.D. 128 (D. Md. 2022) ................................................ passim

*In re Marriott Int'l, Inc.*,
    78 F.4th 677 (4th Cir. 2023) ................................................ 24

*In re Nexium Antitrust Litig.*,
    777 F.3d 9, 20 (1st Cir. 2015) ................................................ 27

iv

*In re Pfa Ins. Mktg. Litig.*,
   2021 U.S. Dist. LEXIS 244526 (N.D. Cal. Nov. 3, 2021)......................................... 27

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
   292 F. Supp. 3d 14 (D.D.C. 2017) ................................................................ 38

*In re Simply Orange Orange Juice Mktg. & Sales Practices Litig.*,
   2017 U.S. Dist. LEXIS 114806 (W.D. Mo. July 24, 2017)......................................... 27

*In re TD Bank, N.A. Debit Card Overdraft Fee Litig.*,
   325 F.R.D. 136 (D.S.C. 2018) ..................................................................... 38

*In re Visa Check/MasterMoney Antitrust Litig.*,
   280 F.3d 124 (2d Cir. 2001)......................................................................... 39

*Jonathan R. v. Just.*,
   344 F.R.D. 294 (S.D.W. Va. 2023)................................................................ 29

*Kay Co., LLC v. EQT*,
   2017 U.S. Dist. LEXIS 228275 (N.D.W. Va. Sep. 6, 2017)...................................... 37

*Kimber Baldwin Designs, LLC v. Silv Communs., Inc.*,
   2016 U.S. Dist. LEXIS 173481 (S.D. Ohio Dec. 15, 2016) .................................... 35

*Krakauer v. Dish Network L.L.C.*,
   925 F.3d 643 (4th Cir. 2019) ................................................................ 25, 26

*McAllister v. St. Louis Rams, LLC*,
   2018 WL 1299553 (E.D. Mo. Mar. 13, 2018) ................................................. 28

*McCrary v. Elations Co., LLC*,
   2014 U.S. Dist. LEXIS 8443 (C.D. Cal. Jan. 13, 2014) ........................................ 27

*Morales v. Kraft Foods Grp., Inc.*,
   2015 U.S. Dist. LEXIS 177918 (C.D. Cal. June 23, 2015) .................................... 29

*Mr. Dee's Inc. v. Inmar, Inc.*,
   2021 U.S. Dist. LEXIS 176176 (M.D.N.C. Sep. 16, 2021)....................................... 37

*Mullins v. Direct Dig., LLC*,
   795 F.3d 654 (7th Cir. 2015) ................................................................ 26, 28

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
   31 F.4th 651 (9th Cir. 2022) ................................................................... 31

v

*Peters v. Aetna Inc.*,
   2 F.4th 199 (4th Cir. 2021) ........................................................................... 26

*Piron v. Gen. Dynamics Info. Tech., Inc.*
   2022 U.S. Dist. LEXIS 21926 (E.D. Va. Feb. 7, 2022) ................................... 38

*Robinson v. Nationstar Mortg. LLC*,
   2019 U.S. Dist. LEXIS 153526 (D. Md. Sep. 9, 2019) ................................... 37

*S. Power Co. v. Cleveland Cty.*,
   24 F.4th 258 (4th Cir. 2022) ...................................................................... 1, 12

*Smith v. Kan. Orthopaedic Ctr., P.A.*,
   49 Kan. App. 2d 812 (2013) ........................................................................... 12

*Soutter v. Equifax Info. Servs., LLC*,
   307 F.R.D. 183 (E.D. Va. 2015) ............................................................... passim

*Spotswood v. Hertz Corp.*,
   2019 U.S. Dist. LEXIS 20536 (D. Md. Feb. 7, 2019) ................................ 25, 27

*Steigerwald v. BHH, LLC*,
   2016 U.S. Dist. LEXIS 21116 (N.D. Ohio Feb. 22, 2016) .............................. 27

*Thorn v. Jefferson-Pilot Life Ins. Co.*,
   445 F.3d 311 (4th Cir. 2006) ......................................................................... 38

*Tyson Foods, Inc. v. Bouaphakeo*,
   577 U.S. 442 (2016) ........................................................................... 3, 33, 34

*Underwood v. Kohl's Dep't Stores, Inc.*,
   2017 U.S. Dist. LEXIS 186927 (E.D. Pa. Nov. 13, 2017) .............................. 35

*Van v. LLR, Inc.*,
   61 F.4th 1053 (9th Cir. 2023) ......................................................................... 35

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011) ................................................................................ 24, 29

*Whitton v. Deffenbaugh Disposal, Inc.*,
   2014 U.S. Dist. LEXIS 153405 (D. Kan. Oct. 28, 2014) ................................ 35

*Williams v. Martorello*,
   59 F.4th 68 (4th Cir. 2023) ............................................................................ 31

vi

**Statutes**

N.C. Gen. Stat. § 25-2-725 ........................................................................ 36

**Rules**

Fed. R. Civ. P. 23(a) ................................................................... 2, 23, 29

Fed. R. Civ. P. 23(a)(2) .................................................................... 29

Fed. R. Civ. P. 23(a)(3) .................................................................... 31

Fed. R. Civ. P. 23(b) .................................................................. 23, 30

Fed. R. Civ. P. 23(b)(3) ............................................................... passim

Fed. R. Civ. P. 23(g)(1) .................................................................... 39

Fed. R. Civ. P. 23(g)(1)(B) ................................................................ 40

**Other Authorities**

2 W. Rubenstein, Newberg on Class Actions § 4:55) (6th ed. November 2023 update) .............. 34

2 W. Rubenstein, Newberg on Class Actions § 4:72) (6th ed. November 2023 update) .............. 39

7AA C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure §1778 (3d ed. 2005) ... 33

# I.    INTRODUCTION

This is a classic case for a class action. Plaintiffs brought this litigation because of the widespread practice of Compass Group USA ("Compass") in charging customers' credit, debit or prepaid cards ("cards") ten cents more than the displayed prices for items it sold from its vending machines, without informing purchasers of that extra charge. Although an extra ten cents may not seem like much, the total of these upcharges for all Class members during the class period comes to nearly $10 million according to *Defendant's* expert David Kalat, who calculated the Class's damages as $9,997,193 (not counting prejudgment interest). Plaintiffs' expert, Brian Kriegler, Ph.D., who included a small category omitted by Mr. Kalat, as well as prejudgment interest, calculated damages as approximately $13.8 million.

The three Plaintiffs seek to represent a nationwide class and California, Florida and South Carolina subclasses consisting of consumers who used cards to purchase items from vending machines of Canteen (Defendant's trade name) that had no labeling or other display informing them that they would be charged more than the exhibited price and were nevertheless charged more than that.[1]

Plaintiffs seek class certification on one claim, breach of a unilateral contract. As opposed to a bilateral contract, "the defining feature of a unilateral contract is that 'it is accepted by performance,' rather than a promise to perform." *S. Power Co. v. Cleveland Cty.*, 24 F.4th 258, 263 (4th Cir. 2022) (citation omitted). Here, Compass offered to sell items at the displayed price from its "two-tier cashless" vending machines.[2] Purchasers accepted the offer with their

---

[1] Compass calls that labeling a "cash discount sticker" because of its position that the posted price represents a discount for paying with cash. It is also sometimes called a "two-tier sticker" (or label), in recognition of the fact that the machines sold products in two price tiers, cash and cards.

[2] A "cashless vending machine" has a card reader allowing a customer to use a card instead of cash. Ex. A, Doc. 257-3 (Goldring Tr. Vol. 1), 21:11–22. A "two-tier cashless vending machine" is one with "a 10-cent lower price for the use of cash." *Id.* at p. 22:1-4. Sometimes, it is simply referred to as a "cashless" or "two-tier" machine.

performance, *i.e.*, by using a card for payment. But Compass breached the contract by charging the purchasers' cards ten cents more than the displayed price. To result in approximately $10 million in damages at ten cents a purchase, these identical transactions occurred approximately 100 million times. And the elements of this cause of action are substantially the same in each of the 33 states where Compass has machines. As shown below, every element to make out a prima facie case for such a breach of unilateral contract presents a common question of fact. Thus, the commonality element (as well as other elements) of Fed. R. Civ. P. 23(a) are easily met.

Nevertheless, Plaintiffs anticipate that Compass will argue that Rule 23's implicit requirement that class membership be ascertainable is absent. But purchasers can establish their class membership either with their credit-card or banking records or with self-identifying affidavits, a practice approved in similar cases in this Circuit and others.

Compass will also likely argue that the predominance element of Rule 23(b)(3) is absent because – or so it will argue – common questions do not outweigh individual questions in that some Class members may have bought items with cards knowing about the surcharge. This is the subject of Compass' Sixth Affirmative Defense. *See* Compass Group USA, Inc.'s Answer to Plaintiff's Amended Consolidated Class Action Complaint ("Answer"), Doc. # 193, at 104. However, after five-and-a-half years of litigation, Compass has not shown that any Class member's *first* card purchase from an unlabeled machine was made with knowledge of the surcharge. At most – and there's no evidence that this was anything but rare – some Class members may have *subsequently* bought an item after discovering the surcharge. But this Affirmative Defense – under what is commonly called the "voluntary payment" doctrine – cannot defeat predominance for two reasons. First, a class may be certified based on common questions "even though other important matters will have to be tried separately, such as damages

2

or some affirmative defenses peculiar to some individual class members." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016)) (citation omitted). That is especially the case where the defendant has proffered no evidence to show that any class member's claim is barred by the defense, as several courts have held. And to the extent that Class members made an initial card purchase (or purchases) unknowingly and *later* learned of the surcharge before making a subsequent card purchase, that only goes to damages. They have a cause of action for breach of a unilateral contract, with the voluntary-payment doctrine limiting their damages. However, those individual damages questions likewise do not prevent the Class from being certified.

For these reasons, as shown more fully below, the Court should certify the Class and Subclass Plaintiffs seek to represent, appoint Plaintiffs as Class and Subclass Representatives and name undersigned counsel as Class Counsel.

## II.   STATEMENT OF PROCEEDINGS

This nearly five-and-a-half-year-old litigation was initiated by former Plaintiff George Moore, a resident of Missouri, in the Circuit Court for the City of St. Louis on October 23, 2018. Plaintiff's Class Action Petition, Doc. # 4. After Compass removed the case to the Eastern District of Missouri, it filed its Answer on November 28, 2018. Doc. # 12. Its "Sixth Affirmative Defense" raised the voluntary-payment issue:

> Compass is not liable under the Missouri Merchandising Practices Act *or under any other legal theory* because, among other reasons, Plaintiff voluntarily made the payments at issue, with full knowledge of all material facts and circumstances.

*Id.* at 23 (emphasis added).

On December 18, 2018, Plaintiff filed an amended complaint, adding a new plaintiff, Virginia Carter, an Illinois resident, and a putative nationwide class. Doc. # 15. (Her case was

3

voluntarily dismissed in 2023. *See* Docs. # 202 and # 203.) Count I alleged breach of contract. On January 31, 2019, Compass filed an Answer (Doc. # 24) and motion to dismiss. Doc. # 25. That motion did not Address Count I but did request that the nationwide class be dismissed on the ground that the named plaintiffs had no standing to represent citizens of other states and that there was no personal jurisdiction over putative class members with no connection to Missouri. (Other issues it raised are irrelevant to this motion and not discussed herein.) On September 26, 2019, the Court deferred the motion to dismiss the nationwide class until the class certification stage. Mem. and Order of 9/26/19, Doc. # 43, at 12, 14.

Meanwhile, on February 20, 2019, Compass served its Rule 26(a) disclosures. Ex. B, Doc. # 257-4.[3] The only persons it listed as likely to have discoverable information and whom it might use to support its defenses were the two Plaintiffs and several Compass employees. *Id.* at 2-4. It listed no other vending machine customers, either by name or generically. And it has not amended its witness list since. Thus, other than persons whom it has deposed or who have answered discovery (*see* below), it has no witness who made card purchases from its machines and might testify that he or she knew or didn't know of the surcharge before making purchases.

In 2020, two other lawsuits with similar claims were consolidated with *Moore*. On April 16, 2020, in response to the parties' consent motion (Doc. # 48), the Court consolidated *Moore* with *Jilek v. Compass Group USA, Inc.*, Case No. 4:19-cv-03335-SNLJ. Doc. # 56. *Jilek*, brought by the undersigned counsel in California, had been transferred by stipulation to the Eastern District of Missouri. Mr. Jilek sought to represent a California class, but not a nationwide class because *Moore* already had a putative nationwide class. On August 31, 2020, the Court consolidated

---

[3] To avoid cluttering the docket, Plaintiffs rely herein on Exhibits A through Q filed in the Eastern District of Missouri in support of their now-withdrawn motion for class certification. They all follow Doc. # 257.

4

*Moore* with *Jaye v. Crane Merchandising Systems, Inc., et al.*, Case No. 4:20-cv-00266-RLW. *Jaye*, brought by two Texas residents, Frances Jaye (also known as Ivery) and Sean Madelmayer, had been filed in Texas state court and after removal transferred to the Eastern District of Missouri. The undersigned counsel had no involvement with *Jaye*, which had been brought by other lawyers, until it was consolidated with *Moore.* The *Jaye* plaintiffs were later dismissed, Mr. Madelmayer because he no longer wished to serve as Class Representative (*see* Docs. # 202 and # 203) and Ms. Jaye when it was revealed that her purchase was not from a Canteen machine. *See* Docs. # 223 and # 226. (The undersigned had assumed her attorneys had verified her purchase.)

The Court appointed the undersigned as Interim Class Counsel on December 8, 2020. Doc, # 80. On April 6, 2021, they filed a Consolidated Class Action Complaint, which did not change the substantive claims and kept Breach of Contract as Count I. Doc. # 91. Compass answered on May 27, 2021, again with voluntary payment as its Sixth Affirmative Defense. Doc. # 97 at 49.

Beginning in June 2021, Plaintiffs took Rule 30(b)(6) depositions of Compass. According to its witness David Goldring, Compass began a survey of its "two-tier" machines, on March 25, 2019. Ex. A, Doc. # 257-3 (D. Goldring Tr., Vol. I, 22:1-4). This huge survey of hundreds of thousands of machines took nearly a year and was designed to learn whether Compass' "two-tier" machines had labeling informing customers of the price difference and to affix new such labels; Compass first informed Plaintiffs about the survey in May 2021, two-and-a-half years into the case. *See* Plaintiffs' Motion for Leave to File Amended Consolidated Class Action Complaint, Doc. # 107, at 3. According to a spreadsheet of the survey that Compass produced on May 12, 2021, at least 58,245 machines had no such label at all. These facts are laid out in Plaintiffs' Amended Consolidated Class Action Complaint ("Amended Complaint" or "Am. Comp."), Doc. # 126, filed October 14, 2021.

5

Defendant answered on November 14, 2022. Doc. # 193. Again, it raised the voluntary-payment doctrine as its Sixth Affirmative Defense. *Id.* at 104.

Plaintiffs moved on March 1, 2023, to supplement that complaint to correct allegations regarding the location of Mr. Jilek's purchases (Doc. # 201), which the Court granted. Doc. # 204. This is now the operative complaint.

Compass produced additional Two-Tier survey data throughout the first half of 2023. *See* Consent Motion to Extend Schedule, Doc. # 232, ¶ 2. In April 2023, Compass *for the first time* produced a version of its system-wide survey spreadsheet that showed that some machines had a so-called "Digital Shopping Cart." As later explained by Martha Morgan, Compass' vice president of business information, in a deposition on May 10, 2023, a Digital Shopping Cart is an iPad-like device on a vending machine that discloses both the cash and credit-card price.[4]

Then on June 27, 2023, Compass produced a Declaration by Ms. Morgan that remarkably attempted to *disavow the survey*. Ex. C, Doc. # 257-5. ("Morgan Decl."). She stated that survey reports contained errors. She explained that the surveyors were to record whether a machine had a label and to take a confirming photograph. If the machine had no label, the surveyor was to affix one and photograph the machine again. But she also stated – and this was the first time Compass had told Plaintiffs of *this* fact – there were errors in the survey. *Id.* ¶¶ 20, 24. She said that she had "performed a spot check of approximately 120 vending machines" that had been

---

[4] Here is her testimony:

> Q And it's your testimony today that this digital shopping cart that looks like -- think of it like an iPad
> is the phrase that you used -- during the entire time that Compass has been using these digital shopping
> carts would display both the credit price and the cash price.
> Is that your testimony?
> A Yes, as long as the two tier is enabled. If the two tier is not enabled, you will only see one sell price.

Ex. D, Doc. # 257-6 (M. Morgan Dep., Vol. II, 91:16-24). Ms. Morgan had been deposed as a 30(b)(6) witness about the survey two years earlier on June 30, 2021, before Compass had produced a report disclosing the Digital Shopping Cart and *said nothing about it*. When Plaintiffs' counsel heard this belated testimony, he was forced to suspend the deposition to evaluate it. *See id.*, 93:8-16, 104:4-9. The deposition was resumed June 28, 2023. *See* Ex. I, Doc. #257-11 (Morgan Tr. Vol. III).

shown on a report as not having a label and found that 72 contained a Digital Shopping Cart, 26 *had* a label, and 14 had no two-tier revenue. Morgan Decl. ¶ 28. Two-tier revenue is the amount Compass generated by selling a product at the card price, compared to the cash price, or $0.10 per purchase. See *id.* ¶ 3. This list of 120 machines, which Compass' attorney had given her, was not randomly selected so far as she knew. Ex. D, Doc. # 257-6 (M. Morgan Dep. Vol. II), 190:25-191:15. Moreover, the photographs had not been produced to Plaintiffs.

Ms. Morgan also stated that not all Compass vending machines had been surveyed. Morgan Decl. ¶ 24. Plaintiffs' expert Brian Kriegler, Ph. D., later found that, in all, 12,093 unsurveyed machines had two-tier revenue (*i.e.*, "upcharges"). Ex. E, Doc. # 257-7 (Kriegler Report) at 15.

Ms. Morgan went on to state that, due to these and other limitations, Compass had created new reports (*i.e.*, spreadsheets), called "Survey Instance Reports." *Id.* ¶ 26. These were the reports that for the first time included "Digital Shopping Carts." (The Morgan Declaration is addressed further in Sec. III.A, *infra*.)

This new information required Plaintiffs to revise their method of calculating classwide damages, which previously had merely involved calculating the total two-tier revenue from unlabeled machines based on the survey reports. Now Plaintiffs had to account for errors in the survey, as well as unsurveyed machines. Accordingly, Plaintiffs' expert Dr. Kriegler developed a method of calculating classwide damages, which depended on the creation of a random sample of surveyed machines and review of the photographs of those machines to estimate the impact of errors, as well as a random sample of unsurveyed machines with a comparison to information to be obtained from Compass about them. Ex. E, Doc. # 257-7 (Kriegler Report). Plaintiffs followed up his report by requesting those photos and the information about unsurveyed machines. Compass took Dr. Kriegler's deposition and followed with a report by its own expert,

7

David Kalat, who did not criticize Dr. Kriegler's methodology but instead used it, with a review of the photos, to calculate classwide damages from surveyed machines as nearly $10 million (not counting prejudgment interest). Ex. F, Doc. # 257-8 (Kalat Report). He made no estimate of damages from unsurveyed machines. (*See* further discussion of these expert reports in Section III.C., *infra*.)

As this was going on, Plaintiffs told the Court that George Moore intended to withdraw from the case. Doc. # 232 at 3 n. 1. The reason: Because of his need to care for his ailing mother and mother-in-law, he could not continue to bear the responsibilities of being a class representative. Ex. G, Doc. # 257-9 (Moore Tr.) 56:18-57:7. That would leave Mr. Jilek as the only plaintiff. In response, the court asked the parties to brief two issues regarding whether, after Mr. Moore's dismissal, the case should be transferred to the Central District of California. Electronic Minute Order of 6/15/2023, Doc. # 236. In response, Plaintiffs asked the Court to dismiss Mr. Moore and transfer the case as it then stood (including the Amended Complaint with him dismissed) to the Central District of California. Compass asked that the case remain in where it was or, in the alternative, that it be transferred to the Western District of North Carolina. On August 25, 2023, Plaintiffs moved to file a Second Amended Consolidated Class Action Complaint, which incorporated the supplemental allegations described above and formally dropped Ms. Carter, Ms. Jaye and Mr. Madelmayer as plaintiffs. Doc. # 250. Compass opposed the motion (Doc. # 253).

On November 15, 2023, the Court granted consent motions to consolidate this case with *Baldwin v. Compass Group USA, Inc.*, No. 4:23-cv-00568-JAR, and *Borrero v. Compass Group USA, Inc.*, No. 4:23-cv-00586-RLW. Doc. # 263. Plaintiffs' counsel herein represents the Plaintiff in each of those cases, *i.e.*, Brian Baldwin and Andres Borrero, who, respectively, seek to represent a South Carolina and Florida subclass. In addition, in light of Mr. Moore's dismissal,

8

the Court transferred the consolidated cases to the Western District of North Carolina. *Id*. It denied Plaintiff's Motion for Leave to Amend without prejudice to refiling in light of the consolidation and transfer order. *Id*.

On February 8, 2024, this Court granted the parties' consent motion regarding Plaintiffs' pending motion for class certification (Doc. # 257-1) and Defendant's pending motion to strike (Doc. 262), both filed in the Eastern District of Missouri, ordering the motions withdrawn and the class certification motion to be filed within 30 days from the date of the order (Doc. # 290).

The parties have had three court-ordered mediation sessions, on February 3 and May 19, 2021, and May 25, 2023. They were unsuccessful.

## III.   STATEMENT OF FACTS

In this section, Plaintiffs discuss the facts regarding four issues relevant to this motion: the facts regarding (a) Compass' machine survey, (b) Plaintiffs' prima facie case for breach of contract, (c) the voluntary-payment defense, and (d) classwide damages.

### A. Compass' Survey of Machines

As Ms. Morgan explained in her Declaration of June 27, 2023, between March 2019 and February 2020 Compass surveyed its two-tier vending machines "to determine whether the machines had two-tier price labelling (a 'Label') in place that notified a consumer of the price differential between purchases with cash and credit or debit cards (the 'Survey')." Ex. C, Doc. # 257-5 (Morgan Decl.), ¶ 4. "To conduct the Survey, Compass created a list of all vending machines in the United States that realized two-tier revenue during the 30 days leading up to March 2019." *Id*., ¶ 5. "Compass created a web-based application that allowed surveyors to conduct the Survey in the field (the 'app')." *Id*., ¶ 6.

The app enabled surveyors to record information from the machine's QR Code, as well as

note whether the machine had a label and upload a photograph of it, showing the label. *Id.*, ¶¶ 7, 10. If it had no label, the surveyor was to apply one and upload another photo showing it. If it had a label, the surveyor was to apply a new one and upload a photo showing it. *Id.*, ¶ 11.

Ms. Morgan also described "Digital Shopping Carts." She said, "Certain makes and models of vending machine have a tablet-like digital display screen installed on the machine which provides information regarding the products for sale to the consumer, including both the cash and credit pricing at the point of purchase." *Id.*, ¶ 12. The Digital Shopping Carts had been permanently installed at the time of manufacture. *Id.* Surveyors were to note and photograph the Digital Shopping Carts but not affix a label to those machines.

According to Ms. Morgan, Compass used that information to create a report summarizing the Survey results and revenue from each unlabeled machine. *Id.*, ¶ 17. "Multiple iterations of this report have been prepared since 2020." *Id.*, ¶ 18. The most recent such versions, which Ms. Morgan referred to by the numbers CG-0063553 through CG-0063604 (*id.,* ¶ 18.c), were electronically produced to Plaintiffs in a file folder Bates labelled CG025; Plaintiffs thus refer to them herein as "CG025" and "Two-Tier Revenue Reports."[5]

In her declaration, Martha Morgan stated for the first time that "the data reflected in these reports is subject to certain limitations which should be accounted for when analyzing the compiled data." *Id.*, ¶ 19. These primarily were errors – *i.e.*, erroneously showing that a machine had no label or a Digital Shopping Cart. *Id.*, ¶¶ 20, 24.

However, as Ms. Morgan stated, "[d]ue in part to these limitations, I oversaw the creation of additional reports that identify all survey instances (the 'Survey Instance Reports')." *Id.*, ¶ 26.

---

[5] The Two-Tier Revenue Reports (CG025) Excel files are too large to be included as an exhibit; there are 52 Excel spreadsheets with a combined file size of 141 MB.

10

The most recent Survey Instance Report, which Ms. Morgan referred to as CG-0063605 and CG-0063606 (*id.* ¶ 26) was electronically produced to Plaintiffs in a file folder Bates labelled CG027 and referred to herein as "CG027."[6]

According to Ms. Morgan, the Survey Instance Reports, which provide information for each machine at issue, were designed "to provide more clarity as to when machines were first surveyed and first remediated" and were intended to identify all instances in which a machine was surveyed. *Id.*, ¶ 27. "Using the combination of the Survey Instance Reports and the previous reports, one can determine when a machine generated two-tier revenue without a Label (subject to the limitations noted …)." *Id*.

She went to state that, "[d]ue in part to the limitations of the reports described above, I performed a spot check [of a non-random sample; *see* Sec. II, *supra*] of approximately 120 vending machines that appeared to have been surveyed at least twice and appeared on a report as indicating that the machine did not contain a Label at the time of the later Survey. This spot check included reviewing the photographs of the machines." *Id.*, ¶ 28. She found various errors, including 72 machines with Digital Shopping Carts, 26 with labels, 14 that had no two-tier revenue, and one with no cashless device. *Id.* This shows that, if Compass is concerned about inaccuracies in the Survey, they can be corrected by reviewing the photographs.

Using a combination of the Two-Tier Revenue Reports (CG025) and the Survey Instance Report (CG027) Dr. Kriegler found that there were 50,293 vending machines generating two-tier revenue that did not have a Label. Ex. E, Doc. # 257-7 (Kriegler Report) at 13–14.

---

[6] The Survey Instance Report (CG027) Excel file is too large to be included as an exhibit; its file size is 72.1 MB, and the worksheet has 38 columns and 246,943 rows of data.

### B.  Plaintiffs' Prima Facie Case

To prove their claims for breach of a unilateral contract, a plaintiff must prove four elements: (1) the existence of a contract, (2) the plaintiff's performance of the contract, (3) breach by the defendant; and (4) damage resulting from the breach. Although states use different language in describing these elements, they apply in each of the 33 states where Class members made card purchases from Compass' machines. *See* Ex. H, Doc. # 257-10, describing the elements of a breach of contract claim in each state, along with that state's definition of unilateral contract.

Here are the facts regarding each element of the Class claim for breach of contract:

### 1.  Existence of a contract

Plaintiffs allege a unilateral contract, which "'is accepted by performance,' rather than a promise to perform." *S. Power Co. v. Cleveland Cty.*, 24 F.4th at 263 (citation omitted). As one court explained:

> A classic example of a unilateral contract involves one person who says to another, "If you walk across the Brooklyn Bridge I will pay you $100." The person making the promise wants performance in return, not merely the promise of action. The contract is formed when the second person performs by walking across the bridge.

*Smith v. Kan. Orthopaedic Ctr., P.A.*, 49 Kan. App. 2d 812, 817, 316 P.3d 790, 795 (2013). Here, Compass offered to sell items from its vending machines at the displayed price and purchasers accepted by inserting their cards into the card reader for payment of that price.

Plaintiffs alleged the elements of these contracts in the Amended Complaint:

> 75. Plaintiffs and Class Members entered into contracts with Defendant; pursuant to those contracts Defendant offered to sell to Plaintiffs and Class Members the items that were for sale in its vending machines for the displayed prices and Plaintiffs and Class Members agreed to pay those prices.

> 76. Plaintiffs and Class Members performed pursuant to those contracts by using their cards to buy the items at the displayed prices.

12

Am. Comp. ¶¶ 75-76. Compass denied these allegations on the ground that it lacked knowledge or information sufficient to form a belief as to the truth of the allegations. Answer, ¶¶ 75-76.[7]

Evidence bears out that the vending machines informed purchasers of the cash price of each item. David Goldring, testified about a PowerPoint presentation created at "the time the survey was being rolled out," or March 2019. Ex. A, Doc. # 257-3 (Goldring Tr. 174:2-8). This PowerPoint referred to three different ways a vending machine would display an item's price:

> Q. Then it says, "Acceptable solutions. Cash price posted at the spiral item," is the first one, "Select item for price" is the next one, and the last one is "Press item number on key pad to display price." Correct?
>
> A. Correct.
>
> Q. These are *the three different* ways in which a consumer at a particular machine might learn what the cash price is for a product in a non-regulatory state; correct?
>
> A. *Yes*.

*Id.* 182:11-20 (emphasis added).[8] Those prices were all cash prices; Mr. Goldring agreed that "it was the policy of Canteen to not display to the consumer at any point in time on these machines the card price …." *Id.*, 182:25-183:5.[9]

That fact was further confirmed by his testimony that the "instructions to the field was [*sic*] that any machine that had a cashless reader on it and that was going to be charging two tier rates had to have specific labeling on it in order that the consumer would understand that there was a *differential in pricing*." *Id.* 30:12-17. To show that differential would mean there was another

---

[7] Compass also stated that the paragraphs "contain or constitute a legal conclusion to which no answer is required." That is an improper response. "Attempts to avoid admitting or denying an allegation by claiming that it contains a legal conclusion … are inappropriate." *Edwards v. CSXT Transp., Inc.*, 338 F.R.D. 590, 594 (E.D.N.C. 2021).

[8] Compass distinguished between what it called "regulatory" and "non-regulatory" states. Regulatory states were those where Compass was required to post "both the cash and the card price on the machine." Goldring Tr., Vol. II, 194:9-15.

[9] In this testimony given on June 30, 2021, Mr. Goldring inexplicably did not refer to Digital Shopping Carts, which, as noted above, displayed both prices but which Compass had not disclosed to Plaintiffs.

price besides what was displayed. As noted above, the differential was to be made clear with an explanatory sticker. But Compass fell far short of that goal:

> Q. So according to the data from this survey, there were more than half of the Canteen machines across the United States that did not contain a two tier sticker at the time of the survey; is that right or is that wrong?
>
> A. That is correct.

Goldring Vol. II, 190:18-23. Under the Class definition, only purchases from unlabeled or unstickered machines are at issue here (except for machines with Digital Shopping Carts, which Compass had not disclosed at the time of the above testimony). Thus, every machine subject to the Class' claims displayed the cash price and did not disclose that card prices were higher.

### 2. The Purchasers' Performance of the Contract

The second element of a breach-of-contract claim is the plaintiffs' performance of the contract, which in this case is their payment for the items purchased, including the undisclosed extra ten cents for using a card. The common evidence showing that is the Two-Tier Revenue Report, CG025, which – by showing two-tier revenue – demonstrates that customers paid for their purchases with a card.

### 3. Compass' Breach of the Contract

The third element, the defendant's breach, is shown by the two-tier revenue Compass generated from its no-sticker, no-Digital Shopping Cart "cashless" machines. (For simplicity, "cashless" machines with no sticker and no Digital Shopping Cart will be referred to herein as "no-label machines."). It breached the contracts by charging more than the displayed prices. This information is shown in Compass' Survey Instance Report in conjunction with the Two-Tier Revenue Report. The Survey Instance Report identifies the no-label machines. The Two-Revenue Report shows the extra revenue Compass generated from those machines by charging

14

the undisclosed extra ten cents for using a card. The machines can be matched between the two reports by their four-digit cost center codes and five-digit machine number. See Ex. C, Doc. # 257-5 (Morgan Decl. ¶ 21); Ex. I, Doc. #257-11 (Morgan Tr. Vol. III) 133:5-133:8, 133:24-134:1, 136:11-134:11). Thus, these two reports together show Compass' breach of the contracts by selling the items for more than the displayed prices.

### 4. Damage Resulting from the Breach

The fourth element, damage resulting from the breach, is likewise shown in Compass' Two-Tier Revenue and Survey Instance Reports. As above, together they show the extra charges Compass imposed for use of a card. Every purchaser suffered the same damage by being charged an extra ten cents per purchase with a card.

### C. "Voluntary Payment" Evidence

Compass has deposed four purchasers from its vending machines. As shown below, all of them testified that they did not know about the credit-card surcharge at the time of their first purchases. Three learned about it as part of the process of enlisting in this lawsuit; of them, two continued to make card purchases, while the third only used cash from then on. The fourth purchaser didn't recall if he made credit-card purchases after he learned of the surcharge other than one purchase to test the process for Plaintiffs' counsel. None of those examples of knowing purchases would be true of class members who did not join this lawsuit. A fifth plaintiff, Brian Baldwin, said in his interrogatory answers that he learned of the surcharge from his bank statement and continued to make purchases. According to his interrogatory answers, a sixth, Andres Borrero, also learned of the surcharge in the process of enlisting in this case. There is no evidence of whether he continued to make card purchases.

15

### 1. James Jilek

Mr. Jilek used Compass' vending machines, typically paying with a credit card, at a co-working facility in El Segundo, California about once a month on average beginning in 2017. Ex. J, Doc. # 257-12 (Jilek Tr.) 45:3-25, 47:3-5, 17-24, 88:15-18. He did not know, or even suspect, that his card was being charged more than the displayed price until a co-worker, Mr. Regus, informed him in mid-2019 as part of a conversation in which Mr. Regus referred him to Plaintiffs' counsel. *Id.*, 24:25-26:2, 82:11-15. Mr. Jilek described the impact of the practice as "getting charged things you don't know you're getting charges [*sic*; charged] about. That's a misrepresentation." *Id.*, 70:17-19. Subsequently, he made two credit-card purchases from the machines as "test cases" to "prove[] to me that it was charging more than it should be" and then about ten more card purchases over the years. *Id.*, 34:19-35:19, 74:14-18, 84:18-23; 85:11-14, 93:23-94:2.

### 2. Virginia Carter

Ms. Carter, a former Plaintiff, used her credit card for purchases from Compass' machines in an office building in downtown St. Louis, where she worked as a security guard. Ex. K, Doc. # 257-13 (Carter Tr.) 16:16-17:6, 17:23-18:9; 18:17-21. She learned about the surcharge when a woman who worked in the building told her about it as part of a conversation in which the woman informed her about this litigation; prior to that, she had no suspicion about it. *Id.* 18:2-19:6, 68:21-69:1.[10] She explained why she took exception to Compass' practices:

> Q. And was that worth paying ten cents extra to you?
>
> A. Honestly, I -- no. I think it should have just still been the same price. A dollar for that. I mean, I've come recently to find out why they do it, but to me it

---

[10] Initially, she testified that this conversation took place in 2018. *Id.*, 69:22. Later, based on an interrogatory answer that said she learned of the surcharge in 2016, she said that this conversation probably took place in 2016. *Id.*, 76:14:77:1. On cross-examination, however, she testified that the reference to 2016 was a typo and that the conversation occurred in 2018. *Id.*, 89:2-22.

16

should have been labeled. Only because my mom owns a bar and she started having to charge for credit cards because of the fact that she's paying a fee every year. But she also put a sign up saying that she was doing that so customers when they came in know.

*Id.*, 35:2-12. Subsequently, Ms. Carter continued to make card purchases from the machines because she was not allowed to leave the building to get food. *Id.*, 49:6-9; 45:16-46:8.

### 3. George Moore

Plaintiff Moore gave his deposition on September 8, 2023, while his request to be dismissed was pending. *See* Ex. G, Doc. # 257-9 (Moore Tr.). He was a day porter at the same building where Ms. Moore worked. *Id.* 10:23-24. Asked what he understood Canteen to be, he said, "A ripoff." *Id.*, 12:23-24. By that, he said:

> What I mean by that is that they're -- they're charging your card extra than when you use your cash money. When you use cash money, it goes direct. But if you use your card, it's charging you like 10, 15 cents extra, and that's not right.

*Id.* 13:5-9. He purchased items from the Canteen vending machines in the building "[p]robably once or twice a week." *Id.* 17:14-16. During the earlier part of the period when the machines were in the building, "I used my card." *Id.*, 17:25-18:4. He learned about the extra charge from an employee of the Cornfeld law office named Carolyn, who also "said that we're going to try to do a lawsuit for the simple fact that people be getting charged over for using their cards instead of using cash …." *Id.* 18:5-12. After that he just used cash for his purchases. *Id.*, 13-18; *see also id.*, 59:59:11-61:9.

### 4. Justin Regus

Mr. Regus, who has served as an expert witness for Mr. Cornfeld in two cases (Ex. L, Doc. # 257-14 (Regus Tr.) 8:1-4, 9:1-5), worked at the same co-working facility in El Segundo as Mr. Jilek; he used the vending machines in the building before 2019, paying with either cash or credit card. *Id.*, 14:4-15:8. Shortly before learning that Mr. Cornfeld was working on a case involving

17

these fees (this lawsuit was already pending), Mr. Regus noticed from his credit-card bill that he had been charged a ten-cent fee for a purchase. He said that "when I paid that extra fee or when I was charged more than what the posted price was, you know, I thought that was kind of wrong." *Id.*, 21:17-19. He stated that "once I had observed that I was getting charged a fee for using my credit card, I would try to avoid ever doing that again." *Id.*, 15:13-15. In fact, he could only recall one subsequent credit card purchase. That was part of the investigation of this case, "when I was trying to -- trying to kind of -- what is it called -- recreate that process, so I could describe it to Mr. Cornfeld's colleague." *Id.*, 15:20-23. He could not recall whether he made any other credit card purchases after that point. *Id.*, 7-16.

### 5. Brian Baldwin

Mr. Baldwin used Compass' vending machines, paying with his debit card, at two locations where he worked in Orangeburg, South Carolina. Ex. R (Baldwin Interrogatory Responses), at 1. Mr. Baldwin learned of the overcharge from reviewing his bank record. *Id.* at 2.

### 6. Andres Borrero

Mr. Borrero used Compass' vending machines, typically paying with his debit card, at the cafeteria of the location where he worked in Ruskin, Florida. Ex. S (Borrero Interrogatory Responses), at 1, 2. Mr. Borrero learned of the overcharge from an internet ad as part of joining this lawsuit shortly before he joined it. *Id.* at 2.

### D. Classwide Damages

Each Class member has a claim for the extra money (the sum of all the dimes) that he or she paid for purchases with a card. As for classwide damages, each side named a damages expert, Dr. Kriegler for Plaintiffs and Mr. Kalat for Compass, who based their determinations on the Two-Tier Revenue and Survey Instance Reports, along with photographs of a random sampling

18

of machines and, in Dr. Kriegler's case, interrogatory answers related to unsurveyed machines (Ex. M, Doc. # 257-15). Other than that last aspect, their opinions do not significantly disagree – so much so that Plaintiffs elected not to take Mr. Kalat's deposition.

### 1. Brian Kriegler's Initial Reports

In his expert report served on August 7, 2023, Dr. Kriegler described a method for calculating classwide damages accounting for errors in the data reported in the Survey Instance Report, as well as the data for unsurveyed machines. That method was based on the creation of a stratified random sample of 250 surveyed machines (which he called "Stratum 1") and 150 unsurveyed machines (called "Stratum 3") with two-tier revenue. Kriegler Rept., ¶ 34 (the Strata are defined in ¶ 30, in Step 5; Strata 2 and 4 were not considered because those machines had labels or Digital Shopping Carts or were not cashless).

Dr. Kriegler said his methodology would involve determining, based on review of photographs which he did not yet have, whether each machine in the sample was a non-cashless device, had a cash discount sticker, or had a Digital Shopping Cart. *Id.* ¶ 38. He would use the dollar amounts of the other machines – *i.e.*, no-label, no-Digital Shopping Cart cashless machines – to extrapolate the amount of upcharges in Stratum 1 and Stratum 3 and calculate 90 and 95% confidence intervals for the total amount of upcharges; he would use two alternative methodologies, called "CLT" and "bootstrapping." *Id.*, ¶¶ 38, 43. He also described a method for determining prejudgment interest for the two-tier revenue in each state. *Id.*, ¶ 38.

Dr. Kriegler included in Table 1 a calculation of principal damages and prejudgment interest but said he "anticipate[d] providing an updated set of extrapolations analogous to Table 1 once the stratified random sample of observations has been collected, reviewed, and analyzed." *Id.*

Dr. Kriegler also provided a supplemental report describing the same methodology for the

19

California Subclass. Ex. N, Doc. # 257-16 (Supplemental Expert Report of Brian Kriegler, Ph. D.) It included a Table 1 that was the counterpart of Table 1 in the original Report.[11]

Subsequently, Compass provided a set of photographs of the samples from Stratum 1 and interrogatory answers identifying non-label non-Digital Shopping Cart machines in Stratum 3.

Following the consolidation of *Baldwin* and *Borrero*, Dr. Kriegler provided a supplemental report in which he described the same methodology for the Florida and South Carolina Subclasses. Ex. T (Kriegler Declaration).

### 2. David Kalat's Report

Mr. Kalat issued his report on September 18, 2023. Ex. F, Doc. # 257-8 (Expert Report of David Kalat ["Kalat Report"]). He did not criticize Dr. Kriegler's methodology or conclusions (though he did point out that Dr. Kriegler hadn't identified any individual's damages or provided a methodology to do so, *id.* ¶ 26).

Mr. Kalat then did an analysis, using Dr. Kriegler's methodology, with a new version of the Survey Instance Report that added a small number of surveyed machines to the total. Kalat Report, ¶¶ 52-59. This new information obviously had been unavailable to Dr. Kriegler. In his analysis, Mr. Kalat reviewed photographs of 207 Stratum 1 machines (the Stratum 1 machines with photos) and found that 26 had stickers. *Id.*, ¶¶ 65, 66. (That was 8%, a far lower percentage than Ms. Morgan had found to have stickers or Digital Shopping Carts among her 120 non-representative photographs.) After removing those 26 machines from the analysis, he found that the unlabeled machines had two-tier revenue averaging $195.13. *Id.*, ¶ 67. Extrapolating that to the entire machine population of 50,293 unlabeled machines resulted in damages of $9,813,673.

---

[11] Dr. Kriegler issued an Errata to Supplemental Expert Report of Brian Kriegler, Ph. D. (Ex. O, Doc. 257-17), which corrected an error in his California calculations that had been brought up in his deposition. That error did not affect his methodology.

*Id.*, ¶ 68. He then added in the additional machines from the new version of the Survey Instance Report and concluded, "**Together these come to collective extrapolated damages for the full Stratum I population of $9,997,193**." *Id.*, ¶ 70 (bold-face in original). Using the same procedure, he calculated California damages as $767,443. *Id.*, ¶ 73. He never stated that, in his opinion, this was an inappropriate methodology for estimating classwide damages in Stratum 1.

Mr. Kalat stated that he had no photographs of the 150 unsurveyed machines in Stratum III. *Id.*, ¶ 77. For that reason, apparently, he did not estimate damages for that population. He did not explain why he didn't use the information Compass had obtained to answer the interrogatory regarding the Stratum 3 machines.

Next, Mr. Kalat calculated one-sided 90% and 95% confidence intervals, using Dr. Kriegler's methodology, for Stratum 1. His estimates were as follows:

| Description | CLT | Bootstrapping |
|---|---|---|
| 90% Conf. Lower Bound for Total Damages | $8,392,344 | $8,408,195 |
| 95% Conf. Lower Bound for Total Damages | $7,865,776 | $7,999,083 |
| 90% Conf. Lower Bound for Cal. Damages | $371,278 | $405,272 |
| 95% Conf. Lower Bound for Cal. Damages | $241,279 | $354,243 |

*Id.*, ¶ 81.

Regarding pre-judgment interest, Mr. Kalat merely commented that Dr. Kriegler's calculations would have to be redone based on the additional information. *Id.*, ¶ 82. He did not perform such a calculation himself.

### 3. Dr. Kriegler's Second Supplemental Report

Dr. Kriegler incorporated the information that Compass had provided since his initial reports in a Second Supplemental Report. *See* Ex. P, Doc. # 257-18. This information included the newly produced photographs and new interrogatory answer (Ex. M, Doc. # 257-15), as well as the revised Survey Instance Report (the one that Mr. Kalat said had added additional machines).

21

Dr. Kriegler relied on Mr. Kalat's analysis of whether the photos showed cash discount stickers.

Initially, Dr. Kriegler reviewed the aspects of Mr. Kalat's report that agreed with or did not dispute his initial reports (which he called "areas of convergence"). Ex. P, Doc. # 257-18. ¶ 7. These included the fact that Mr. Kalat had reviewed and analyzed the photos of the machines in the random samples, a process Dr. Kriegler had recommended, and that he utilized each of the statistical approaches that Dr. Kriegler had recommended. *Id.* However, Mr. Kalat had not done a quantitative analysis of either the Nationwide or California Stratum 3 (the previously unsurveyed machines, the ones that were the subject of Compass' new interrogatory answers) or calculated prejudgment interest. *Id.,* ¶¶ 10, 12.

Dr. Kriegler analyzed the data to calculate Nationwide and California classwide principal damages for both Stratum 1 and Stratum 3 and then to add in prejudgment interest. Although he did so using both the bootstrapping and CLT methods, the estimated total damages incorporating both Stratum 1 and Stratum 3 were nearly identical. The estimated damage totals, incorporating the additional machines from the data in the revised Survey Instance Report (as Mr. Kalat had done) were $10,073,865 using bootstrapping and $10,070,802 using CLT. *Id.*, ¶ 23. (These were less than $80,000 more than Mr. Kalat's total looking only at Stratum 1, indicating that Stratum 3 did not add much to the total.) When Dr. Kriegler added in prejudgment interest at the legal rates for each state, it brought the totals to $13,773,043 for bootstrapping and $13,768,971 with the CLT method. *Id.*, ¶ 23 (Table C).

The corresponding numbers for the California subclass were $1,085,811 (bootstrapping) and $1,088,269 (CLT). *Id.* ¶ 26 (Table E). For Florida and South Carolina. they were, respectively, $3,462,367/$ (bootstrapping)/$3,458,428 (CLT) and $826,108 (bootstrapping)/$826,587 (CLT) (adding principal damages plus interest). Ex. T (Kriegler Declaration), ¶ 19, Tables 1, 2.

22

Dr. Kriegler's findings for the lower limits of the 90% and 95% confidence intervals, including prejudgment interest, were as follows:

| Description | CLT | Bootstrapping |
|---|---|---|
| 90% Conf. Lower Bound for Total Damages | $11,480,525 | $11,544,786 |
| 95% Conf. Lower Bound for Total Damages | $10,827,977 | $10,984,352 |
| 90% Conf. Lower Bound for Cal. Damages | $592,413 | $629,866 |
| 95% Conf. Lower Bound for Cal. Damages | $448,534 | $555,060 |
| 90% Conf. Lower Bound for Fl. Damages | $605,017 | $619,199 |
| 95% Conf. Lower Bound for Fl. Damages | $544,540 | $576,442 |
| 90% Conf. Lower Bound for S.C. Damages | $220,918 | $223,744 |
| 95% Conf. Lower Bound for S.C. Damages | $202,369 | $206,728 |

Ex. P, Doc. # 257-18, ¶ 23, 26 (Tables C and E); Ex. T, ¶ 19 (Declaration, ¶ 19 Tables 1 and 2).

Between the two methods, Dr. Kriegler recommended focusing on the bootstrapping method because of several statistical considerations, which he enumerated. Ex. P, Doc. # 257-18, ¶ 28.

Dr. Kriegler's conclusion was as follows.

> Using bootstrapping, the unbiased statistical estimate of alleged principal damages plus pre-judgment interest for the proposed Nationwide class is $13,773,043. Damages plus interest are at least $11,544,786 with 90 percent confidence and at least $10,984,352 with 95 percent confidence. For the proposed California class, the unbiased statistical estimate of alleged principal damages plus pre-judgment interest is $1,085,811. Damages plus interest are at least $629,866 with 90 percent confidence and at least $555,060 with 95 percent confidence.

*Id.* ¶ 30; *see also* Ex. T (Kriegler Declaration) ¶ 19 for Florida and South Carolina.

## IV. CLASS DEFINITIONS

*See* Motion for Class Certification, filed contemporaneously herewith, at 1-2.

## V. LEGAL STANDARD

"Rule 23(a) requires that the prospective class comply with four prerequisites: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. … In addition, 'the class action must fall within one of the three categories enumerated in Rule 23(b)." *EQT*

*Prod. Co. v. Adair*, 764 F.3d 347, 357 (4th Cir. 2014) (citations omitted). Here, Plaintiffs seek certification under Rule 23(b)(3), under which "(1) common questions of law or fact must predominate over any questions affecting only individual class members; and (2) proceeding as a class must be superior to other available methods of litigation." *Id.* In addition, a threshold "ascertainability" condition requires "that the members of a proposed class be 'readily identifiable.'" *Id.*, 764 F.3d at 358 (citations omitted).

A party seeking class certification "must present evidence that the putative class complies with Rule 23." *Id.*, 764 F.3d at 357. "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent--but only to the extent--that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Tr. Fund*s, 568 U.S. 455, 466 (2013). "It is the plaintiffs' burden to demonstrate compliance with Rule 23, but the district court has an independent obligation to perform a 'rigorous analysis' to ensure that all of the prerequisites have been satisfied." *Id.* at 358 (citing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 131 (2011)).

## VI.  <u>ARGUMENT</u>

### A.  The Class is Ascertainable

The ascertainability requirement in this Circuit "has two components. First, '[a] class cannot be certified unless a court can readily identify the class members in reference to *objective criteria*.' … Second, there must be an '*administratively feasible* [way] for the court to determine whether a particular individual is a [class] member.')." *In re Marriott Int'l, Inc*., 341 F.R.D. 128, 143 (D. Md. 2022), *vacated on other grounds and remanded, In re Marriott Int'l, Inc.,* 78 F.4th 677 (4th Cir. 2023)*, reinstated by In re Marriott Int'l Customer Data Sec. Breach Litig*., 345

24

F.R.D. 137 (D. Md. 2023). (quoting *EQT,* 764 F.3d at 358, and *Krakauer v. Dish Network L.L.C.*, 925 F.3d 643, 657-58 (4th Cir. 2019) (emphases and bracket insertions in *Marriott*). "The plaintiffs need not be able to identify every class member at the time of certification. But 'if class members are impossible to identify without *extensive and individualized fact-finding or mini-trials*, then a class action is inappropriate." *EQT*, 764 F.3d at 358 (internal quotation marks and citation omitted; emphasis added).

*Marriott* pointed out that district courts in this Circuit have applied two different approaches, a more lenient one exemplified by *Souter v. Equifax Info. Servs., LLC*, 307 F.R.D. 183, 196 (E.D. Va. 2015), and the stricter approach of *Spotswood v. Hertz Corp*., 2019 U.S. Dist. LEXIS 20536, 2019 WL 498822, at *6-8 (D. Md. Feb. 7, 2019). But as *Marriott* observed*, even under *Spotswood,* it is only "an exceptionally complicated *administrative* review of company records" that defeats ascertainability. *See Marriott*, 341 F.R.D. at 144 (emphasis in original). As *Marriott* went on to hold, however, "the case law 'does not suggest that no level of inquiry as to the identity of class members can ever be undertaken.' ... 'If that were the case, no Rule 23(b)(3) class could ever be certified.' *Id.* (citation omitted).

Here, Plaintiffs have satisfied the objective-criteria factor because the class definitions rely on no subjective terms. The second factor is also met because there is an administratively feasible way to determine class membership. Class members can submit their credit or debit card records to show purchases at Defendant's machines, or if needed, provide affidavits to verify card purchases. Claimants will, of course, need to identify the location of the machines from which their purchases were made; that will enable the administrator to perform a simple match with Compass' data to verify that they were, in fact, Compass' no-label machines. Furthermore, most machines at issue are in workplaces, making it easy for employees to recall using them. As

25

the District Court stated in *Marriott*, "[a]ffidavits, in combination with records or other reliable and administratively feasible means, can meet the ascertainability standard." 341 F.R.D. at 145 (citation omitted). Here, the objective records that support the affidavits will come from Defendant's own survey of its machines. *See Krakauer*, 925 F.3d at 658 (finding class ascertainable because defendant's records allowed class members to "be identified on a large-scale basis …"; *Peters v. Aetna Inc.*, 2 F.4th 199, 242 (4th Cir. 2021) (same).

Moreover, the small amount of individual damages further supports the use of affidavits here. "'[W]here the charge at issue is so small that it is unlikely to induce fraudulent claims,' … and when 'class members can obtain objective records with relative ease that would confirm their membership in the class,' … 'those concerns are minimized.'" *Marriott*, 341 F.R.D. at 145 (quoting *In re Delta/AirTran Baggage Fee Antitrust Litig.*, 317 F.R.D. 675 (N.D. Ga. 2016)). In *Marriott*, the harms were overpaying for hotel rooms by consumers unaware of the hotelier's poor data security and the loss of their personally identifiable information. 341 F.R.D. at 153-54. In *Delta*, it was an airline baggage fee. Here, the harm is much smaller – ten cents per purchase – making the "minimized" concern in those cases even smaller. Similarly, in *Mullins v. Direct Dig., LLC*, 795 F.3d 654, 667 (7th Cir. 2015)), the court allowed self-identifying affidavits; it stated: "We are aware of no empirical evidence that the risk of dilution caused by inaccurate or fraudulent claims in the typical low-value consumer class action is significant. In most cases, the expected recovery is so small that we question whether many people would be willing to sign affidavits under penalty of perjury saying that they purchased the good or service." 795 F.3d at 667 (7th Cir. 2015). The same is obviously true here. *See also In re Dollar General Corp. Motor Oil Mktg. & Sales Practices Litig.*, 2019 U.S. Dist. LEXIS 58082 (W.D. Mo. Mar. 21, 2019), ("Self-identification affidavits are appropriate in 'consumer class actions concerning low-cost

26

products ... where class members are unlikely to retain purchasing records and financial incentives to falsify are low.'")

Many other courts have likewise approved the use of self-identifying affidavits to determine class membership. For example, *In re Simply Orange Orange Juice Mktg. & Sales Practices Litig.*, 2017 U.S. Dist. LEXIS 114806, at *15-17 (W.D. Mo. July 24, 2017), approved self-identification in certifying a class of allegedly overcharged orange juice purchasers, The court stated that it was "sympathetic to plaintiffs' argument that in low-value consumer goods cases, there may be no better means of identifying members of a class …." *Id.* at *17. The court relied on a ruling by the First Circuit that, "if unrebutted consumer testimony 'would be sufficient to establish injury in an individual suit, it follows that similar testimony in the form of an affidavit or declaration would be sufficient in a class action. There cannot be a more stringent burden of proof in class actions than in individual actions.'" *Id.* (quoting *In re Nexium Antitrust Litig.*, 777 F.3d 9, 20 (1st Cir. 2015)).[12]

Moreover, this case is far different from *Spotswood*, the case cited by *Mariott* as occupying the strict extreme in this Circuit. *Spotswood* ruled that, because the class was limited to consumers who paid for car rentals themselves (rather than, for example, through insurers) and because the defendant's database wasn't searchable for that purpose, ascertainability was absent. 2019 U.S. Dist. LEXIS 20536, at *18-22. Nothing like that is present here because the administrator will be able to search the database for locations identified by claimants.

---

[12] Other cases approving self-identifying affidavits include (citing one case per district court): *Head v. Citibank, N.A.*, 340 F.R.D. 145, 153 (D. Ariz. 2022); *In re Pfa Ins. Mktg. Litig.*, 2021 U.S. Dist. LEXIS 244526, at *68 (N.D. Cal. Nov. 3, 2021); *Hasemann v. Gerber Prods. Co.*, 331 F.R.D. 239, 270-71 (E.D.N.Y. 2019); *Bakov v. Consol. World Travel, Inc.*, 2019 U.S. Dist. LEXIS 46510, at *64-65 (N.D. Ill. Mar. 21, 2019); *Goldemberg v. Johnson & Johnson Consumer Cos.*, 317 F.R.D. 374, 399 (S.D.N.Y. 2016); *Steigerwald v. BHH, LLC*, 2016 U.S. Dist. LEXIS 21116, at *14 (N.D. Ohio Feb. 22, 2016); *In re Dial Complete Mktg. & Sales Practices Litig.*, 312 F.R.D. 36 (D.N.H. 2016); *McCrary v. Elations Co., LLC*, 2014 U.S. Dist. LEXIS 8443, at *22-23 (C.D. Cal. Jan. 13, 2014); *Donovan v. Philip Morris USA, Inc.*, 2012 U.S. Dist. LEXIS 37974, at *97 (D. Mass. Mar. 21, 2012).

Nor does it matter if, because of Compass' sloppy practices, some of its machines are inaccurately shown to be no-label, possibly leading to inaccurate comparisons of information in class members' affidavits and Compass' records. "In general, courts do not look favorably upon the argument that records a defendant treats as accurate for business purposes are not accurate enough to define a class." *Soutter*, 307 F.R.D. 183, 197–98 (E.D. Va. 2015); *accord*, *McAllister v. St. Louis Rams, LLC*, 2018 WL 1299553 *9 (E.D. Mo. Mar. 13, 2018) ("the Rams should be hard-pressed to hide behind their data systems' shortcomings to avoid class certifications.") Here, Compass should not be allowed to hide behind its sloppy practices to avoid class certification. And if Compass is concerned about inaccuracies, it is free to correct them, as both Ms. Morgan and Mr. Kalat have done with some of the machines.

Two other factors, recognized by courts in other Circuits, also support the use of affidavits here. First, before any Class member is called on to support a claim, there will have been a Class trial with a finding of liability and a classwide damage award based on the testimony of the parties' two experts. At that point, the administrator will presumably be distributing $9.97 million (Compass' number), $13.77 million (Plaintiffs' number) or perhaps something in between. But whatever it is, the claims will come from that award. Should there be a false claim, therefore, it will not increase the amount Compass will have to pay. As the Ninth Circuit stated in a case in which the plaintiffs – like Plaintiffs here – proposed to calculate the defendant's aggregate liability to the class:

> We agree with the Seventh Circuit that, in cases in which aggregate liability can be calculated in such a manner, "the identity of particular class members does not implicate the defendant's due process interest at all" because "[t]he addition or subtraction of individual class members affects neither the defendant's liability nor the total amount of damages it owes to the class."

*Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1132 (9th Cir. 2017) (quoting *Mullins*, 795 F.3d

28

at 670).

Second, if this approach were not allowed, consumer class actions involving small dollar purchases like these would be impossible to bring, a result "inconsistent with the bases for Rule 23." *Morales v. Kraft Foods Grp., Inc.*, 2015 U.S. Dist. LEXIS 177918, at *36 (C.D. Cal. June 23, 2015). Wrongdoers like Compass would be allowed to obtain millions of dollars illegally with no possible redress. That cannot be the intent behind Rule 23.

## B. Rule 23(a) Requirements Are Satisfied

Rule 23(a) has four requirements, which are commonly called numerosity, commonality, typicality, and adequacy of representation. Each of them is met here.

### 1. Numerosity

"Where 'general knowledge and common sense' indicate the class is so large that joinder of all members is impracticable, the numerosity requirement is satisfied.'" *Jonathan R. v. Just.*, 344 F.R.D. 294, 303 (S.D.W. Va. 2023) (citations omitted). That is clearly the case here, and Plaintiffs do not expect Compass to contest this element given that they did not do so when the case was pending in the Eastern District of Missouri. *See* Doc. 260.

### 2. Commonality

"Rule 23(a)(2) requires a plaintiff to show that 'there are questions of law or fact common to the class.'" *EQT*, 764 F.3d at 360. "Although the rule speaks in terms of common questions, 'what matters to class certification ... [is] the capacity of a classwide proceeding to generate common <u>answers</u> apt to drive the resolution of the litigation.' … A single common question will suffice, ... but it must be of such a nature that its determination 'will resolve an issue that is central to the validity of each one of the claims in one stroke ....' *Id.* (citing *Wal-Mart*, 564 U.S. at 350, 359) (underlining and bracket insertion in *EQT*).

29

In opposing the motion for class certification in the Eastern District of Missouri, Compass did not contest commonality (the focus of its argument was on the predominance element of Rule 23(b); *see* Doc. 260 at 20-34), but it is important to consider the common questions here.

### a.  Common Legal Questions

There is one central common legal question, namely what are the elements of the class members' prima facie case for breach of a unilateral contract? Although the 33 states in which Compass has machines use different language in describing those elements, they can all be characterized as (1) the existence of a contract, (2) the plaintiff/claimant's performance of the contract, (3) breach by the defendant; and (4) damage resulting from the breach. And they all define a unilateral contract as a promise given in exchange for an act (*i.e.*, the plaintiff's performance). *See* Exhibit H describing the elements of a prima facie case for breach of contract in each state, along with that state's definition of "unilateral contract."[13] These are common legal questions across the class.

### b.  Common Factual Questions

There are common factual questions with respect to whether the claimants can prove the elements of breach of contract because each of those questions can be answered in "one stroke."

The existence of a contract is shown by evidence that each machine displayed a price for each item, as shown above. The other elements are shown by Compass' reports. Class members' performance is shown in its Two-Tier Revenue Report, which shows that purchasers performed by paying for their items. Compass' breach is also shown by that report, along with the Survey Instance reports, which together identify the no-label machines and show their revenue from

---

[13] As shown in Exhibit H, the plaintiff's performance is not an element of the *prima facie* case for breach of contract in many of those states. However, in each of those states, the plaintiff's performance is incorporated in the definition of a unilateral contract. Thus, the plaintiff's performance is an element of a claim for breach of a unilateral contract in every state at issue.

charging the undisclosed extra ten cents for using a card. Class members' damage from the breach is similarly shown by the two reports, which together show the extra charges imposed for use of a card. The damage was the same for every purchase, ten cents. *See* Sec. III.B, *supra*.

Based on the evidence described above, the factfinder should find each element present. But the Court need not decide that at this point. "[T]he office of a Rule 23(b)(3) certification ruling is not to adjudicate the case; rather, it is to select the 'metho[d]' best suited to adjudication of the controversy 'fairly and efficiently.'" *Amgen*, 568 U.S. at 460 (citations omitted). The court is to "resolv[e] whether the evidence establishes that a common question is capable of class-wide resolution, not whether the evidence in fact establishes that plaintiffs would win at trial." *Williams v. Martorello*, 59 F.4th 68, 91 (4th Cir. 2023) (quoting *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 666-67 (9th Cir. 2022) (en banc)).

In addition, under *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013), "any model supporting a 'plaintiff's damages case must be consistent with its liability case ….'" That is true with respect to Dr. Kriegler's calculations in his Second Supplemental Report. He simply estimated the sum of the extra charges paid by class members for using cards. That this model fits Plaintiffs' liability case is easily seen from the fact that Compass' expert used the same methodology. *See* Sec. III.D.2, *supra*.

### c. California, Florida and South Carolina Subclasses

For the reasons stated above, there is commonality regarding the breach of contract claims of the California, Florida and South Carolina Subclasses.

### 3. Typicality

Rule 23(a)(3) requires that "the claims *or* defenses of the representative parties [be] typical of the claims or defenses of the class." (emphasis added). Thus, "[t]he class representative must 'be

part of the class and possess the same interest and suffer the same injury as the class members.'" *Soutter v. Equifax Info. Servs.*, LLC, 307 F.R.D. 183, 208 (E.D. Va. 2015) (citation omitted). This element and commonality "tend to merge." *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 157 n.13 (1982). As a result, the Fourth Circuit observed that, where, as here, commonality is present, "we need not tarry for long" on typicality. *1988 Tr. for Allen Children v. Banner Life Ins. Co.*, 28 F.4th 513, 523 (4th Cir. 2022). This Court need not tarry long on this element either.

The fact is that the claims of every class member are based on the same actions and course of conduct of Defendants. Thus, Plaintiffs clearly satisfy typicality, just as they satisfy commonality. In the Eastern District of Missouri, Compass argued that Plaintiff's claim was atypical because he made a few purchases after learning of the surcharge. Doc. 260 at 38-39. However, he will not recover for those purchases. The fact that they are not part of his claim doesn't make his *claim* atypical. And, in any event, it is not the case that "typicality requires that the plaintiff's claim and the claims of class members be perfectly identical or perfectly aligned." *Soutter*, 307 F.R.D. at 208 (quoting *Deiter v. Microsoft Corp.*, 436 F.3d 461, 466-67 (4th Cir. 2006)). The test is whether his "interest in prosecuting his own case … simultaneously tend[s] to advance the interests of the absent class members." *Id.* It does so here without a doubt.

### 4. Adequacy of Representation

"The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 625 (1997). "The adequacy heading also factors in competency and conflicts of class counsel." *Id*. There are no conflicts, and counsel is competent. *See* Ex. Q, Doc. # 257-19 (declarations of counsel). In the Eastern District of Missouri, Compass did not contest this element (*see* Doc. 260), and Plaintiffs therefore do not expect it will do so here either.

32

### C. The Requirements of Rule 23(b)(3) Are Satisfied

Rule 23(b)(3) requires that common questions of law or fact predominate over questions affecting only individual members, and that a class action be superior to other available methods for fairly and efficiently adjudicating the controversy. Each requirement is present.

#### 1. Predominance

To establish predominance, a plaintiff need not show that there are no individual questions. To the contrary, as the Supreme Court has held, "[w]hen 'one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, *such as damages or some affirmative defenses peculiar to some individual class members*." *Tyson,* 577 U.S. at 453-54 (quoting 7AA C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure §1778, pp. 123-124 (3d ed. 2005) (emphasis added).

"Considering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action.'" *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011). In *Marriott*, the court found that "[t]he elements of breach of contract in the bellwether states are broadly similar" between the states involved even though New York required the plaintiff's performance and Maryland did not. 341 F.R.D. at 156. Here, where the plaintiff's performance is required in every relevant state (see Sec. VI.B.2.a, *supra*), even that difference doesn't exist, and the elements of breach of contract in those states are at least "broadly similar."

#### a. Affirmative defenses

#### i. Voluntary Payment Doctrine

Plaintiffs expect Compass to argue that, under its voluntary-payment affirmative defense,

33

there need to be individual determinations of whether Class members knew of the surcharge when making their purchases. *See* Answer at 104. But this argument misses the point. Whether Compass can establish this affirmative defense against a single Class member is entirely speculative. After nearly five-and-a-half years of litigation, Compass has found no Class member who knew of the surcharge before making his or her first purchase and whose claim would therefore be barred by this defense. The most Compass has found are several individuals who *later* learned of the surcharge (see below). Their claims are not barred by the defense.

It is true that affirmative defenses "must be factored into the calculus of whether common issues predominate." *Gunnells v. Healthplan Servs., Inc*., 348 F.3d 417, 438 (4th Cir. 2003). But, as *Marriott* ruled, there is no "per se rule in the Fourth Circuit precluding a finding of predominance if there are any individualized issues raised by affirmative defenses." 341 F.R.D. at 157. Such a "per se rule would be inconsistent with the overall approach to Rule 23(b)(3): The predominance inquiry asks whether the common, aggregation-enabling, issues in the case *are more prevalent or important* than the non-common, aggregation-defeating, individual issues." *Id.* (quoting *Tyson*, 577 U.S. at 453; emphasis added by *Marriott*). For that proposition, *Tyson* relied on the 2012 edition of Newberg on Class Actions. The current edition states: "Affirmative defenses will foreclose a finding that common issues predominate only where they are, for some reason, *unusually important* or are coupled with other individual issues." 2 W. Rubenstein, Newberg on Class Actions § 4:55) (6th ed. November 2023 update) (emphasis added). And *Marriott* went on to state: "If any individualization defeated predominance, this inquiry related to prevalence and importance would be irrelevant."

Several courts have flatly held that the voluntary-payment defense does not bar class

certification.[14] But this court need not go that far to reject Compass' argument. Its voluntary-payment defense cannot be regarded as unusually important for the critical reason that Compass has presented *no evidence* to support it against a single individual. In *Van v. LLR, Inc*., 61 F.4th 1053, 1067 (9th Cir. 2023), the Ninth Circuit rejected this defense as a basis to defeat predominance because the defendant had "scant evidence" to support it. In a statement that could apply equally here, the court stated: "We do not permit a defendant to support its invocation of individualized issues with mere speculation." *Id.* But speculation is all Compass can offer. *See also Cox v. Porsche Fin. Servs*., 330 F.R.D. 322, 335, *affirmed and* adopted, 330 F.R.D. 322, 327 (S.D. Fla. 2019) (rejecting this argument because "Defendant … has not proffered any record evidence of any proposed class member who had knowledge" that the charge was improper.); *Underwood v. Kohl's Dep't Stores, Inc*., 2017 U.S. Dist. LEXIS 186927 (E.D. Pa. Nov. 13, 2017) ("[T]he common question of Defendants' liability under Delaware law still predominates because Plaintiffs have shown that Defendants lack evidence for their voluntary payment defense."). Defendants' argument fails for the same reason.

### ii. Statute of Limitations

Compass may also argue, as it did in the Eastern District of Missouri, that state differences in statutes of limitations, including whether the "discovery rule" affects when the claim accrues, present insurmountable individual issues. Doc. # 260. Plaintiffs first alleged a nationwide class on December 18, 2018. Their damages claim begins at the earliest in 2014, when Compass began receiving two-tier revenue. *See* M. Morgan Declaration, Doc. 257-5, ¶ 2. Thus, only a statute of

---

[14] See *Kimber Baldwin Designs, LLC v. Silv Communs., Inc*., 2016 U.S. Dist. LEXIS 173481, at *15 (S.D. Ohio Dec. 15, 2016); *Whitton v. Deffenbaugh Disposal, Inc*., 2014 U.S. Dist. LEXIS 153405, at *21 (D. Kan. Oct. 28, 2014); *Ackerman v. Coca-Cola Co*., 2013 U.S. Dist. LEXIS 184232, at *88 n.35 (E.D.N.Y. July 17, 2013*); Dupler v. Costco Wholesale Corp.*, 249 F.R.D. 29, 39 (E.D.N.Y. 2008).

limitations of four years or less would bar any claims. A five-year statute puts the earliest permissible accrual date into 2013, before Compass began charging extra for card purchases.

The vast majority of states in this case adopt the statute of limitations from Article 2 of the UCC, with a four-year period for breach of a contract for sale; those statutes also provide: "A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach." *E.g.,* N.C. Gen. Stat. § 25-2-725. *See* Ex. U. (compiling applicable statutes of limitations). Thus, there is no discovery rule in those states. One exception to the four-year period is Colorado's three years, but still no discovery rule. *Id.* at 3-4. None of the non-UCC states has a period less than five years, so no class members in those states are time-barred. *Id.*

As for states with four-year statutes (and Colorado with three), they have "statute of limitations question[s] that can be answered by referring to objective information to determine whose claims fall inside and outside the applicable limitations period" (*Marriott*, 341 F.R.D. at 158) – i.e., when did the sale take place? As in *Marriott*, therefore, they "do[] not defeat predominance." *Id.*

### b. Damages

The claims of Class members who made one or more card purchases without knowledge of the surcharge but later learned of it and continued to make such purchases are not barred by the voluntary-payment doctrine, but it will limit the amount of the claim. Several present or former plaintiffs, such as Mr. Jilek, learned of the extra charge as part of joining this lawsuit after making many card purchases. *See* Sec. VI.C.1.b, *supra*. That fact doesn't make the voluntary-payment issue important *class-wide*, in other words for those who never considered joining the case. There is evidence of only one person, Brian Baldwin, who learned of the surcharge in any other way (he learned from reviewing his bank record). That's just one person out of thousands

36

of Class members. If he were not a rarity, surely Compass would have found more such individuals.

In any event, Mr. Baldwin's knowledge of the surcharge, at most, affects his damages and thus cannot defeat predominance. "To satisfy predominance, Plaintiffs' damages must be 'capable of measurement on a classwide basis.'" *Marriott*, 341 F.R.D. at 161 (quoting Comcast, 569 U.S. at 34.

However, that doesn't mean each *individual* damage claim must be so calculated. That was the holding in *Gunnells v. Healthplan Servs*., 348 F.3d 417, 429 (4th Cir. 2003), where the Fourth Circuit rejected the argument that the need to make individual determinations of damages defeats predominance. The court stated: "[T]his is precisely the same argument made by almost all defendants in mass tort cases: determining damages will require an individualized inquiry. Courts have routinely rejected this argument, concluding, as we have in previous cases, that the need for individualized proof of damages alone will not defeat class certification." *Id*; *accord*, *Mr. Dee's Inc. v. Inmar, Inc*., 2021 U.S. Dist. LEXIS 176176, at *34 (M.D.N.C. Sep. 16, 2021); *Robinson v. Nationstar Mortg. LLC*, 2019 U.S. Dist. LEXIS 153526, at *59 (D. Md. Sep. 9, 2019); *Souter*, 307 F.R.D. at 217. Quoting another statement from *Gunnells*, 348 F.3d at 427-28, one district court stated: "When such individualized inquiries are necessary, if 'common questions predominate over individual questions *as to liability*, courts generally find the predominance standard of Rule 23(b)(3) to be satisfied.'" *Kay Co., LLC v. EQT*, 2017 U.S. Dist. LEXIS 228275, at *43 (N.D.W. Va. Sep. 6, 2017) (emphasis added). That is the case here.

As noted above, Plaintiffs' damages model "must be consistent with its liability case," *Comcast*, 569 U.S. at 35, and the model presented by Dr. Kriegler is, both in the aggregate based on the experts' reports and individually because each Class member will simply receive the

37

amount of their overcharges plus prejudgment interest. However, Plaintiffs' expect Compass to challenge the model on the ground that it didn't exclude purchases made with knowledge of the surcharge. But "damages calculations made pursuant to a common methodology 'need not be exact' at the class-certification stage." *In re TD Bank, N.A. Debit Card Overdraft Fee Litig.*, 325 F.R.D. 136, 173 (D.S.C. 2018) (quoting *Comcast*, 569 U.S. at 35). Compass can show at most that, in the scope of a $13.8 million damages estimate, a de minimis number of purchases might have been made with knowledge. Courts have concluded that the inclusion of a de minimis number of *uninjured* class members doesn't defeat predominance. *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 292 F. Supp. 3d 14, 135 (D.D.C. 2017) (citing cases). A damages model that includes a de minimis number of *purchases* certainly cannot do so.

### 2. Superiority

"The superiority requirement ensures that 'a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3) *Thorn v. Jefferson-Pilot Life Ins. Co*., 445 F.3d 311, 319 (4th Cir. 2006). As Newberg states, '[a] primary purpose of class action lawsuits, particularly money damages claims aggregated under Rule 23(b)(3), is to enable the litigation of claims that are worth too little money to be pursued individually." 2 Newberg § 4:65. *Id.* In fact, "[a] 'strong presumption in favor of a finding of superiority' arises where 'the alternative to a class action' is 'no action at all.'" *Piron v. Gen. Dynamics Info. Tech., Inc.* 2022 U.S. Dist. LEXIS 21926, at *38 (E.D. Va. Feb. 7, 2022) (Quoting *Soutter*, 307 F.R.D. at 218). That is the case here. "The realistic alternative to a class action is not 17 million individual suits, but zero individual suits, as only a lunatic or a fanatic sues for $30." *Carnegie v. Household Int'l, Inc*., 376 F.3d 656, 661 (7th Cir. 2004); *accord*, *Glover v. EQT Corp*., 2023 U.S. Dist. LEXIS 154309, at *44 (N.D.W. Va. Aug. 31, 2023).

38

Thus, a class action is inherently superior to other methods of adjudicating this controversy.

And Rule 23(b)(3) sets forth four easily-satisfied factors in assessing the superiority requirement:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

Compass did not contest the first three factors in the Eastern District of Missouri, and they should not give the Court pause. Few class members have an interest in controlling their claims because few have filed lawsuits. This is the only case pertaining to this controversy. And it is more desirable that the case be tried here rather than in each of the 33 states involved in the case.

Compass did contest the fourth factor, manageability, which looks at "how the problems that might occur in managing a class suit compare to the problems that would occur in managing litigation without a class suit." Newberg § 4:72 at 284. But its objections all related to the supposed difficulty in proving damages, an issue that cannot bar certification, as shown above.

Moreover, it is not surprising that, given the strong presumption in favor of finding superiority, denial of certification for management reasons "should be the exception rather than the rule." *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 140 (2d Cir. 2001) (Sotomayor, J.; citation omitted).

### D. Plaintiffs Should be Appointed Class Representatives and Plaintiffs' Counsel Should Be Appointed Class Counsel

Plaintiffs request that Messrs. Baldwin, Borrero and Jilek be appointed Class Representative and the undersigned attorneys be appointed Class counsel under Fed. R. Civ. P. 23(g)(1). That

Rule directs the Court to consider the following factors in selecting Class counsel:

> (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources counsel will commit to representing the class ….

*In re Bank of Am. Corp. Sec. Litig.*, 2015 U.S. Dist. LEXIS 69550, at *8 (E.D. Mo. May 29, 2015). The Court "may consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(1)(B). Plaintiffs believe this request shouldn't be belabored because counsel's work here and in similar cases amply show that they meet this standard. See Ex. Q, Doc. # 257-19 (counsel's declarations and resumes).

## VII.   CONCLUSION

Plaintiffs respectfully request that the Court certify the Class and the Subclasses, name Plaintiffs as Class Representatives, and appoint the undersigned attorneys as Class Counsel.

Dated: March 8, 2024                              Respectfully submitted,

**GOLDENBERG HELLER & ANTOGNOLI, P.C.**

By:/s/*Richard S. Cornfeld*
Richard S. Cornfeld (admitted *pro hac vice*)
2227 S. State Route 157
Edwardsville, Illinois 62025
618.656.5150
rick@ghalaw.com
daniel@ghalaw.com

Mike Arias (admitted *pro hac vice*)
M. Anthony Jenkins (admitted *pro hac vice*)
**ARIAS SANGUINETTI WANG & TEAM LLP**
6701 Center Drive West, 14th Floor
Los Angeles, California 90045
Tel: (310) 844-9696 / Fax: (310) 861-0168
mike@aswtlawyers.com

40

anthony@aswtlawyers.com

Joel R. Rhine, NC SBN 16028
Martin A. Ramey, NC SBN 33617
**RHINE LAW FIRM, PC**
1612 Military Cutoff Rd, Suite 300
Wilmington, NC 28403
Tel: 910−772−9960
Fax: 910−772−9062
jrr@rhinelawfirm.com
mjr@rhinelawfirm.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on March 8, 2024, the foregoing was served upon all counsel of record via electronic mail.

/s/ *Richard S. Cornfeld*