# EXHIBIT T

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

|  |  |
|---|---|
| **GEORGE MOORE and JAMES JILEK,**<br><br>       **Plaintiffs,**<br><br>**v.**<br><br>**COMPASS GROUP USA, INC., D/B/A CANTEEN,**<br><br>       **Defendant.** | **No. 3:23-CV-818-RJC-DCK** |

**DECLARATION OF BRIAN KRIEGLER, PH.D.**

**Econ ONE Research, Inc.**

**March 6, 2024**

Suite 800
550 South Hope Street
Los Angeles, California 90071

# TABLE OF CONTENTS

I. **Introduction** ........................................................................................ **1**

    A. Qualifications and Fee Statement ...................................................... 1

    B. Reports and Testimony in this Case to Date ........................................ 2

    C. Assignment .................................................................................... 3

II. **Deriving/Defining the Sampled Populations** .......................... **3**

    A. "Florida Stratum 1" and "South Carolina Stratum 1" ............................ 3

    B. "Florida Stratum 3" and "South Carolina Stratum 3" ............................ 3

III. **Selecting Each State's Stratified Random Sample** ................... **4**

IV. **Potential Damages and Interest Calculations Pertaining to Florida and South Carolina** ...................................................... **4**

V. **Concluding Remarks** ................................................................. **6**

# LIST OF ATTACHMENTS

1 - Curriculum Vitae and Testimonial Experience

2 - True and Correct Copy of the Expert Report of Brian Kriegler, Ph.D., dated August 7, 2023 (excluding exhibits)

3 - True and Correct Copy of the Supplemental Expert Report of Brian Kriegler, Ph.D., dated August 11, 2023 (excluding exhibits)

4 - True and Correct Copy of the Second Supplemental Expert Report of Brian Kriegler, Ph.D., dated October 12, 2023 (excluding exhibits)

5 - Stratified Random Sample of Combinations of Cost Center and Machine Number
    5A - Among Machines Located in Florida
    5B - Among Machines Located in South Carolina

6 - Upcharges Among Randomly Selected Combinations of Cost Center and Machine Number
    6A - Among Machines Located in Florida
    6B - Among Machines Located in South Carolina

7 - Potential Pre-Judgment Interest Among Randomly Selected Combinations of Cost Center and Machine Number
    7A - Among Machines Located in Florida
    7B - Among Machines Located in South Carolina



I, Brian Kriegler, declare as follows:

# I.    Introduction

1.    I have personal knowledge of the facts set forth in this declaration, except where otherwise specified.  If called to testify to these facts as a witness in this action, I would so testify.

2.    I have been retained by the Plaintiffs in *George Moore, et al. v. Compass Group USA, d/b/a Canteen*, Case No. 3:23-CV-818-RJC-DCK, in the United States District Court for the Western District of North Carolina, Charlotte Division.

## A. Qualifications and Fee Statement

3.    I am a Managing Director at Econ One Research, Inc. ("Econ One"), an economic and statistical consulting firm with offices in Denver, Houston, Los Angeles, Memphis, New York, Sacramento, the San Francisco Bay Area, Washington, D.C, and India. I earned my M.S. and Ph.D. in statistics from UCLA and my B.A. in mathematics/economics from Claremont McKenna College. I have published several articles in peer-reviewed journals on the use of sampling and statistical modeling.

4.    I have testified as an expert statistician in deposition and/or trial more than 80 times, collectively in the areas of wage and hour, civil rights, consumer protection, and breach of contract.  I have been an invited speaker at numerous legal conferences, including the American Bar Association's Annual Labor and Employment Conference in 2017,[1] the California Employment Lawyers' Association Annual Conference in 2018,[2] the ABA's Fair Labor Standards Legislation mid-winter meeting in 2020,[3] and the Los Angeles County Bar Association's Labor and Employment

---

[1] *"Representative Evidence in Class Actions after Tyson Foods."* With Ryan Haggerty, John Ho, Rachhana Srey, and Debra Nahrstadt. 2017 Annual ABA Labor and Employment Law Conference, Washington, DC.

[2] "An Analysis of California Employment-Related Arbitrations," with Genie Harrison and Cliff Palefsky. 31st Annual CELA Conference, San Diego, CA.

[3] "Arbitrating Individual FLSA Claims Under Compulsion," with Matthew Helland, Sally Abrahamson, Eric Su, and Sheri Eisner. 2020 ABA FLSL Midwinter Meeting, Los Cabos, MX.

Page 1

 *Moore v. Canteen* • Declaration of Brian Kriegler, Ph.D.
Case 3:23-cv-00818-JAG-DCK      Document 293-4      Filed 03/08/24      Page 4 of 164

Symposium in 2023.[4]  A true and correct copy of my curriculum vitae, which includes my testimonial experience, is attached hereto as **Attachment 1**.

5.    Econ One currently is being compensated for the time I spend on this matter at $550 per hour.  Econ One is being compensated for the time spent by other Econ One employees on this project at their normal and customary hourly rates.

## B. Reports and Testimony in this Case to Date

6.    To date, I have authored the following expert reports:

- Expert Report of Brian Kriegler, Ph.D., dated August 7, 2023 ("Kriegler Report") - A true and correct copy of the body of this report along with the appendix chapters on random sampling is attached hereto as **Attachment 2**.

- Supplemental Expert Report of Brian Kriegler, Ph.D., dated August 11, 2023 ("Kriegler Supplemental Report") - A true and correct copy of the body of this report is attached hereto as **Attachment 3**.[5]

- Second Supplemental Expert Report of Brian Kriegler, Ph.D., dated October 12, 2023 ("Kriegler Second Supplemental Report") - A true and correct copy of the body of this report is attached hereto as **Attachment 4**.

7.    On August 23, 2023, I gave deposition testimony at opposing counsel's office in Los Angeles, California.

8.    Except where specified otherwise, the terminology and methodology utilized in this declaration are the same as in the Kriegler Report.

---

[4] "Show Me the Money: Pay Transparency and Pay Equity Litigation," with Felicia Davis, Genie Harrison, and Ali Saad. 2023 LACBA Annual Labor & Employment Symposium, Los Angeles, CA.

[5] The Errata to the Supplemental Expert Report of Brian Kriegler, Ph.D. was dated August 25, 2023.



### C. Assignment

9.    The purpose of this declaration is to provide (i) a stratified random sample of machines located in Florida[6] ("Florida Stratified Random Sample"), and (ii) a stratified random sample of machines located in South Carolina[7] ("South Carolina Stratified Random Sample").  The methodology used to select each of these random samples is identical to the approach used to select the California Stratified Random Sample, as described in the Kriegler Supplemental Report.

## II.   Deriving/Defining the Sampled Populations

### A. "Florida Stratum 1" and "South Carolina Stratum 1"

10.   The "Florida Stratum 1" is the sub-population of all machines in Stratum 1 that were in Florida at or before the earliest survey date.  There are 5,375 combinations of cost center and machine numbers that fit this description.  Note that total Upcharges in Florida through the earliest survey date in this stratum are equal to $1,622,230.49.

11.   Similarly, the "South Carolina Stratum 1" is the sub-population of all machines in Stratum 1 that were in South Carolina at or before the earliest survey date.  There are 2,391 combinations of cost center and machine numbers that fit this description. Note that total Upcharges in South Carolina through the earliest survey date in this stratum are equal to $619,442.30.

### B. "Florida Stratum 3" and "South Carolina Stratum 3"

12.   "Florida Stratum 3" is the sub-population of all machines in Stratum 3 that were or are located in Florida.  There are 1,169 combinations of cost center and machine numbers that fit this description.  Note that total Upcharges in Florida are equal to $463,321.16.

---

[6] Plaintiffs' counsel has advised me that the statute of limitation in Florida dates back to December 18, 2013. Given that the Two-Tier Revenue Report dates back to January 2014, it follows that all data pertaining to Florida in the Two-Tier Revenue Report was during said statute.

[7] Plaintiffs' counsel has advised me that the statute of limitation in South Carolina dates back to December 18, 2012.  Given that the Two-Tier Revenue Report dates back to January 2014, it follows that all data pertaining to South Carolina in the Two-Tier Revenue Report was during said statute.



13. Similarly, "South Carolina Stratum 3" is the sub-population of all machines in Stratum 3 that were or are located in South Carolina. There are 55 combinations of cost center and machine numbers that fit this description. Note that total Upcharges in South Carolina are equal to $11,997.00.

## III. Selecting Each State's Stratified Random Sample

14. All observations in Florida Stratum 1 are placed in a random order. Subsequently, the first 65 observations in this random order are selected. The same process and sample size is applied to South Carolina Stratum 1.

15. Similarly, all observations in Florida Stratum 3 are placed in a random order. Subsequently, the first 35 observations in this random order are selected. The same process and sample size is applied to South Carolina Stratum 3.

16. The Florida-specific stratified sample of 100 observations is shown in **Attachment 5A**. The South Carolina-specific stratified sample of 100 observations is shown in **Attachment 5B**. These exhibits are analogous to (i) Exhibit 2 in the Kriegler Report, and (ii) Supplemental Exhibit 1 in the Kriegler Supplemental Report. Within each stratum, the sampled observations are to be reviewed/analyzed <u>in the order that they appear in this list</u>.

## IV. Potential Damages and Interest Calculations Pertaining to Florida and South Carolina

17. **Attachment 6** shows Upcharges for each unique combination of cost center and machine in the stratified random sample. **Attachment 6A** pertains to Florida, and **Attachment 6B** pertains to South Carolina. These exhibits are analogous to (i) Exhibit 4 in the Kriegler Report, and (ii) Supplemental Exhibit 2 in the Kriegler Supplemental Report.

18. **Attachment 7** shows potential pre-judgment interest for each unique combination of cost center and machine number in the stratified random sample. **Attachment 7A** pertains to Florida, and **Attachment 7B** pertains to South Carolina.[8] These exhibits

---

[8] Pre-judgment interest on Florida machines is calculated at 6 percent simple per annum, and pre-judgment interest on South Carolina machines is calculated at 9 percent simple per annum.. *See* Kriegler Report, Ex. 3.

Page 4

 econ**ONE**

*Moore v. Canteen* • Declaration of Brian Kriegler, Ph.D.
Case 3:23-cv-00818-JAG-DCK    Document 293-4    Filed 03/08/24    Page 7 of 164

are analogous to (i) Exhibit 5 in the Kriegler Report, and (ii) Supplemental Exhibit 3 in the Kriegler Supplemental Report. At the outset, pre-judgment interest is calculated through March 7, 2024.

19. **Declaration Table 1** below shows extrapolated potential principal damages and pre-judgment interest pertaining to the sampled population of machines in Florida, along with corresponding confidence intervals. This table is followed by **Declaration Table 2**, which pertains to South Carolina. These tables are analogous to Table 1 in the Kriegler Report, as well as Supplemental Table 1 in the Kriegler Supplemental Report.

| Declaration Table 1: Potential Principal Damages and Pre-Judgment Interest Pertaining to Machines that Are or Were in Florida | | |
|---|---|---|
| **Description** | **Using CLT-Based Formulas** | **Using Bootstrapping** |
| *Potential Principal Damages* | | |
| Extrapolated Total | $ 2,644,071 | $ 2,647,425 |
| Lower Bound of a 1-Sided 90 Percent Confidence Interval | $ 2,090,772 | $ 2,139,543 |
| Lower Bound of a 1-Sided 95 Percent Confidence Interval* | $ 1,930,952 | $ 2,004,359 |
| *Potential Pre-Judgment Interest* | | |
| Extrapolated Total | $ 814,357 | $ 814,942 |
| Lower Bound of a 1-Sided 90 Percent Confidence Interval | $ 605,017 | $ 619,199 |
| Lower Bound of a 1-Sided 95 Percent Confidence Interval* | $ 544,540 | $ 576,442 |
| * - Equivalent to the lower bound of a two-sided 90 percent confidence interval | | |

econ ONE
*Moore v. Canteen* • Declaration of Brian Kriegler, Ph.D.
Case 3:23-cv-00818-JAG-DCK    Document 293-4    Filed 03/08/24    Page 8 of 164

| Declaration Table 2: Potential Principal Damages and Pre-Judgment Interest Pertaining to Machines that Are or Were in South Carolina | | |
|---|---|---|
| **Description** | **Using CLT-Based Formulas** | **Using Bootstrapping** |
| *Potential Principal Damages* | | |
| Extrapolated Total | $ 541,461 | $ 541,144 |
| Lower Bound of a 1-Sided 90 Percent Confidence Interval | $ 426,423 | $ 429,882 |
| Lower Bound of a 1-Sided 95 Percent Confidence Interval* | $ 393,189 | $ 401,130 |
| *Potential Pre-Judgment Interest* | | |
| Extrapolated Total | $ 285,126 | $ 284,964 |
| Lower Bound of a 1-Sided 90 Percent Confidence Interval | $ 220,918 | $ 223,744 |
| Lower Bound of a 1-Sided 95 Percent Confidence Interval* | $ 202,369 | $ 206,728 |
| * - Equivalent to the lower bound of a two-sided 90 percent confidence interval | | |

## V.  Concluding Remarks

20.  The same methodologies presented in both the Kriegler Report and in the Kriegler Supplemental Report are applied to the subset of machines that (i) are or were in Florida, and similarly, (ii) are or were in South Carolina.

21.  Should additional, relevant information become available to me in this class action, I am open to incorporating it into my future calculations and opinions.

22.    I declare the foregoing to be true under penalty of perjury of the laws of the State of North Carolina and the United States of America.  Executed this 6th day of March, 2024.

<div align="right">
Brian Kriegler, Ph.D.<br>
March 6, 2024
</div>

# ATTACHMENT 1

*DR. BRIAN KRIEGLER*
**Managing Director**
**Los Angeles, California**
**Tel: 213 624 9600**
**Email: bkriegler@econone.com**



**Brian Kriegler** is a Managing Director at Econ One Research in Los Angeles, California, bringing a wealth of expertise in sampling, statistics, and data analysis to his role. He is a distinguished expert statistician, testifying in both State and Federal courts in over 100 cases. The majority of these cases are wage and hour class/representative actions, and he also has testified in lawsuits involving discrimination, civil rights, consumer claims, and Medicare reimbursement.

Dr. Kriegler played a pivotal role in *Senne v. Major League Baseball*, a landmark class action lawsuit addressing systemic minimum wage and overtime violations among minor league baseball players. Retained by the plaintiffs, his classwide damages model involved "re-creating" the workday by combining player transactional data, team schedules, rosters, game information from the Minor League Baseball website, Google Maps, and survey data. Once the parties reached a settlement agreement, Dr. Kriegler was tasked with determining individual awards for each class member based on his analysis during the litigation.

Other noteworthy cases in which Courts have relied directly on Dr. Kriegler's analysis/opinions include:

- *Bennett v. Providence* - Employees alleged time rounding and missed meal periods

- Woodworth v. LLUMC - Employees alleged time rounding and missed meal/rest periods

- *Alberts v. Aurora* - Employees alleged missed meal/rest periods and off-the-clock work

- *Benton v. TNS* - Cell phone tower installers alleged underpaid overtime and missed meal/rest periods

- *Hamilton v. Walmart* - Fulfillment center employees alleged underpaid overtime and non-compliant meal periods

- *Espinoza v. East West Bank* - Plaintiff and the putative class alleged they were misclassified as salary exempt employees

Additionally, Dr. Kriegler and his team have built a versatile wage and hour consulting practice. These services include:

- *Damages analyses for mediation purposes* - Whether retained by the employer or employee(s), the primary aim of the Kriegler Group is to

assess the potential amount in unpaid wages and penalties should the event that the case proceeds to trial.

- *Historical and recurring time/pay audits for employers* - These evaluations are pivotal for monitoring the occurrence of deficient meal periods and daily overtime. Historical audits involve scrutinizing recent months or years of employer's data, while recurring audits entail developing a system capable of processing records on an ongoing basis.

- Review of employer's wage and hour policies and practices - Dr. Kriegler works directly with proactive business owners and operators to enhance labor operations, while at the same time assessing/mitigating the risk of significant legal disputes.

## EDUCATION

Ph.D., Statistics, University of California, Los Angeles
M.S., Statistics, University of California, Los Angeles
B.A., Mathematics-Economics, Claremont McKenna College

## WORK EXPERIENCE

*Econ One Research, Inc.*
    Managing Director, January 2015 to Present
    Statistician, August 2008 - December 2014

*Claremont McKenna College (Silicon Valley Program)*, Guest Lecturer
    Econ 123, Quantitative Data Analysis, March 2016
    Econ 123, Quantitative Data Analysis, October 2015

*University of Pennsylvania Department of Statistics,* Post-Doctoral
    Researcher, 2007 - 2008

*UCLA Department of Statistics,* Lecturer
    Statistics 10, Introduction to Statistical Reasoning, Winter 2008
    Statistics 130B, Statistical Analysis with SAS, Summer 2007

*Self-Employed*, Statistical Consultant, 2004 - 2008

*Claremont McKenna College Reed Institute for Applied Statistics,* Post-
    Doctoral Researcher, 2007

*RAND Corporation,* Summer Associate, 2006

*UCLA Department of Statistics,* Graduate Student Researcher,
    2004 - 2006

*UCLA Department of Statistics,* Technology Teaching Assistant Coordinator, 2004 - 2005

*Lockheed Martin Missiles and Space,* Associate Reliability Engineer, 2001 - 2003

## INVITED PRESENTATIONS

"*Show Me the Money: Pay Transparency and Pay Equity Litigation*," with Felicia Davis, Genie Harrison, and Ali Saad. 2023 LACBA Annual Labor & Employment Symposium.

"*Using Experts in Wage and Hour Litigation Cases: Understanding Costs, Expectations, and the Role of Experts*," with Megan Lawson. 2022 Bridgeport Wage & Hour Litigation Conference, Los Angeles, CA.

"*Calculating Damages in Employment Cases.*" 2022 Annual AAJ Convention, Seattle, WA.

"*Arbitrating Individual FLSA Claims Under Compulsion*," with Matthew Helland, Sally Abrahamson, Eric Su, and Sheri Eisner. 2020 ABA FLSL Midwinter Meeting, Los Cabos, MX.

"*An Analysis of California Employment-Related Arbitrations*," with Genie Harrison and Cliff Palefsky. 31st Annual CELA Conference, San Diego, CA.

"*Representative Evidence in Class Actions after Tyson Foods*," with Ryan Haggerty, John Ho, Rachchana Srey, and Debra Nahrstadt. 2017 Annual ABA Labor and Employment Law Conference, Washington, DC.

"*Effective Use of Statistical Evidence in Employment Class Action Litigation: Practical Guide in 2017.*" Webinar presentation through The Knowledge Group with Eric Savage, Dubravka Tosic, Ph.D., and Paul White, Ph.D.

"*Counting the Homeless in Los Angeles County.*" Joint Statistical Meetings, Seattle, WA, August 2006.

"*A Southpaw Secret: Are Their Salaries Consistent with Their Contributions to Team Performance*?" Claremont McKenna College, Claremont, CA, March 2002.

"*Mixing Component and System Data in Reliability Assessment.*" United States Navy Complex, Washington, DC, July 2001.

**PUBLISHED ARTICLES & PAPERS**

*"An Exploration and Validation of Confidence Intervals."* Law360 (July 15, 2019).

*"Practitioner's Guide to Stratified Random Sampling."* Law360 (Nov 30-Dec 3, 2018).
Part 1: Four Reasons to Select a Stratified Random Sample
Part 2: Three Misconceptions About Stratified Random Sampling

*"Practitioner's Guide to Statistical Sampling."* Law360 (Jan 8-11, 2018).
*Part 1*: Validating Random Sampling and the Central Limit Theorem
*Part 2*: Resampling and Bootstrapping: A Method for Determining Confidence Intervals from Small Datasets
*Part 3*: Making Valid Statistical Inferences When Sample Selections Are Missing
*Part 4*: Three Myths About Random Sampling Requirements

*"Delving Deeper into Duran."* Law360 (Oct 1, 2014).

*"Small Area Estimation of the Homeless Population in Los Angeles County: An Application of Cost-Sensitive Stochastic Gradient Boosting,"* Annals of Applied Statistics. Vol. 4 (3), 1234-1255, with Berk, R. (2010).

*"Counting the Homeless in Los Angeles County."* IMS Collections. Probability and Statistics: Essays in Honor of David A. Freedman, Vol. 2. 127-141, with Berk, R. and Ylvisaker, D. (2008).

*"Cost-Sensitive Stochastic Gradient Boosting Within a Quantitative Regression Framework,"* Ph.D. Dissertation, Committee Chair: Richard Berk. Portions of this research have been implemented into the "gbm" library in R (open source statistical software) available at www.r-project.org (2007).

*"Forecasting Dangerous Inmate Misconduct: An Application of Ensemble Statistical Procedures."* Journal of Quantitative Criminology, 22(2). 131-145, with Berk, R. and Baek, J.H. (2006).

*"Comparison of Achievement of 8th Graders Who Used the MathScape Curriculum to Those Who Used a More Traditional Curriculum,"* Creative Publications (2001).

*"Estimation of Component and System Reliabilities Using Binomial and Exponential Data and Various Test Methods,"* Undergraduate Senior Thesis, Chair: Janet Myhre (2001).

**DR. BRIAN KRIEGLER**
*Managing Director*

**REPRESENTATIVE CONSULTING ENGAGEMENTS**

### Employment

One-Time Compliance Audit
In the context of a pending class action, retained by a large restaurant chain to estimate how long various job activities took to complete. Worked with restaurant industry expert to develop a survey of kitchen managers.

Recurring Compliance Audits
Retained by a landscaping company to generate a monthly report on the extent of deficient meal periods and daily overtime. Each report included results by employee, by location, and across the State of California. Meal period compliance went from approximately 87 to 97 percent within a three-month period.

Retained by a San Diego-based restaurant chain with 12 locations to assist with meal period compliance and staffing optimization. Implemented a real-time software solution that reduced the rate of deficient meal periods by 45 percent.

Retained by a California restaurant chain with 20+ locations to assist in meal period compliance and to reduce unapproved daily overtime. Implemented a real-time software solution that helped the company save $20,000 annually in meal premiums and $35,000 annually in overtime pay.

Company Policies Audit
Retained by a manufacturing company to review company policies and time/pay practices. Made recommendations based on discussions with the employer and their management counsel.

### False Claims Act

Medicare Reimbursements and Disgorgement
Retained by the relator, who alleged that a pharmaceutical company offered illegal kickbacks to doctors for prescribing specific drugs and inflated revenue for the pharmaceutical company. Constructed damages model that was used for settlement proceedings.

Medicare Audits
Regularly retained by a healthcare consulting firm to (i) select a random sample of Medicare claims, and (ii) perform extrapolations based on said sample once a medical expert has reviewed said sample. The results from sampling and extrapolation typically are submitted to the applicable Medicare Administrative Contractor (MAC).

**DR. BRIAN KRIEGLER**
*Managing Director*

Appellate Process
Retained to review/analyze the MAC's statistical sampling and
overpayment extrapolation methods used to derive the amount that the
Centers for Medicare/Medicaid Services demanded.

## REPRESENTATIVE TESTIMONIAL ENGAGEMENTS

### Employment

Time Rounding and Missed Breaks
*Bennett v. Providence* - To date, retained by the plaintiffs to calculate
classwide damages stemming from time rounding and non-compliant
second meal periods.  Trial court granted summary adjudication on liability
to the plaintiffs.  Case is pending.

Missed Breaks and Off-the-Clock Work
*Alberts v. Aurora* - Retained by the plaintiffs to (i) analyze historical
timekeeping and payroll records, along with survey data, and (ii) calculate
classwide damages.

Missed Breaks and Underpaid Overtime
*Benton v. Telecom Network Specialists* - To date, retained by the plaintiffs
to (i) analyze historical timekeeping and payroll records from numerous
staffing companies, and (ii) calculate classwide damages.  Case is
pending.

*DLSE v. Adat Shalom Board and Care* - Retained by the defendant to
evaluate the sampling design carried out by the DLSE.

Non-Compliant Breaks and Underpaid Overtime
*Hamilton v. Walmart* - Retained by the plaintiffs to analyze timekeeping
data, payroll data, and security camera footage.  Calculated damages and
penalties stemming from various wage and hour violations.

Missed Breaks, Underpaid Overtime, and Off-the-Clock Work
*Landon Fulmer v. Golden State Drilling* - Retained by the plaintiffs to
calculate classwide damages using class member deposition testimony,
timekeeping, and payroll records.

Misclassification
*Boyd v. Landsafe* - Retained by the plaintiffs to calculate classwide
damages using survey data, activity logs, and payroll records.  Also
worked with survey experts to design and implement a questionnaire to
estimate hours worked.

*Espinoza v. East West Bank* - Retained by the defense to evaluate
declarations and deposition testimony of potential class members prior to

class certification.  Opined on Plaintiffs' experts' approach regarding the proposed use of surveying and sampling.

Seating
*Lampkins v. Chase Bank* - Retained by the plaintiff to analyze the length of time between transaction, the frequency of various types of transactions, and timekeeping data.

Discrimination
*Capen v. Temecula Preparatory School* - Retained by the plaintiff to conduct a statistical analysis of hiring and terminating practices at a charter school.

*Horvath v. Western Refining* - In a single plaintiff age discrimination case, conducted a statistical analysis of hiring and terminating practices at a logistics company.

**Civil Rights**

Over-Detention and Unlawful Strip Searches
*Barnes v. District of Columbia* - Retained by the plaintiffs to analyze inmate databases and to identify potentially impacted individuals.  Also constructed a sampling design for selecting inmate files, and subsequently extrapolated the number of over-detentions and number of post-release strip-searched inmates based on a criminal justice expert's analysis of the sample.

Unlawful Strip Searches
*Craft v. San Bernardino* - Retained by the plaintiffs to analyze large databases to identify inmates who were subjected to strip searches (i) prior to their arraignment, (ii) after being ordered released, and/or (iii) in large groups.  Collaborated with system administrators and officers from the law enforcement agency to construct criteria for identifying class members.

**False Claims Act**

Medicare Reimbursements
*U.S. ex rel. Carlo Santa Ana v. Winter Park Urology* - Retained by the relator, who alleged that the medical provider submitted improperly up-coded Medicare claims. Extrapolated damages based on a random sample of patients' data.

**Antitrust**

Large Transactional Data Analysis
*Marchbanks v. Comdata* - In a consulting role to the testifying expert to manage approximately one billion proprietary debit card transactions.

Collaborated with class administrator to locate class members and calculate damages for settlement purposes.

**Consumer Class Actions/Breach of Contract**

Unjust Enrichment

*McAllister v. St. Louis Rams* - Retained by the plaintiff, who alleged that season ticket holders were entitled to a refund for their personalized seating license. Developed a damages model and sampling methodology.

*Moore v. Compass USA* - Retained by the Plaintiffs, who alleged that they were not properly informed of higher fees when using a credit card at vending machines. Developed a sampling methodology and analyzed large transaction databases in order to calculate alleged classwide damages.

**DR. BRIAN KRIEGLER**
*Prior Testimony/Reports*

| Proceeding | Court/Commission/Agency | Docket or File | Deposition/ Trial/Reports | Date | On Behalf Of |
|---|---|---|---|---|---|
| **Employment** | | | | | |
| 1. Richard Fairfield v. Advantage Rent-A-Car | Superior Court of the State of California, for the County of Los Angeles | BC342461 | Declaration Declaration Declaration Deposition Supplemental Declaration | December 2006 February 2007 March 2007 March 2007 May 2007 | Plaintiff |
| 2. Elveta Louise Francis v. State of California Department of Corrections | Superior Court of the State of California, for the County of Los Angeles | BC302856 | Declaration Declaration | January 2007 May 2010 | Plaintiff |
| 3. David Lubocki v. ZipRealty, Inc. | U.S. District Court, Central District of California | CV 07 2959 SJO (JCx) | Declaration | September 2007 | Plaintiff |
| 4. Eric Moore v. Roadway Express, Inc. et al. | U.S. District Court, Central District of California | 2:09-CV-01588 RBL (Opx) | Declaration | May 2010 | Plaintiff |
| 5. Maria Martinez v. Jatco, Inc. | Superior Court of the State of California, for the County of Alameda | RG08397316 | Deposition Trial | September 2011 December 2011 | Defendant |

Case 3:23-cv-00818-JAG-DCK    Document 293-4    Filed 03/08/24    Page 20 of 164

**DR. BRIAN KRIEGLER**
*Prior Testimony/Reports*

| | Proceeding | Court/Commission/Agency | Docket or File | Deposition/ Trial/Reports | Date | On Behalf Of |
|---|---|---|---|---|---|---|
| 6. | Valerie Alberts v. Aurora Behavioral Health Care | Superior Court of the State of California, for the County of Los Angeles | BC419340 | Declaration Deposition Deposition Supplemental Declaration Declaration Deposition Reply Declaration Declaration Declaration Deposition Reply Declaration | May 2012 July 2012 October 2012 April 2013 December 2017 February 2018 April 2018 November 2020 May 2023 June 2023 August 2023 | Plaintiff |
| 7. | Patrick Santiago v. Amdocs, Inc. | U.S. District Court, Northern District of California | 3:10-CV-04317 SI | Declaration Deposition | April 2013 May 2013 | Plaintiff |
| 8. | Christina Espinoza v. East West Bank | Superior Court of the State of California, for the County of Los Angeles | BC502166 | Declaration Deposition | November 2014 February 2015 | Defendant |
| 9. | Crystal Brock v. Living Spaces Furniture; and Ronald Monroe v. Living Spaces Furniture | Superior Court of the State of California, for the County of Los Angeles | BC498415 / BC521299 | Declaration | December 2014 | Plaintiff |
| 10. | Marie Minns, Kemberly Briggs v. Advanced Clinical Employment Staffing LLC, et al. | U.S. District Court, Northern District of California | 3:13-03249-SI | Declaration Supplemental Declaration | February 2015 March 2015 | Plaintiff |

Case 3:23-cv-00818-JAG-DCK    Document 293-4    Filed 03/08/24    Page 21 of 164

**DR. BRIAN KRIEGLER**
*Prior Testimony/Reports*

| | Proceeding | Court/Commission/Agency | Docket or File | Deposition/ Trial/Reports | Date | On Behalf Of |
|---|---|---|---|---|---|---|
| 11. | Kimberly Murphy v. CVS Caremark Corporation, et al. | Superior Court of the State of California, for the County of Los Angeles | BC464785 | Declaration Deposition | March 2015 April 2015 | Plaintiff |
| 12. | Lorenzo Benton v. Telecom Network Specialists | Superior Court of the State of California, for the County of Los Angeles | BC354230 | Declaration Deposition Declaration Supplemental Declaration Supplemental Declaration Supplemental Declaration Reply Declaration Declaration Deposition Trial Declaration | March 2015 May 2015 July 2017 November 2017 <br><br> March 2018 <br><br> April 2018 <br><br> August 2018 <br><br> August 2019 August 2019 January 2020 November 2020 | Plaintiff |
| 13. | Connie Capen v. Temecula Preparatory School, et al. | Superior Court of the State of California, for the County of Riverside | MCC 1300098 | Declaration | April 2015 | Plaintiff |
| 14. | Terry P. Boyd v. LandSafe, et al. | U.S. District Court, Central District of California | SA13-CV-00561 DOC (JPRx) | Expert Report | July 2015 | Plaintiff |
| 15. | Valerie Horvath v. Western Refining Wholesale | Superior Court of the State of California, for the County of San Bernardino | CIVDS1311846 | Declaration Deposition | November 2015 January 2016 | Plaintiff |

Case 3:23-cv-00818-JAG-DCK    Document 293-4    Filed 03/08/24    Page 22 of 164

**DR. BRIAN KRIEGLER**
*Prior Testimony/Reports*

| | Proceeding | Court/Commission/Agency | Docket or File | Deposition/ Trial/Reports | Date | On Behalf Of |
|---|---|---|---|---|---|---|
| 16. | David Kaanaana v. Barrett Business Services, Inc., et al. | Superior Court of the State of California, for the County of Los Angeles | BC496090 | Deposition Declaration Trial | December 2015 January 2016 February 2016 | Plaintiff |
| 17. | James Cole v. CRST, Inc. | U.S. District Court, Central District of California | EDCV 08-1570-VAP(SPx) | Declaration Deposition Expert Report Declaration | January 2016 February 2016 December 2016 February 2017 | Plaintiff |
| 18. | Christopher Williams v. Allstate Insurance Company | Superior Court of the State of California, for the County of Los Angeles | BC382577 | Declaration | March 2016 | Plaintiff |
| 19. | Larry Loffredo v. Astro Spar, Inc. | Superior Court of the State of California, for the County of Los Angeles | BC559611 | Declaration Deposition | March 2016 April 2016 | Plaintiff |
| 20. | Aaron Senne v. Office of the Commissioner of Baseball, et al. | U.S. District Court, Northern District of California | 3:14-CV-00608-JCS / 3:14-CV-03289-JCS | Declaration Declaration Supplemental Declaration Expert Report Rebuttal Declaration Supplemental Expert Report Deposition Declaration Declaration | March 2016 April 2016 April 2016 August 2016 October 2016 August 2021 September 2021 November 2021 July 2022 January 2023 | Plaintiff |

**DR. BRIAN KRIEGLER**
*Prior Testimony/Reports*

| Proceeding | Court/Commission/Agency | Docket or File | Deposition/ Trial/Reports | Date | On Behalf Of |
|---|---|---|---|---|---|
| 21. Annette Blackwell v. Steve's Plating Corporation | Superior Court of the State of California, for the County of Los Angeles | BC531129 | Deposition | March 2016 | Defendant |
| 22. Bertha Sanchez v. St. Mary Medical Center | Superior Court of the State of California, for the County of San Bernardino | CIVDS 1304898 | Declaration Deposition Rebuttal Declaration Rebuttal Declaration Deposition Declaration | April 2016 May 2016 July 2016  April 2018  April 2018 May 2018 | Plaintiff |
| 23. Antoaneta Vatraleva v. Sears, Robuck & Co. | Superior Court of the State of California, for the County of Los Angeles | BC515650 | Declaration | August 2016 | Plaintiff |
| 24. Donald Harrington v. Marten Transport | U.S. District Court, Central District of California | 15-CV-01419-MWF-ASx | Declaration | October 2016 | Plaintiff |
| 25. Roderick Wright v. Renzenberger, Inc. | U.S. District Court, Central District of California | 2:13-CV-06642-FMO-AGR | Expert Report | April 2017 | Plaintiff |
| 26. Holly Attia v. The Neiman Marcus Group, Inc. | U.S. District Court, Central District of California | 8:16-CV-00504 DOC (FFM) | Declaration | April 2017 | Plaintiff |

**DR. BRIAN KRIEGLER**
*Prior Testimony/Reports*

| Proceeding | Court/Commission/Agency | Docket or File | Deposition/ Trial/Reports | Date | On Behalf Of |
|---|---|---|---|---|---|
| 27. Clayton Dezan v. Dignity Health | Superior Court of the State of California, for the County of San Bernardino | CIVDS1516658 | Declaration Deposition Rebuttal Declaration Declaration Declaration Reply Declaration Deposition Trial Trial | April 2017 June 2017 September 2017 August 2019 March 2021 July 2021 July 2021 August 2021 September 2021 | Plaintiff |
| 28. Darel D. Woods v. JFK Memorial Hospital, Inc. | Superior Court of the State of California, for the County of Riverside | INC 1205209 | Declaration Deposition Rebuttal Declaration Supplemental Declaration Declaration | May 2017 August 2017 December 2017 June 2018 August 2019 | Plaintiff |
| 29. Isaac Rodriguez v. Nike Retail Services, Inc. | U.S. District Court, Northern District of California | 5:14-CV-1508 BLF | Declaration Deposition Supplemental Declaration | June 2017 June 2017 August 2017 | Plaintiff |
| 30. Eric Chavez v. Converse, Inc. | U.S. District Court, Northern District of California | 15-CV-03746 NC | Declaration Expert Report Declaration Deposition Supplemental Declaration | June 2017 September 2017 September 2017 September 2017 September 2017 | Plaintiff |

**DR. BRIAN KRIEGLER**
*Prior Testimony/Reports*

| Proceeding | Court/Commission/Agency | Docket or File | Deposition/ Trial/Reports | Date | On Behalf Of |
|---|---|---|---|---|---|
| 31. Segundina Morin v. Physicians' Surgery Center of Downey, Inc. | Superior Court of the State of California, for the County of Los Angeles | BC625567 | Deposition | July 2017 | Plaintiff |
| 32. Amber Stewart v. Hat World, Inc. | Superior Court of the California, for the County of San Mateo | CIV 533617 | Declaration Declaration Expert Report Supplemental Expert Report | August 2017 April 2018 January 2019 February 2019 | Plaintiff |
| 33. Safeway Wage and Hour Cases | Superior Court of the State of California, for the County of Los Angeles | JCCP 4772 | Rebuttal Declaration Deposition | August 2017 September 2017 | Plaintiff |
| 34. Robyn James and Tiffany Belle v. American Corporate Security, Inc. | Superior Court of the State of California, for the County of Los Angeles | BC525388 | Declaration | August 2017 | Plaintiff |
| 35. Janae Brown v. Blazin' Wings, Inc | Superior Court of the State of California, for the County of Los Angeles | BC620185 | Declaration Declaration Declaration | October 2017 July 2018 March 2019 | Plaintiff |
| 36. Ta'quonna Lampkins et al. v. JP Morgan Chase Bank | U.S. District Court, Central District of California | 11-CV-03428-PSG (PLAx) | Expert Report Supplemental Expert Report Expert Report Errata Supplemental Expert Report Errata Deposition | February 2018 March 2018 March 2018 March 2018 March 2018 | Plaintiff |

Case 3:23-cv-00818-JAG-DCK    Document 293-4    Filed 03/08/24    Page 26 of 164

**DR. BRIAN KRIEGLER**
*Prior Testimony/Reports*

| Proceeding | Court/Commission/Agency | Docket or File | Deposition/ Trial/Reports | Date | On Behalf Of |
|---|---|---|---|---|---|
| 37. Juan Garcia v. Walmart Stores, Inc. | U.S. District Court, Central District of California | 5:16-CV-01645 TJH (RAOx) | Declaration<br>Reply Declaration<br>Expert Report<br>Deposition<br>Reply Expert Report | February 2018<br>May 2018<br><br>April 2019<br>April 2019<br>June 2019 | Plaintiff |
| 38. Landon Fulmer, Jr. v. Golden State Drilling | Superior Court of the State of California, for the County of Kern | S-1500-CV-279707 | Deposition | April 2018 | Plaintiff |
| 39. Emmy Song v. THC-Orange County | U.S. District Court, Central District of California | 8:17-cv-00965-JLS-DFMx | Declaration<br>Deposition | April 2018<br>May 2018 | Plaintiff |
| 40. Chelsea Hamilton v. Walmart Stores, Inc. | U.S. District Court, Central District of California | 5:17-CV-01415 | Declaration<br>Deposition<br>Reply Declaration<br>Declaration<br>Expert Report<br>Supplemental Expert Report<br>Supplemental Expert Report<br>Deposition<br>Trial | June 2018<br>July 2018<br>August 2018<br><br>September 2018<br>September 2018<br>November 2018<br><br>February 2019<br><br>March 2019<br>April 2019 | Plaintiff |

**DR. BRIAN KRIEGLER**
*Prior Testimony/Reports*

| Proceeding | Court/Commission/Agency | Docket or File | Deposition/ Trial/Reports | Date | On Behalf Of |
|---|---|---|---|---|---|
| 41. Nicole Woodworth v. Loma Linda University Medical Center | Superior Court of the State of California, for the County of San Bernardino | CIVDS1408640 | Declaration Declaration Declaration Deposition Declaration Reply Declaration | June 2018 June 2018 December 2018 December 2018 February 2019 February 2019 | Plaintiff |
| 42. Roderick Magadia v. Walmart Associates, Inc. | U.S. District Court, Northern District of California | 17-CV-00062-LHK | Expert Report Deposition Supplemental Expert Report Trial | July 2018 September 2018 October 2018 December 2018 | Plaintiff |
| 43. Christopher Wilson v. Harbor Rail Services | Superior Court of the State of California, for the County of Los Angeles | BC598348 | Declaration | July 2018 | Plaintiff |
| 44. Candice Ritenour v. Carrington Mortgage Services, LLC | U.S. District Court, Central District of California | 8:16-CV-02011-CJC-DFM | Declaration | August 2018 | Plaintiff |
| 45. Debbie Salazar v. See's Candy Shops, Inc | Superior Court of the State of California, for the County of Los Angeles | BC651132 | Declaration Declaration | September 2018 December 2018 | Plaintiff |
| 46. Janeice Thomas v. CheckSmart Financial, LLC | Superior Court of the State of California, for the County of Sacramento | 34-2014-00168533-CU-OE-GDS | Declaration Declaration | October 2018 June 2019 | Plaintiff |

**DR. BRIAN KRIEGLER**
*Prior Testimony/Reports*

| Proceeding | Court/Commission/Agency | Docket or File | Deposition/ Trial/Reports | Date | On Behalf Of |
|---|---|---|---|---|---|
| 47. Maykel Rodriguez v. La-Z-Boy Inc | Superior Court of the State of California, for the County of San Bernardino | CIVDS1615392 | Declaration | October 2018 | Plaintiff |
| 48. Brandon Vawter v. United Parcel Service | U.S. District Court, Central District of California | 2:18-cv-01318-RGK-E | Expert Report | November 2018 | Plaintiff |
| 49. Gregorio Rosales et al. v. Professional Service Construction | Superior Court of the State of California, for the County of Orange | 30-2016-00892554-CU-OE-CXC | Declaration | November 2018 | Plaintiff |
| 50. Maria Herrera v. Federal Express Corporation | U.S. District Court, Central District of California | 5:17-CV-02137 | Declaration Deposition | November 2018 December 2018 | Plaintiff |
| 51. Julio Garcia v. Walmart Associates, Inc. | U.S. District Court, Southern District of California | 3:18-cv-00500-L-MDD | Declaration Declaration Expert Report Supplemental Expert Report Rebuttal Declaration | December 2018 December 2021 October 2022 October 2022 December 2022 | Plaintiff |
| 52. Rose Gutierrez v. St. Bernardine Medical Center | Superior Court for the State of California, for the County of San Bernardino | CIVDS1703269 | Declaration | February 2019 | Plaintiff |
| 53. Sepehr Forghani v. Whole Foods Market California, Inc. | Superior Court of the State of California, for the County of Los Angeles | BC637964 | Expert Report Deposition Amended Report Deposition | February 2019 February 2019 March 2019 April 2019 | Plaintiff |

**DR. BRIAN KRIEGLER**
*Prior Testimony/Reports*

| | Proceeding | Court/Commission/Agency | Docket or File | Deposition/ Trial/Reports | Date | On Behalf Of |
|---|---|---|---|---|---|---|
| 54. | Bryon Dittman v. Medical Solution, Inc. | U.S. District Court, Eastern District of California | 2:17-CV-01851 | Declaration | February 2019 | Plaintiff |
| 55. | Reginald Lyle v. Doctors Hospital of Manteca | Superior Court of the State of California, for the County of San Joaquin | STK-CV-UOE-2016-6523 | Declaration Deposition | March 2019 April 2019 | Plaintiff |
| 56. | Division of Labor Standards Enforcement, Bureau of Field Enforcement v. Adat Shalom Board and Care | Department of Industrial Relations Office of the Labor Commissioner, State of California | 35-CM-259095 | Hearing | June 2019 | Appellant |
| 57. | Crystal Perkins v. Exclusive Wireless, Inc. | Superior Court of the State of California, for the County of Fresno | 17CECG04108 | Declaration | June 2019 | Plaintiff |
| 58. | Matthew Ogura v. Thrifty Payless, Inc. | Superior Court of the State of California, for the County of Los Angeles | BC605968 | Declaration | June 2019 | Plaintiff |
| 59. | Cipriano Ponce v. Agro-Jal Farming Enterprises, Inc. | Superior Court of the State of California, for the County of San Luis Obispo | 15 CV-0373 | Declaration Reply Declaration | June 2019 September 2019 | Plaintiff |
| 60. | Salvador Ochoa v. CKE Restaurants Holdings; and Hermelinda Aguilar v. CKE Restaurants Holdings | Superior Court of the State of California, for the County of Los Angeles | BC623041 / BC686601 | Declaration | July 2019 | Plaintiff |

**DR. BRIAN KRIEGLER**
*Prior Testimony/Reports*

| Proceeding | Court/Commission/Agency | Docket or File | Deposition/ Trial/Reports | Date | On Behalf Of |
|---|---|---|---|---|---|
| 61. Blanca Castaneda v. San Gabriel Transit | Superior Court of the State of California, for the County of Los Angeles | BC590907 | Declaration | August 2019 | Plaintiff |
| 62. Yelter Cruz v. Gelson's Market | Superior Court of the State of California, for the County of Los Angeles | BC670061 | Declaration Deposition | August 2019 October 2019 | Plaintiff |
| 63. Alyssa Diersing v. Sharp Rees-Stealy Medical Group | Superior Court of the State of California, for the County of San Diego--Central | 37-2017-00029164-CU-OE-CTL | Declaration Deposition | September 2019 September 2019 | Plaintiff |
| 64. Scott Carney v. Geo Drilling Fluids, Inc. | Superior Court of the State of California, for the County of Kern | BCV-15-101729 | Declaration | September 2019 | Defendant |
| 65. Stacy O'Braza v. Dignity Health | Superior Court of the State of California, for the County of Sacramento | 34-2018-00240446 | Declaration | October 2019 | Plaintiff |
| 66. Michelle Flynn v. Macy's Corporate Services, Inc. | Superior Court of the State of California, for the County of Los Angeles | BC669170 | Declaration | October 2019 | Plaintiff |
| 67. Ser Lao v. H & M Hennes & Mauritz, L.P. | U.S. District Court, Northern District of California | 5:16-CV-333 EJD | Expert Report Supplemental Expert Report Deposition | November 2019 November 2019 December 2019 | Plaintiff |

**DR. BRIAN KRIEGLER**
*Prior Testimony/Reports*

| Proceeding | Court/Commission/Agency | Docket or File | Deposition/ Trial/Reports | Date | On Behalf Of |
|---|---|---|---|---|---|
| 68. Jillian Hameister v. Jaco Oil Company | Superior Court of the State of California, for the County of Kern | BCV-17-102876 | Declaration Reply Declaration | November 2019 May 2020 | Plaintiff |
| 69. Juan Trevino v. Amazon Fulfillment Services, Inc. | U.S. District Court, Eastern District of California | 1:18-cv-00120-DAD-BAM | Declaration Deposition Reply Declaration Declaration | November 2019 December 2019 January 2020 February 2020 | Plaintiff |
| 70. Terrance Bailey v. Blue Apron, LLC | U.S. District Court, Northern District of California | 3:18-CV-07000-VC | Declaration | December 2019 | Plaintiff |
| 71. Armando Gutierrez Recendez v. ICO Builders, Inc. | Superior Court of the State of California, for the County of Los Angeles, Central District | BC720019 | Deposition | December 2019 | Defendant |
| 72. Rina Acosta v. Remington Hotels | Superior Court of the State of California, for the County of Contra Costa | MSC 16-02404 | Declaration Declaration Declaration Declaration | December 2019 May 2021 September 2021 February 2023 | Plaintiff |
| 73. Eric Camel v. Town of Chesterton | U.S. District Court, Northern District of Indiana, Hammond Division | 2:19-CV-00065-JVB-JPK | Expert Report | January 2020 | Plaintiff |
| 74. Keenan Patton v. Skyler Electric | Superior Court of the State of California, for the County of Nevada | CU17-082544 | Declaration | January 2020 | Plaintiff |

**DR. BRIAN KRIEGLER**
*Prior Testimony/Reports*

| | Proceeding | Court/Commission/Agency | Docket or File | Deposition/ Trial/Reports | Date | On Behalf Of |
|---|---|---|---|---|---|---|
| 75. | Securitas Wage and Hour Cases | Superior Court of the State of California, for the County of Los Angeles | JCCP 4837 | Declaration Declaration Deposition | January 2020 April 2020 May 2020 | Plaintiff |
| 76. | Ana Mandujano v. Macy's West Stores | Superior Court of the State of California, for the County of Los Angeles | 19STCV33919 | Declaration | January 2020 | Plaintiff |
| 77. | Rafael Balderrama v. Park West Landscape Maintenance, Inc. | Superior Court of the State of California, for the County of Los Angeles, Central District | BC 644491 | Declaration Deposition | February 2020 January 2021 | Plaintiff |
| 78. | John Utne v. Home Depot U.S.A. | U.S. District Court, Northern District of California | 3:16-CV-01854-RS | Rebuttal Declaration Deposition | March 2020 January 2022 | Plaintiff |
| 79. | Jesus A. Rios v. All Star Seed | Superior Court of the State of California, for the County of Imperial | ECU008770 | Declaration | March 2020 | Plaintiff |
| 80. | Stephanie Heredia v. Eddie Bauer | U.S. District Court, Northern District of California | 5:16-CV-06236-BLF (SVK) | Expert Report | March 2020 | Plaintiff |
| 81. | Juan Vincente De La Cruz v. Standard Drywall, Inc. | Superior Court of the State of California, for the County of Los Angeles | BC 591790 | Declaration Deposition | March 2020 April 2020 | Plaintiff |

**DR. BRIAN KRIEGLER**
*Prior Testimony/Reports*

| Proceeding | Court/Commission/Agency | Docket or File | Deposition/ Trial/Reports | Date | On Behalf Of |
|---|---|---|---|---|---|
| 82. Saldana v. Amazon.com, LLC | U.S. District Court, Western Division of Kentucky at Louisville | 3:14-MD-2504 | Declaration | May 2020 | Other* |
| 83. Robert Van Bebber v. Dignity Health | U.S. District Court, Eastern District of California | 1:19-cv-00265-DAD-EPG | Declaration Declaration Deposition Reply Declaration Declaration Rebuttal Declaration Reply Declaration | September 2020 September 2020 October 2020 January 2021 March 2023 April 2023 May 2023 | Plaintiff |
| 84. Melanie McCracken v. Riot Games, Inc. | Superior Court of the State of California, for the County of Los Angeles | 18STCV03957 | Declaration | November 2020 | Plaintiff |
| 85. Felipe Villasenor v. Pizza Loca, Inc. Samuel Zarate v. La Pizza Loca, Inc. | Superior Court of the State of California, for the County of Los Angeles | BC642655 BC642714 | Declaration Deposition | November 2020 | Defendant |
| 86. Neutron Holdings Wage and Hour Cases | Superior Court of the State of California, for the County of San Francisco | CJC-19-005044 | Declaration Declaration | December 2020 April 2021 | Plaintiff |
| 87. Mauricio Navarro v. United Parcel Service, Inc. | Superior Court of the State of California, for the County of Los Angeles | BC592098 | Declaration | December 2020 | Plaintiff |

---

* Retained by the plaintiff in Trevino v. Amazon Fulfillment Services to prepare a declaration in support of a motion to intervene.

**DR. BRIAN KRIEGLER**
*Prior Testimony/Reports*

| Proceeding | Court/Commission/Agency | Docket or File | Deposition/ Trial/Reports | Date | On Behalf Of |
|---|---|---|---|---|---|
| 88. Kelvin Liu v. QNAP, Inc. | Superior Court of the State of California, for the County of Los Angeles | 19PSCV00668 | Declaration | January 2021 | Plaintiff |
| 89. Jesenia Zamora and Brandan Griego v. Wal-Mart Stores, Inc. | U.S. District Court, Central District of California | 3:20-CV-00401-BAS-AHG | Declaration Deposition | March 2021 April 2021 | Plaintiff |
| 90. Casey Troyer v. The Yerba Mate Co., LLC | U.S. District Court, Northern District of California | 3:20-CV-06065-WHA | Declaration | March 2021 | Plaintiff |
| 91. Jose Delgado v. Taylor Farms California, Inc. | Superior Court of the State of California, for the County of Monterey | 18-CV-001381 | Declaration Deposition Trial Declaration Declaration Trial | April 2021 April 2021 May 2021 August 2021 August 2021 August 2021 | Plaintiff |
| 92. Lynnett Myers v. Marietta Memorial Hospital | U.S. District Court, Southern District of Ohio, Eastern Division | 2:15-CV-2956 | Expert Report Rebuttal Expert Report Deposition | April 2021 May 2021 June 2021 | Plaintiff |
| 93. Christine Crump v. Hyatt Corporation | U.S. District Court, Northern District of California | 4:20-CV-00295-HSG | Declaration Deposition | May 2021 June 2021 | Plaintiff |
| 94. Sharayah Bosch v. PeaceHealth | Superior Court of the State of Washington, for Clark County | 20-2000924-06 | Declaration | May 2021 | Plaintiff |

**DR. BRIAN KRIEGLER**
*Prior Testimony/Reports*

| Proceeding | Court/Commission/Agency | Docket or File | Deposition/ Trial/Reports | Date | On Behalf Of |
|---|---|---|---|---|---|
| 95. Keith Williams v. St. Joseph Personal Care Services | Superior Court of California, County of Orange | 30-20-01134268-CU-OE-CXC | Declaration Deposition Reply Declaration | June 2021 September 2021 December 2021 | Plaintiff |
| 96. Denver Davis v. Amazon Canada Fulfillment Services | Ontario Superior Court of Justice (Canada) | CV-20-00642361-00CP | Affidavit Reply Affidavit | July 2021 | Plaintiff |
| 97. David Diaz v. Sun-Maid Growers of California | Superior Court of the State of California, for the County of Fresno | 18CECG04501 | Declaration Supplemental Declaration | August 2021 October 2022 | Plaintiff |
| 98. Curtis Markson v. CRST International | U.S. District Court, Central District of California | 5:17-CV-012610SB-(SPx) | Declaration Deposition | August 2021 June 2022 | Plaintiff |
| 99. Benjamin Cardenas v. CVS Pharmacy | American Arbitration Association | 01-19-0002-3726 | Deposition Arbitration Hearing | September 2021 October 2021 | Claimant |
| 100. George Stickles v. Atria Senior Living | U.S. District Court, Northern District of California | 3:20-CV-09220-WHA | Declaration Deposition | October 2021 November 2021 | Plaintiff |
| 101. In re Lowe's Companies, Inc. FLSA and Wage and Hour Litigation | U.S. District Court, Western District of North Carolina, Statesville Division | 5:20-MD-2947-KDB-DSC | Expert Report Rebuttal Expert Report Deposition | October 2021 November 2021 December 2021 | Plaintiff |
| 102. Josefina Martinez v. The Fairmont Miramar Hotel & Bungalows | Superior Court of California, for the County of Los Angeles | BC623651 | Declaration | October 2021 | Plaintiff |

**DR. BRIAN KRIEGLER**
*Prior Testimony/Reports*

| | Proceeding | Court/Commission/Agency | Docket or File | Deposition/Trial/Reports | Date | On Behalf Of |
|---|---|---|---|---|---|---|
| 103. | Tim Blackwell v. Climate Pros | U.S. District Court, Eastern District of California | 2:20-CV-01968-KJM-CKD | Declaration Deposition | December 2021 January 2022 | Plaintiff |
| 104. | Clifford Feldman v. Aurora Las Encinas | Superior Court of the State of California, for the County of Los Angeles | 20STCV24203 | Deposition | January 2022 | Plaintiff |
| 105. | Ashley Thong and Idolina Valadez v. Outlook Resources | Superior Court of the State of California, for the County of Los Angeles | 19STCV44400 20STCV43738 | Declaration Reply Declaration | January 2022 June 2022 | Plaintiff |
| 106. | Luz Chinchilla v. C.G. Investments | Superior Court of the State of California, for the County of Los Angeles | BC665540 | Declaration | January 2022 | Plaintiff |
| 107. | Paul Hancock v. Resource Enterprise Services | Superior Court of the State of California, for the County of Santa Clara | 19CV358675 | Declaration | January 2022 | Plaintiff |
| 108. | Charles Bates v. Leprino Foods | U.S. District Court, Eastern District of California | 2:20-CV-00700-AWI-BAM | Declaration | February 2022 | Plaintiff |
| 109. | Lilia Ali v. Setton Pistachio of Terra Bella | U.S. District Court, Eastern District of California | 1:19-CV-00959-JLT-BAM | Declaration Reply Declaration | February 2022 June 2022 | Plaintiff |
| 110. | Gerardo Soto v. Greif Packaging | Superior Court of California for the County of Orange, Civil Complex Center | 30-2017-00952534-CU-OS-CXC | Declaration Deposition | April 2022 July 2022 | Plaintiff |

**DR. BRIAN KRIEGLER**
*Prior Testimony/Reports*

| Proceeding | Court/Commission/Agency | Docket or File | Deposition/ Trial/Reports | Date | On Behalf Of |
|---|---|---|---|---|---|
| 111. Brian Gile v. Dolgen California, LLC | U.S. District Court, Central District of California | 5:20-CV-01863-MCS-SP | Declaration Deposition Reply Declaration Expert Report | May 2022 May 2022 June 2022 November 2022 | Plaintiff |
| 112. Sara DeRosa v. ViacomCBS | U.S. District Court, Central District of California, Western Division | 2:20-CV-02965-MCS (GJSx) | Declaration Deposition | June 2022 June 2022 | Plaintiff |
| 113. Robert E. Owens, Jr. v. O'Reilly Automotive Stores, Inc. | Superior Court of California, County of Los Angeles | BC475210 | Declaration Deposition | August 2022 November 2022 | Plaintiff |
| 114. Robert Stafford, Jr. v. Bojangles' Restaurants, Inc. | U.S. District Court, Western District of North Carolina, Charlotte Division | 3:20-CV-266-MOC | Expert Report Deposition Reply Expert Report | August 2022 October 2022 November 2022 | Plaintiff |
| 115. John Perez v. Leprino Foods | U.S. District Court, Eastern District of California | 1:17-CV-00686-AWI-BAM | Expert Report | August 2022 | Plaintiff |
| 116. Frank Cuellar v. First Transit | U.S. District Court, Central District of California, Eastern Division | 8:20-CV-01075-JWH-(JDEx) | Declaration | September 2022 | Plaintiff |
| 117. Denise Droesch v. Wells Fargo Bank | U.S. District Court, Northern District of California | 3:20-CV-06751-JSC | Declaration Deposition | October 2022 October 2022 | Plaintiff |
| 118. Garrett Ramsey v. Geo Guidance Drilling Services | Superior Court of California, County of Kern | BCV-19-100463 | Declaration Deposition | November 2022 January 2023 | Plaintiff |

Case 3:23-cv-00818-JAG-DCK    Document 293-4    Filed 03/08/24    Page 38 of 164

**DR. BRIAN KRIEGLER**
*Prior Testimony/Reports*

| | Proceeding | Court/Commission/Agency | Docket or File | Deposition/ Trial/Reports | Date | On Behalf Of |
|---|---|---|---|---|---|---|
| 119. | Louis Ames and James Guiffrida v. San Antonio Regional Hospital | Superior Court of California, County of San Bernardino | CIVDS2018953 | Declaration Deposition | November 2022 May 2023 | Plaintiff |
| 120. | Rosa Chavez and Estanislao Crisantos v. Crown Building Maintenance | Superior Court of California, for the County of Orange | 30-2018-01040053-CU-OE-CXC | Declaration | January 2023 | Plaintiff |
| 121. | Esteban Palomino v. Northrop Grumman Systems Corporation | Superior Court of California, County of Santa Clara | 19CV345534 | Declaration Deposition Trial | January 2023 January 2023 January 2023 | Plaintiff |
| 122. | Fidel Torres, Henry Garcia, Francisco Muñoz, and Consuelo Alcala v. D/T Carson Enterprises | Superior Court of California, County of Riverside | RIC1821431 | Declaration Deposition | January 2023 April 2023 | Plaintiff |
| 123. | David Hernandez v. Burdick Painting | Superior Court of California, County of Santa Clara | 20CV363833 | Declaration Deposition | January 2023 March 2023 | Plaintiff |
| 124. | Salvador Guzman and James Marshall v. Walmart | U.S. District Court, Northern District of California | 21-CV-09133-NC | Declaration Deposition | February 2023 March 2023 | Plaintiff |
| 125. | Shailesh Jahagirdar v. CityMac | U.S. District Court, Western District of North Carolina, Asheville Division | 1:20-CV-0033-MOC | Declaration Trial | February 2023 February 2023 | Plaintiff[*] |

---

[*] Under FRE 1006.

Case 3:23-cv-00818-JAG-DCK   Document 293-4   Filed 03/08/24   Page 39 of 164

**DR. BRIAN KRIEGLER**
*Prior Testimony/Reports*

| Proceeding | Court/Commission/Agency | Docket or File | Deposition/ Trial/Reports | Date | On Behalf Of |
|---|---|---|---|---|---|
| 126. Naomi Bennett and Janet Hughes v. Providence Health & Services | Superior Court of the State of Washington, for King County | 21-2-13058-1 SEA | Declaration Declaration Expert Report Rebuttal Report Deposition | February 2023 September 2023 November 2023 January 2024 February 2024 | Plaintiff |
| 127. Claudia Carr and Lashawna Wicker v. Walmart | U.S. District Court, Central District of California | 5:21-CV-01429-AB-KK | Declaration | February 2023 | |
| 128. Verna Maxwell Clarke v. AMN | U.S. District Court, for the Central District of California | 2:16-CV-04132 | Expert Report Supplemental Expert Report Deposition | March 2023 May 2023 June 2023 | Plaintiff |
| 129. Scott Williams v. U.S. Bancorp | Superior Court of California, County of San Francisco | CGC-10-499011 | Declaration Deposition | April 2023 May 2023 | Plaintiff |
| 130. Yolanda Callister v. Swedish Health Services | Superior Court for the State of Washington, for King County | 21-2-16148-7 SEA | Declaration | April 2023 | Plaintiff |
| 131. Arthur Ferrer v. Ameriflex | Superior Court of the State of California, County of Riverside | RIC2002157 | Declaration | April 2023 | Plaintiff |
| 132. Andrew Howell v. Leprino Foods Company | U.S. District Court, Eastern District of California | 1:18-CV-01404-AWI-BAM | Expert Report | April 2023 | Plaintiff |
| 133. Agustin Carmona Dionicio, Luis Melchor, and Mario Ramriez v. Pacific Agri-Products | Superior Court of California, County of Alameda | RG20070369 | Declaration | May 2023 | Defendant |

Case 3:23-cv-00818-JAG-DCK    Document 293-4    Filed 03/08/24    Page 40 of 164

**DR. BRIAN KRIEGLER**
*Prior Testimony/Reports*

| Proceeding | Court/Commission/Agency | Docket or File | Deposition/ Trial/Reports | Date | On Behalf Of |
|---|---|---|---|---|---|
| 134. Ruben Porcayo v. So Cal Land Maintenance | Superior Court of the State of California, County of Orange | 30-2021-01236054-CU-OE-CXC | Declaration Deposition | July 2023 September 2023 | Plaintiff |
| 135. Angel Vera v. Laurel Hardware | Superior Court of the State of California, County of Los Angeles -- Santa Monica | 22SMCV00594 | Deposition | August 2023 | Defendant |
| 136. Dwayne Lynch v. The Johns Hopkins Hospital | Circuit Court for Baltimore City, Maryland | 24-C-23-000527 | Declaration | August 2023 | Plaintiff |
| 137. Fernando Torres v. Johnston Nurseries | Superior Court of the State of California, for the County of Kern -- Metropolitan Division | BCV-19-100830-TSC | Declaration Deposition | September 2023 December 2023 | Plaintiff |
| 138. Anthony Cervantes and Mike Cross v. CRST | U.S. District Court, Northern District of Iowa -- Cedar Rapids Division | 1:20-CV-00075-CJW-KEM | Expert Report Deposition Reply Report | November 2023 January 2024 January 2024 | Plaintiff |
| 139. Michael Bolden v. MobleWash | Superior Court of the State of California, County of Los Angeles | 19STCV26304 | Declaration | December 2023 | Plaintiff |
| 140. Dan Goldthorpe v. Cathay Pacific Airways | U.S. District Court, Northern District of California | 3:17-CV-03233-VC | Declaration | January 2024 | Plaintiff |
| 141. Carson G. Taylor v. Seattle Children's Hospital | Superior Court of the State of Washington, for King County | 22-2-15300-8 SEA | Declaration | January 2024 | Plaintiff |
| 142. LaMont Atkinson v. Life Care Centers of America | Superior Court of the State of Washington, for King County | 22-2-00662-5 SEA | Declaration Declaration | January 2024 March 2024 | Plaintiff |

**DR. BRIAN KRIEGLER**
*Prior Testimony/Reports*

| | Proceeding | Court/Commission/Agency | Docket or File | Deposition/ Trial/Reports | Date | On Behalf Of |
|---|---|---|---|---|---|---|
| 143. | Tammy Tenny v. Dignity Health | Superior Court of California, County of Kern | BCV-18-102316 | Declaration Deposition Supplemental Declaration | February 2024 February 2024 February 2024 | Plaintiff |

**Civil Rights**

| | Proceeding | Court/Commission/Agency | Docket or File | Deposition/ Trial/Reports | Date | On Behalf Of |
|---|---|---|---|---|---|---|
| 144. | Dianna Johnson v. U.S. Marshals | U.S. District Court, District of Columbia | 02-2364 (RMC) | Declaration Declaration | July 2007 April 2010 | Plaintiff |
| 145. | Marsial Lopez v. Sheriff Donny Youngblood | U.S. District Court, Eastern District of California | CV-F-07-0474 DLB | Declaration | June 2008 | Plaintiff |
| 146. | Thomas Lee Goldstein v. City of Long Beach, John Henry Miller, William Collette, and Logan Wren | U.S. District Court, Central District of California | CV 04-9692 AHM (Ex) | Expert Report Deposition Declaration | November 2009 February 2010 June 2010 | Plaintiff |
| 147. | Carl A. Barnes v. District of Columbia | U.S. District Court, District of Columbia | 06-315 (RCL) | Declaration Expert Report Supplemental Expert Report Deposition Declaration Expert Report Declaration Expert Report Deposition Expert Report Trial | March 2010 November 2010 December 2010  December 2010 November 2011 February 2012 March 2012 June 2012 October 2012 November 2012 March 2013 | Plaintiff |

**DR. BRIAN KRIEGLER**
*Prior Testimony/Reports*

| Proceeding | Court/Commission/Agency | Docket or File | Deposition/ Trial/Reports | Date | On Behalf Of |
|---|---|---|---|---|---|
| 148. Eric Jones v. Baltimore City Police Department, et al. | U.S. District Court, District of Maryland | CCB 05 CV 1287 | Declaration Deposition Declaration | July 2010 October 2010 January 2011 | Plaintiff |
| 149. Mary Amador v. Sheriff Leroy Baca, et al. | U.S. District Court, Central District of California | CV 10-1649 SVW (JEMx) | Declaration Declaration Declaration Declaration Declaration | October 2010 January 2011 June 2013 July 2013 February 2016 | Plaintiff |
| 150. C. Alan Powell v. Jacqueline H. Barrett, et al. | U.S. District Court, Northern District of Georgia, Atlanta Division | 1:04-CV-1100 (RWS) | Declaration | October 2011 | Plaintiff |
| 151. Duncan Roy v. Sheriff Leroy Baca, et al. | U.S. District Court, Central District of California | CV 12-09012 BRO (FFMx) | Declaration Declaration Rebuttal Declaration Declaration Declaration Declaration | July 2014 May 2016 July 2016 May 2018 May 2018 November 2018 | Plaintiff |
| 152. Marlon Johnson v. County of San Bernardino, et al. | U.S. District Court, Central District of California | 5:18-CV-01121-GW (AFM) | Declaration | October 2019 | Plaintiff |
| 153. William Scott Rogers v. Lewis & Clark County | Montana First Judicial District Court, Lewis and Clark County | DDV-2018-1332 | Declaration | December 2022 | Plaintiff |

**False Claims Act**

Case 3:23-cv-00818-JAG-DCK    Document 293-4    Filed 03/08/24    Page 43 of 164

**DR. BRIAN KRIEGLER**
*Prior Testimony/Reports*

| Proceeding | Court/Commission/Agency | Docket or File | Deposition/ Trial/Reports | Date | On Behalf Of |
|---|---|---|---|---|---|
| 154. U.S. ex rel. Carlo Santa Ana v. Winter Park Urology Associates, P.A., et al. | U.S. District Court, Middle District of Florida | 6:10-CV-806-28TBS | Expert Report Deposition | December 2012 February 2013 | Plaintiff |
| 155. U.S. ex rel. Misty Wall v. VistaCare Hospice Care, et al. | U.S. District Court, Northern District of Texas | 3-07-CV-0604-M | Declaration Declaration Expert Report Rebuttal Report Deposition Declaration | August 2014 September 2014 July 2015 January 2016 January 2016 April 2016 | Plaintiff |
| 156. U.S. ex rel. Laura Lovett and Lisa Mayhew v. Holzer Clinic | U.S. District Court, Southern District of Ohio, Eastern Division | 2:08-CV-312 | Expert Report | March 2015 | Plaintiff |
| 157. Nicolle O'Neill v. Somnia | U.S. District Court, Eastern District of California | 1:15-CV-00433-DAD-EPG | Expert Report | September 2021 | Plaintiff |
| **Breach of Contract/Unjust Enrichment** | | | | | |
| 158. In the Matter of City of Moss Point v. FEMA | U.S. Civilian Board of Contract Appeals | CBCA 2346-FEMA | Arbitration Hearing | June 2012 | Plaintiff |
| 159. Amtrust North America, Inc., v. SquareTrade, Inc. | Judicial Arbitration and Mediation Services, San Francisco Office | 1100079447 | Expert Report Supplemental Expert Report Declaration Arbitration Hearing Rebuttal Declaration | April 2015 May 2015 June 2015 June 2015 July 2015 | Claimant |

Case 3:23-cv-00818-JAG-DCK    Document 293-4    Filed 03/08/24    Page 44 of 164

**DR. BRIAN KRIEGLER**
*Prior Testimony/Reports*

| Proceeding | Court/Commission/Agency | Docket or File | Deposition/Trial/Reports | Date | On Behalf Of |
|---|---|---|---|---|---|
| 160. Michael Nozzi v. Housing Authority of the City of Los Angeles, et al. | U.S. District Court, Central District of California | CV07-00380-PA (FFMx) | Declaration Expert Report Supplemental Expert Report Declaration | April 2016 February 2017 March 2017 March 2017 | Plaintiff |
| 161. Ronald McAllister v. The St. Louis Rams, LLC | U.S. District Court, Eastern District of Missouri | 4:16-CV-00172-SNLJ | Rebuttal Report Deposition | August 2017 September 2017 | Plaintiff |
| 162. Amtrust North America, Inc. v. SquareTrade, Inc. | Judicial Arbitration and Mediation Services, San Francisco Office | 1100086491 | Expert Report | March 2018 | Claimant |
| 163. Lisa Barkel-Williams v. Aoto Club Group and Auto Club Services | U.S. District Court, Eastern District of Michigan | 2:19-CV-10403-DPH-MKM | Declaration Deposition | February 2024 February 2024 | Plaintiff |
| **Consumer/False Advertising** | | | | | |
| 164. Christopher O'Shea v. Epson America, Inc., et al. | U.S. District Court, Central District of California | CV09-8063 PSG (CWx) | Declaration | February 2011 | Plaintiff |
| 165. Manny Villanueva v. Fidelity National Title Company | Superior Court of the State of California, for the County of Santa Clara | 1-10-CV-173356 | Deposition Declaration Deposition Trial | March 2014 April 2014 April 2014 April 2014 | Plaintiff |
| 166. Charlene Eike v. Allergan, Inc., et al. | U.S. District Court, East St. Louis Division | 3:12-CV-01141-DRH-DGW | Expert Report Deposition | May 2014 August 2014 | Plaintiff |

**DR. BRIAN KRIEGLER**
*Prior Testimony/Reports*

| | Proceeding | Court/Commission/Agency | Docket or File | Deposition/Trial/Reports | Date | On Behalf Of |
|---|---|---|---|---|---|---|
| 167. | Mohammed Rahman v. Mott's LLP | Superior Court of the State of California, for the County of San Francisco | CGC-13-532078 | Declaration | October 2019 | Plaintiff |
| 168. | Carla Jimenez v. Charter Communications | Judicial Arbitration and Mediation Services, Irvine Office | 1100106389 | Arbitration Hearing | February 2023 | Claimant |
| 169. | George Moore v. Compass Group USA | United States District Court, Eastern District of Missouri, Eastern Division | 4:18-CV-01962-SEP | Expert Report Supplemental Expert Report Deposition Supplemental Expert Report | August 2023 August 2023 August 2023 October 2023 | Plaintiff |

**Miscellaneous**

| | Proceeding | Court/Commission/Agency | Docket or File | Deposition/Trial/Reports | Date | On Behalf Of |
|---|---|---|---|---|---|---|
| 170. | 2009 Aircraft Tax Refund Cases: American Airlines, Inc. v. County of Los Angeles, et al, and United Airlines, Inc. v. County of Los Angeles | Superior Court of the State of California, for the County of Orange | JCCP 4803 / BC547243 / BC550656 | Declaration | July 2017 | Court Appointed |

# ATTACHMENT 2

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

**GEORGE MOORE, VIRGINIA CARTER,
JAMES JILEK, FRANCIS JAYE, and SEAN
MADELMAYER,**

        **Plaintiffs,**

**v.**

**COMPASS GROUP USA, INC., D/B/A
CANTEEN,**

        **Defendant.**

**No. 4:18-CV-01962-SEP**

**EXPERT REPORT OF BRIAN KRIEGLER, PH.D.**

**Econ ONE Research, Inc.**

**August 7, 2023**

Suite 800
550 South Hope Street
Los Angeles, California 90071

# TABLE OF CONTENTS

**I.     Introduction** ...................................................................**1**

    A.  Qualifications and Fee Statement ........................................................ 1

    B.  Assignment and Scope of this Expert Report ........................................ 2

    C.  Materials Relied Upon ...................................................................... 3

    D.  Summary of Opinions ...................................................................... 4

**II.    Understanding of Plaintiff's Allegations and the Proposed Class Definitions** ...................................................................**5**

**III.   Data Description** ...................................................................**6**

    A.  Two-Tier Revenue Report .................................................................. 6

    B.  Survey Instance Report ...................................................................... 7

**IV.    Overview of Random Sampling and Statistical Considerations** ..**7**

    A.  Confidence Interval and the Margin of Error Considerations ................... 8

    B.  The Size of the Population Typically Does Not Drive the Sample Size .... 12

**V.     Deriving/Defining the Sampled Population** .............................**13**

**VI.    Methodology for Extrapolating Classwide Principal Damages and Pre-Judgment Interest Using the Stratified Random Sample of Vending Machines** ...................................................................**15**

    A.  Determining the Sample Size and Selecting the Stratified Random Sample of Surveyed and Unsurveyed Observations ........................... 15



1. Accounting for the Possibility of Missing and/or Incomplete Sampled Records ................................................................................ 17

B. Methodology for Calculating Classwide Principal Damages.................. 18

C. Methodology for Calculating Pre-Judgment Interest .......................... 19

**VII. Potential Damages and Interest Calculations**..........................**20**

**VIII. Concluding Remarks**..............................................................**23**

# LIST OF APPENDIX CHAPTERS AND EXHIBITS

*Appendix Chapters*
A - A Validation of Random Sampling and the Central Limit Theorem
B - Derivation of Confidence Interval Formulas When Applying the Central Limit Theorem
C - Resampling and Bootstrapping: A Robust Method for Determining Confidence Intervals
D - An Interpretation and Validation of Confidence Intervals


*Exhibits*
1 - Curriculum Vitae
2 - Stratified Random Sample of Combinations of Cost Center and Machine Number
3 - Interest Rates by State
4 - Upcharges Among Randomly Selected Combinations of Cost Center and Machine Number
5 - Potential Pre-Judgment Interest Among Among Randomly Selected Combinations of Cost Center and Machine Number

# I.   Introduction

1.   I have personal knowledge of the facts set forth in this expert report, except where otherwise specified.  If called to testify to these facts as a witness in this action, I would so testify.

2.   I have been retained by the Plaintiffs in *George Moore, et al. v. Compass Group USA, d/b/a Canteen*, Case No. 4:18-CV-01962-SEP, in the United States District Court for the Eastern District of Missouri, Eastern Division.

3.   Plaintiffs allege that Canteen had an extensive practice of failing to disclose to customers a price differential of $0.10 per transaction when making a purchase using a credit card, debit card, or pre-paid card.  As a result, my understanding is that Plaintiffs and the putative class are seeking reimbursement for each of these alleged improper charges and pre-judgment interest.

## A. Qualifications and Fee Statement

4.   I am a Managing Director at Econ One Research, Inc. ("Econ One"), an economic and statistical consulting firm with offices in Denver, Houston, Los Angeles, Memphis, New York, Sacramento, the San Francisco Bay Area, Washington, D.C, and India. I earned my M.S. and Ph.D. in statistics from UCLA and my B.A. in mathematics/economics from Claremont McKenna College. I have published several articles in peer-reviewed journals on the use of sampling and statistical modeling.

5.   I have testified as an expert statistician in deposition and/or trial more than 80 times, collectively in the areas of wage and hour, civil rights, consumer protection, and breach of contract.  I have been an invited speaker at numerous legal conferences, including the American Bar Association's Annual Labor and Employment Conference in 2017,[1] the California Employment Lawyers' Association Annual Conference in 2018,[2] the ABA's Fair Labor Standards Legislation mid-winter meeting

---

[1] "*Representative Evidence in Class Actions after Tyson Foods.*" With Ryan Haggerty, John Ho, Rachhana Srey, and Debra Nahrstadt. 2017 Annual ABA Labor and Employment Law Conference, Washington, DC.

[2] "An Analysis of California Employment-Related Arbitrations," with Genie Harrison and Cliff Palefsky. 31st Annual CELA Conference, San Diego, CA.



in 2020,[3] and the Los Angeles County Bar Association's Labor and Employment Symposium in 2023.[4] A true and correct copy of my curriculum vitae, which includes my testimonial experience, is attached hereto as **Exhibit 1**.

6.  Econ One currently is being compensated for the time I spend on this matter at $520 per hour. Econ One is being compensated for the time spent by other Econ One employees on this project at their normal and customary hourly rates.

## B. Assignment and Scope of this Expert Report

7.  To date, my assignment is to provide a methodology for calculating classwide damages and pre-judgment interest, given my understanding of Plaintiffs' allegations and proposed class definitions. To do so, I propose the following three steps:

-   Selecting a random sample of vending machines from a defined population;

-   Obtaining and recording specific information about this sample of vending machines; and

-   Using established statistical methods to extrapolate the results from the sample to the defined population.

8.  This expert report includes seven sections, four appendix chapters, and two exhibits. Briefly:

    a.  Section II includes my understanding of Plaintiffs' allegations, the proposed class definitions, and the damages/interest that they seek. Section III provides a description of the data analyzed to date. Section IV covers a series of characteristics related to random sampling. In Section V, the stratified random sampling of vending machines is derived and defined. Section VI includes the methodology for calculating classwide damages and interest. Potential damages and pre-

---

[3] "Arbitrating Individual FLSA Claims Under Compulsion," with Matthew Helland, Sally Abrahamson, Eric Su, and Sheri Eisner. 2020 ABA FLSL Midwinter Meeting, Los Cabos, MX.

[4] "Show Me the Money: Pay Transparency and Pay Equity Litigation," with Felicia Davis, Genie Harrison, and Ali Saad. 2023 LACBA Annual Labor & Employment Symposium, Los Angeles, CA.



judgment interest are presented in Section VII.  I offer concluding remarks in Section VIII.

b. The appendix chapters address various characteristics associated with random sampling.

c. The exhibits cover my curriculum vitae, the stratified random sample of vending machines, and potential damages/interest in said sample.

## C. Materials Relied Upon

9. The materials relied upon to formulate my analyses and opinions in this expert report include the following:

*Bates-stamped electronic data*

- CG025 (Two-Tier Revenue Report)

- CG027 (Survey Instance Report)

*Declarations and depositions*

- Declaration of Martha Morgan, dated June 27, 2023

- Videoconference Deposition of Martha Morgan, Vol. III (June 28, 2023)

- Virtual Zoom Videotaped 30(b)(6) Deposition of Compass Group USA, Inc. by David Goldring, Vol. II (June 30, 2021)

*Statistical textbooks and articles*

- Berk, R.A. (2004) *Regression Analysis: A Constructive Critique.* Thousand Oaks: Sage Publications.

- Moore, D.S., and McCabe, G.P. (1999). *Introduction to the Practice of Statistics.* 3rd Ed. New York: W.H. Freeman.

- Moore, D.S., McCabe, G.P., and Craig, B.A. (2009). *Introduction to the Practice of Statistics.* 6th Ed. New York: W.H. Freeman.

- Thompson, Steven K. (2002). *Sampling.* 2nd Ed. New York: Wiley.

Page 3

*Moore v. Canteen* • Expert Report of Brian Kriegler, Ph.D.
Case 3:23-cv-00818-JAG-DCK     Document 293-4     Filed 03/08/24     Page 54 of 164

- *Reference Manual on Scientific Evidence* (2011). 3rd Ed. Federal Judicial Center. National Academies Press. Washington, DC.

- Efron, B. and Tibshirani, R.J. (1993). *An Introduction to the Bootstrap.* New York: Chapman & Hall.

- Statistical Sampling: A Toolkit for MFCUs. URL: https://oig.hhs.gov/fraud/medicaid-fraud-control-units-mfcu/files/MFCU%20Sampling%20Guidance%20Final.pdf.

- CMS Medicare Program Integrity Manual. URL: https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/pim83c08.pdf.

- Dorfschmid, C. (December 2011). "Confidence and Precision in Claims Audits: Quality of the Estimate." URL: https://www.compliance.com/resources/confidence-and-precision-in-claims-audits-quality-of-the-estimate/.

### D. Summary of Opinions

10.   It is my opinion that the combination of Canteen's historical data, statistical sampling, and an eventual analysis of a stratified random sample of vending machines can be used to derive reliable estimates of classwide damages. Canteen's data is used to define a sampled population. Random sampling is applied in order to ensure that the selection of vending machines is neutral and unbiased. Total principal damages and pre-judgment interest will be extrapolated based on the results of the random sample of vending machines. Confidence intervals and margins of error of classwide totals will be calculated using established statistical methods.

11.   In this instance, the review of a stratified random sample of vending machines is essential for two reasons.

- *First*, while Canteen conducted a survey of its vending machines in 2019-2020, Defendant's vice president of business information, Martha Morgan, indicated that the data that were recorded are subject to

Page 4

*Moore v. Canteen* • Expert Report of Brian Kriegler, Ph.D.
Case 3:23-cv-00818-JAG-DCK    Document 293-4    Filed 03/08/24    Page 55 of 164

human error.[5]  By collecting, reviewing, and analyzing photographs of a random sample of previously-surveyed machines, this portion of classwide damages can be calculated and verified.

- *Second*, Canteen's survey did not cover all of its vending machines.[6]  By collecting, reviewing, and analyzing additional information pertaining to a random sample of unsurveyed machines (*e.g.*, photographs), the portion of classwide damages pertaining to unsurveyed machines can be calculated and verified.

12.  Data pertaining to the random sample is presented in a way to make it straightforward to update and utilize in the future.  At the outset, the extrapolations herein are characterized as "potential" monetary awards because additional information about a stratified random sample is pending.  Once the data on a random sample of vending machines have been collected, reviewed, and analyzed, the extrapolations will be updated using the methodologies described in Section VI herein.

## II. Understanding of Plaintiff's Allegations and the Proposed Class Definitions

13.  My understanding is that Canteen owns and operates over 200,000 vending machines in the United States.  I further understand that many of these vending machines utilize a "two-tier" pricing structure for products sold in the machines.  One tier is a cash price, and the other tier includes an upcharge of $0.10 when paying via credit card, debit card, or prepaid card ("Upcharge").[7]

14.  I further understand that Canteen allegedly had an extensive practice of failing to disclose the $0.10 Upcharge.  Therefore, Plaintiffs and the putative class are seeking damages for each transaction in which (i) the $0.10 Upcharge was not properly

---

[5] *See, e.g.*, Declaration of Martha Morgan, dated June 27, 2023 ("Morgan Decl."), ¶ 20.

[6] *See, e.g.*, Videoconference Deposition of Martha Morgan, Vol. III (June 28, 2023) ("Morgan Depo."), at 147:25-148:16.

[7] *See, e.g.*, Plaintiffs' Amended Consolidated Class Action Complaint, filed October 14, 2021 (Dkt. 126) ("Complaint"), ¶¶ 54-55.

Page 5



*Moore v. Canteen* • Expert Report of Brian Kriegler, Ph.D.
Case 3:23-cv-00818-JAG-DCK     Document 293-4     Filed 03/08/24     Page 56 of 164

disclosed on the machine, and (ii) the purchase was made via credit card, debit card, or prepaid card.[8]

15.     My understanding is that the Plaintiffs seek certification of the following class:

> *Class*: All persons or entities who, within the applicable statute of limitations preceding the filing of this lawsuit to the date of class certification, purchased an item from a vending machine owned or operated by Defendant in the United States with a credit, debit or prepaid card and were charged an amount in excess of the price displayed for that item on the vending machine.

## III.  Data Description

### A. Two-Tier Revenue Report

16.     The "Two-Tier Revenue Report" (bates number CG025) includes information about each machine and the corresponding revenue. Noteworthy information in each row of data includes the following:

- The cost center identification number

- The machine number

- The physical address of the machine

- The date that the machine was surveyed (*i.e.*, examined by Canteen), if it was surveyed

- The amount of monthly revenue attributed to Upcharges

In total, the Two-Tier Revenue Report includes 309,485 rows of data with Upcharges spanning January 2014 to March 2023.

---

[8] *Id. See also*, Complaint, ¶¶ 66B, 75-77.

### B. Survey Instance Report

17.    The "Survey Instance Report" (bates number CG027) includes information about vending machines that purportedly have been examined internally by Canteen. Noteworthy information in each row of data includes the following:

- The cost center identification number

- The machine number

- The survey date (if applicable)

- Whether the vending machine has a "digital shopping cart" screen

- Whether the vending machine is a "cashless" device

- The machine model

- Whether the machine had a cash discount sticker at the time that the machine was surveyed

- A file directory and file name of an image purportedly showing the machine at the time that it was surveyed[9]

In total, the Survey Instance Report includes 246,943 rows of data.

## IV.   Overview of Random Sampling and Statistical Considerations

18.    Random sampling is a process that generally involves three steps. *First*, a population of observations is defined. *Second*, a subset of observations is selected from the defined population. Each observation must have a known probability of selection. *Third*, statistical extrapolations, confidence intervals, and margin of error calculations are reported. These computations are a by-product of (i) the sampling design, (ii) the sample size, (iii) each observation's probability of selection, and (iv) the population size.

19.    There are numerous advantages associated with relying on a random sample of observations from a defined population. *First*, random sampling provides formal and

---

[9] In CG027, the links to these file directories and file names are inactive and/or inaccessible.

Page 7


*Moore v. Canteen* • Expert Report of Brian Kriegler, Ph.D.
Case 3:23-cv-00818-JAG-DCK    Document 293-4    Filed 03/08/24    Page 58 of 164

scientific bases for calculating population estimates. *Second*, there are established methods for calculating reliable confidence intervals based on a random sample of observations. *Third*, random sampling inherently is neutral and unbiased.

20. The appendix chapters to this expert report cover various characteristics related to random sampling. In particular:

    a. **Appendix A** establishes that random sampling is a neutral and unbiased process. This appendix includes a discussion about the "Central Limit Theorem" ("CLT"). The CLT is a law in statistics that dictates when specific formulas can be used to calculate confidence intervals and the margin of error.

    b. **Appendix B** includes the derivation of several formulas pertaining to the margin of error and confidence intervals when the sample is "large enough" to invoke the CLT.

    c. **Appendix C** provides an alternative approach for deriving confidence intervals and the margin of error that do not depend on the CLT. This is especially valuable if conditions for the CLT have not been met, *e.g.*, if the number of sampled observations is relatively small.

    d. **Appendix D** includes proof that confidence intervals are likely to be within 5 percent of the stated level of confidence for random sample sizes of at least 25 observations.[10]

21. The next two subsections collectively address (i) the calculation of confidence intervals and margins of error, and (ii) a common misperception about the relationship between the population size and sample size.

### A. Confidence Interval and the Margin of Error Considerations

22. Deciding what confidence intervals to use and what margin of error to tolerate depends on the subject matter. There are no universal statistical rules regarding what margin of error must be achieved, what level of confidence to use, or what type of

---

[10] For instance, using established methods/formulas for deriving a 90 percent confidence interval, the "true" amount of confidence is most likely at least 85 percent. Likewise, when deriving a 95 percent confidence interval, the "true" amount of confidence is most likely at least 90 percent.

econ**ONE**
*Moore v. Canteen* • Expert Report of Brian Kriegler, Ph.D.
Case 3:23-cv-00818-JAG-DCK     Document 293-4     Filed 03/08/24     Page 59 of 164

confidence interval to use. These decisions are entirely about how much margin of error, *i.e.*, imprecision, the Court is willing to tolerate and what level of confidence the Court requires. Below I discuss each of these concepts in the context of this class action litigation and the discretion that I understand the Court has.

23. I understand that the Court has discretion regarding what margin of error is deemed tolerable when relying on a sample average to calculate damages. In general, the sample size must increase in order to achieve a smaller margin of error.

24. I further understand that the Court has discretion regarding what confidence interval to use. A 95 percent confidence interval is most common, but it is by no means a scientific standard. Numerous statistical textbooks discuss the use of other confidence levels, such as 90 percent.[11] In addition, the *Reference Manual on Scientific Evidence* discusses 68, 90, 95, and 99 percent intervals.[12] As the confidence level increases, the sample size must also increase in order to achieve a target margin of error. Conversely, lower confidence levels (*e.g.*, 80 or 90 percent) require smaller sample sizes in order to achieve a target margin of error.

25. My understanding is that the Court also has discretion in terms of whether it wants to rely on one-sided or two-sided confidence intervals. For instance, a two-sided 95 percent confidence interval may be 60 ± 10 percent. The interpretation is that with 95 percent certainty, the true percentage is between 50 and 70 percent. Alternatively, a one-sided confidence interval has a lower or upper bound, but not both. For example, suppose a one-sided 95 percent confidence interval produces an estimate of 60 - 10 percent. The correct interpretation is that, with 95 percent certainty, the true percentage is *at least* 50 percent. This lower bound of a one-sided 95 percent confidence interval is also the lower bound of a two-sided 90 percent confidence interval.

---

[11] *See, e.g.*, Moore, D.S., McCabe, G.P., and Craig, B.A. (2009). *Introduction to the Practice of Statistics*. 6th Ed. New York: W.H. Freeman. ("Moore *et al.*"), p. 364.

[12] *Reference Manual on Scientific Evidence* (2011). 3rd Ed. Federal Judicial Center. National Academies Press. Washington, DC. ("Reference Manual"), pp. 244-245.



26.     It is important to note that a relatively high margin of error does not mean that a sample was not selected at random or that it is unreliable.  Rather, *it highlights the importance of deriving, interpreting, and potentially applying the confidence interval.*  The true population value falls within the confidence interval with a specified level of certainty.  For instance, the trier of fact may choose to apply the lower bound of a confidence interval for determining classwide damages.  This way, the trier of fact can be highly confident that classwide damages are not overestimated.[13]

27.     When calculating damages, a one-sided confidence interval would appear to suit this Court's needs.  As I understand it, Plaintiff has the burden to show the extent of liability and damages.  It follows that the upper bound to a two-sided confidence interval is less essential.  For example, suppose classwide damages are $10 million dollars with a margin of error of $1,000,000.  This implies that we can be 95 percent confident that actual damages in the population are *at least* $9,000,000.[14]  Thus, the lower bound signifies a conservative measure of classwide damages using established statistical principles.

28.     The fact of the matter is that the desired level of confidence and target margin of error vary across professional industries and arenas.  This is addressed in the statistical literature, industry standards, and court opinions.  Consider the following textbooks and government agencies:

    a.     In *Sampling*, author Steven K. Thompson characterizes 90, 95, and 99 percent confidence levels as "[t]ypical (arbitrary but conventional) choices."[15]

---

[13] For example, suppose a random sample reveals 70 percent non-compliance, and that the margin of error is 15 percent.  If this margin of error is based on a one-sided 95 percent confidence interval, then the true percentage is at least 55 percent with 95 percent confidence.  If the confidence interval is two-sided, then the true percentage is between 55 and 85 percent with 95 percent confidence and at least 55 percent with 97.5 percent confidence.  The Court could award damages based on the lower bound of one of these confidence intervals, the estimated average, or somewhere in between these two percentages.

[14] The lower bound of a one-sided 95 percent confidence interval is equivalent to the lower bound of a two-sided 90 percent confidence interval.  In this hypothetical, we can be 90 percent certain that damages are between $900,000 and $1.1 million.

[15] Thompson, Steven K. (2002).  *Sampling.*  2nd Ed.  New York: Wiley ("Thompson"), p. 29.



b.	In the *Introduction to the Practice of Statistics*, David S. Moore *et al.* explain that "[f]or most problems you would choose a confidence level of 90%, 95%, or 99%."[16]

c.	The CMS Medicare Program Integrity Manual states that "[i]n most situations the lower limit of a **one-sided 90 percent confidence interval** shall be used as the amount of overpayment to be demanded for recovery from the provider or supplier. The details of the calculation of this lower limit involve subtracting some multiple of the estimated standard error from the point estimate, thus yielding a lower figure. This procedure, which, through confidence interval estimation, incorporates the uncertainty inherent in the sample…"[17]

d.	The Office of Inspector General has published a guidebook on statistical sampling titled *Statistical Sampling: A Toolkit for MFCUs*.  The stated thesis is "…to outline the basics of statistical sampling for use by State Medicaid Fraud Control Units (MFCUs) in calculating improper payment amounts."  Therein it states "[m]ost agencies, as a matter of policy, use either a 90- or 95-percent confidence level.  **A 90-percent confidence level is common in the Medicare administrative appeals process.  A 95-percent confidence level is more common in academic settings.**"[18]

e.	Strategic Management Services, LLC explains that the "OIG requires reporting the overpayment point estimate for the universe at 90% confidence level (two-sided) **and requires that it must reach a [margin of error] of +/- 25%.**"[19]

---

[16] Moore *et al.*, p. 363.

[17] https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/pim83c08.pdf (bolded emphasis added)

[18] https://oig.hhs.gov/fraud/medicaid-fraud-control-units-mfcu/files/MFCU%20Sampling%20Guidance%20Final.pdf (bolded emphasis added)

[19] https://compliance.com/publications/confidence-and-precision-in-claims-audits-quality-of-the-estimate/ (bolded emphasis added)



To summarize, these textbooks and guidelines demonstrate that there are no hard, fast rules regarding the confidence levels and margins of error. The fact is that confidence intervals and margins of error are statistically reliable when the sample is selected at random and properly analyzed.

### B. The Size of the Population Typically Does Not Drive the Sample Size

29. It is worth noting that a modest-sized random sample (*e.g.*, between 25 and 100 observations) can be used to draw valid statistical inferences about a relatively large population. In my experience, some practitioners claim that this cannot be done because (i) the population is so large relative to the sample size, and (ii) numerous variables must be controlled (*e.g.*, year, location) in order to draw valid statistical inferences. These perceptions are incorrect, for three established statistical reasons:

    a.   *First*, it is established in the statistical textbooks that the size of the population typically does not impact the number of observations in the sample.[20]

    b.   *Second*, it can be arithmetically proven that once the population is at least 10 times as large as the sample, the size of the population has virtually no impact on the margin of error for the average.[21]

    c.   *Third*, when the objective is to derive a confidence interval and margin of error for a singular population average, there is no statistical requirement to control for factors that vary across the defined population. By not controlling for certain data attributes in the sampling design, it may well be that the margin of error is relatively

---

[20] *See, e.g.*, Moore *et al.*, p. 365 ("[t]he size of the population…does not influence the sample size"). *See also*, *Reference Manual*, p. 246 ("Population size (i.e., the number of items in the population) usually has little bearing on the precision of the estimates for the population average.").

[21] *See, e.g.*, Thompson, pp. 15, 40, 120. The author shows various formulas for the variance, which is equal to the square of the standard deviation. Part of this calculation entails deriving a "finite correction factor." The finite correction factor entails (i) taking the difference between the population and sample sizes, and (ii) dividing (i) by the population size. For instance, if the sample size is 100 and the population is 2,000, then this calculation equals 0.950. Thus, the finite correction factor will approach 1.0 if the sample is very small relative to the defined population size. All things being equal, the margin of error will decrease if the sample comprises a relatively large portion of the population.



higher. However, a relatively high margin of error does not signify that a confidence interval is statistically unreliable. *See* Appendix Chapter D herein.

## V. Deriving/Defining the Sampled Population

30. In this instance, the sampled population is intended to include two groups of observations: (i) machines with a relatively high likelihood of having alleged invalid Upcharges, and (ii) machines that have not yet been surveyed. To the extent that Canteen has identified machines that, according to their records, do not have invalid Upcharges, they are carved out of the sampled population. Defining the sampled population entails five steps:

- *Step 1*: For each combination of cost center identification number (column C) and machine identification number (column D) in the Two-Tier Revenue Report, add together the Upcharges for a given month. For instance, suppose two rows of data have the same cost center and machine, and the Upcharges in January 2020 are $5 and $10. The newly created dataset will show include one row of data with this cost center and machine, and Upcharges in January 2020 of $15.

- *Step 2*: For each combination of cost center identification numbers (column P) and machine numbers (column AI) in the Survey Instance Report,[22] identify the row of data with the earliest survey date (column AF). Note that the day prior to the earliest survey date signifies the last day of potential damages.

- *Step 3*: Categorize the rows of data from Step 2 in which <u>all</u> of the following data conditions are met:

  o The status column (column B) is populated with "In Scope / Current" or "In Scope / Not Current."[23]

---

[22] *See* Morgan Depo., at 127:18-128:21.

[23] *See* Morgan Depo., at 153:4-155:21.

Page 13



*Moore v. Canteen* • Expert Report of Brian Kriegler, Ph.D.
Case 3:23-cv-00818-JAG-DCK    Document 293-4    Filed 03/08/24    Page 64 of 164

o The cashless device field (column W) is populated with a value of "Y"[24]

o The cash discount sticker field (column X) is populated with a value of "N"[25]

o The digital shopping cart field (column Y) shows a value of "N"[26]

o The machine model field (column AA) is <u>not</u> any one of the following "Machine Models Not at Issue:" (i) "Media Bev Max: 713 or 723," "Media Snack: 186 or 187," "Voce: 605, 606, or 607," or "Media Combo-Food: 471 or 472."[27]

These rows of data will be referred to as "Surveyed Machines - Category A." Conversely, rows of data pertaining to all other surveyed machines will be referred to as "Surveyed Machines - Category B."

- Step 4: Cross-reference the dataset in Step 3 with the dataset created in Step 1. Match records by cost center and by machine number.

- Step 5: From the cross-referenced dataset in Step 4, place each row of data into one of four strata:

o *Stratum 1*: There are 50,293 combinations of cost center and machine number that are in both the Two-Tier Revenue Report and in "Surveyed Machines - Category A," for which Upcharges through the earliest survey date are greater than $0. Note that total Upcharges through the earliest survey date in Stratum 1 are equal to $12,051,294.75.

o *Stratum 2*: There are 133,186 combinations of cost center and machine number that are in both the Two-Tier Revenue Report

---

[24] *See, e.g.*, Morgan Decl., ¶ 28e. *See also*, Morgan Depo., at 199:1-7.

[25] *See, e.g.*, Morgan Decl., ¶ 4.

[26] *See, e.g.*, Morgan Decl., ¶ 28a.

[27] *See* Virtual Zoom Videotaped 30(b)(6) Deposition of Compass Group USA, Inc. by David Goldring, Vol. II (June 30, 2021), Ex. 56 at slide 13. According to this document, the "Machine Models Not at Issue" included a digital shopping cart feature.



*Moore v. Canteen* • Expert Report of Brian Kriegler, Ph.D.

and in "Surveyed Machines - Category B," and where Upcharges from January 2014 through March 2023 are greater than $0.

- o *Stratum 3*: There are 12,093 combinations of cost center and machine number in the Two-Tier Revenue Report and not in the Survey Instance Report, in which there are Upcharges greater than $0 in February 2023 and/or March 2023. Note that total Upcharges in Stratum 3 are equal to $2,376,499.

- o *Stratum 4*: There are 58,704 combinations of cost center and machine number in the Two-Tier Revenue Report and not in the Survey Instance Report, in which Upcharges are $0 in February and March 2023.

31.   Ultimately, a stratified random sample is selected (i) from Stratum 1, and separately, (ii) from Stratum 3. Subsequently, classwide principal damages are calculated by (i) extrapolating within Stratum 1, (ii) extrapolating within Stratum 3, and (iii) adding the results of Stratum 1 and Stratum 3 together.

32.   Conversely, Stratum 2 and Stratum 4 are not sampled because Canteen's data suggest that (i) the machine did not generate allegedly invalid Upcharges, and/or (ii) the machine likely cannot be found. At the outset, no damages are calculated stemming from the observations in these two strata.

## VI. Methodology for Extrapolating Classwide Principal Damages and Pre-Judgment Interest Using the Stratified Random Sample of Vending Machines

### A. Determining the Sample Size and Selecting the Stratified Random Sample of Surveyed and Unsurveyed Observations

33.   When utilizing random sampling, my general practice is twofold:

- a.   *Select the largest sample size allowed, given various pragmatic constraints.* All things being equal, this increases precision and reduces the margin of error. My experience is that the eventual sample size is a function of the amount of time that it takes to collect and review sampled records.

- b.   *Allow for the possibility that the sample size may be less than the anticipated maximum number.* One way to preserve the validity of statistical



inferences is to place sampled observations in a random order, and to have them reviewed/analyzed in the order that they appear. For example, suppose that the anticipated maximum sample size is 400 observations, but time constraints ultimately result in an analysis of 300 observations. Extrapolations will remain valid as long as the sampled observations are *the first* 300 that were selected.

34. In this instance, my understanding is that the sample data collection process involves (i) reviewing existing images of surveyed machines, (ii) examining and taking photos of unsurveyed machines,[28] and (iii) recording results based on the stratified random sample of machines. Accordingly, I anticipate that the sample size could be on the order of hundreds of observations.[29] Therefore, I have written computational programs to select at random 250 observations from Stratum 1 and 150 observations from Stratum 3. Specifically:

- All observations in Stratum 1 are placed in a random order. Subsequently, the first 250 observation in this random order are selected.

- All observations in Stratum 3 are placed in a random order. Subsequently, the first 150 observation in this random order are selected.

---

[28] Alternatively, my understanding is that Plaintiffs ultimately may request from Canteen specific pieces of information in writing about randomly sampled machines that have not been surveyed to date. Such information includes (i) whether the machine is a cashless device, (ii) whether the machine includes a digital shopping cart, and (iii) whether the machine already includes a label.

[29] It is worth noting that Canteen's vice president of business information, Martha Morgan, reviewed photographs of 120 machines. *See, e.g.*, Morgan Decl., ¶ 28, and Morgan Depo., at 190:24-7. The fact that Ms. Morgan characterized this review as a "spot check" suggests that it is feasible and practical to examine up to 250 photographs as recommended herein.

Relatedly, Ms. Morgan acknowledges that the list of 120 machines was provided to her by an attorney. *See* Morgan Depo., at 190:24-191:7. My understanding is that Canteen has not offered any documentation regarding the process that was used to select these 120 machines. Therefore at the outset, there is no statistical justification for projecting the results from these 120 machines onto any larger population.



35. The stratified sample of 400 observations is shown in **Exhibit 2**.[30] Within each stratum, the sampled observations are to be reviewed/analyzed <u>in the order that they appear in this list</u>.

### 1. Accounting for the Possibility of Missing and/or Incomplete Sampled Records

36. After a random sample has been selected/analyzed, one must be prepared for the possibility that some sampled observations will be missing and/or incomplete. Here, the issue comes to the forefront if information about some randomly sampled observations cannot be found.

37. While it is premature to know the prevalence of missing/incomplete records, below are methods that aid in preserving the ability to draw valid statistical inferences. I anticipate using one or more of these methods to the extent necessary.

    a. *For observations in Stratum 1, assign the amount that currently appears in Canteen's Two-Tier Revenue Report.* By definition, observations in Stratum 1 purportedly have been reviewed and examined by Canteen. In the event that Canteen provides no additional information on their machines that they already analyzed, Plaintiffs' counsel has instructed me to calculate damages and interest based on what appears in Canteen's existing historical records, namely the Two-Tier Revenue Report and Survey Instance Report.

    b. *Show that sampled observations are missing and/or incomplete at random.* This approach typically entails conducting statistical comparisons between the sample and parent population. If it can be shown that sampled observations are in fact missing and/or incomplete at random, then the practitioner generally can choose to (i) work with a smaller sample, or (ii) select additional observations at random.

    c. *For observations in Stratum 3, assign $0 in damages to the extent that the requested information is missing and/or incomplete.* This approach naturally

---

[30] Observations in Stratum 1 and Stratum 3 were placed in a random order using the computational program Stata.



*Moore v. Canteen* • Expert Report of Brian Kriegler, Ph.D.

yields the most conservative calculation of principal damages and pre-judgment interest.

Each of the above methods ensure that all randomly selected observations are taken into account. This puts the practitioner in a strong position to draw valid statistical inferences about the defined population.

### B. Methodology for Calculating Classwide Principal Damages

38. Calculating classwide principal damages entails two processes: (i) collecting, reviewing and analyzing the stratified random sample of data, and (ii) using the results from the stratified random sample to extrapolate classwide principal damages and derive the corresponding confidence intervals. In total, seven steps are involved:

*Within the stratified random sample*:

- *Step 1*: Examine the sampled observations in the order that they appear in Exhibit 2 herein.

- *Step 2*: Obtain/record additional information about each observation based on photographs of vending machines, namely:[31]

  o Whether the machine is a cashless device

  o Whether the machine has a cash discount sticker

  o Whether the machine has a digital shopping cart

- *Step 3*: Assign $0 in damages to each observation in which (i) the machine is not a cashless device, (ii) the cash discount sticker was already on the machine, and/or (iii) the machine has a digital shopping carts.

---

[31] My understanding is that Plaintiffs will be serving Canteen with discovery requests to obtain, among other things, (i) images of sampled vending machines, and/or (ii) information in writing about each of the three sub-bullet points in Step 2.

Page 18

*Moore v. Canteen* • Expert Report of Brian Kriegler, Ph.D.
Case 3:23-cv-00818-JAG-DCK    Document 293-4    Filed 03/08/24    Page 69 of 164

- *Step 4*: For all other observations, use the dollar amounts listed in the Two-Tier Revenue Report to calculate the amount in Upcharges up until the date that the machine was surveyed.[32]

*Extrapolating to the defined population*:

- *Step 5*: Within each stratum, multiply the average Upcharge in the sample by the number of observations in the defined population. This is the extrapolated amount in Upcharges within each stratum.

- *Step 6*: Add the extrapolated amount of Upcharges in Stratum 1 to the extrapolated amount of Upcharges in Stratum 3.

- *Step 7*: Calculate 90 and 95 percent confidence intervals for the total amount in Upcharges, given the stratified random sampling design and distribution of alleged principal damages among sampled observations.[33]

### C. Methodology for Calculating Pre-Judgment Interest

39. Plaintiffs' counsel has advised me that the applicable interest rate varies by state. **Exhibit 3** lists the interest rates for each of the states in which Canteen operates.

40. Extrapolating classwide pre-judgment interest and deriving the corresponding confidence intervals entails seven steps:

*Within the stratified random sample*:

- *Step 1*: For each sampled machine, identify the state in which the machine is located.

---

[32] Upcharges in the Two-Tier Revenue Report are listed on a monthly basis. For the month in which the machine is surveyed, Upcharges are pro-rated based on the number of days in the month and up to one day prior to the survey. For example, suppose Upcharges in a given month are $60 and a machine is surveyed on April 6, 2019. There are five days in April prior to this machine being surveyed. Therefore, estimated damages pertaining to this machine during the month of April are (5/30) x $60 = $10.

[33] *See* Appendix Chapters B and C for methodologies for calculating confidence intervals. *See also*, Thompson, pp. 120-121.



- *Step 2*: Using this state's interest rate, calculate pre-judgment interest for each month in which there are principal damages.

- *Step 3*: Repeat Steps 1 and 2 for each sampled observation and each month.

- Step 4: Add pre-judgment interest together across all sampled observations.

By way of example, suppose a randomly sampled machine is from a state in which the applicable interest rate is 7 percent simple per annum. Further suppose that the Upcharges for this sampled machine were $10 in July 2021 and $5 in July 2022. If interest is earned up to August 2023, then pre-judgment interest approximately is equal to the following:

$$7\% \times (\$10 \times 2 \text{ years} + \$5 \times 1 \text{ year}) = \$1.75.$$

*Extrapolating to the defined population*:

- *Step 5*: Within each stratum, multiply the average pre-judgment interest amount by the number of observations in the defined population. This is the extrapolated amount in pre-judgment interest within each stratum.

- *Step 6*: Add the extrapolated amount of pre-judgment interest in Stratum 1 to the extrapolated amount of Upcharges in Stratum 3.

- *Step 7*: Calculate 90 and 95 percent confidence intervals for the total amount in pre-judgment interest, given the stratified random sampling design and distribution of alleged principal damages among sampled observations.[34]

## VII. Potential Damages and Interest Calculations

41.    **Exhibit 4** shows Upcharges for each unique combination of cost center and machine number in the stratified random sample.[35] At the outset, the Upcharges in Exhibit 4

---

[34] *See* Appendix Chapters B and C for methodologies for calculating confidence intervals. *See also*, Thompson, pp. 120-121.

[35] For observations in Stratum 1, alleged invalid Upcharges are calculated through the day prior to the earliest



constitute potential principal damages.  Once the sample data are collected, reviewed, and analyzed, I anticipate applying Steps 1 through 4 described in Section VI.B above to calculate principal damages among the sampled observations.

42.     **Exhibit 5** shows potential pre-judgment interest for each unique combination of cost center, machine number, and state in the stratified random sample.  For a given month with Upcharges, potential pre-judgment interest is calculated starting at the end of that month.[36]  Once the sample data are collected, reviewed, and analyzed, I anticipate applying the Steps 1 through 4 described in Section VI.C above to calculate updated pre-judgment interest among the sampled observations.[37]

43.     **Table 1** below shows extrapolated potential principal damages and pre-judgment interest, along with corresponding confidence intervals.  Extrapolated potential principal damages are calculated using Steps 5 through 7 in Section VI.B above.  Likewise, extrapolated potential pre-judgment interest is calculated using Steps 5 through 7 in Section VI.C above.  Ultimately, I anticipate providing an updated set of extrapolations analogous to Table 1 once the stratified random sample of observations has been collected, reviewed, and analyzed.

---

survey date.  For observations in Stratum 3, Upcharges are calculated through the end of the Two-Tier Revenue Report.

[36] To the extent that a sampled observation has Upcharges in multiple states prior to the earliest survey date, this sampled observation appears on multiple rows in Exhibit 5.

[37] At the outset, potential pre-judgment interest is calculated through August 7, 2023.  Upon request from the Court and/or Plaintiffs' counsel, I can update the date through which pre-judgment interest is earned.

Page 21


*Moore v. Canteen* • Expert Report of Brian Kriegler, Ph.D.
Case 3:23-cv-00818-JAG-DCK     Document 293-4     Filed 03/08/24     Page 72 of 164

| Table 1: Potential Classwide Principal Damages and Pre-Judgment Interest | | |
|---|---|---|
| **Description** | **Using CLT-Based Formulas** | **Using Bootstrapping** |
| *Potential Principal Damages* | | |
| Extrapolated Total | $14,663,731 | $14,661,503 |
| Lower Bound of a 1-Sided 90 Percent Confidence Interval | $12,891,014 | $12,974,889 |
| Lower Bound of a 1-Sided 95 Percent Confidence Interval* | $12,386,073 | $12,564,991 |
| *Potential Pre-Judgment Interest* | | |
| Extrapolated Total | $5,088,893 | $5,089,068 |
| Lower Bound of a 1-Sided 90 Percent Confidence Interval | $4,320,508 | $4,354,471 |
| Lower Bound of a 1-Sided 95 Percent Confidence Interval* | $4,101,626 | $4,165,151 |
| * - Equivalent to the lower bound of a two-sided 90 percent confidence interval | | |

44.     Once the analysis of the sample is complete, I also anticipate determining which confidence interval methodology to use, *i.e.*, CLT or bootstrapping.  While it is premature to make a decision in this regard, I can offer the following insights at this time:

- CLT-based confidence intervals generally require a sufficiently large sample size and/or sample data that are not heavily skewed[38]

---

[38] *See, e.g.*, Appendix A, Figure A.1, Figure A.4, and Table A.2.

Page 22



*Moore v. Canteen* • Expert Report of Brian Kriegler, Ph.D.
Case 3:23-cv-00818-JAG-DCK     Document 293-4     Filed 03/08/24     Page 73 of 164

- Bootstrapped confidence intervals (referred to as "Percentile Confidence Intervals in Appendix C) only requires a sample of data and knowing the random selection process[39]

- It is equally feasible to calculate both CLT-based and bootstrapped confidence intervals

For all of these reasons, both types of confidence intervals are reported in Table 1 above.

## VIII. Concluding Remarks

45.  Canteen's historical data are used to define a population of observations.  A stratified random sample of observations has been selected.  This sample has been presented in a way that allows for straightforward updating once additional information are collected, reviewed, and analyzed.  Established statistical methods are used to calculate total potential principal damages and pre-judgment interest.  Those same statistical methods will be used to determine total updated potential damages and interest.

46.  Should additional, relevant information become available to me in this class action, I am open to incorporating it into my future calculations and opinions.

Brian Kriegler, Ph.D.
August 7, 2023

---

[39] *See* Appendix C.

# APPENDIX CHAPTERS

# APPENDIX A: A VALIDATION OF RANDOM SAMPLING AND THE CENTRAL LIMIT THEOREM

## I.    Introduction

Random sampling is used to reach conclusions about a defined population based on a subset of its observations.  It is especially valuable when time and cost constraints only allow for the examination of a small fraction of the defined population.  Random samples can be used to estimate population characteristics and the corresponding uncertainty.  If the sample is "large enough," then this uncertainty can be determined using a law of statistics known as the Central Limit Theorem ("CLT").

Random sampling has been studied and applied for over a hundred years.  Countless textbooks have shown it to be a neutral and unbiased process.  It is also a highly efficient process.  Nevertheless random sampling is met with some skepticism.  How can the practitioner *demonstrate* that random sampling is a neutral and unbiased process?  How does the practitioner *know* when a sample is "large enough" to apply the CLT?  The answers to these questions lie in four core principles of random sampling:

- Estimates are unbiased no matter what the defined population of data looks like.

- Different populations may require different sample sizes in order to apply the CLT.

- A sample size of a few hundred observations or more almost surely is "large enough" to invoke the CLT.

- Differences between sample means and the population mean decrease as the sample size increases.

This appendix chapter serves two purposes.  First, we will prove each of the four core principles listed above.  Second, we will offer practical recommendations for justifying statistical inference calculations.

## II. Demonstrating Noteworthy Properties of Random Sampling

### A. Three Populations, Three Targets

We will work with three populations of data to show how the four core properties of random sampling depend on the nature of the population. These populations exhibit the following fact patterns and data characteristics:

- ("Skewed Data") The first population consists of hours worked off the clock by restaurant employees. These values range from 0.25 hours to 5.0 hours and have an average of 0.440 hours. Approximately 70 percent of values are less than an hour.

- ("50/50 Data") The second population consists of hospital employees. Half of the employees signed allegedly invalid meal break waivers and the remaining employees did not sign meal break waivers.

- ("90/10 Data") The third population also consists of hospital employees. 90 percent of the employees signed allegedly invalid meal break waivers and the remaining employees did not sign meal break waivers.

**Figure A.1** below is a graphical representation of these three populations. Skewed Data are shown in medium blue, 50/50 Data are in green, and 90/10 Data are in light blue.



**FIGURE A.1**
**Three Populations of Data**

Example of Skewed Data: Hours Worked
Off the Clock per Employee Workweek

Population Average: 0.4396 Hours

Example of 50/50 Data: Half of Employees
Signed Allegedly Invalid Meal Waivers

Example of 90/10 Data: 90% of Employees
Signed Allegedly Invalid Meal Waivers

We will apply a sequence of computational steps to each of these three populations. For the time being we will assume that all values in each population are observable and known. This allows us to compare the results from random sampling to the population. We use the following five computational steps to demonstrate that random sampling can be used to draw conclusions about a population:

1. *Identify* a population of data points and calculate the population mean. This is the "target."

2. *Select* a random sample of a desired size and record the sample mean. We will use sample sizes of 20, 50, and 100.

3. *Repeat* step 2 many times. This allows the practitioner to observe virtually all likely sample averages, *a.k.a.* sample means.

4. *Calculate* the average of the sample means and compare it to the "target," *i.e.*, the average of the population from which the sample was randomly selected.

5. *Graph* the sample means in a "histogram"[1] and observe how the sample means are distributed. Statistical practitioners typically refer to the histogram of sample means as a "sampling distribution."

These five steps are used to address two issues. First, we want the average of the sample means to be equal to the "target." Such result proves that random sampling is a neutral and unbiased process. Second, we want to gauge whether the sampling distribution is approximately symmetric and bell-curved. If so, then the sample is "large enough" to rely on the CLT to compute confidence intervals for the population mean. If the histogram is not approximately symmetric and bell-curved, then an alternative method is likely more appropriate for deriving confidence intervals. That topic will be discussed in the next appendix chapter.

Figures A.2, A.3, and A.4 show three sampling distributions. **Figure A.2** is derived from Skewed Data, **Figure A.3** is derived from 50/50 Data, and **Figure A.4** is derived from 90/10 Data.[2] Within each of these figures, the respective histograms are based on a few

---

[1] A histogram is a graphical display where data are grouped into ranges (*e.g.*, 40 to 49, 50 to 59, etc.) and then plotted as bars. It is similar to a bar graph, except that with a histogram, each bar is for a range of data rather than a specific value.

[2] With the 50/50 and 90/10 Data, a histogram of sample means requires a transformation. Observe that each employee either did or did not sign a meal break waiver. These are not numerical values but rather categorical values. Therefore, the measurement of interest is the *proportion* of employees that signed meal

thousand random samples of 20, 50, and 100 observations. Just as in Figure A.1, results based on Skewed Data are in medium blue, 50/50 Data are in green, and 90/10 data are in light blue. In addition, **Table A.1** and **Table A.2** below show selected results from these graphs.

---

break waivers. The population mean (proportion) equals the number of employees that signed meal break waivers divided by the number of employees in the population. Likewise, each sample mean is the number of employees that signed meal break waivers divided by the sample size.



**FIGURE A.2**
**Histograms of Sample Means from Skewed Data**

From Random Samples of 20 Observations

Average of Sample Means: 0.4394 Hours

From Random Samples of 50 Observations

Average of Sample Means: 0.4395 Hours

From Random Samples of 100 Observations

Average of Sample Means: 0.4394 Hours

Average Amount of Time Working Off the Clock Per Employee Workweek



**FIGURE A.3**
**Histograms of Sample Proportions from 50/50 Data**



**FIGURE A.4**
**Histograms of Sample Proportions from 90/10 Data**

From Random Samples of 20 Observations

Average of Sample Proportions: 90.03%

From Random Samples of 50 Observations

Average of Sample Proportions: 89.95%

From Random Samples of 100 Observations

Average of Sample Proportions: 89.99%

% of Employees that Signed Meal Waivers

econ ONE

| Table A.1: Comparison of Population Means to Averages of Sample Means Shown in Figures A.2, A.3, and A.4 | | | |
|---|---|---|---|
| Population & Mean / Sample Size | Skewed Data (Figure A.2) **0.440** | 50/50 Data (Figure A.3) **0.5000** | 90/10 Data (Figure A.4) **0.9000** |
| 20 | 0.439 | 0.5007 | 0.9003 |
| 50 | 0.440 | 0.5004 | 0.8995 |
| 100 | 0.440 | 0.4997 | 0.8999 |

| Table A.2: Assessment of Whether the Sampling Distribution is Bell-Curved Shown in Figures A.2, A.3, and A.4 | | | |
|---|---|---|---|
| Population / Sample Size | Skewed Data (Figure A.2) | 50/50 Data (Figure A.3) | 90/10 Data (Figure A.4) |
| 20 | | | No |
| 50 | YES | YES | No |
| 100 | | | Yes |

## B. Analysis

The figures and tables reveal four fundamental properties about random sampling:

- *First*, for each population and sample size, the average of the sample means is virtually identical to the population mean, hitting the "target." This demonstrates that random sampling is a neutral and unbiased process.

- *Second*, we observe bell-curved histograms using sample sizes of 20 when selected from Skewed Data and 50/50 Data. 90/10 Data require a relatively large sample size in order to achieve a bell-curved histogram. These differences demonstrate that the sample size needed to utilize the CLT depends on the shape of the population of data.

- *Third*, each histogram based on a random sample of 100 observations is symmetric and bell-curved. This result demonstrates that with a "large enough" sample size, the sampling distribution will be bell-curved even if the population is not bell-curved.

- *Fourth*, in each figure, the histograms get taller and narrower as the sample size increases. This shows that sample means are more likely to be closer to the population mean as the sample size increases.

# III.  Practical Considerations

Thus far we have assumed for demonstrative purposes that we know the values for every observation in the population.  This allows us to compare the histogram of sample means to the population mean.  However, these circumstances are solely for illustration. Sampling typically is necessitated in practice by the fact that the population of data values *cannot* be viewed in its entirety.  Only *one* random sample is selected from a defined population, not thousands.  Therefore, we will resolve three pragmatic issues.

## A. How Can the Practitioner Make Statements Using a Random Sample When the Population Mean is Unknown?

Referring to Figures A.2 through A.4, each sample mean is essentially a random selection from the sampling distribution.  The peak of each histogram is at or close to the population mean.  In addition, sample means tend to "bunch up" at or around this value. The sample mean is therefore a neutral and unbiased *estimate* for the population mean.

## B. How Can the Practitioner Account for the Fact that Different Samples will Produce Different Population Estimates?

Confidence intervals (discussed in Appendix B through Appendix D) are calculated to address the fact that results vary from one random sample to the next.  A confidence interval indicates a range of values that likely contains the population measurement of interest, *e.g.*, the population mean.  The CLT provides a series of formulas for computing confidence intervals if the sample is "large enough."

## C. How Does the Practitioner Know in Advance What Sample Size will be "Large Enough?"

In this subsection we will describe what statistical practitioners frequently do in order to justify the sample size and method by which they compute confidence intervals.

### 1. Take a Relatively Large Random Sample

In Table A.2 and in Figures A.2 through A.4 above, we show that a random sample of 100 results in a bell-curved histogram.  This is true even when sampling from the 90/10 Data.  With rare exceptions--for instance, if 99% of observations have one value and the remaining 1% of observations have another value--a sample of a few hundred or more observations will be more than adequate.

### 2.  Select a Random Sample in Multiple Phases

We have established that the shape of the population impacts what sample size is needed to yield a bell-curved histogram.  Because a random sample is a neutral and unbiased representation of the population, its shape will generally resemble that of the population.  Typically after examining a few dozen observations, the practitioner can get a sense of what sample size will ultimately be needed.  If the data are highly unbalanced, like the 90/10 data, then a relatively large sample will be required.  If not, then the required sample size will be more modest.

### 3.  Apply an Alternative Method to the CLT

Suppose that a random sample is not "large enough" to invoke the CLT, *e.g.*, a sample of 20 from a population of 90/10 Data.  Confidence intervals can still be determined, just not using the CLT.  One approach for doing so builds on "resampling."  This approach will be discussed in the Appendix C.

## IV.   Concluding Remarks about Random Sampling

The advantages of random sampling cannot be understated.  It gives the practitioner formal and scientific bases to estimate population characteristics and to compute confidence intervals.  It is hard to argue that the computations explained in this appendix chapter are biased and/or not neutral.  This puts the practitioner in a strong position to make statements about the defined population.

# APPENDIX B: DERIVATION OF CONFIDENCE INTERVAL FORMULAS WHEN APPLYING THE CENTRAL LIMIT THEOREM

Statisticians typically use two types of confidence intervals for the population mean or population proportion: "two-sided" and "one-sided" confidence intervals. A two-sided confidence interval is symmetric around the point estimate (*e.g.*, sample average) of interest; the true value of interest in the population is just as likely to be above as it is below the point estimate. In some cases, the lower bound (or upper bound) on the point estimate may be of particular interest, so the researcher can be confident that the measurement of interest is *above* a certain value (or *below* a certain value). If so, then a one-sided confidence interval may be appropriate. As I demonstrate below, while 95 percent is a commonly used confidence level, other levels can be sufficient in certain circumstances.

Half of the width of a confidence interval--that is, the difference between the population estimate and the lower (or upper) bound--is generally referred to as the "margin of error."[3] Arithmetically, a two-sided confidence interval is generally expressed as:

$$Sample\ Average \pm Margin\ of\ Error.$$

In addition, a one-sided confidence interval with a lower bound is generally expressed as:

$$Sample\ Average - Margin\ of\ Error.$$

The margin of error is a byproduct of (i) the sample size, (ii) the variability in the data, and (iii) the desired level of confidence. All things being equal, the confidence interval will be wider if there is a considerable amount of disparity in the data. Conversely, the confidence interval will be tighter as one increases the sample size.

---

[3] *See, e.g.*, Moore, D.S., and McCabe, G.P. (1999). *Introduction to the Practice of Statistics*. 3rd Ed. New York: W.H. Freeman. p. 506. (Hereinafter, "Moore and McCabe.") While the term "margin of error" is frequently associated with a 95 percent confidence interval, the fact of the matter is that this term broadly refers to the amount of uncertainty that one can tolerate. *See also*, the definition of "margin of error" on www.stattrek.com. ("The margin of error expresses the maximum expected difference between the true population parameter and a sample estimate of that parameter…For example, a pollster might report that 50% of voters will choose the Democratic candidate. To indicate the quality of the survey result, the pollster might add that the margin of error is ±5%, with a confidence level of 90%.").

From an informational perspective, it is more desirable to have a tighter confidence interval, and along with this, a precise population estimate. At the same time, there are no hard, fast rules in the field of Statistics about what constitutes a "tight enough" confidence interval or "small enough" margin of error. Likewise, there are no hard, fast rules about what *level* of confidence one must use. These depend heavily on the subject matter and the objective(s) of the issue at hand.

As explained in Appendix A, random samples of 20 or more are generally large enough to invoke the Central Limit Theorem. Provided that the sample is "sufficiently large," a two-sided 68 percent confidence interval for the population mean based on a simple random sample is approximately equal to the following:[4]

$$Sample\ Average \pm Standard\ Error,$$

where the Standard Error is equal to:

$$Standard\ Deviation\ /\ \sqrt{Sample\ Size}.$$

As the sample size increases, there is less uncertainty about the population more broadly. In addition, with a two-sided 68 percent confidence interval, the margin of error *equals* the standard error.

Similarly, a two-sided 95 percent confidence interval is approximately equal to the following:

$$Sample\ Average \pm 2\ x\ Standard\ Error.$$

With a two-sided 95 percent confidence interval, observe that the lower bound also corresponds to a one-sided 97.5 percent confidence interval (since 2.5 percent fall below the

---

[4] *See, e.g.*, Moore and McCabe (2009):

- p. 72 (showing that 68 percent of the normal distribution is within one standard deviation of the mean, 95 percent of the normal distribution is within two standard deviations of the mean, and 99 percent of the normal distribution is within three standard deviations of the mean).
- p. 402 (explaining that the distribution of the sample mean is nearly normally distributed); and
- pp. 505-506 (defining the standard error as the standard deviation of the sample mean, which is equal to the standard deviation divided by the square root of the sample size).

confidence interval). It follows that, to obtain a *one-sided* 95 percent confidence interval, one must multiply the standard error by a number between 1 and 2, which is a multiplier that varies depending on the sample size. It is well-established that, for sample sizes of at least 30, this number will be between 1.65 and 1.70, depending on the sample size.[5] Thus, in general for a simple random sample, the one-sided 95 percent confidence interval with a lower bound is approximately equal to the following:

*Sample Average* - 1.7 x *Standard Error.*

---

[5] *See, e.g.*, Moore and McCabe, p. T-11 (showing that the scalar for a 95 percent confidence interval with 30 or more degrees of freedom ranges from 1.65 to 1.70). For these kinds of confidence intervals, degrees of freedom are equal the number of observations minus 1).

# APPENDIX C: RESAMPLING AND BOOTSTRAPPING: A ROBUST METHOD FOR DETERMINING CONFIDENCE INTERVALS

## I. Introduction

We established in Appendix A that random sampling is a neutral and unbiased process. A random sample's data characteristics will approximate those in the population. If the sample is "large enough," then confidence intervals for the population average can be calculated using well-established formulas based on the Central Limit Theorem ("CLT"). CLT requirements are likely met if the data include at least 30 randomly selected observations.

An alternative method may be desirable if the practitioner cannot confirm that the dataset is "large enough" to apply the CLT. Consider a class action lawsuit in which the Court allows 25 randomly selected class members to testify. Testimony from these people is used to estimate characteristics about the class, *e.g.*, damages per class member, along with the corresponding confidence interval. This sample may not be large enough to invoke the CLT. In this appendix chapter we show one way to derive reliable confidence intervals irrespective of the sample size.

For future reference this CLT-alternative method is called "bootstrapping." It builds on "resampling" the data (also referred to as "sampling with replacement"). We will study three questions in this appendix chapter:

- How are confidence intervals derived using resampling and bootstrapping?

- How do we *know* that these confidence intervals are statistically reliable?

- How do confidence intervals based on resampling compare to those using the CLT?

Observations can be randomly selected multiple times, once, or not at all when sampling with replacement. This is different from the "usual" random sampling *without* replacement in which each observation is selected once or not at all.

**Table C.1** lists three pragmatic differences between sampling with and without replacement.

| Table C.1: Differences between "Sampling with Replacement" and "Sampling without Replacement" | |
|---|---|
| **Sampling without Replacement** | **Sampling with Replacement** |
| Each observation can only be selected once | There is no restriction on the number of times an observation can be selected |
| The "observed data" is a randomly selected subset from the defined population | The sample with replacement is selected from--and has the same number of observations as--the observed data |
| *One* subset of observations is selected from the defined population | *Many* samples with replacement can be selected from the observed data, *i.e., as if it were the population* |

Below is a simple demonstration of sampling with replacement. Consider the commuting time for five randomly selected people. These five people's commute times are 15, 20, 25, 30, and 35 minutes. The average of these times is 25 minutes. Assume that the commute times from the first three samples with replacement are as follows:

- 1st sample with replacement: 15, 15, 20, 35, 35 (average = 24 minutes)

- 2nd sample with replacement: 15, 15, 25, 30, 30 (average = 23 minutes)

- 3rd sample with replacement: 20, 30, 30, 35, 35 (average = 30 minutes)

We will explore how sampling with replacement a large number of times provides valuable results.

## II.    How is Resampling Used to Derive Confidence Intervals?

Six steps are used to derive confidence intervals from resampled data. Among statistical practitioners, this sequence is commonly referred to as "bootstrapping:"[6]

1.    *Determine* which sampling procedure was used to select the observed data, *e.g.*, simple random sampling.

2.    *Draw* a random sample with replacement from the observed data using the sampling procedure identified in step 1.

---

[6] *See, e.g.*, Efron, B. and Tibshirani, R.J. (1993). *An Introduction to the Bootstrap.* New York: Chapman & Hall. pp. 168-174. Note that the term "bootstrapping" implies getting into (or out of) a situation using existing resources. In a statistical context, the "existing resources" consist of *one* randomly selected dataset.

3.   *Calculate* the "resampled mean."

4.   *Repeat* steps 2 and 3 a few thousand times or more.  With each repetition, the number of observations should be the same as in the observed data.

5.   *Identify* the percentiles of sample means that align with the desired confidence interval.

      *Example:* Assume that steps 2 and 3 are repeated 10,000 times with the assistance of a computer program.  A common goal is to derive "one-sided" and "two-sided" 95 percent confidence intervals.  A one-sided 95 percent confidence interval has a single lower bound at the 5th percentile of resampled means. With 10,000 observations, the 5th percentile is the 500th lowest value.  A two-sided 95 percent confidence interval ranges from 2.5 percentile to the 97.5 percentile of resampled means.  These are at the 250th lowest to the 250th highest value.  These are "**Percentile Confidence Intervals.**"[7]

6.   *Graph* the histogram of resampled means.  This histogram will be symmetric or asymmetric.  A symmetric histogram usually indicates that bootstrapping and CLT-based formulas will produce similar confidence intervals.  An asymmetric histogram may suggest that bootstrapping produces more reliable confidence intervals.

There are pros and cons to bootstrapping.  Bootstrapping only requires two pieces of information: a random sample of data and knowing how these data were selected.  There are no requirements about the minimum sample size or population data characteristics.  The drawback to bootstrapping is that there is no statistical formula to follow.  Percentile Confidence Intervals typically are authenticated based on a review of the computer program that generated the resampled means.

## III.   Why Does Resampling from the Observed Data Produce Reliable Confidence Intervals?

Bootstrapping yields reliable confidence intervals because of three fundamental characteristics of random samples.

---

[7] Percentile Confidence Intervals are discussed in Efron and Tibshirani (1993), pp. 168-174.  *See also, e.g.,* Berk, R.A. (2004) *Regression Analysis: A Constructive Critique.* Thousand Oaks: Sage Publications. pp. 74-76.

- The observed dataset is an unbiased approximation of the population because random sampling is inherently neutral and unbiased

- Multiple random samples drawn from the same population will yield different results

- One observed dataset can be resampled a large number of times to approximate the variation across multiple random samples

## IV.  Case Study: How Much Time Did Employees Work Off the Clock?

Consider a class action lawsuit consisting of 100,000 employees.  The employees allege that they were not paid for all time worked.  Alleged work performed "off the clock" must be estimated because the employer does not keep track of this time.  It is prohibitively expensive to ask each employee how much work time was not recorded.  Instead a random sample of class members is deposed and asked how much time they worked off the clock.  These employees' testimony is used to estimate the average--and ultimately total amount--of unrecorded work time across all class members.  In addition, there is a need to derive confidence intervals for the population average and total.[8]

Random sampling and bootstrapping are necessitated by the fact that the population average is not known.  Setting aside that this fact is unknown to the practitioner, assume that the population consists of 90,000 class members who worked 10 minutes off the clock per workweek.  The remaining 10,000 class members worked 60 minutes off the clock per workweek.  This works out to an average of 15 minutes per workweek for each class member.

To learn about the population the practitioner selects a random sample of class members who report in deposition their off-the-clock time.  This deposition testimony is analyzed after 20, 50, and 100 class members.  **Table C.2** shows the results after each stage of sampling.

---

[8] The estimated total amount of time that class members worked off the clock equals the number of class members multiplied by the estimated average.

| Table C.2: Illustrative Results Based on a Random Sample of Class Members' Deposition Testimony | | | |
|---|---|---|---|
| Sample Size | # People with 10 Minutes Off the Clock | # People with 60 Minutes Off the Clock | Sample Average |
| 20 | 17 | 3 | (17 x 10 + 3 x 60) / 20 = 17.5 |
| 50 | 44 | 6 | (44 x 10 + 6 x 60) / 50 = 16.0 |
| 100 | 91 | 9 | (91 x 10 + 9 x 60) / 100 = 14.5 |
| Population Average (in practice, not observed) | 90,000 | 10,000 | (90,000 x 10 + 10,000 x 60) / 100,000 = 15.0 |

## A. Deriving Percentile Confidence Intervals

The practitioner resamples the observed data 10,000 times using the aforementioned bootstrapping steps. 10,000 resampled means are generated in the process. **Figure C.1** below shows three histograms of these resampled means. The three graphs are based on samples of 20, 50, and 100 randomly selected class members. 95 percent of resampled means are between the two blue dotted lines. This also captures the essence of a 95 percent confidence interval. The dotted red line shows the true population average of 15 minutes. The scales on each graph are different because the collection of resampled means gets narrower as the sample size increases.



**Figure C.1**
**Histograms of 10,000 Resampled Averages**
**And Percentile Confidence Intervals for the Classwide Average**

### B. Verifying that Percentile Confidence Intervals are Statistically Reliable

How do we *know* that the histograms of resampled means selected from the observed data are meaningful? We can find out by comparing Figure C.1 to **Figure C.2** below. Figure C.2 contains histograms of sample means selected from the *population*. Here we are assuming that we know the amount of time that every class member worked off the clock strictly for illustrative and comparative purposes. In reality, random sampling is necessitated by virtue of the fact that this information is unknown.



**Figure C.2**
**Histograms of 10,000 Sample Averages**
**Assuming that Data Were Available for All Class Members**

The histograms in Figure C.1 strongly resemble those in Figure C.2. Both histograms based on 20 observations are asymmetric and disjointed. Both histograms based on 50 observations are slightly asymmetric. Both histograms based on 100 observations are approximately symmetric and bell-curved. The fact that these two figures look so similar confirms that bootstrapping can be used to approximate the true distribution of sample means. It follows that bootstrapping also can be used to derive confidence intervals for the population mean.[9]

### C. How Do Percentile Confidence Intervals Compare to CLT-based Confidence Intervals?

Using our practitioner's sample data, **Table C.3** compares Percentile Confidence Intervals with CLT-based confidence intervals[10] for several commonly relied-upon confidence levels: one-sided 95 percent, two-sided 95 percent, and two-sided 99 percent.

---

[9] Figure C.2 does not include confidence intervals for the population mean. This is intentional. A confidence interval is only needed if the population mean is *unknown*. In this theoretical demonstration, data are available for every person in the population.

[10] The CLT-based formulas for confidence intervals applied in this appendix chapter are approximately the following:

- One-sided 95 percent confidence interval with a lower bound: Sample Mean - 1.7 x Standard Deviation / √Sample Size.

- Two-sided 95 percent confidence interval: Sample Mean ± 2.0 x Sample Standard Deviation / √Sample Size.

- Two-sided 99 percent confidence interval: Sample Mean ± 2.6 x Sample Standard Deviation / √Sample Size.

| Sample Size & Sample Mean | Confidence Interval Method | One-Sided 95% Interval Lower Bound | Two-Sided 95% Interval Lower Bound | Two-Sided 95% Interval Upper Bound | Two-Sided 99% Interval Lower Bound | Two-Sided 99% Interval Upper Bound |
|---|---|---|---|---|---|---|
| header: **Table C.3: Comparison of Percentile Confidence Intervals to CLT-based Confidence Intervals Using Case Study Data** | | | | | | |
| | | (Number of minutes working off the clock) | | | | |
| 20 Depositions (Mean = 17.5) | Percentile | 10.00 | 10.00 | 22.50 | 10.00 | 25.00 |
| | CLT | 9.05 | 7.80 | 22.20 | 5.16 | 24.85 |
| | *Difference* | *0.95* | *2.20* | *0.30* | *4.84* | *0.15* |
| 50 Depositions (Mean = 16.0) | Percentile | 12.00 | 11.00 | 19.00 | 10.00 | 21.00 |
| | CLT | 11.41 | 10.69 | 19.31 | 9.26 | 20.74 |
| | *Difference* | *0.59* | *0.31* | *0.31* | *0.74* | *0.26* |
| 100 Depositions (Mean = 14.5) | Percentile | 12.50 | 12.50 | 18.00 | 11.50 | 19.00 |
| | CLT | 12.50 | 12.01 | 17.99 | 11.04 | 18.96 |
| | *Difference* | 0.00 | 0.49 | 0.01 | 0.46 | 0.04 |
| Note: The practitioner does not observe or know that the population mean is 15.00 minutes. | | | | | | |

Differences between Percentile and CLT-based confidence intervals are noticeably large when based on 20 randomly selected class members. The 99 percent confidence interval lower bounds differ by nearly five minutes, and the 95 percent confidence interval lower bounds differ by more than two minutes.[11] These are relatively large differences considering the population average is 15 minutes. Such results suggest that a sample of 20 observations is not enough to apply the CLT. Bootstrapping is especially valuable under these circumstances.

Percentile and CLT-based confidence intervals tend to converge as more depositions are taken and analyzed. Random samples of 100 produce very similar results across confidence interval methodologies. This demonstrates that the practitioner can choose which confidence interval method to apply as the sample size grows. It also supports the notion that the CLT can be used to calculate confidence intervals if the random sample is "sufficiently large."

---

[11] That is, 10.00 - 5.16 = 4.84 minutes, and 10.00 - 7.80 = 2.20 minutes.

## V.    Concluding Remarks about Bootstrapped Confidence Intervals

Statistical practitioners have multiple tools for deriving confidence intervals.  In Appendix A, we showed that the CLT has sample size requirements for calculating confidence intervals.  Bootstrapping is an alternative method that can be applied to any random sample even if the sample size is relatively small.

Resampling and bootstrapping are applicable if the observed data were selected using random sampling.  It is tempting to conclude that a small number of observations--such as 20-50 depositions--cannot be used to draw inferences about thousands of people.  A small sample may well look different than the defined population.  This is why it is so important to calculate, interpret, and rely on confidence intervals when drawing conclusions about the population.  Bootstrapping provides an efficient and reliable tool for determining confidence intervals in a broad set of circumstances.

# APPENDIX D: AN INTERPRETATION AND VALIDATION OF CONFIDENCE INTERVALS

## I.   Introduction

In Appendix C, we showed that random samples have numerous advantageous features.  Such datasets can be used to reach conclusions about a defined population.  The statistical literature has shown random sampling to be a neutral and unbiased process.  In Appendix chapters B and C, we discussed formal and scientific methods for deriving confidence intervals ("CIs") for measurements such as the population mean.

By way of example, suppose a random sample of employees are asked how long they are at the workplace before their shift begins.  Assume that the 95 percent CI is 20 +/- 7 minutes.  The interpretation is that (i) the unbiased estimate for average is 20 minutes, and (ii) we are 95 percent confident that the population average is between 13 and 27 minutes.

**Figure D.1** below shows a visual representation of a CI. Each horizontal line shows a CI based on a new random sample.  Blue lines straddle the population mean and red lines do not capture the mean.  Over a large number (*e.g.*, thousands) of random samples of a specified size, we would expect 95 percent of the horizontal lines to cross the vertical (black) bar signifying the population mean.  Equivalently, we can also expect that 5 percent of the horizontal lines will not cross the vertical bar.  In this appendix chapter, we will refer to the percentage of intervals that contain the population mean as the "Capture Rate."



**FIGURE D.1**
**Graphical Illustration of 100 Distinct**
**95 Percent Confidence Intervals**

*Population mean = 20*

Interval Sorted by the Sample Average

*91 out of 100 random samples yielded intervals that captured the population mean.*

Sample Average

| Sample Mean | Interval Captures the Population Mean | Interval Does Not Capture the Population Mean |

Figure D.1 illustrates three key features of CIs and the Capture Rate. *First*, each random sample produces a different sample average and interval. *Second*, some intervals will not contain the population mean. *Third*, the Capture Rate does not necessarily equal the stated confidence level. In this instance the Capture Rate is 91 percent while the stated confidence level was 95 percent, *i.e.*, a difference of 4 percent.

We will explore the implications of the distance between the Capture Rate and stated confidence level in more detail below. The Capture Rate provides valuable information about a confidence interval. It can be used as a basis for comparison to the desired level of confidence. It also signifies an estimate for the actual level of certainty.

Here are four questions pertaining to the use of CIs and the Capture Rate:

1.    How do we design an experiment so that the Capture Rate is compared to the stated confidence level, *e.g.*, 90 or 95 percent?

2.    To what extent is the CI reliable if the difference between the Capture Rate and stated confidence level is "relatively large?"

3.    How does the Capture Rate compare to the stated confidence level if the underlying data are not symmetric and/or the sample size is small?

4.    How do we estimate the Capture Rate based on a random sample of data?

These questions will be addressed using computational simulations. Results will be shown across combinations of (i) four distinct populations, and (ii) four sample sizes, (iii) two methods for calculating CIs, and (iv) two stated confidence levels.[12]

## II.    The Experiment

**Table D.1** below lists nine steps needed to (i) compute the Capture Rate, and (ii) gauge the distance between the Capture Rate and the stated confidence level. The steps shaded in grey apply to both the CLT-based and bootstrapped CIs.

---

[12] In total there are 64 experiments, *i.e.*, 2 methods x 2 CIs x 4 populations x 4 sample sizes.

| | | Table D.1: | |
|---|---|---|---|
| | | **Steps Needed to Compare the Capture Rate to the Stated Confidence Level** | |
| **Step** | **If Using the Central Limit Theorem (CLT)** | | **If Using Bootstrapping** |
| 1 | *Define* a population and calculate its mean | | |
| 2 | *State* the desired confidence level(s) | | |
| 3 | *Select* a random sample of a specified size from the population defined in <u>Step 1</u> | | |
| 4 | *Compute* the sample mean and sample standard deviation from <u>Step 3</u> | | *Generate* thousands of samples with replacement ("resamples") from the random selection in <u>Step 3</u> |
| 5 | *Compute* the confidence interval(s) of interest using (i) established confidence interval formulas, and (ii) the sample mean and standard deviation from <u>Step 4</u> | | *Identify* the percentiles of resample means that align with the desired confidence level* |
| 6 | *Record* whether the confidence interval from <u>Step 5</u> has captured the population mean computed in <u>Step 1</u> | | |
| 7 | *Repeat* <u>Steps 3 through 6</u> thousands of times | | |
| 8 | *Calculate* the "Capture Rate," *i.e.*, percentage of CIs that include the population mean based on <u>Step 7</u> | | |
| 9 | *Compare* this percentage to the target confidence level stated in <u>Step 2</u> | | |
| * For instance, if 1,000 resamples were taken, a two-sided 90 percent confidence interval would range from the 50th lowest resample mean to the 50th highest resample mean. | | | |

We will apply the steps listed in Table D.1 using a wide range of statistical circumstances.  Specifically, we will:

- *Assume* four hypothetical and distinct populations

- *Select* random samples of 25, 50, 100, and 300 observations

- *Apply* stated confidence levels of 90 and 95 percent

- *Compute* both CLT-based and bootstrapped CIs

For the time being we will assume that all values in each population are observable and known.  The "Practical Considerations" section below includes a discussion about how

the practitioner can apply the aforementioned nine steps using a random sample of data, *i.e.*, when the whole population is not available.

**Figure D.2** below shows graphs of each of the four hypothetical and distinct populations. These populations are defined as follows:

- "Uniform Data" - The first population consists of hours worked off the clock by hourly employees. These values range from 0 to 10 with an average of 5 hours. Each data value has roughly the same probability of occurrence.

- "Skewed Data" - The second population consists of hours worked off the clock under a different set of circumstances. These values range from 0 hours to 10 with an average of just 1.0 hour. Approximately 65 percent of values are less than an hour. The remaining 35 percent of values range from 1 to 10 hours.

- "50/50 Data" - The third population consists of nonexempt employees. Half of the employees signed allegedly invalid meal break waivers and the remaining employees did not sign meal break waivers.

- "90/10 Data" - The fourth population also consists of nonexempt employees under a different set of circumstances. 90 percent of the employees signed allegedly invalid meal break waivers and the remaining 10 percent of employees did not sign meal break waivers.



**FIGURE D.2**
**Four Distinct Data Populations:**
**Uniform, Skewed, 50/50, and 90/10 Data**

Uniform Population of
Hours Worked Off the Clock

Skewed Population of
Hours Worked Off the Clock

50/50 Population of Employees
Who Signed Meal Period Waivers

90/10 Population of
Employees Who
Signed Meal Waivers

## III. Summary of Results and Graphical Representations

This section includes results pertaining to the distance between the Capture Rate and stated confidence level for each population and sample size. Such comparisons are performed using CLT-based and bootstrapped confidence intervals. In summary:

*Results from CLT experiments:*

- Capture Rates for 90% CIs range from 87 to 92 percent

- Capture Rates for 95% CIs range from 88 to 96 percent

*Results from bootstrapping experiments:*

- Capture Rates for 90% CIs range from 86 to 92 percent

- Capture Rates for 95% CIs range from 91 to 96 percent

*Results across all experiments:*

- Differences between the Capture Rate and stated confidence level tend to decrease as the sample size grows[13]

- The skewed and 90/10 population yield relatively larger differences between the Capture Rate and the stated confidence level[14]

- The uniform distribution yields the smallest differences between the Capture Rate and the stated confidence level[15]

- The largest difference between the Capture Rate is 6.7 percent and the stated confidence level

---

[13] For the four sample sizes, the median differences between the Capture Rate and stated confidence level are as follows: 25 observations - 1.8 percent, 50 observations - 1.6 percent, 100 observations - 0.8 percent, and 300 observations - 0.7 percent.

[14] When the population is skewed, the median difference between the Capture Rate and stated confidence level is 1.5 percent. When the population is unbalanced, this difference is 1.65 percent.

[15] When the population is uniformly distributed, the median difference between the Capture Rate and stated confidence level is 0.3 percent.

**Figure D.3** and **Figure D.4** below show graphical representations of these results. The red dotted line denotes the stated confidence level, *i.e.*, the "target." Figure D.3 includes output using CLT-based formulas for CIs, and Figure D.4 is based on bootstrapped CIs. These graphs use the same color scheme as in Figure D.2 to denote each distinct population.[16] For a given population, sample size, and CI method, the Capture Rates tend to straddle and/or be close to the stated level of confidence.

---

[16] The uniform population is in blue, the skewed population is in light blue, the 50/50 population is in medium green, and the 90/10 population is in light green.



**FIGURE D.3**
**Capture Rates When Applying the CLT**



**FIGURE D.4**

**Capture Rates When Applying Bootstrapping**

# IV. Practical Considerations when Deriving the Capture Rate and Interpreting Confidence Intervals

Thus far we have assumed that we know the values for every observation in the population. However, these circumstances are solely for illustrative purposes. In practice, it can be challenging to derive the Capture Rate because the practitioner only gets to collect/analyze *one* random sample, not hundreds or thousands. How might the experimental process and results described above be used given that only limited data are available? Below are four recommendations that can aid in the sampling process and/or CI interpretation.

## A. Estimate the Capture Rate by Creating a Proxy for the Population and Proceeding with the Nine Steps Listed Above

A random sample can generate a "stand-in" for the population. Suppose the defined population includes 10,000 observations and a random sample of 100 observations has been analyzed. That sample can be used to simulate a dataset of 10,000 analyzed observations. Each observation can be selected multiple times, once, or not at all.[17] Subsequently, the practitioner can calculate the Capture Rate and compare it to the stated confidence level.

## B. Assess Whether the Likely Value of the Capture Rate is "High Enough"

By way of example, consider a 95 percent CI based on a random sample of 25 observations. The results herein suggest that the actual level of confidence may be closer to 90 percent.[18] Depending on the circumstances and/or industry standards, 90 percent may be considered sufficiently high.[19] If so, then this random sample of 25 observations can be used to make inferences about the population mean and its range of likely values.

---

[17] Statisticians frequently refer to this type of selection as "sampling with replacement."

[18] Bootstrapping is likely a more appropriate CI method given a sample size of 25 observations. Applying a stated confidence level of 95 percent, the bootstrapped Capture Rates are as follows: Uniform Data - 93.3%, Skewed Data - 90.9%, 50/50 Data - 92.7%, and 90/10 Data - 92.3%.

[19] *See, e.g.*, the CMS Medicare Program Integrity Manual ("[i]n most situations the lower limit of a one-sided 90 percent confidence interval shall be used as the amount of overpayment to be demanded for recovery from the provider or supplier." URL: https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/pim83c08.pdf.

### C. Recognize the Shape of Data Distribution in the Sample

If the random sample produces a nearly symmetric distribution of data, this supports the notion that the Capture Rate and the stated confidence level are relatively close to one another. Conversely, an asymmetric data distribution may imply that the actual level of confidence is lower than its target.

### D. Increase the Sample Size so that the Capture Rate is More Likely to Approach the Stated Confidence Level.

Ideally, the Capture Rate equals or is very close to the stated confidence level. The results herein suggest that this is likely to be the case when the random sample includes several hundred observations or more.

## V. Concluding Remarks about the Interpretation and Validation of Confidence Intervals

This appendix chapter includes a method that enables statistical practitioners to: (i) account for the fact that each random sample yields a unique estimate and margin of error, (ii) estimate the rate at which the CI will capture the population mean, and (iii) compare the Capture Rate to the stated confidence level. Numerous experiments, which run the gamut in terms of population shapes and sample sizes, have been performed. The computational process and results provide powerful information about CIs and their interpretation.

For some practitioners, it may be tempting to dismiss a random sample and corresponding CIs if the data are asymmetric and/or the sample size is small. The results presented above provide compelling evidence that neither of these issues impede the calculation of reliable confidence intervals. Ultimately, it may be informative to derive and report the Capture Rate in order to gauge the actual level of confidence. Doing so places the practitioner on solid ground when making statements about the defined population.

# ATTACHMENT 3

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

|  |  |
|---|---|
| **GEORGE MOORE, VIRGINIA CARTER, JAMES JILEK, FRANCIS JAYE, and SEAN MADELMAYER,**<br><br>　　　　**Plaintiffs,**<br><br>**v.**<br><br>**COMPASS GROUP USA, INC., D/B/A CANTEEN,**<br><br>　　　　**Defendant.** | **No. 4:18-CV-01962-SEP** |

**SUPPLEMENTAL EXPERT REPORT OF BRIAN KRIEGLER, PH.D.**

**Econ ONE Research, Inc.**

**August 11, 2023**

Suite 800
550 South Hope Street
Los Angeles, California 90071

**TABLE OF CONTENTS**

**I.     Introduction**..............................................................................**1**

**II.    Deriving/Defining the California Sampled Population** ..............**1**

**III.   Selecting the California Stratified Random Sample** ..................**1**

**IV.    Potential Damages and Interest Calculations Pertaining to California**................................................................................**2**

**V.     Concluding Remarks**..................................................................**3**

**LIST OF SUPPLEMENTAL EXHIBITS**

1 - Stratified Random Sample of Combinations of Cost Center and Machine Number Among Machines Located in California

2 - Upcharges Among Randomly Selected Combinations of Cost Center and Machine Number in California

3 - Potential Pre-Judgment Interest Among Among Randomly Selected Combinations of Cost Center and Machine Number in California

i

*Moore v. Canteen* • Supplemental Expert Report of Brian Kriegler, Ph.D.

Case 3:23-cv-00818-JAG-DCK     Document 293-4     Filed 03/08/24     Page 115 of 164

## I. Introduction

1. I have personal knowledge of the facts set forth in this expert report, except where otherwise specified. If called to testify to these facts as a witness in this action, I would so testify.

2. I have been retained by the Plaintiffs in *George Moore, et al. v. Compass Group USA, d/b/a Canteen*, Case No. 4:18-CV-01962-SEP, in the United States District Court for the Eastern District of Missouri, Eastern Division.

3. Except where specified otherwise, the terminology and methodology utilized in this supplemental expert report are the same as in the Expert Report of Brian Kriegler, Ph.D., dated August 7, 2023 ("Kriegler Report").

4. The purpose of this supplemental expert report is to provide a stratified random sample of machines located in California ("California Stratified Random Sample").

## II. Deriving/Defining the California Sampled Population

5. "California Stratum 1" is the sub-population of all machines in Stratum 1 that were in California at or before the earliest survey date. There are 4,555 combinations of cost center and machine numbers that fit this description. Note that total Upcharges in California through the earliest survey date in this stratum are equal to $1,339,716.82.

6. "California Stratum 3" is the sub-population of all machines in Stratum 3 that were or are located in California. There are 306 combinations of cost center and machine numbers that fit this description. Note that total Upcharges in California are equal to $64,033.08.

## III. Selecting the California Stratified Random Sample

7. All observations in California Stratum 1 are placed in a random order. Subsequently, the first 65 observations in this random order are selected.

8. Similarly, all observations in California Stratum 3 are placed in a random order. Subsequently, the first 35 observations in this random order are selected.



*Moore v. Canteen* • Supplemental Expert Report of Brian Kriegler, Ph.D.

Case 3:23-cv-00818-JAG-DCK    Document 293-4    Filed 03/08/24    Page 116 of 164

9.    The California-specific stratified sample of 100 observations is shown in **Supplemental Exhibit 1**. This exhibit is analogous to Exhibit 2 in the Kriegler Report. Within each stratum, the sampled observations are to be reviewed/analyzed in the order that they appear in this list.

## IV.    Potential Damages and Interest Calculations Pertaining to California

10.    **Supplemental Exhibit 2** shows Upcharges for each unique combination of cost center and machine in the California stratified random sample. This exhibit is analogous to Exhibit 4 in the Kriegler Report.

11.    **Supplemental Exhibit 3** shows potential pre-judgment interest for each unique combination of cost center and machine number in the California stratified random sample. This exhibit is analogous to Exhibit 5 in the Kriegler Report.

12.    **Supplemental Table 1** below shows extrapolated potential principal damages and pre-judgment interest pertaining to the California Sampled Population, along with corresponding confidence intervals. This table is analogous to Table 1 in the Kriegler Report.

Page 2

*Moore v. Canteen* • Supplemental Expert Report of Brian Kriegler, Ph.D.
Case 3:23-cv-00818-JAG-DCK    Document 293-4    Filed 03/08/24    Page 117 of 164

| Supplemental Table 1: Potential Principal Damages and Pre-Judgment Interest Pertaining to Machines that Are or Were in California | | |
|---|---|---|
| **Description** | **Using CLT-Based Formulas** | **Using Bootstrapping** |
| *Potential Principal Damages* | | |
| Extrapolated Total | $1,542,324 | $1,542,852 |
| Lower Bound of a 1-Sided 90 Percent Confidence Interval | $1,088,508 | $1,116,427 |
| Lower Bound of a 1-Sided 95 Percent Confidence Interval* | $957,404 | $1,007,564 |
| *Potential Pre-Judgment Interest* | | |
| Extrapolated Total | $645,323 | $646,032 |
| Lower Bound of a 1-Sided 90 Percent Confidence Interval | $450,875 | $463,283 |
| Lower Bound of a 1-Sided 95 Percent Confidence Interval* | $394,700 | $423,071 |
| * - Equivalent to the lower bound of a two-sided 90 percent confidence interval | | |

## V.   Concluding Remarks

13.   The same methodologies presented in the Kriegler Report are applied to the subset of machines that are or were in California.

14.   Should additional, relevant information become available to me in this class action, I am open to incorporating it into my future calculations and opinions.

Brian Kriegler, Ph.D.
August 11, 2023

Page 3

*Moore v. Canteen* • Supplemental Expert Report of Brian Kriegler, Ph.D.
Case 3:23-cv-00818-JAG-DCK     Document 293-4     Filed 03/08/24     Page 118 of 164

# ATTACHMENT 4

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

**GEORGE MOORE, VIRGINIA CARTER,**
**JAMES JILEK, FRANCIS JAYE, and SEAN**
**MADELMAYER,**

               **Plaintiffs,**

**v.**

**COMPASS GROUP USA, INC., D/B/A**
**CANTEEN,**

               **Defendant.**

**No. 4:18-CV-01962-SEP**

**SECOND SUPPLEMENTAL EXPERT REPORT OF BRIAN KRIEGLER, PH.D.**

**Econ ONE Research, Inc.**

**October 12, 2023**

Suite 800
550 South Hope Street
Los Angeles, California 90071

# TABLE OF CONTENTS

**I.    Introduction** ................................................................1

**II.   Evaluation of the Kalat Report** .................................2

    A. Areas of Agreement and/or that are Not Contested ............................ 2

    B. The Kalat Report's Analysis of Nationwide Stratum 1 and of California Stratum 1 ............................................................ 3

    C. The Kalat Report Does Not Include a Quantitative Analysis of Nationwide Stratum 3 or of California Stratum 3 ................................. 5

    D. Evaluation of the Kalat Report's Classwide Damages Calculations ........... 5

    E. Pre-Judgment Interest Calculations are Missing from the Kalat Report .... 6

**III.  Evaluation of Canteen's Interrogatory Responses** .....................6

**IV.   Combining the Exhibits from the Kriegler Reports with the Results from Canteen's Interrogatory Responses and the Kalat Report** ..............................................................7

**V.    Alleged Classwide Damages and Pre-Judgment Interest** .........10

    A. The Proposed Nationwide Class ...................................................... 10

        1. Comparison of Results Using CLT-based Formulas Versus Bootstrapping .......................................................... 12

    B. The Proposed California Class......................................................... 13

        1. Comparison of Results Using CLT-based Formulas Versus Bootstrapping .......................................................... 14

i

*Moore v. Canteen* • Second Supplemental Expert Report of Brian Kriegler, Ph.D.

Case 3:23-cv-00818-JAG-DCK    Document 293-4    Filed 03/08/24    Page 121 of 164

**VI.   Concluding Remarks**................................................................**16**

ii

*Moore v. Canteen* • Second Supplemental Expert Report of Brian Kriegler, Ph.D.

Case 3:23-cv-00818-JAG-DCK     Document 293-4     Filed 03/08/24     Page 122 of 164

# LIST OF EXHIBITS

1 - Alleged Nationwide Principal Damages and Pre-Judgment Interest Among Randomly Sampled Machines that Were Analyzed by Defendants

2 - Alleged California Principal Damages and Pre-Judgment Interest Among Randomly Sampled Machines that Were Analyzed by Defendants

econ**ONE**

iii

*Moore v. Canteen* • Second Supplemental Expert Report of Brian Kriegler, Ph.D.
Case 3:23-cv-00818-JAG-DCK    Document 293-4    Filed 03/08/24    Page 123 of 164

# I. Introduction

1. I have personal knowledge of the facts set forth in this expert report, except where otherwise specified. If called to testify to these facts as a witness in this action, I would so testify.

2. I have been retained by the Plaintiffs in *George Moore, et al. v. Compass Group USA, d/b/a Canteen*, Case No. 4:18-CV-01962-SEP, in the United States District Court for the Eastern District of Missouri, Eastern Division.

3. I am the same Brian Kriegler, Ph.D., who previously has provided analyses and opinions in the following settings:

    • Expert Report of Brian Kriegler, Ph.D., dated August 7, 2023 ("Kriegler Report")

    • Supplemental Expert Report of Brian Kriegler, Ph.D., dated August 11, 2023 ("Kriegler Supplemental Report")[1]

    • Deposition of Brian Kriegler, Ph.D., dated August 23, 2023 ("Kriegler Deposition")

    Collectively, the Kriegler Report and Kriegler Supplemental Report are referred to as the "Kriegler Reports."

4. The same terminology and methodology introduced in the Kriegler Report is applied herein, with the following modifications:

    • Stratum 1 is referred to as "Nationwide Stratum 1"

    • Stratum 3 is referred to as "Nationwide Stratum 3"

5. In this class action lawsuit, there have been three key events since the Kriegler Deposition that pertain to my analysis/opinions:

---

[1] This report was followed up by an errata, dated August 25, 2023.

Page 1

*Moore v. Canteen* • Second Supplemental Expert Report of Brian Kriegler, Ph.D.

Case 3:23-cv-00818-JAG-DCK    Document 293-4    Filed 03/08/24    Page 124 of 164

- *First*, Canteen produced additional data/documents consisting of (i) an updated Survey Instance Report that includes 263,016 rows of data,[2] and (ii) photographs for sampled machines in Nationwide Stratum 1 and/or in California Stratum 1.[3]

- *Second*, Canteen provided "Interrogatory Responses" in which they provided pertinent information about sampled machines in Nationwide Stratum 3 and in California Stratum 3.[4]

- *Third*, Canteen's expert, David Kalat, submitted a report dated September 18, 2023 ("Kalat Report"). Therein, Mr. Kalat provided an analysis of the sampled observations in Nationwide Stratum 1 and in California Stratum 1. *See* Kalat Report, Exhibit 4.

6. The purpose of this report is to provide alleged classwide damages and interest using a combination of (i) the methodologies set forth in the Kriegler Report, (ii) the random sample selections presented in the Kriegler Reports, (iii) Canteen's recent data production and interrogatory responses, and (iv) the analyses and opinions presented in the Kalat Report.

## II.  Evaluation of the Kalat Report

### A. Areas of Agreement and/or that are Not Contested

7. As an initial matter, there is a significant amount of convergence between the Kriegler Reports and the Kalat Report. In particular:

---

[2] *See* CG-0063607, which was included in CG028. Note that the Survey Instance Report referenced in the Kriegler Report includes 246,943 rows of data. *See* Kriegler Report, ¶ 17.

[3] *See* CG-0063608 through CG-0064129, which were included in CG028. Canteen also produced an Excel spreadsheet that matched each bates-stamped photograph to the file name as it appeared in the updated Survey Instance Report. The name of that Excel spreadsheet, as I received it, was titled "CG028 bates and file names.xlsx."

[4] Compass Group USA, Inc.'s Responses and Objections to Plaintiff's Interrogatories Regarding Vending Machines, dated September 8, 2023, Attachment A, ROG 1 and ROG 2 (hereinafter, "Interrogatory Responses").

Page 2

econ**ONE**

*Moore v. Canteen* • Second Supplemental Expert Report of Brian Kriegler, Ph.D.

Case 3:23-cv-00818-JAG-DCK     Document 293-4     Filed 03/08/24     Page 125 of 164

- The Kalat Report does not dispute that random sampling provides a neutral and unbiased selection process.

- The Kalat Report does not appear to include any impactful critiques of the sampling designs set forth in the Kriegler Reports.

- Mr. Kalat reviewed/analyzed photos of sampled machines, a process that was recommended in the Kriegler Report.[5]

- The Kalat Report utilizes each of the two statistical approaches for calculating principal damages that are set forth in the Kriegler Reports.[6]

### B. The Kalat Report's Analysis of Nationwide Stratum 1 and of California Stratum 1

8. Among other things, Exhibit 4 to the Kalat Report includes an analysis of the sampled observations in Nationwide Stratum 1 and in California Stratum 1. These results indicate whether there was a cash discount sticker at the time that the machine was surveyed. To summarize, the Kalat Report concluded the following:

*In Nationwide Stratum 1*:

- The Kalat Report includes an analysis of 207 out of 250 sampled machines.[7]

- 181 out of 207 sampled machines in Nationwide Stratum 1 did not have a cash discount sticker prior to being surveyed.[8]

---

[5] Kriegler Report, § VI.B.

[6] *See, e.g.*, Kalat Report, ¶ 81.

[7] *See, e.g.*, Kalat Report, ¶ 62 ("…[T]here are 207 unique Stratum [1] machines for which an image designated as "BEFORE" was provided….").

[8] Kalat Report, ¶ 67 ("The two-tier revenue collected by the sample population of **207 Stratum [1]** machines nationwide totals $46,910.83. After removing the revenue contributed by the **26 machines** for which the photographic review confirmed had displayed a Cash Discount Sticker, the updated total revenue for the sample population is $40,391.75.") (bolded emphasis added). 207 - 26 = 181.



- The Kalat Report extrapolates damages using the results from the 207 sampled machines and extrapolating to the Nationwide Stratum 1 population. That extrapolated damages amount is $9,813,673.[9]

- Thus, the Kalat Report effectively treats 43 out of 250 sampled machines in Nationwide Stratum 1 as missing at random.[10]

- There are an additional 1,044 machines that have a total of $183,520 in Upcharges. The Kalat Report adds these this dollar amount to arrive at an estimated total of $9,997,193 in alleged principal damages owed to the proposed Nationwide class. [11]

*In California Stratum 1*:

- The Kalat Report includes an analysis of 53 out of 65 sampled machines.[12]

- 30 out of 53 sampled machines in California Stratum 1 did not have a cash discount sticker prior to being surveyed.[13]

- The Kalat Report extrapolates damages using the results from the 53 sampled machines and extrapolating to the California Stratum 1 population. That extrapolated damages amount is $751,045.[14]

---

[9] *See, e.g.*, Kalat Report, ¶ 79.

[10] *See* Kalat Report, ¶¶ 67-68. The average Upcharge across 207 sampled machines is multiplied by the number of machines in Nationwide Stratum 1 to arrive at the extrapolated total of $9,813,673.

[11] Kalat Report, ¶ 70 ("…I add the newly identified two-tier revenue of $183,520 from the additional 1,044 machines in Stratum [1] to the figure calculated above ($195.13*50293). **Together these come to collective extrapolated damages for the full Stratum [1] population of $9,997,193.**"). *See also*, Kalat Report, ¶ 81 (showing nationwide calculations that include $183,520).

[12] *See, e.g.*, Kalat Report, ¶ 62 ("I also observed the availability of "BEFORE" photographs for 53 of the 65 machines identified in [Dr. Kriegler's] sample for California-based Stratum [1] machines….").

[13] Kalat Report, ¶ 71 ("The two-tier revenue collected by the sample population of 53 Stratum I machines in California totals $16,153. In my examination of the photographs, I identified that **23 of these 53 machines** showed Cash Discount Stickers in the 'BEFORE' images.") (bolded emphasis added). 53 - 23 = 30.

[14] Kalat Report, ¶ 72.

econ**ONE**
*Moore v. Canteen* • Second Supplemental Expert Report of Brian Kriegler, Ph.D.
Case 3:23-cv-00818-JAG-DCK    Document 293-4    Filed 03/08/24    Page 127 of 164

- Thus, the Kalat Report effectively treats 12 out of 65 sampled machines in California Stratum 1 as missing at random.[15]

- There are an additional 114 machines that have a total of $16,398 in Upcharges. The Kalat Report adds these this dollar amount to arrive at an estimated total of $767,443 in alleged principal damages owed to the proposed California class.[16]

9. Looking ahead to Section V, my classwide damages and interest calculations are derived using the results from the Kalat Report and my analysis of Nationwide/California Stratum 3.

### C. The Kalat Report Does Not Include a Quantitative Analysis of Nationwide Stratum 3 or of California Stratum 3

10. Canteen produced information about machines in the Nationwide and/or California Stratum 3 in their interrogatory responses. Section III below discusses these interrogatory responses. Section V below incorporates these interrogatory responses into my classwide damages and interest calculations. Nevertheless, the Kalat Report does not provide any quantitative opinions pertaining to the machines that are in Nationwide Stratum 3 and/or California Stratum 3.

### D. Evaluation of the Kalat Report's Classwide Damages Calculations

11. The Kalat Report provides classwide principal damages for Nationwide Stratum 1 and for California Stratum 1. In contrast, Section V below includes principal damages based on both Strata 1 and 3, both for the proposed Nationwide class and the proposed California class.

---

[15] *See* Kalat Report, ¶¶ 71-72. The average Upcharge across 53 sampled machines is multiplied by the number of machines in California Stratum 1 to arrive at the extrapolated total of $751,045.

[16] Kalat Report, ¶ 73 ("To arrive at a total figure of collective extrapolated damages for the California Stratum [1] machines, I add the newly identified two-tier revenue of $16,398 from the additional 114 machines in California to the figure calculated above ($164.88*4555). **Together these come to collective extrapolated damages for the full Stratum [1] population of $767,443.**"). *See also,* Kalat Report, ¶ 81 (showing California calculations that include $16,398).

Page 5

*Moore v. Canteen* • Second Supplemental Expert Report of Brian Kriegler, Ph.D.
Case 3:23-cv-00818-JAG-DCK    Document 293-4    Filed 03/08/24    Page 128 of 164

### E. Pre-Judgment Interest Calculations are Missing from the Kalat Report

12. The Kalat Report does not provide classwide pre-judgment interest calculations. In contrast, Section V below includes pre-judgment interest for both the proposed Nationwide class and the proposed California class.

## III. Evaluation of Canteen's Interrogatory Responses

13. Canteen's "Interrogatory Responses" (defined in paragraph 5 above) includes two spreadsheets. "Attachment A, ROG 1" pertains to the random sample of 150 machines in Nationwide Stratum 3. "Attachment A, ROG 2" pertains to the random sample of 35 machines in California Stratum 3. Each spreadsheet indicates whether sampled machines (i) did/did not have a cash discount sticker, (ii) were/were not cash-only devices, and (iii) did/did not include a digital shopping cart.

14. My review of Canteen's Interrogatory Responses reveals the following results:

*In Nationwide Stratum 3* (150 sampled machines):

- 85 out of 150 sampled machines purportedly were analyzed by Canteen.

- 11 out of these 85 sampled machines (i) do not have a cash discount sticker, (ii) are not cash-only devices, and (iii) do not include a digital shopping cart.

- For the remaining 65 sampled machines (*i.e.*, 150 sampled machines minus 85 analyzed machines), Canteen's Interrogatory Responses list "NA" with respect to (i), (ii), and (iii) directly above.

*In California Stratum 3* (35 sampled machines):

- 23 out of 35 sampled machines purportedly were analyzed by Canteen.

- 10 out of these 23 sampled machines (i) do not have a cash discount sticker, (ii) are not cash-only devices, and (iii) do not include a digital shopping cart.

Page 6


*Moore v. Canteen* • Second Supplemental Expert Report of Brian Kriegler, Ph.D.
Case 3:23-cv-00818-JAG-DCK    Document 293-4    Filed 03/08/24    Page 129 of 164

- For the remaining 12 sampled machines (*i.e.*, 35 sampled machines minus 23 analyzed machines), Canteen's Interrogatory Responses list "NA" with respect to (i), (ii), and (iii) directly above.

The next section discusses how these results are combined with the sample selection from Nationwide Stratum 3 and from California Stratum 3.

## IV.  Combining the Exhibits from the Kriegler Reports with the Results from Canteen's Interrogatory Responses and the Kalat Report

15.  **Table A** below lists the datasets that are analyzed in order to apply the methodologies set forth in Sections VI.B and VI.C in the Kriegler Report.

econ**ONE**

*Moore v. Canteen* • Second Supplemental Expert Report of Brian Kriegler, Ph.D.

| Table A: Datasets Used to Calculate Alleged Damages and Pre-Judgment Interest | | |
|---|---|---|
| **Stratum** | **From the Kriegler Reports** | **From Canteen** |
| *Proposed Nationwide Class* | | |
| Stratum 1 | Kriegler Report, Ex. 4 and 5 | Kalat Report, Ex. 4 <br> Kalat Report, ¶ 81[1] <br> CG-63607 (updated Survey Instance Report)[2] |
| Stratum 3 | Kriegler Report, Ex. 4 and 5 | Interrogatory Responses, Attachment A, ROG 1 |
| *Proposed California Class* | | |
| Stratum 1 | Kriegler Supplemental Report, Ex. 2 and 3 | Kalat Report, Ex. 4 <br> Kalat Report, ¶ 81[3] <br> CG-63607 (updated Survey Instance Report)[4] |
| Stratum 3 | Kriegler Supplemental Report, Ex. 2 and 3[5] | Interrogatory Responses, Attachment A, ROG 2 |

Notes:
[1] - Specifically, $183,520 in alleged principal damages pertaining to the 1,044 additional machines that meet the criteria for Nationwide Stratum 1.
[2] - Specifically, $23,976 in pre-judgment interest pertaining to the 1,044 additional machines that meet the criteria for Nationwide Stratum 1.
[3] - Specifically, $16,398 in alleged principal damages pertaining to the 114 additional machines that meet the criteria for California Stratum 1.
[4] - Specifically, $4,287 in pre-judgment interest pertaining to the 114 additional machines that meet the criteria for California Stratum 1.
[5] - Corrected Upcharges are listed in the errata to the Kriegler Supplemental Report.

16.    For each stratum listed in Table A above, datasets are cross-referenced by cost-center and machine number. For example, in Exhibit 4 to the Kriegler Report, the 64th sample selection in Nationwide Stratum 1 is machine number 17634 from cost center 5553. This machine had Upcharges of $26.40 leading up to the earliest survey date. Additionally, Exhibit 5 to the Kriegler Report indicates $6.17 in alleged pre-judgment interest through August 7, 2023. Exhibit 4 to the Kalat Report indicates that this

Page 8

*Moore v. Canteen* • Second Supplemental Expert Report of Brian Kriegler, Ph.D.
Case 3:23-cv-00818-JAG-DCK    Document 293-4    Filed 03/08/24    Page 131 of 164

machine did not have a sticker prior to being surveyed.[17]  Therefore, this sampled observation is assigned $26.40 in alleged principal damages and $6.17 in alleged pre-judgment interest.

17.  For each of the sampled observations in Nationwide and/or California Stratum 1, principal damages and interest are $0 if the Kalat Report indicates that the machine already had a cash discount sticker at the time that it was surveyed.

18.  For each of the sampled observations in Nationwide and/or California Stratum 3, principal damages and interest are $0 if Canteen's Interrogatory Responses indicate that (i) the machine had a cash discount sticker, (ii) the machine was not cashless, and/or (iii) the machine had a digital shopping cart.

19.  A randomly sampled machine is treated as missing at random under each of the following circumstances:

- For machines in Nationwide and/or California Stratum 1, the "Notes" column in Exhibit 4 to the Kalat Report says "Indeterminate" or "Can't see reader."

- For machines in Nationwide and/or California Stratum 3, Canteen's Interrogatory Response is listed as "NA."

- For machines in either stratum in the Nationwide and/or California sample, no photograph was produced.

This approach is consistent with the Kalat Report that is summarized in Section II.B above.

20.  **Second Supplemental Exhibit 1** lists alleged monetary principal damages and pre-judgment interest for each sampled observation that (i) was in the Nationwide stratified random sample, and (ii) was reviewed by Mr Kalat.  Similarly, **Second Supplemental Exhibit 2** lists alleged monetary principal damages and pre-judgment interest for each sampled observation that (i) was in the California stratified random sample, and (ii) was listed in Canteen's Interrogatory Responses.

---

[17] The corresponding photo for this particular sampled machine is CG-0063881.

## V. Alleged Classwide Damages and Pre-Judgment Interest

21. Tables B through E below show alleged classwide principal damages and pre-judgment interest.[18] In each table:

    a. The numbers are calculated using (i) the methodologies set forth in Section VI.B and VI.C to the Kriegler Report, (ii) the cross-referencing methodology described in Section IV above and the data sources referenced therein.

    b. The extrapolated total signifies an unbiased statistical estimate of alleged classwide damages/interest.

    c. Each confidence interval calculation signifies an "at least" amount of alleged classwide dollars owed, with a specified degree of certainty.

### A. The Proposed Nationwide Class

22. **Table B** below shows alleged principal damages and pre-judgment interest for the proposed Nationwide class. Each of the numbers in Table B cover the combination of Nationwide Stratum 1 and Nationwide Stratum 3. This table reveals the following results, among other things:

- Using bootstrapping, the unbiased statistical estimate of alleged classwide principal damages is $9,890,345.

- Using bootstrapping, alleged classwide principal damages is at least $8,313,708 with 90 percent certainty and is at least $7,928,961.

- Using bootstrapping, the unbiased statistical estimate of alleged classwide principal damages plus pre-judgment interest is $13,565,547.

- Using bootstrapping, alleged classwide principal damages plus pre-judgment interest is at least $11,337,290 with 90 percent certainty and at least $10,776,856 with 95 percent certainty.

---

[18] Just as in the Kriegler Report, pre-judgment interest is calculated through August 7, 2023.

| Table B: Alleged Nationwide Principal Damages and Pre-Judgment Interest Not Including 1,044 Additional Machines in Nationwide Stratum 1 | | |
|---|---|---|
| Description | Using CLT-Based Formulas | Using Bootstrapping |
| *Alleged Principal Damages* | | |
| Extrapolated Total | $9,887,282 | $9,890,345 |
| Lower Bound of a 1-Sided 90 Percent Confidence Interval | $8,270,889 | $8,313,708 |
| Lower Bound of a 1-Sided 95 Percent Confidence Interval* | $7,809,977 | $7,928,961 |
| *Alleged Principal Damages Plus Pre-Judgment Interest* | | |
| Extrapolated Total | $13,561,475 | $13,565,547 |
| Lower Bound of a 1-Sided 90 Percent Confidence Interval | $11,273,029 | $11,337,290 |
| Lower Bound of a 1-Sided 95 Percent Confidence Interval* | $10,620,481 | $10,776,856 |
| * - Equivalent to the lower bound of a two-sided 90 percent confidence interval. | | |

econ ONE

*Moore v. Canteen* • Second Supplemental Expert Report of Brian Kriegler, Ph.D.
Case 3:23-cv-00818-JAG-DCK    Document 293-4    Filed 03/08/24    Page 134 of 164

23.  **Table C** is analogous to Table B.  The distinction is that Table C accounts for 1,044 additional machines in Nationwide Stratum 1.  These additional machines result in $183,520 in additional alleged principal damages and $23,976 in additional pre-judgment interest.

| Table C: Alleged Nationwide Principal Damages and Pre-Judgment Interest Including 1,044 Additional Machines in Nationwide Stratum 1 | | |
|---|---|---|
| Description | Using CLT-Based Formulas | Using Bootstrapping |
| *Alleged Principal Damages* | | |
| Extrapolated Total | $10,070,802 | $10,073,865 |
| Lower Bound of a 1-Sided 90 Percent Confidence Interval | $8,454,409 | $8,497,228 |
| Lower Bound of a 1-Sided 95 Percent Confidence Interval* | $7,993,497 | $8,112,481 |
| *Alleged Principal Damages Plus Pre-Judgment Interest* | | |
| Extrapolated Total | $13,768,971 | $13,773,043 |
| Lower Bound of a 1-Sided 90 Percent Confidence Interval | $11,480,525 | $11,544,786 |
| Lower Bound of a 1-Sided 95 Percent Confidence Interval* | $10,827,977 | $10,984,352 |
| * - Equivalent to the lower bound of a two-sided 90 percent confidence interval. | | |

### 1. Comparison of Results Using CLT-based Formulas Versus Bootstrapping

24.  Alleged monetary awards for the proposed Nationwide class are not sensitive to the statistical method that is used.  For example, in terms of classwide principal damages, the difference between CLT-based and bootstrapped lower bounds of a 1-sided 90

Page 12

*Moore v. Canteen* • Second Supplemental Expert Report of Brian Kriegler, Ph.D.
Case 3:23-cv-00818-JAG-DCK    Document 293-4    Filed 03/08/24    Page 135 of 164

percent confidence interval is $3,063. This difference constitutes less than 0.05 percent percent of the classwide total.[19]

### B. The Proposed California Class

25.    **Table D** is analogous to Table B. The distinction is that Table D pertains to the proposed California class.

| Table D: Alleged California Principal Damages and Pre-Judgment Interest Not Including 114 Additional Machines in California Stratum 1 | | |
|---|---|---|
| Description | Using CLT-Based Formulas | Using Bootstrapping |
| *Alleged Principal Damages* | | |
| Extrapolated Total | $786,242 | $784,890 |
| Lower Bound of a 1-Sided 90 Percent Confidence Interval | $382,077 | $418,639 |
| Lower Bound of a 1-Sided 95 Percent Confidence Interval* | $264,803 | $371,281 |
| *Alleged Principal Damages Plus Pre-Judgment Interest* | | |
| Extrapolated Total | $1,067,584 | $1,065,126 |
| Lower Bound of a 1-Sided 90 Percent Confidence Interval | $571,728 | $609,181 |
| Lower Bound of a 1-Sided 95 Percent Confidence Interval* | $427,849 | $534,375 |
| * - Equivalent to the lower bound of a two-sided 90 percent confidence interval. | | |

---

[19] Both $3,063 / $9,887,282 and $3,063 / $9,890,345 are equal to approximately 0.03 percent.

26. **Table E** is analogous to Table D. The distinction is that Table E accounts for 114 additional machines in California Stratum 1. These additional machines result in $16,398 in additional alleged principal damages and $4,287 in additional pre-judgment interest.

| Table E: Alleged Principal Damages and Pre-Judgment Interest in California Including 114 Additional Machines in California Stratum 1 | | |
|---|---|---|
| **Description** | **Using CLT-Based Formulas** | **Using Bootstrapping** |
| *Alleged Principal Damages, Including Additional Machines Identified in the Kalat Report* | | |
| Extrapolated Total | $802,640 | $801,288 |
| Lower Bound of a 1-Sided 90 Percent Confidence Interval | $398,475 | $435,037 |
| Lower Bound of a 1-Sided 95 Percent Confidence Interval* | $281,201 | $387,679 |
| *Alleged Principal Damages Plus Pre-Judgment Interest* | | |
| Extrapolated Total | $1,088,269 | $1,085,811 |
| Lower Bound of a 1-Sided 90 Percent Confidence Interval | $592,413 | $629,866 |
| Lower Bound of a 1-Sided 95 Percent Confidence Interval* | $448,534 | $555,060 |
| * - Equivalent to the lower bound of a two-sided 90 percent confidence interval. | | |

### 1. Comparison of Results Using CLT-based Formulas Versus Bootstrapping

27. For each measurement (principal damages and pre-judgment interest) and for each confidence interval, CLT-based formulas and bootstrapping produce different results. For example, Table E reports that the one-sided 90 percent confidence interval in damages plus interest is $592,413 using CLT-based formulas and $629,866 using

Page 14

*Moore v. Canteen* • Second Supplemental Expert Report of Brian Kriegler, Ph.D.
Case 3:23-cv-00818-JAG-DCK    Document 293-4    Filed 03/08/24    Page 137 of 164

econ**ONE**

bootstrapping.  This signifies a difference of $37,453 and approximately 6 percent of each confidence interval calculation.[20]

28.  From a statistical perspective, my recommendation is to focus on the bootstrapped calculations.  I have reached this position based on the following statistical considerations:

- The distribution of each dollar amount is highly unbalanced.  Across California Strata 1 and 3, there are 76 sampled machines for which Canteen provided additional information.[21]  Of these, 40 sampled machines yield $0 in damages, 15 sampled machines yield less than $100 in damages, 24 sampled machines yield between $100 and $1,000 in damages, and 1 sampled machine yields over $3,500 in damages.[22]

- Appendix A to the Kriegler Report demonstrates that in order to invoke the CLT, a relatively larger sample size is needed when the data are highly skewed.[23]

- There are 53 sampled/analyzed machines in California Stratum 1 and 23 sampled/analyzed machines in California Stratum 3.  The statistical literature dictates that a stratified random sample of this size is equivalent to a simple random sample of approximately 50-55 observations.[24]

---

[20] That is, $37,453 / $588,126 = 6.4 percent, and $37,453 / $622,579 = 6.0 percent.

[21] 53 of these sampled machines are from California Stratum 1, and 23 of these sampled machines are from California Stratium 3.

[22] The distribution of pre-judgment interest follows a similar pattern.  40 sampled machines yield $0 in interest, 26 sampled machines yield less than $100 in interest, 12 sampled machines yield between $100 and $300 in interest, and 2 sampled machine yields over $500 in interest.

[23] *See* Kriegler Report, Figure A.4 and Table A.1.

[24] *See, e.g.,* Thompson, Steven K. (2002).  *Sampling.*  2nd Ed.  New York: Wiley, p. 121.  Therein, the formula for the number of degrees of freedom for a stratified random sample is shown.  Using this formula, the California stratified sample has 52 degrees of freedom.  In terms of sample size, the interpretation is that the California stratified random sample is equivalent to a simple random sample of 53 observations (*i.e.*, 52+1).

Note that the Nationwide stratified sample has 206 degrees of freedom, which is equivalent to a simple random sample of 207 observations.  Under these circumstances, both CLT-based formulas and



*Moore v. Canteen* • Second Supplemental Expert Report of Brian Kriegler, Ph.D.

- Appendix D to the Kriegler Report suggests that bootstrapped confidence intervals tend to be more accurate when (i) the sample of data are highly skewed, and (ii) the sample includes approximately 50 observations.[25]

- Appendix Chapters C and D to the Kriegler Report demonstrate that bootstrapping provides a statistically reliable method for deriving confidence intervals even when the sample size is relatively small.[26]

## VI. Concluding Remarks

29. The methodologies set forth in the Kriegler Report have been applied as intended. Alleged principal damages and pre-judgment interest are calculated both for each proposed class. There is a significant amount of convergence between the parties in terms of (i) the results among the sampled observations, and (ii) the statistical methodologies used to calculate monetary awards and corresponding confidence intervals.

30. Using bootstrapping, the unbiased statistical estimate of alleged principal damages plus pre-judgment interest for the proposed Nationwide class is $13,773,043. Damages plus interest are at least $11,544,786 with 90 percent confidence and at least $10,984,352 with 95 percent confidence. For the proposed California class, the unbiased statistical estimate of alleged principal damages plus pre-judgment interest is $1,085,811. Damages plus interest are at least $629,866 with 90 percent confidence and at least $555,060 with 95 percent confidence.

31. From a statistical perspective, bootstrapping and the CLT yield substantively similar results for the proposed Nationwide class. My recommendation is to focus on bootstrapped confidence intervals for the prosposed California class given the highly skewed data distribution and its relatively small sample size.

---

boostrapping are viable options for calculating confidence intervals.

[25] *See* Kriegler Report, Figures D.3 and D.4. The "square" points signify random samples of 50 observations. For random samples of this size bootstrapped confidence intervals tend to be closer to the target red dotted line. This is especially true when the data are "skewed" or from a "90/10" population.

[26] *See, e.g.,* Kriegler Report, Table C.3 and Figure D.4.

Page 16

*Moore v. Canteen* • Second Supplemental Expert Report of Brian Kriegler, Ph.D.
Case 3:23-cv-00818-JAG-DCK     Document 293-4     Filed 03/08/24     Page 139 of 164

32.     Should additional, relevant information become available to me in this class action, I am open to incorporating it into my future calculations and opinions.


_Brian Kriegler_
_____
Brian Kriegler, Ph.D.
October 12, 2023

Page 17

*Moore v. Canteen* • Second Supplemental Expert Report of Brian Kriegler, Ph.D.
Case 3:23-cv-00818-JAG-DCK     Document 293-4     Filed 03/08/24     Page 140 of 164

# ATTACHMENT 5A

# Stratified Random Sample of Combinations of Cost Center and Machine Number in Florida

| Random Order Within Stratum | Cost Center | Machine Number | Earliest Survey Date (Stratum 1 Only) |
|---|---|---|---|
| *Within Florida Stratum 1* | | | |
| Florida Stratum 1 - 1 | 5080 | 66801 | 08/20/2019 |
| Florida Stratum 1 - 2 | 5080 | 66461 | 04/25/2019 |
| Florida Stratum 1 - 3 | 5047 | 66019 | 04/11/2019 |
| Florida Stratum 1 - 4 | 5073 | 66149 | 06/08/2019 |
| Florida Stratum 1 - 5 | 5073 | 97343 | 08/27/2019 |
| Florida Stratum 1 - 6 | 5073 | 97392 | 04/26/2019 |
| Florida Stratum 1 - 7 | 5064 | 96366 | 07/09/2019 |
| Florida Stratum 1 - 8 | 5564 | 94030 | 06/27/2019 |
| Florida Stratum 1 - 9 | 5064 | 65184 | 06/13/2019 |
| Florida Stratum 1 - 10 | 5564 | 94362 | 06/18/2019 |
| Florida Stratum 1 - 11 | 5047 | 66807 | 06/11/2019 |
| Florida Stratum 1 - 12 | 5073 | 68976 | 05/16/2019 |
| Florida Stratum 1 - 13 | 5073 | 98055 | 05/18/2019 |
| Florida Stratum 1 - 14 | 5064 | 63824 | 05/03/2019 |
| Florida Stratum 1 - 15 | 5073 | 97130 | 05/24/2019 |
| Florida Stratum 1 - 16 | 5064 | 61425 | 04/04/2019 |
| Florida Stratum 1 - 17 | 5047 | 94251 | 06/19/2019 |
| Florida Stratum 1 - 18 | 5544 | 93029 | 05/24/2019 |
| Florida Stratum 1 - 19 | 5080 | 66580 | 04/02/2019 |
| Florida Stratum 1 - 20 | 5545 | 90829 | 05/14/2019 |
| Florida Stratum 1 - 21 | 5073 | 90339 | 06/03/2019 |
| Florida Stratum 1 - 22 | 5047 | 94186 | 05/01/2019 |
| Florida Stratum 1 - 23 | 5545 | 72274 | 08/19/2019 |
| Florida Stratum 1 - 24 | 5064 | 97430 | 05/07/2019 |
| Florida Stratum 1 - 25 | 5080 | 93604 | 08/16/2019 |
| Florida Stratum 1 - 26 | 5085 | 60475 | 05/03/2019 |
| Florida Stratum 1 - 27 | 5073 | 67654 | 06/08/2019 |
| Florida Stratum 1 - 28 | 5085 | 61224 | 04/26/2019 |
| Florida Stratum 1 - 29 | 5047 | 94941 | 07/12/2019 |
| Florida Stratum 1 - 30 | 5545 | 95564 | 06/12/2019 |
| Florida Stratum 1 - 31 | 5564 | 94181 | 03/29/2019 |
| Florida Stratum 1 - 32 | 5564 | 94485 | 06/27/2019 |
| Florida Stratum 1 - 33 | 5064 | 60537 | 05/28/2019 |
| Florida Stratum 1 - 34 | 5564 | 66225 | 03/29/2019 |
| Florida Stratum 1 - 35 | 5085 | 97014 | 07/03/2019 |

# Stratified Random Sample of Combinations of
# Cost Center and Machine Number in Florida

| Random Order Within Stratum | Cost Center | Machine Number | Earliest Survey Date (Stratum 1 Only) |
|---|---|---|---|
| Florida Stratum 1 - 36 | 5545 | 98038 | 05/28/2019 |
| Florida Stratum 1 - 37 | 5047 | 66301 | 03/27/2019 |
| Florida Stratum 1 - 38 | 5073 | 96540 | 05/28/2019 |
| Florida Stratum 1 - 39 | 5064 | 97877 | 05/02/2019 |
| Florida Stratum 1 - 40 | 5064 | 63139 | 05/03/2019 |
| Florida Stratum 1 - 41 | 5073 | 67424 | 06/04/2019 |
| Florida Stratum 1 - 42 | 5085 | 97040 | 04/10/2019 |
| Florida Stratum 1 - 43 | 5080 | 61081 | 04/25/2019 |
| Florida Stratum 1 - 44 | 5064 | 63603 | 06/07/2019 |
| Florida Stratum 1 - 45 | 5073 | 91401 | 05/16/2019 |
| Florida Stratum 1 - 46 | 5073 | 97869 | 06/11/2019 |
| Florida Stratum 1 - 47 | 5047 | 66124 | 03/27/2019 |
| Florida Stratum 1 - 48 | 5544 | 60064 | 08/22/2019 |
| Florida Stratum 1 - 49 | 5545 | 97931 | 04/08/2019 |
| Florida Stratum 1 - 50 | 5545 | 97578 | 05/21/2019 |
| Florida Stratum 1 - 51 | 5080 | 94984 | 01/04/2022 |
| Florida Stratum 1 - 52 | 5064 | 90508 | 04/10/2019 |
| Florida Stratum 1 - 53 | 5064 | 65217 | 08/21/2019 |
| Florida Stratum 1 - 54 | 5064 | 92852 | 04/19/2019 |
| Florida Stratum 1 - 55 | 5064 | 90213 | 05/20/2019 |
| Florida Stratum 1 - 56 | 5545 | 64277 | 04/29/2019 |
| Florida Stratum 1 - 57 | 5545 | 97618 | 06/11/2019 |
| Florida Stratum 1 - 58 | 5085 | 60123 | 04/10/2019 |
| Florida Stratum 1 - 59 | 5047 | 66207 | 05/08/2019 |
| Florida Stratum 1 - 60 | 5085 | 61216 | 04/15/2019 |
| Florida Stratum 1 - 61 | 5064 | 69075 | 04/09/2019 |
| Florida Stratum 1 - 62 | 5064 | 94502 | 04/10/2019 |
| Florida Stratum 1 - 63 | 5064 | 63311 | 05/22/2019 |
| Florida Stratum 1 - 64 | 5544 | 90395 | 05/17/2019 |
| Florida Stratum 1 - 65 | 5073 | 96725 | 05/14/2019 |
| *Within Florida Stratum 3* | | | |
| Florida Stratum 3 - 1 | 5073 | 60364 | - |
| Florida Stratum 3 - 2 | 5545 | 66777 | - |
| Florida Stratum 3 - 3 | 5047 | 95110 | - |
| Florida Stratum 3 - 4 | 5073 | 98381 | - |

Econ One

# Stratified Random Sample of Combinations of
# Cost Center and Machine Number in Florida

| Random Order<br>Within Stratum | Cost Center | Machine Number | Earliest Survey Date<br>(Stratum 1 Only) |
|---|---|---|---|
| Florida Stratum 3 - 5 | 5073 | 60585 | - |
| Florida Stratum 3 - 6 | 5064 | 98957 | - |
| Florida Stratum 3 - 7 | 5073 | 60488 | - |
| Florida Stratum 3 - 8 | 5073 | 60282 | - |
| Florida Stratum 3 - 9 | 5080 | 94931 | - |
| Florida Stratum 3 - 10 | 5073 | 60662 | - |
| Florida Stratum 3 - 11 | 5564 | 66496 | - |
| Florida Stratum 3 - 12 | 5073 | 60460 | - |
| Florida Stratum 3 - 13 | 5545 | 60655 | - |
| Florida Stratum 3 - 14 | 5545 | 61479 | - |
| Florida Stratum 3 - 15 | 5085 | 26039 | - |
| Florida Stratum 3 - 16 | 5073 | 98706 | - |
| Florida Stratum 3 - 17 | 5064 | 98739 | - |
| Florida Stratum 3 - 18 | 5085 | 99402 | - |
| Florida Stratum 3 - 19 | 5564 | 66504 | - |
| Florida Stratum 3 - 20 | 5545 | 90060 | - |
| Florida Stratum 3 - 21 | 5073 | 97634 | - |
| Florida Stratum 3 - 22 | 5064 | 65770 | - |
| Florida Stratum 3 - 23 | 5073 | 69349 | - |
| Florida Stratum 3 - 24 | 5073 | 98336 | - |
| Florida Stratum 3 - 25 | 5047 | 67662 | - |
| Florida Stratum 3 - 26 | 5073 | 60421 | - |
| Florida Stratum 3 - 27 | 5064 | 99260 | - |
| Florida Stratum 3 - 28 | 5073 | 98364 | - |
| Florida Stratum 3 - 29 | 5073 | 98809 | - |
| Florida Stratum 3 - 30 | 5064 | 98265 | - |
| Florida Stratum 3 - 31 | 5064 | 98906 | - |
| Florida Stratum 3 - 32 | 5073 | 98611 | - |
| Florida Stratum 3 - 33 | 5073 | 60700 | - |
| Florida Stratum 3 - 34 | 5073 | 98474 | - |
| Florida Stratum 3 - 35 | 5073 | 98492 | - |

# ATTACHMENT 5B

## Stratified Random Sample of Combinations of
## Cost Center and Machine Number in South Carolina

| Random Order Within Stratum | Cost Center | Machine Number | Earliest Survey Date (Stratum 1 Only) |
|---|---|---|---|
| *Within South Carolina Stratum 1* | | | |
| South Carolina Stratum 1 - 1 | 5902 | 66693 | 05/16/2019 |
| South Carolina Stratum 1 - 2 | 5273 | 65198 | 05/10/2019 |
| South Carolina Stratum 1 - 3 | 5539 | 94758 | 05/06/2019 |
| South Carolina Stratum 1 - 4 | 5273 | 65399 | 05/22/2019 |
| South Carolina Stratum 1 - 5 | 5539 | 67161 | 06/25/2019 |
| South Carolina Stratum 1 - 6 | 5902 | 97374 | 05/15/2019 |
| South Carolina Stratum 1 - 7 | 5273 | 66962 | 06/10/2019 |
| South Carolina Stratum 1 - 8 | 5539 | 93072 | 12/21/2019 |
| South Carolina Stratum 1 - 9 | 5539 | 94634 | 02/14/2023 |
| South Carolina Stratum 1 - 10 | 5273 | 93591 | 08/28/2019 |
| South Carolina Stratum 1 - 11 | 5273 | 65104 | 05/08/2019 |
| South Carolina Stratum 1 - 12 | 5902 | 66200 | 04/01/2019 |
| South Carolina Stratum 1 - 13 | 5273 | 67003 | 08/21/2019 |
| South Carolina Stratum 1 - 14 | 5539 | 67368 | 05/03/2019 |
| South Carolina Stratum 1 - 15 | 5902 | 66855 | 06/10/2019 |
| South Carolina Stratum 1 - 16 | 5539 | 92159 | 06/06/2019 |
| South Carolina Stratum 1 - 17 | 5273 | 68197 | 02/14/2020 |
| South Carolina Stratum 1 - 18 | 5539 | 67331 | 05/03/2019 |
| South Carolina Stratum 1 - 19 | 5539 | 94641 | 02/22/2021 |
| South Carolina Stratum 1 - 20 | 5902 | 98234 | 05/30/2019 |
| South Carolina Stratum 1 - 21 | 5539 | 94024 | 06/19/2019 |
| South Carolina Stratum 1 - 22 | 5902 | 92264 | 06/10/2019 |
| South Carolina Stratum 1 - 23 | 5273 | 96675 | 04/29/2019 |
| South Carolina Stratum 1 - 24 | 5539 | 67226 | 04/26/2019 |
| South Carolina Stratum 1 - 25 | 5539 | 92144 | 01/29/2021 |
| South Carolina Stratum 1 - 26 | 5539 | 94520 | 06/06/2019 |
| South Carolina Stratum 1 - 27 | 5273 | 96346 | 04/12/2019 |
| South Carolina Stratum 1 - 28 | 5539 | 67719 | 01/09/2020 |
| South Carolina Stratum 1 - 29 | 5273 | 96408 | 08/28/2019 |
| South Carolina Stratum 1 - 30 | 5902 | 97131 | 06/25/2019 |
| South Carolina Stratum 1 - 31 | 5273 | 66325 | 06/14/2019 |
| South Carolina Stratum 1 - 32 | 5273 | 96389 | 04/12/2019 |
| South Carolina Stratum 1 - 33 | 5539 | 94308 | 06/06/2019 |
| South Carolina Stratum 1 - 34 | 5273 | 66396 | 08/28/2019 |
| South Carolina Stratum 1 - 35 | 5273 | 95535 | 05/25/2019 |
| South Carolina Stratum 1 - 36 | 5539 | 67355 | 06/06/2019 |

Econ One

# Stratified Random Sample of Combinations of
# Cost Center and Machine Number in South Carolina

| Random Order Within Stratum | Cost Center | Machine Number | Earliest Survey Date (Stratum 1 Only) |
|---|---|---|---|
| South Carolina Stratum 1 - 37 | 5273 | 66921 | 08/21/2019 |
| South Carolina Stratum 1 - 38 | 5273 | 95727 | 05/07/2019 |
| South Carolina Stratum 1 - 39 | 5902 | 95211 | 04/30/2019 |
| South Carolina Stratum 1 - 40 | 5902 | 69122 | 05/17/2019 |
| South Carolina Stratum 1 - 41 | 5902 | 97713 | 05/29/2019 |
| South Carolina Stratum 1 - 42 | 5902 | 98093 | 06/21/2019 |
| South Carolina Stratum 1 - 43 | 5902 | 90138 | 06/01/2019 |
| South Carolina Stratum 1 - 44 | 5902 | 66610 | 08/06/2021 |
| South Carolina Stratum 1 - 45 | 5273 | 68305 | 05/03/2019 |
| South Carolina Stratum 1 - 46 | 5902 | 98173 | 04/22/2019 |
| South Carolina Stratum 1 - 47 | 5273 | 94471 | 06/18/2019 |
| South Carolina Stratum 1 - 48 | 5902 | 97354 | 06/24/2019 |
| South Carolina Stratum 1 - 49 | 5539 | 92871 | 01/26/2021 |
| South Carolina Stratum 1 - 50 | 5902 | 72507 | 06/04/2019 |
| South Carolina Stratum 1 - 51 | 5539 | 67558 | 05/13/2019 |
| South Carolina Stratum 1 - 52 | 5539 | 67393 | 01/29/2021 |
| South Carolina Stratum 1 - 53 | 5539 | 67723 | 01/25/2021 |
| South Carolina Stratum 1 - 54 | 5539 | 67447 | 05/20/2019 |
| South Carolina Stratum 1 - 55 | 5273 | 66797 | 05/29/2019 |
| South Carolina Stratum 1 - 56 | 5273 | 65339 | 05/24/2019 |
| South Carolina Stratum 1 - 57 | 5902 | 98203 | 05/21/2019 |
| South Carolina Stratum 1 - 58 | 5902 | 97510 | 05/17/2019 |
| South Carolina Stratum 1 - 59 | 5902 | 92374 | 05/30/2019 |
| South Carolina Stratum 1 - 60 | 5539 | 92555 | 04/24/2019 |
| South Carolina Stratum 1 - 61 | 5902 | 97706 | 06/10/2019 |
| South Carolina Stratum 1 - 62 | 5539 | 67749 | 10/26/2021 |
| South Carolina Stratum 1 - 63 | 5902 | 69338 | 05/21/2019 |
| South Carolina Stratum 1 - 64 | 5539 | 67237 | 04/26/2019 |
| South Carolina Stratum 1 - 65 | 5273 | 65219 | 05/23/2019 |

*Within South Carolina Stratum 3*

| | | | |
|---|---|---|---|
| South Carolina Stratum 3 - 1 | 5273 | 68585 | - |
| South Carolina Stratum 3 - 2 | 5273 | 68052 | - |
| South Carolina Stratum 3 - 3 | 5273 | 72537 | - |
| South Carolina Stratum 3 - 4 | 5273 | 96261 | - |
| South Carolina Stratum 3 - 5 | 5273 | 21733 | - |
| South Carolina Stratum 3 - 6 | 5273 | 96969 | - |

Econ One

## Stratified Random Sample of Combinations of
## Cost Center and Machine Number in South Carolina

| Random Order<br>Within Stratum | Cost Center | Machine Number | Earliest Survey Date<br>(Stratum 1 Only) |
|---|---|---|---|
| South Carolina Stratum 3 - 7 | 5273 | 96943 | - |
| South Carolina Stratum 3 - 8 | 5273 | 95340 | - |
| South Carolina Stratum 3 - 9 | 5141 | 99863 | - |
| South Carolina Stratum 3 - 10 | 5273 | 96945 | - |
| South Carolina Stratum 3 - 11 | 5273 | 68625 | - |
| South Carolina Stratum 3 - 12 | 5273 | 97011 | - |
| South Carolina Stratum 3 - 13 | 5273 | 68583 | - |
| South Carolina Stratum 3 - 14 | 5273 | 66920 | - |
| South Carolina Stratum 3 - 15 | 5141 | 64745 | - |
| South Carolina Stratum 3 - 16 | 5141 | 97732 | - |
| South Carolina Stratum 3 - 17 | 5273 | 66316 | - |
| South Carolina Stratum 3 - 18 | 5273 | 66787 | - |
| South Carolina Stratum 3 - 19 | 5273 | 68070 | - |
| South Carolina Stratum 3 - 20 | 5273 | 96985 | - |
| South Carolina Stratum 3 - 21 | 5273 | 66487 | - |
| South Carolina Stratum 3 - 22 | 5273 | 96908 | - |
| South Carolina Stratum 3 - 23 | 5273 | 96993 | - |
| South Carolina Stratum 3 - 24 | 5141 | 98890 | - |
| South Carolina Stratum 3 - 25 | 5273 | 68603 | - |
| South Carolina Stratum 3 - 26 | 5273 | 65261 | - |
| South Carolina Stratum 3 - 27 | 5273 | 66725 | - |
| South Carolina Stratum 3 - 28 | 5273 | 65063 | - |
| South Carolina Stratum 3 - 29 | 5273 | 68630 | - |
| South Carolina Stratum 3 - 30 | 5539 | 92659 | - |
| South Carolina Stratum 3 - 31 | 5273 | 96988 | - |
| South Carolina Stratum 3 - 32 | 5539 | 94680 | - |
| South Carolina Stratum 3 - 33 | 5273 | 65666 | - |
| South Carolina Stratum 3 - 34 | 5273 | 96974 | - |
| South Carolina Stratum 3 - 35 | 5273 | 68627 | - |

# ATTACHMENT 6A

# Upcharges Among Randomly Selected Combinations of
# Cost Center and Machine Number in Florida

| Random Order Within Stratum | Cost Center | Machine Number | Upcharges |
|---|---|---|---|
| *Within Florida Stratum 1 - Upcharges in Florida are calculated through the day prior to the earliest survey date* | | | |
| Florida Stratum 1 - 1 | 5080 | 66801 | $ 2.82 |
| Florida Stratum 1 - 2 | 5080 | 66461 | 40.58 |
| Florida Stratum 1 - 3 | 5047 | 66019 | 1,014.93 |
| Florida Stratum 1 - 4 | 5073 | 66149 | 124.22 |
| Florida Stratum 1 - 5 | 5073 | 97343 | 28.50 |
| Florida Stratum 1 - 6 | 5073 | 97392 | 11.23 |
| Florida Stratum 1 - 7 | 5064 | 96366 | 278.92 |
| Florida Stratum 1 - 8 | 5564 | 94030 | 4.17 |
| Florida Stratum 1 - 9 | 5064 | 65184 | 323.80 |
| Florida Stratum 1 - 10 | 5564 | 94362 | 21.93 |
| Florida Stratum 1 - 11 | 5047 | 66807 | 964.57 |
| Florida Stratum 1 - 12 | 5073 | 68976 | 332.79 |
| Florida Stratum 1 - 13 | 5073 | 98055 | 30.49 |
| Florida Stratum 1 - 14 | 5064 | 63824 | 1,835.55 |
| Florida Stratum 1 - 15 | 5073 | 97130 | 153.20 |
| Florida Stratum 1 - 16 | 5064 | 61425 | 158.10 |
| Florida Stratum 1 - 17 | 5047 | 94251 | 16.14 |
| Florida Stratum 1 - 18 | 5544 | 93029 | 172.60 |
| Florida Stratum 1 - 19 | 5080 | 66580 | 2,740.30 |
| Florida Stratum 1 - 20 | 5545 | 90829 | 25.55 |
| Florida Stratum 1 - 21 | 5073 | 90339 | 229.41 |
| Florida Stratum 1 - 22 | 5047 | 94186 | 831.00 |
| Florida Stratum 1 - 23 | 5545 | 72274 | 105.00 |
| Florida Stratum 1 - 24 | 5064 | 97430 | 84.50 |
| Florida Stratum 1 - 25 | 5080 | 93604 | 160.48 |
| Florida Stratum 1 - 26 | 5085 | 60475 | 532.28 |
| Florida Stratum 1 - 27 | 5073 | 67654 | 177.58 |
| Florida Stratum 1 - 28 | 5085 | 61224 | 127.02 |
| Florida Stratum 1 - 29 | 5047 | 94941 | 110.12 |
| Florida Stratum 1 - 30 | 5545 | 95564 | 204.66 |
| Florida Stratum 1 - 31 | 5564 | 94181 | 9.08 |
| Florida Stratum 1 - 32 | 5564 | 94485 | 109.87 |
| Florida Stratum 1 - 33 | 5064 | 60537 | 531.64 |
| Florida Stratum 1 - 34 | 5564 | 66225 | 5.90 |
| Florida Stratum 1 - 35 | 5085 | 97014 | 205.20 |
| Florida Stratum 1 - 36 | 5545 | 98038 | 920.10 |
| Florida Stratum 1 - 37 | 5047 | 66301 | 115.55 |
| Florida Stratum 1 - 38 | 5073 | 96540 | 22.54 |
| Florida Stratum 1 - 39 | 5064 | 97877 | 42.73 |

# Upcharges Among Randomly Selected Combinations of
# Cost Center and Machine Number in Florida

| Random Order Within Stratum | Cost Center | Machine Number | Upcharges |
|---|---|---|---|
| Florida Stratum 1 - 40 | 5064 | 63139 | 3,442.15 |
| Florida Stratum 1 - 41 | 5073 | 67424 | 512.19 |
| Florida Stratum 1 - 42 | 5085 | 97040 | 163.87 |
| Florida Stratum 1 - 43 | 5080 | 61081 | 258.86 |
| Florida Stratum 1 - 44 | 5064 | 63603 | 379.50 |
| Florida Stratum 1 - 45 | 5073 | 91401 | 1,673.40 |
| Florida Stratum 1 - 46 | 5073 | 97869 | 125.00 |
| Florida Stratum 1 - 47 | 5047 | 66124 | 301.89 |
| Florida Stratum 1 - 48 | 5544 | 60064 | 22.00 |
| Florida Stratum 1 - 49 | 5545 | 97931 | 118.50 |
| Florida Stratum 1 - 50 | 5545 | 97578 | 236.99 |
| Florida Stratum 1 - 51 | 5080 | 94984 | 6.33 |
| Florida Stratum 1 - 52 | 5064 | 90508 | 1,740.50 |
| Florida Stratum 1 - 53 | 5064 | 65217 | 454.90 |
| Florida Stratum 1 - 54 | 5064 | 92852 | 289.80 |
| Florida Stratum 1 - 55 | 5064 | 90213 | 68.75 |
| Florida Stratum 1 - 56 | 5545 | 64277 | 377.22 |
| Florida Stratum 1 - 57 | 5545 | 97618 | 730.40 |
| Florida Stratum 1 - 58 | 5085 | 60123 | 482.92 |
| Florida Stratum 1 - 59 | 5047 | 66207 | 450.68 |
| Florida Stratum 1 - 60 | 5085 | 61216 | 186.05 |
| Florida Stratum 1 - 61 | 5064 | 69075 | 16.70 |
| Florida Stratum 1 - 62 | 5064 | 94502 | 280.63 |
| Florida Stratum 1 - 63 | 5064 | 63311 | 378.15 |
| Florida Stratum 1 - 64 | 5544 | 90395 | 538.73 |
| Florida Stratum 1 - 65 | 5073 | 96725 | 79.87 |

*Within Florida Stratum 3 - Upcharges in Florida are calculated through the end of the Two-Tier Revenue Report*

| | | | |
|---|---|---|---|
| Florida Stratum 3 - 1 | 5073 | 60364 | $ 1,098.00 |
| Florida Stratum 3 - 2 | 5545 | 66777 | 194.50 |
| Florida Stratum 3 - 3 | 5047 | 95110 | 154.80 |
| Florida Stratum 3 - 4 | 5073 | 98381 | 364.84 |
| Florida Stratum 3 - 5 | 5073 | 60585 | 272.40 |
| Florida Stratum 3 - 6 | 5064 | 98957 | 48.90 |
| Florida Stratum 3 - 7 | 5073 | 60488 | 37.70 |
| Florida Stratum 3 - 8 | 5073 | 60282 | 667.90 |
| Florida Stratum 3 - 9 | 5080 | 94931 | 134.40 |
| Florida Stratum 3 - 10 | 5073 | 60662 | 696.60 |
| Florida Stratum 3 - 11 | 5564 | 66496 | 473.40 |
| Florida Stratum 3 - 12 | 5073 | 60460 | 103.00 |

# Upcharges Among Randomly Selected Combinations of Cost Center and Machine Number in Florida

| Random Order Within Stratum | Cost Center | Machine Number | Upcharges |
|---|---|---|---|
| Florida Stratum 3 - 13 | 5545 | 60655 | 271.80 |
| Florida Stratum 3 - 14 | 5545 | 61479 | 205.80 |
| Florida Stratum 3 - 15 | 5085 | 26039 | 1.10 |
| Florida Stratum 3 - 16 | 5073 | 98706 | 134.30 |
| Florida Stratum 3 - 17 | 5064 | 98739 | 258.50 |
| Florida Stratum 3 - 18 | 5085 | 99402 | 1,568.80 |
| Florida Stratum 3 - 19 | 5564 | 66504 | 951.50 |
| Florida Stratum 3 - 20 | 5545 | 90060 | 23.80 |
| Florida Stratum 3 - 21 | 5073 | 97634 | 979.60 |
| Florida Stratum 3 - 22 | 5064 | 65770 | 34.20 |
| Florida Stratum 3 - 23 | 5073 | 69349 | 3.10 |
| Florida Stratum 3 - 24 | 5073 | 98336 | 1,898.10 |
| Florida Stratum 3 - 25 | 5047 | 67662 | 26.00 |
| Florida Stratum 3 - 26 | 5073 | 60421 | 300.30 |
| Florida Stratum 3 - 27 | 5064 | 99260 | 306.90 |
| Florida Stratum 3 - 28 | 5073 | 98364 | 186.00 |
| Florida Stratum 3 - 29 | 5073 | 98809 | 103.90 |
| Florida Stratum 3 - 30 | 5064 | 98265 | 1,128.80 |
| Florida Stratum 3 - 31 | 5064 | 98906 | 357.10 |
| Florida Stratum 3 - 32 | 5073 | 98611 | 590.70 |
| Florida Stratum 3 - 33 | 5073 | 60700 | 740.70 |
| Florida Stratum 3 - 34 | 5073 | 98474 | 157.80 |
| Florida Stratum 3 - 35 | 5073 | 98492 | 17.60 |

Case 3:23-cv-00818-JAG-DCK     Document 293-4     Filed 03/08/24     Page 152 of 164

# ATTACHMENT 6B

# Upcharges Among Randomly Selected Combinations of
## Cost Center and Machine Number in South Carolina

| Random Order Within Stratum | Cost Center | Machine Number | Upcharges |
|---|---|---|---|
| *Within South Carolina Stratum 1 - Upcharges in South Carolina are calculated through the day prior to the earliest survey date* | | | |
| South Carolina Stratum 1 - 1 | 5902 | 66693 | $ 46.01 |
| South Carolina Stratum 1 - 2 | 5273 | 65198 | 447.26 |
| South Carolina Stratum 1 - 3 | 5539 | 94758 | 15.36 |
| South Carolina Stratum 1 - 4 | 5273 | 65399 | 138.69 |
| South Carolina Stratum 1 - 5 | 5539 | 67161 | 23.38 |
| South Carolina Stratum 1 - 6 | 5902 | 97374 | 228.73 |
| South Carolina Stratum 1 - 7 | 5273 | 66962 | 123.44 |
| South Carolina Stratum 1 - 8 | 5539 | 93072 | 1.03 |
| South Carolina Stratum 1 - 9 | 5539 | 94634 | 0.05 |
| South Carolina Stratum 1 - 10 | 5273 | 93591 | 238.00 |
| South Carolina Stratum 1 - 11 | 5273 | 65104 | 794.12 |
| South Carolina Stratum 1 - 12 | 5902 | 66200 | 1,320.90 |
| South Carolina Stratum 1 - 13 | 5273 | 67003 | 89.90 |
| South Carolina Stratum 1 - 14 | 5539 | 67368 | 117.83 |
| South Carolina Stratum 1 - 15 | 5902 | 66855 | 194.22 |
| South Carolina Stratum 1 - 16 | 5539 | 92159 | 27.65 |
| South Carolina Stratum 1 - 17 | 5273 | 68197 | 39.94 |
| South Carolina Stratum 1 - 18 | 5539 | 67331 | 20.23 |
| South Carolina Stratum 1 - 19 | 5539 | 94641 | 0.68 |
| South Carolina Stratum 1 - 20 | 5902 | 98234 | 20.99 |
| South Carolina Stratum 1 - 21 | 5539 | 94024 | 11.94 |
| South Carolina Stratum 1 - 22 | 5902 | 92264 | 206.92 |
| South Carolina Stratum 1 - 23 | 5273 | 96675 | 555.00 |
| South Carolina Stratum 1 - 24 | 5539 | 67226 | 61.58 |
| South Carolina Stratum 1 - 25 | 5539 | 92144 | 0.30 |
| South Carolina Stratum 1 - 26 | 5539 | 94520 | 20.23 |
| South Carolina Stratum 1 - 27 | 5273 | 96346 | 36.73 |
| South Carolina Stratum 1 - 28 | 5539 | 67719 | 1.47 |
| South Carolina Stratum 1 - 29 | 5273 | 96408 | 231.10 |
| South Carolina Stratum 1 - 30 | 5902 | 97131 | 10.86 |
| South Carolina Stratum 1 - 31 | 5273 | 66325 | 1,524.54 |
| South Carolina Stratum 1 - 32 | 5273 | 96389 | 102.05 |
| South Carolina Stratum 1 - 33 | 5539 | 94308 | 94.15 |
| South Carolina Stratum 1 - 34 | 5273 | 66396 | 219.90 |
| South Carolina Stratum 1 - 35 | 5273 | 95535 | 136.02 |
| South Carolina Stratum 1 - 36 | 5539 | 67355 | 85.08 |
| South Carolina Stratum 1 - 37 | 5273 | 66921 | 305.20 |
| South Carolina Stratum 1 - 38 | 5273 | 95727 | 525.24 |
| South Carolina Stratum 1 - 39 | 5902 | 95211 | 114.26 |
| South Carolina Stratum 1 - 40 | 5902 | 69122 | 828.19 |
| South Carolina Stratum 1 - 41 | 5902 | 97713 | 85.58 |

# Upcharges Among Randomly Selected Combinations of
# Cost Center and Machine Number in South Carolina

| Random Order<br>Within Stratum | Cost Center | Machine Number | Upcharges |
|---|---|---|---|
| South Carolina Stratum 1 - 42 | 5902 | 98093 | 183.80 |
| South Carolina Stratum 1 - 43 | 5902 | 90138 | 25.30 |
| South Carolina Stratum 1 - 44 | 5902 | 66610 | 154.88 |
| South Carolina Stratum 1 - 45 | 5273 | 68305 | 537.66 |
| South Carolina Stratum 1 - 46 | 5902 | 98173 | 74.66 |
| South Carolina Stratum 1 - 47 | 5273 | 94471 | 158.16 |
| South Carolina Stratum 1 - 48 | 5902 | 97354 | 438.60 |
| South Carolina Stratum 1 - 49 | 5539 | 92871 | 0.64 |
| South Carolina Stratum 1 - 50 | 5902 | 72507 | 256.57 |
| South Carolina Stratum 1 - 51 | 5539 | 67558 | 0.46 |
| South Carolina Stratum 1 - 52 | 5539 | 67393 | 0.18 |
| South Carolina Stratum 1 - 53 | 5539 | 67723 | 74.51 |
| South Carolina Stratum 1 - 54 | 5539 | 67447 | 1.60 |
| South Carolina Stratum 1 - 55 | 5273 | 66797 | 202.98 |
| South Carolina Stratum 1 - 56 | 5273 | 65339 | 134.19 |
| South Carolina Stratum 1 - 57 | 5902 | 98203 | 41.56 |
| South Carolina Stratum 1 - 58 | 5902 | 97510 | 268.31 |
| South Carolina Stratum 1 - 59 | 5902 | 92374 | 602.70 |
| South Carolina Stratum 1 - 60 | 5539 | 92555 | 118.10 |
| South Carolina Stratum 1 - 61 | 5902 | 97706 | 835.65 |
| South Carolina Stratum 1 - 62 | 5539 | 67749 | 415.57 |
| South Carolina Stratum 1 - 63 | 5902 | 69338 | 118.80 |
| South Carolina Stratum 1 - 64 | 5539 | 67237 | 94.52 |
| South Carolina Stratum 1 - 65 | 5273 | 65219 | 587.77 |

*Within South Carolina Stratum 3 - Upcharges in South Carolina are calculated through the end of the Two-Tier Revenue Report*

| | | | |
|---|---|---|---|
| South Carolina Stratum 3 - 1 | 5273 | 68585 | $ 72.70 |
| South Carolina Stratum 3 - 2 | 5273 | 68052 | 745.80 |
| South Carolina Stratum 3 - 3 | 5273 | 72537 | 42.00 |
| South Carolina Stratum 3 - 4 | 5273 | 96261 | 106.60 |
| South Carolina Stratum 3 - 5 | 5273 | 21733 | 20.20 |
| South Carolina Stratum 3 - 6 | 5273 | 96969 | 69.90 |
| South Carolina Stratum 3 - 7 | 5273 | 96943 | 265.20 |
| South Carolina Stratum 3 - 8 | 5273 | 95340 | 246.80 |
| South Carolina Stratum 3 - 9 | 5141 | 99863 | 163.70 |
| South Carolina Stratum 3 - 10 | 5273 | 96945 | 53.80 |
| South Carolina Stratum 3 - 11 | 5273 | 68625 | 70.30 |
| South Carolina Stratum 3 - 12 | 5273 | 97011 | 3.60 |
| South Carolina Stratum 3 - 13 | 5273 | 68583 | 55.40 |
| South Carolina Stratum 3 - 14 | 5273 | 66920 | 908.20 |
| South Carolina Stratum 3 - 15 | 5141 | 64745 | 134.60 |
| South Carolina Stratum 3 - 16 | 5141 | 97732 | 1,438.80 |

# Upcharges Among Randomly Selected Combinations of
# Cost Center and Machine Number in South Carolina

| Random Order Within Stratum | Cost Center | Machine Number | Upcharges |
|---|---|---|---|
| South Carolina Stratum 3 - 17 | 5273 | 66316 | 532.20 |
| South Carolina Stratum 3 - 18 | 5273 | 66787 | 354.20 |
| South Carolina Stratum 3 - 19 | 5273 | 68070 | 78.70 |
| South Carolina Stratum 3 - 20 | 5273 | 96985 | 121.30 |
| South Carolina Stratum 3 - 21 | 5273 | 66487 | 192.90 |
| South Carolina Stratum 3 - 22 | 5273 | 96908 | 83.60 |
| South Carolina Stratum 3 - 23 | 5273 | 96993 | 27.30 |
| South Carolina Stratum 3 - 24 | 5141 | 98890 | 47.90 |
| South Carolina Stratum 3 - 25 | 5273 | 68603 | 247.80 |
| South Carolina Stratum 3 - 26 | 5273 | 65261 | 241.40 |
| South Carolina Stratum 3 - 27 | 5273 | 66725 | 445.40 |
| South Carolina Stratum 3 - 28 | 5273 | 65063 | 330.20 |
| South Carolina Stratum 3 - 29 | 5273 | 68630 | 55.80 |
| South Carolina Stratum 3 - 30 | 5539 | 92659 | 2.90 |
| South Carolina Stratum 3 - 31 | 5273 | 96988 | 287.50 |
| South Carolina Stratum 3 - 32 | 5539 | 94680 | 1.40 |
| South Carolina Stratum 3 - 33 | 5273 | 65666 | 461.70 |
| South Carolina Stratum 3 - 34 | 5273 | 96974 | 203.10 |
| South Carolina Stratum 3 - 35 | 5273 | 68627 | 29.50 |

# ATTACHMENT 7A

# Potential Pre-Judgment Interest Among Randomly Selected
# Combinations of Cost Center and Machine Number in Florida

| Random Order Within Stratum | Cost Center | Machine Number | Pre-Judgment Interest Through 3/7/2024 |
|---|---|---|---|

*Within Florida Stratum 1 - Interest is based on Upcharges in Florida through the day prior to the earliest survey date*

| Random Order Within Stratum | Cost Center | Machine Number | Pre-Judgment Interest Through 3/7/2024 |
|---|---|---|---|
| Florida Stratum 1 - 1 | 5080 | 66801 | $ 0.70 |
| Florida Stratum 1 - 2 | 5080 | 66461 | 11.91 |
| Florida Stratum 1 - 3 | 5047 | 66019 | 318.16 |
| Florida Stratum 1 - 4 | 5073 | 66149 | 36.38 |
| Florida Stratum 1 - 5 | 5073 | 97343 | 7.94 |
| Florida Stratum 1 - 6 | 5073 | 97392 | 3.04 |
| Florida Stratum 1 - 7 | 5064 | 96366 | 105.27 |
| Florida Stratum 1 - 8 | 5564 | 94030 | 1.08 |
| Florida Stratum 1 - 9 | 5064 | 65184 | 110.22 |
| Florida Stratum 1 - 10 | 5564 | 94362 | 5.99 |
| Florida Stratum 1 - 11 | 5047 | 66807 | 466.06 |
| Florida Stratum 1 - 12 | 5073 | 68976 | 96.13 |
| Florida Stratum 1 - 13 | 5073 | 98055 | 10.27 |
| Florida Stratum 1 - 14 | 5064 | 63824 | 623.01 |
| Florida Stratum 1 - 15 | 5073 | 97130 | 44.15 |
| Florida Stratum 1 - 16 | 5064 | 61425 | 49.88 |
| Florida Stratum 1 - 17 | 5047 | 94251 | 4.84 |
| Florida Stratum 1 - 18 | 5544 | 93029 | 56.08 |
| Florida Stratum 1 - 19 | 5080 | 66580 | 1,095.17 |
| Florida Stratum 1 - 20 | 5545 | 90829 | 8.75 |
| Florida Stratum 1 - 21 | 5073 | 90339 | 76.79 |
| Florida Stratum 1 - 22 | 5047 | 94186 | 284.57 |
| Florida Stratum 1 - 23 | 5545 | 72274 | 31.96 |
| Florida Stratum 1 - 24 | 5064 | 97430 | 31.58 |
| Florida Stratum 1 - 25 | 5080 | 93604 | 56.55 |
| Florida Stratum 1 - 26 | 5085 | 60475 | 243.47 |
| Florida Stratum 1 - 27 | 5073 | 67654 | 52.79 |
| Florida Stratum 1 - 28 | 5085 | 61224 | 39.14 |
| Florida Stratum 1 - 29 | 5047 | 94941 | 28.85 |
| Florida Stratum 1 - 30 | 5545 | 95564 | 75.65 |
| Florida Stratum 1 - 31 | 5564 | 94181 | 2.52 |
| Florida Stratum 1 - 32 | 5564 | 94485 | 31.61 |
| Florida Stratum 1 - 33 | 5064 | 60537 | 185.36 |
| Florida Stratum 1 - 34 | 5564 | 66225 | 1.61 |
| Florida Stratum 1 - 35 | 5085 | 97014 | 64.63 |
| Florida Stratum 1 - 36 | 5545 | 98038 | 335.24 |
| Florida Stratum 1 - 37 | 5047 | 66301 | 34.64 |
| Florida Stratum 1 - 38 | 5073 | 96540 | 6.85 |
| Florida Stratum 1 - 39 | 5064 | 97877 | 13.70 |

Econ One

## Potential Pre-Judgment Interest Among Randomly Selected
## Combinations of Cost Center and Machine Number in Florida

| Random Order Within Stratum | Cost Center | Machine Number | Pre-Judgment Interest Through 3/7/2024 |
|---|---|---|---|
| Florida Stratum 1 - 40 | 5064 | 63139 | 1,385.64 |
| Florida Stratum 1 - 41 | 5073 | 67424 | 158.55 |
| Florida Stratum 1 - 42 | 5085 | 97040 | 50.34 |
| Florida Stratum 1 - 43 | 5080 | 61081 | 72.38 |
| Florida Stratum 1 - 44 | 5064 | 63603 | 125.29 |
| Florida Stratum 1 - 45 | 5073 | 91401 | 588.45 |
| Florida Stratum 1 - 46 | 5073 | 97869 | 44.84 |
| Florida Stratum 1 - 47 | 5047 | 66124 | 91.42 |
| Florida Stratum 1 - 48 | 5544 | 60064 | 6.72 |
| Florida Stratum 1 - 49 | 5545 | 97931 | 36.84 |
| Florida Stratum 1 - 50 | 5545 | 97578 | 82.48 |
| Florida Stratum 1 - 51 | 5080 | 94984 | 0.73 |
| Florida Stratum 1 - 52 | 5064 | 90508 | 551.98 |
| Florida Stratum 1 - 53 | 5064 | 65217 | 146.90 |
| Florida Stratum 1 - 54 | 5064 | 92852 | 103.86 |
| Florida Stratum 1 - 55 | 5064 | 90213 | 22.86 |
| Florida Stratum 1 - 56 | 5545 | 64277 | 127.51 |
| Florida Stratum 1 - 57 | 5545 | 97618 | 266.39 |
| Florida Stratum 1 - 58 | 5085 | 60123 | 148.02 |
| Florida Stratum 1 - 59 | 5047 | 66207 | 130.89 |
| Florida Stratum 1 - 60 | 5085 | 61216 | 59.53 |
| Florida Stratum 1 - 61 | 5064 | 69075 | 4.74 |
| Florida Stratum 1 - 62 | 5064 | 94502 | 92.68 |
| Florida Stratum 1 - 63 | 5064 | 63311 | 121.41 |
| Florida Stratum 1 - 64 | 5544 | 90395 | 163.12 |
| Florida Stratum 1 - 65 | 5073 | 96725 | 25.06 |

*Within Florida Stratum 1 - Interest is based on Upcharges in Florida through March 2023*

| | | | |
|---|---|---|---|
| Florida Stratum 3 - 1 | 5073 | 60364 | $ 106.41 |
| Florida Stratum 3 - 2 | 5545 | 66777 | 14.80 |
| Florida Stratum 3 - 3 | 5047 | 95110 | 14.06 |
| Florida Stratum 3 - 4 | 5073 | 98381 | 39.70 |
| Florida Stratum 3 - 5 | 5073 | 60585 | 26.34 |
| Florida Stratum 3 - 6 | 5064 | 98957 | 4.47 |
| Florida Stratum 3 - 7 | 5073 | 60488 | 3.74 |
| Florida Stratum 3 - 8 | 5073 | 60282 | 51.22 |
| Florida Stratum 3 - 9 | 5080 | 94931 | 11.08 |
| Florida Stratum 3 - 10 | 5073 | 60662 | 66.22 |
| Florida Stratum 3 - 11 | 5564 | 66496 | 39.39 |
| Florida Stratum 3 - 12 | 5073 | 60460 | 7.46 |

## Potential Pre-Judgment Interest Among Randomly Selected
## Combinations of Cost Center and Machine Number in Florida

| Random Order Within Stratum | Cost Center | Machine Number | Pre-Judgment Interest Through 3/7/2024 |
|---|---|---|---|
| Florida Stratum 3 - 13 | 5545 | 60655 | 96.12 |
| Florida Stratum 3 - 14 | 5545 | 61479 | 12.66 |
| Florida Stratum 3 - 15 | 5085 | 26039 | 0.09 |
| Florida Stratum 3 - 16 | 5073 | 98706 | 13.21 |
| Florida Stratum 3 - 17 | 5064 | 98739 | 30.30 |
| Florida Stratum 3 - 18 | 5085 | 99402 | 146.55 |
| Florida Stratum 3 - 19 | 5564 | 66504 | 60.94 |
| Florida Stratum 3 - 20 | 5545 | 90060 | 1.38 |
| Florida Stratum 3 - 21 | 5073 | 97634 | 129.58 |
| Florida Stratum 3 - 22 | 5064 | 65770 | 1.98 |
| Florida Stratum 3 - 23 | 5073 | 69349 | 0.23 |
| Florida Stratum 3 - 24 | 5073 | 98336 | 225.84 |
| Florida Stratum 3 - 25 | 5047 | 67662 | 1.34 |
| Florida Stratum 3 - 26 | 5073 | 60421 | 28.02 |
| Florida Stratum 3 - 27 | 5064 | 99260 | 21.29 |
| Florida Stratum 3 - 28 | 5073 | 98364 | 15.67 |
| Florida Stratum 3 - 29 | 5073 | 98809 | 7.76 |
| Florida Stratum 3 - 30 | 5064 | 98265 | 96.79 |
| Florida Stratum 3 - 31 | 5064 | 98906 | 33.42 |
| Florida Stratum 3 - 32 | 5073 | 98611 | 60.37 |
| Florida Stratum 3 - 33 | 5073 | 60700 | 67.33 |
| Florida Stratum 3 - 34 | 5073 | 98474 | 15.39 |
| Florida Stratum 3 - 35 | 5073 | 98492 | 1.88 |

# ATTACHMENT 7B

# Potential Pre-Judgment Interest Among Randomly Selected
# Combinations of Cost Center and Machine Number in South Carolina

| Random Order Within Stratum | Cost Center | Machine Number | Pre-Judgment Interest Through 3/7/2024 |
|---|---|---|---|

*Within South Carolina Stratum 1 - Interest is based on Upcharges in South Carolina through the day prior to the earliest survey date*

| Random Order Within Stratum | Cost Center | Machine Number | Pre-Judgment Interest Through 3/7/2024 |
|---|---|---|---|
| South Carolina Stratum 1 - 1 | 5902 | 66693 | $ 21.42 |
| South Carolina Stratum 1 - 2 | 5273 | 65198 | 212.94 |
| South Carolina Stratum 1 - 3 | 5539 | 94758 | 7.43 |
| South Carolina Stratum 1 - 4 | 5273 | 65399 | 75.83 |
| South Carolina Stratum 1 - 5 | 5539 | 67161 | 12.07 |
| South Carolina Stratum 1 - 6 | 5902 | 97374 | 116.47 |
| South Carolina Stratum 1 - 7 | 5273 | 66962 | 65.25 |
| South Carolina Stratum 1 - 8 | 5539 | 93072 | 0.38 |
| South Carolina Stratum 1 - 9 | 5539 | 94634 | 0.00 |
| South Carolina Stratum 1 - 10 | 5273 | 93591 | 130.50 |
| South Carolina Stratum 1 - 11 | 5273 | 65104 | 477.29 |
| South Carolina Stratum 1 - 12 | 5902 | 66200 | 763.90 |
| South Carolina Stratum 1 - 13 | 5273 | 67003 | 43.53 |
| South Carolina Stratum 1 - 14 | 5539 | 67368 | 57.62 |
| South Carolina Stratum 1 - 15 | 5902 | 66855 | 89.94 |
| South Carolina Stratum 1 - 16 | 5539 | 92159 | 13.10 |
| South Carolina Stratum 1 - 17 | 5273 | 68197 | 17.88 |
| South Carolina Stratum 1 - 18 | 5539 | 67331 | 9.01 |
| South Carolina Stratum 1 - 19 | 5539 | 94641 | 0.18 |
| South Carolina Stratum 1 - 20 | 5902 | 98234 | 8.83 |
| South Carolina Stratum 1 - 21 | 5539 | 94024 | 5.50 |
| South Carolina Stratum 1 - 22 | 5902 | 92264 | 111.05 |
| South Carolina Stratum 1 - 23 | 5273 | 96675 | 252.72 |
| South Carolina Stratum 1 - 24 | 5539 | 67226 | 31.12 |
| South Carolina Stratum 1 - 25 | 5539 | 92144 | 0.08 |
| South Carolina Stratum 1 - 26 | 5539 | 94520 | 9.66 |
| South Carolina Stratum 1 - 27 | 5273 | 96346 | 17.41 |
| South Carolina Stratum 1 - 28 | 5539 | 67719 | 0.53 |
| South Carolina Stratum 1 - 29 | 5273 | 96408 | 122.50 |
| South Carolina Stratum 1 - 30 | 5902 | 97131 | 4.77 |
| South Carolina Stratum 1 - 31 | 5273 | 66325 | 801.14 |
| South Carolina Stratum 1 - 32 | 5273 | 96389 | 48.15 |
| South Carolina Stratum 1 - 33 | 5539 | 94308 | 45.22 |
| South Carolina Stratum 1 - 34 | 5273 | 66396 | 125.61 |
| South Carolina Stratum 1 - 35 | 5273 | 95535 | 86.89 |
| South Carolina Stratum 1 - 36 | 5539 | 67355 | 40.29 |
| South Carolina Stratum 1 - 37 | 5273 | 66921 | 148.15 |
| South Carolina Stratum 1 - 38 | 5273 | 95727 | 279.16 |
| South Carolina Stratum 1 - 39 | 5902 | 95211 | 60.75 |
| South Carolina Stratum 1 - 40 | 5902 | 69122 | 557.04 |
| South Carolina Stratum 1 - 41 | 5902 | 97713 | 41.05 |

# Potential Pre-Judgment Interest Among Randomly Selected
# Combinations of Cost Center and Machine Number in South Carolina

| Random Order Within Stratum | Cost Center | Machine Number | Pre-Judgment Interest Through 3/7/2024 |
|---|---|---|---|
| South Carolina Stratum 1 - 42 | 5902 | 98093 | 87.17 |
| South Carolina Stratum 1 - 43 | 5902 | 90138 | 10.64 |
| South Carolina Stratum 1 - 44 | 5902 | 66610 | 76.88 |
| South Carolina Stratum 1 - 45 | 5273 | 68305 | 255.64 |
| South Carolina Stratum 1 - 46 | 5902 | 98173 | 35.08 |
| South Carolina Stratum 1 - 47 | 5273 | 94471 | 77.83 |
| South Carolina Stratum 1 - 48 | 5902 | 97354 | 204.52 |
| South Carolina Stratum 1 - 49 | 5539 | 92871 | 0.18 |
| South Carolina Stratum 1 - 50 | 5902 | 72507 | 135.12 |
| South Carolina Stratum 1 - 51 | 5539 | 67558 | 0.19 |
| South Carolina Stratum 1 - 52 | 5539 | 67393 | 0.05 |
| South Carolina Stratum 1 - 53 | 5539 | 67723 | 21.41 |
| South Carolina Stratum 1 - 54 | 5539 | 67447 | 0.82 |
| South Carolina Stratum 1 - 55 | 5273 | 66797 | 120.98 |
| South Carolina Stratum 1 - 56 | 5273 | 65339 | 65.21 |
| South Carolina Stratum 1 - 57 | 5902 | 98203 | 18.72 |
| South Carolina Stratum 1 - 58 | 5902 | 97510 | 149.07 |
| South Carolina Stratum 1 - 59 | 5902 | 92374 | 368.96 |
| South Carolina Stratum 1 - 60 | 5539 | 92555 | 58.58 |
| South Carolina Stratum 1 - 61 | 5902 | 97706 | 394.01 |
| South Carolina Stratum 1 - 62 | 5539 | 67749 | 212.50 |
| South Carolina Stratum 1 - 63 | 5902 | 69338 | 59.12 |
| South Carolina Stratum 1 - 64 | 5539 | 67237 | 53.77 |
| South Carolina Stratum 1 - 65 | 5273 | 65219 | 339.51 |

*Within South Carolina Stratum 1 - Interest is based on Upcharges in South Carolina through March 2023*

| | | | |
|---|---|---|---|
| South Carolina Stratum 3 - 1 | 5273 | 68585 | $ 9.25 |
| South Carolina Stratum 3 - 2 | 5273 | 68052 | 409.95 |
| South Carolina Stratum 3 - 3 | 5273 | 72537 | 4.38 |
| South Carolina Stratum 3 - 4 | 5273 | 96261 | 37.43 |
| South Carolina Stratum 3 - 5 | 5273 | 21733 | 11.46 |
| South Carolina Stratum 3 - 6 | 5273 | 96969 | 10.68 |
| South Carolina Stratum 3 - 7 | 5273 | 96943 | 40.17 |
| South Carolina Stratum 3 - 8 | 5273 | 95340 | 85.69 |
| South Carolina Stratum 3 - 9 | 5141 | 99863 | 13.58 |
| South Carolina Stratum 3 - 10 | 5273 | 96945 | 8.01 |
| South Carolina Stratum 3 - 11 | 5273 | 68625 | 6.96 |
| South Carolina Stratum 3 - 12 | 5273 | 97011 | 0.47 |
| South Carolina Stratum 3 - 13 | 5273 | 68583 | 7.69 |
| South Carolina Stratum 3 - 14 | 5273 | 66920 | 464.03 |
| South Carolina Stratum 3 - 15 | 5141 | 64745 | 11.23 |
| South Carolina Stratum 3 - 16 | 5141 | 97732 | 218.23 |

# Potential Pre-Judgment Interest Among Randomly Selected
# Combinations of Cost Center and Machine Number in South Carolina

| Random Order Within Stratum | Cost Center | Machine Number | Pre-Judgment Interest Through 3/7/2024 |
|---|---|---|---|
| South Carolina Stratum 3 - 17 | 5273 | 66316 | 132.07 |
| South Carolina Stratum 3 - 18 | 5273 | 66787 | 59.85 |
| South Carolina Stratum 3 - 19 | 5273 | 68070 | 32.14 |
| South Carolina Stratum 3 - 20 | 5273 | 96985 | 13.91 |
| South Carolina Stratum 3 - 21 | 5273 | 66487 | 60.03 |
| South Carolina Stratum 3 - 22 | 5273 | 96908 | 19.49 |
| South Carolina Stratum 3 - 23 | 5273 | 96993 | 3.51 |
| South Carolina Stratum 3 - 24 | 5141 | 98890 | 6.08 |
| South Carolina Stratum 3 - 25 | 5273 | 68603 | 25.65 |
| South Carolina Stratum 3 - 26 | 5273 | 65261 | 100.85 |
| South Carolina Stratum 3 - 27 | 5273 | 66725 | 82.97 |
| South Carolina Stratum 3 - 28 | 5273 | 65063 | 63.95 |
| South Carolina Stratum 3 - 29 | 5273 | 68630 | 5.25 |
| South Carolina Stratum 3 - 30 | 5539 | 92659 | 0.42 |
| South Carolina Stratum 3 - 31 | 5273 | 96988 | 34.16 |
| South Carolina Stratum 3 - 32 | 5539 | 94680 | 0.11 |
| South Carolina Stratum 3 - 33 | 5273 | 65666 | 162.81 |
| South Carolina Stratum 3 - 34 | 5273 | 96974 | 28.80 |
| South Carolina Stratum 3 - 35 | 5273 | 68627 | 2.91 |