IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| JAMES JILEK, *et al.,* on behalf of himself and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>COMPASS GROUP USA, INC., D/B/A Canteen<br><br>Defendant. | Case No. 3:23-cv-00818-RJC-DCK |

## COMPASS GROUP USA, INC.'S REPLY IN SUPPORT OF MOTION TO STRIKE

Defendant Compass Group USA, Inc., d/b/a Canteen ("Compass"), by its undersigned counsel, respectfully submits this Reply in Support of its Motion to Strike brought pursuant to Federal Rules of Civil Procedure 26 and 37 to exclude the three untimely and prejudicial supplemental expert reports of Plaintiff's expert, Dr. Brian Kriegler, (Doc. No. 297) (the "Motion"), and in further support thereof, states as follows:

### INTRODUCTION[1]

Plaintiff's Response to Compass's Motion to Strike ("Response") is premised on a representation to the Court that Plaintiff's counsel know to be untrue. Plaintiff states that Compass "took until late June 2023 – more than three years after it first began producing reports of its survey

---

[1] Plaintiff suggests that this Motion is deficient because it fails to comply with LCvR 7.1(b). However, the Motion was originally filed in the Eastern District of Missouri, (Doc. No. 262), not the Western District of North Carolina. Following transfer of this case to the Western District of North Carolina, the parties *jointly* asked this Court to allow Compass to re-file the Motion and set a new briefing schedule. (Doc. No. 285.) Compass submits that, in the event that LCvR 7.1(b) applies under these circumstances, Compass has complied with the spirit of the rule and Plaintiff has not been prejudiced by any technical deficiency.

– to reveal the existence of the photographs." (Doc. No. 303 at 3 [hereinafter "Resp."].) In fact, Plaintiff's counsel knew about the photographs by no later than June 2021, when Compass's corporate representative testified about the photographs in his first deposition. Plaintiff cannot now excuse his counsel's own lack of diligence in requesting the photographs by leveling false accusations of discovery violations against Compass. Compass should not be forced to pay the price for Plaintiff's own failure to timely litigate this case.

Further, Plaintiff acknowledges in his Response that, in light of the fact that both Brian Baldwin and Andres Borrero have joined the long line of class representatives who have withdrawn from this case, Plaintiff can no longer pursue South Carolina and Florida subclasses and the "Declaration" of Brian Kriegler, (Doc. No. 293-4), is moot. As a result, it should be stricken because it addresses issues irrelevant to the remaining dispute. Only two of Dr. Kriegler's late reports require the Court's further consideration: (i) the Supplemental Expert Report of Brian Kriegler, (Doc. Nos. 262-3, 257-16) and (ii) the Second Supplemental Expert Report of Brian Kriegler, (Doc. Nos. 262-4, 257-18).

**RESPONSE TO PLAINTIFF'S STATEMENT OF "FACTS"**

**A.    Plaintiff's Misrepresentations Regarding Photographs and Human Errors**

Plaintiff's entire argument rests upon a purported "revelation" on June 27, 2023 which "necessitated a dramatic change in how planned to prove classwide damages." (Resp. 4.) For support, Plaintiff offers the Court the following representations of "fact":

> On the afternoon of June 27, 2023, the day before Plaintiff was scheduled to take the deposition of Martha Morgan, Defendant's vice president of business information, and only six weeks before the due date for Plaintiff's expert report, Defendant emailed Plaintiff a Declaration signed by her that informed Plaintiff *for the first time* that these survey reports were subject to human error. This was *more than three years* after Compass first disclosed the existence of this survey. At that point, Plaintiff had taken six depositions of Compass employees about the survey, and none of the deponents had disclosed these human errors. Nor did Ms. Morgan describe the extent of the errors, but she said she had found some by reviewing

photographs of the machines that had been taken as part of the survey. This was also the first time Defendant had told Plaintiff that there *were* such photographs.

(Resp. 2 (emphasis in original).) Each of the points emphasized with italics in Plaintiff's Response is a blatant mischaracterization which is addressed in turn.

*First*, Plaintiff's representation that Ms. Morgan's June 27, 2023 Declaration was "*the first time*" Compass disclosed that the "survey reports were subject to human error" is wrong, as is his representation that Compass did not disclose that the survey might contain human error until "*more than three years* after Compass first disclosed the existence of this survey." On *June 9, 2021*— *i.e.* one hundred thirteen weeks before the due date of Plaintiff's expert report—Compass's Rule 30(b)(6) designee, David Goldring, testified in his deposition in response to questions posed by Plaintiff's counsel:

> Q. After the survey was completed in or around February of 2020, did you and your team do anything to audit the results of the survey?
>
> A. No. We were really primarily focused on trying to make sure that we had covered all of the two tier designated machines.
>
> Q. Okay. Well, for instance, you told me that the app that was being used by the folks out in the field required the person gathering the data to take a photograph of where the labeling should be. Is that right?
>
> A. Yes.
>
> Q. Did anyone go back and take a sample of 500 or a thousand or 5,000 of the results to compare the photographs with the actual data that was recorded?
>
> A. I looked through some of the photographs just to kind of see what the – what kind of the visual results were, but I didn't look at anywhere near a thousand or anything like that.
>
> Q. Okay. Well, I guess what I'm saying is or what I'm asking I should say is that is it possible that data was either input incorrectly or that someone in the field checked yes when it should have been no and – and – and there's some error rate in there that you don't know about?
>
> A. It's certainly possible, it is when you're going through this many machines and

the – and a number of different people coming in and out of the project, yes, I'm sure there could be errors. As to the error rate, I have no idea.

(Ex. 1 [hereinafter "6/9/21 Goldring Dep. Tr."] 102:20-103:24.)[2] Mr. Goldring was the first witness to be deposed in this case and Plaintiff, through his counsel, was made aware of potential human errors in the survey results within the first hours of the first deposition taken in this case.

*Second*, Plaintiff's representation that "none" of the Compass employees deposed prior to June 27, 2023 disclosed that there could be "human errors" in the survey is wrong and misleading. The first Compass employee to be deposed, Mr. Goldring, confirmed that he was "sure there could be *errors*" in the survey results due to the "number of different *people*" compiling data from "many machines" for the survey. Mr. Goldring proceeded to testify that Martha Morgan was "the individual that was tasked with developing the app [used to conduct the surveys] in conjunction Canteen's IT group and **making sure that it all functioned and gave us the information** that we believed would be relevant." (Ex. 1, 6/9/21 Goldring Dep. Tr. 90:1-5.) On June 30, 2021, just a couple weeks after learning that it was "certainly possible" that the survey contained errors and that Martha Morgan oversaw the implementation of the survey, Plaintiff had the opportunity to delve into that issue: Ms. Morgan's deposition. Plaintiff failed to ask Ms. Morgan a single question about potential errors in the survey or a potential audit of the survey results. Plaintiff blames Compass for his counsel's own failure to delve into this issue with subsequent witnesses, but deponents need not answer questions that are not asked.

*Third*, Plaintiff represents that June 27, 2023 was "the first time [Compass] had told Plaintiff" that there were "photographs of the machines that had been taken as part of the survey." This statement is also wrong, and is perhaps the most egregious misrepresentation, as evidenced

---

[2] Relevant excerpts from the June 9, 2021 deposition of Compass's David Goldring are collectively attached hereto as **Exhibit 1**.

by a line of questioning from Plaintiff's counsel at the June 9, 2021 deposition of Mr. Goldring (*i.e.*, two years before Compass purportedly "told" Plaintiff for "the first time" that "photographs of the machines that had been taken as part of the survey" and *twenty-six months* prior to the deadline for Plaintiff to serve his expert report):

> Q. How was the data collected in the field? Was – and by that I mean if it was a route driver, for instance, that was doing the survey on a particular day on a particular machine, how did that route driver collect the data and transmit that data to – to you and your group?
>
> A. It was done via an app. So, whoever was doing the survey had to have a phone that had picture taking capability and the ability to use the app that we developed specifically for this project.
> . . .
>
> Q. And the app would guide that person through the process of gathering the data for that machine. Is that right?
>
> A. Yes. It had a series of specific questions that they had to either answer or do something before they could proceed through the survey.
>
> Q. And *were the folks doing the survey in the field required to physically take pictures of each machine*?
>
> A. *Yes*.
>
> Q. Specifically *were they required to take pictures of where the labeling either was or should be*?
>
> A. *Yes*.

(Ex. 1, 6/9/21 Goldring Dep. Tr. 87:4-88:14 (emphasis added); *see id.* 103:1-6 ("**Q.** Well, for instance, you told me that the app that was being used by the folks out in the field required the person gathering the data to take a photograph of where the labeling should be. Is that right? **A. Yes.**").)

At the risk of presenting unnecessarily cumulative evidence demonstrating the falsity of Plaintiff's representation to the Court that June 27, 2023 was "the first time [Compass] had told

5

Case 3:23-cv-00818-JAG-DCK    Document 305    Filed 05/24/24    Page 5 of 18

Plaintiff" that "photographs of the machines had been taken as part of the survey," it bears noting that the photographs were a subject of discussion at no less than four other depositions taken prior to June 27, 2023.[3] Plaintiff's counsel also asked Mr. Goldring about the photographs taken in connection with the survey at Mr. Goldring's second deposition on June 30, 2021:

> Q. Then it looked like the folks in the field were to take a picture of that sticker as part of the process; correct?
>
> A. They were to take a picture of that QR code, which then puts the machine ID number and location information into the survey.
>
> Q. When I'm looking at this one here, it says, "Upload image of the Canteen Connect sticker." Do you see that right next to where my cursor is?
>
> A. Yes. That's the purpose of it.
>
> …
>
> Q. And then they were – it appears that this person was to upload an image of the machine corner to corner, meaning they were to take a picture of the entire machine so that you could see the top, bottom, sides, and everything; is that right?
>
> A. ***That's correct.***

(Ex. 2 [hereinafter "6/30/21 Goldring Dep. Tr."] 179:5-180:9 (emphasis added).)[4]

Plaintiff's counsel again asked about the photographs of machines at the February 4, 2022 deposition of Compass's Michael Coffey:

> Q. And Martha [Morgan] here appears to be the person responsible for creating this application to take photographs of machines before and after the updated labeling. Do you see that?

---

[3] Also in June 2021, the photographs' existence was disclosed in (at least) two documents produced by Compass as CG-0018047 and CG-0018060, both of which set forth the survey procedure, including a directive requiring surveyors to take photographs of the machine while conducting the survey. Plaintiff's counsel introduced CG-0018047 and CG-0018060 as exhibits at Mr. Goldring's second deposition, which was held later that month on June 30, 2021.

[4] Relevant excerpts from the June 30, 2021 deposition of Compass's David Goldring are collectively attached hereto as **Exhibit 2**.

> A. ***I do.***

(Ex. 3 [hereinafter "2/4/22 Coffey Dep. Tr."] 73:8-13 (emphasis added).)[5]

The photographs of machines taken in connection with Compass's survey were also discussed at the March 3, 2022 deposition of another Compass witness, Peter Fetherston. Here is an exchange between Plaintiff's counsel and Mr. Fetherston:

> Q. . . . . In prior depositions it was described to me that an app had been developed so that people in the field could actually conduct a survey by taking a photograph and documenting some information about the machines and these sorts of things. Is that what you're referring to?
>
> A. ***Yes***.

(Ex. 4 [hereinafter "3/3/22 Fetherston Dep. Tr."] 45:8-15 (emphasis added).)[6]

At the second deposition of Ms. Morgan, held May 10, 2023, Plaintiff's counsel again asked about the photographs taken in connection with the survey:

> Q. Alright. And I thank you also – well, I forget if you told me. They also took a picture of the machine when they were there; is that right?
>
> A. ***Yes. More than one picture.***
>
> Q. Okay. They took pictures of the machines when they were in front of it; correct?
>
> A. ***Correct***.

(Ex. 5 [hereinafter "5/10/23 Morgan Dep. Tr."] 39:9-16 (emphasis added).)[7]

Plaintiff waited until August 9, 2023—*i.e.*, after his expert report deadline—to serve a

---

[5] Relevant excerpts from the February 4, 2022 deposition of Compass's Michael Coffey are collectively attached hereto as **Exhibit 3**.

[6] Relevant excerpts from the March 3, 2022 deposition of Compass's Peter Fetherston are collectively attached hereto as **Exhibit 4**.

[7] Relevant excerpts from Ms. Morgan's May 10, 2023 deposition are collectively attached hereto as **Exhibit 5**.

request for production seeking copies of the photographs taken in connection with the survey. Compass objected on the ground that collecting and producing every photograph taken of every vending machine would be unduly burdensome. In response, the parties agreed to a sampling production given the number of photographs at issue. Compass produced those photographs the day Compass's discovery responses were due (*i.e.*, September 8, 2023). Plaintiff complains that Compass did not produce these photographs in response to a general discovery previously served, which sought, without limitation, "[a]ny and all documents that refer or relate to Compass's offer of discounts for cash transactions at Compass vending machines or that refer or relate to the implementation of that practice." (Resp. 3 (quoting RFP No. 14)). Compass objected to this request because it lacked the requisite particularity, but also on the same grounds of burden. Despite the number of times that Compass testified to the photographs' existence, Plaintiff did not ask Compass to waive its objection with respect to the photographs or otherwise demand them until after its expert deadline had passed.

After marching through a litany of misrepresented facts,[8] Plaintiff calls for Compass to explain itself:

> And to this day, Compass has not explained why it took until late June 2023 – more than three years after it first began producing reports of its survey – to reveal the existence of the photographs or the human errors that the photographs could confirm or refute.

(Resp. 3.) In light of the foregoing testimony—which unequivocally show that Plaintiff was made aware time and again of the existence of the photographs taken in connection with the survey and

---

[8] Should the Court hold oral argument on the Motion, Plaintiff will have the opportunity to reconcile the representation that Ms. Morgan's June 27, 2023 Declaration was "the first time [Compass] had told Plaintiff" that there were "photographs of the machines that had been taken as part of the survey" with the testimony and record excerpts provided here. *Cf.* Fed. R. Civ P. 11(b)(3).

8
Case 3:23-cv-00818-JAG-DCK    Document 305    Filed 05/24/24    Page 8 of 18

the fact that those photographs could be used to verify the survey results (but no later than by June 2021) and subsequently failed to seek additional discovery—no further explanation is required.

B. <u>The Survey Instance Reports</u>

Over the last four years, Compass has produced various iterations of reports that attempt to summarize revenue and survey data relating to each individual vending machine. For the reasons explained by Compass's employees (and set forth above in Section A), this proved to be an onerous process. The initial reports were produced to Plaintiff on March 4, 2020, and contained identifying information regarding each vending machine. In May 2021, February 2022, July 2022, September 2022, and April 2023, Compass produced revised iterations of the reports, which supplied supplemental information regarding each machine, including the date each machine was last surveyed, the results of the survey, and contained revenue data as of the last survey date for each vending machine. As the parties continued to confer regarding the substance and format of these reports, Compass continued to produce additional iterations to show the progress of the survey and to update other data, including machine revenue data and the last survey date for each machine. Consistent with its obligation under Fed. R. Civ. P. 26 to supplement its discovery, Compass produced additional iterations to capture data relating to additional revenue collected by machines and surveys performed.

On May 4 and May 22, 2023, more than **thirteen weeks before Plaintiff's deadline** to submit his expert report, Compass produced the Survey Instance Report, which identified *all* instances in which a vending machine had been surveyed, rather than the date of the last survey.

**ARGUMENT**

Under Rule 37(c)(1), "a party who fails to comply with the expert witness disclosure rules is prohibited from 'us[ing] that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." *Bresler v. Wilmington*

*Tr. Co.*, 855 F.3d 178, 189-90 (4th Cir. 2017) (quoting Fed. R. Civ. P. 37(c)(1)). In determining whether a party's nondisclosure or untimely disclosure of evidence is substantially justified or harmless, courts are guided by the following factors:

> (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence.

*S. States Rack & Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 597 (4th Cir. 2003). Plaintiff cannot carry his burden of showing that the untimely disclosure of the First Supplemental Report or the Second Supplemental Report was substantially justified or harmless. *Bresler*, 855 F.3d at 190.

### A. Plaintiff's Explanation for Failing to Timely Disclose their Expert's Supplemental Reports is based on Misrepresentations of the Case's History

Given the litany of discovery misconduct accusations lodged at Compass in Plaintiff's Response, the final *Southern States* factor, "the nondisclosing party's explanation for its failure to disclose the evidence" (*S. States Rack & Fixture*, 318 F.3d at 597), will be addressed at the outset. The sole justification offered by Plaintiff for the untimely disclosure of the Second Supplemental Report is based upon a complete fabrication of events, but centers around an alleged groundbreaking "revelation" on June 27, 2023 that "necessitated a dramatic change in how planned to prove classwide damages." (Resp. 4.) This "revelation," according to Plaintiff, was Compass's disclosure that it had taken photographs in connection with its survey of the machines and that those photographs could be used to identify human errors in the survey results. (*Id.*) But in reality, this was no revelation, as counsel for Plaintiff was made aware of the photographs years prior. (Ex. 1, 6/9/21 Goldring Dep. Tr. 87:4-88:14; *see* Ex. 2, 6/30/21 Goldring Dep. Tr. 179:5-180:9;

Ex. 3, 2/4/22 Coffey Dep. Tr. 73:8-13; Ex. 4, 3/3/22 Fetherston Dep. Tr. 45:8-15; Ex. 5, 5/10/23 Morgan Dep. Tr. 39:9-16.)[9]

Plaintiff also learned that the survey results might contain human errors—at the latest—on June 9, 2021. Mr. Goldring confirmed that he was "sure there could be *errors*" in the survey results due to the "number of different *people*" compiling data from "many machines" for the survey. (Ex. 1, 6/9/21 Goldring Dep. Tr. 103:14-24.)

Plaintiff's counsel was also well aware that the survey results for a given machine could be verified and confirmed using the photographs taken when that machine was surveyed as of June 9, 2021. (Ex. 1, 6/9/21 Goldring Dep. Tr. 102:20-103:24.) And Plaintiff obtained similar testimony from other Compass witnesses well before June 2023. For instance, at his February 4, 2022 deposition, Mr. Coffey explained that one "could use a photo capture position and a database to reconcile those photos and the information collected" through the survey. (Ex. 3, 2/4/22 Coffey Dep. Tr. 10:22-11:7; *see id.* at 89:23-90:9.)

While Plaintiff was armed with the knowledge that Compass had taken photographs which could be used to verify the accuracy of the survey results by no later than June 9, 2021, he did not serve a discovery request seeking those photographs until August 9, 2023 (*i.e.*, after his expert report deadline had already passed). Compass timely produced those photographs on September 8, 2023.

---

[9] Mr. Jenkins' Declaration, which avers, under the penalty of perjury, that June 27, 2023 was "the first time Defendant had told Plaintiff that there were such photographs," (Doc. No. 303-1 ¶ 6), cannot be reconciled with the clear testimony of witnesses and the records previously produced in this case.

In sum, Plaintiff seeks to blame Compass for his own failures by materially misrepresenting the facts to this Court. His untimely disclosure of the First Supplemental Report and Second Supplemental Report was not substantially justified.[10]

### B. Plaintiff's Failure to Timely Disclose Was Not Harmless

Plaintiff's arguments under the other *Southern States* factors fare no better.

*i. Surprise to Compass*

Turning to the first *Southern States* factor, the "surprise to the party against whom the evidence would be offered" (*S. States Rack & Fixture*, 318 F.3d at 597), Plaintiff argues that "any surprise to [Compass] was minimal at best[.]" (Resp. 9.)

With respect to the First Supplemental Report, Plaintiff simply concludes, without offering any support whatsoever, that "Compass had to know [this belated expert report] was coming." (Resp. 9.) Dr. Kriegler had the opportunity to address and opine regarding the purported damages of a sub-class of California residents in his Opening Report. Indeed, Compass did not produce any new documents or information, nor did any depositions occur, between the August 7, 2023 expert disclosure deadline and service of Dr. Kriegler's First Supplemental Report on August 11, 2023. *See EEOC v. Freeman*, 961 F. Supp. 2d 783, 797-98 (D. Md. 2013) (excluding untimely "supplemental reports and declarations" because expert's analyses therein were "based on materials that were available to him prior to his initial submission deadline, not on newly discovered information").

The surprise to Compass arising out of Dr. Kriegler's Second Supplemental Report, served on October 13, 2023, was even more egregious. The Second Supplemental Report was not served

---

[10] In Plaintiff's Response, he acknowledges that Dr. Kriegler's First Supplemental Report was untimely because "the California subclass was inadvertently omitted from the initial scope of work requested by Plaintiff's counsel." (Resp. 11.)

until ten weeks after Plaintiff's expert report deadline expired on August 7, 2023, seven weeks after Dr. Kriegler's deposition on August 23, 2023, and four weeks after Compass served the report of its rebuttal expert on September 18, 2023. More importantly, however, the Second Supplemental Report was served just a couple hours before Plaintiff filed the prior Motion for Class Certification in the Eastern District of Missouri. *Cf. Morgan v. City of Charlotte*, No. 3:22-CV-00003-KDB-DCK, 2023 U.S. Dist. LEXIS 103888, at *14 (W.D.N.C. June 13, 2023) ("Plaintiff also waited until filing her opposition to the motions for summary judgment to attach the second expert report as an exhibit. The belated and unusual manner in which this report was disclosed only adds to Defendants' surprise."). Serving the Second Supplemental Report two hours before filing and relying upon it as an exhibit to the prior motion for class certification is the epitome of unfair gamesmanship. *See Gallagher v. S. Source Packaging, LLC*, 568 F. Supp. 2d 624, 631 (E.D.N.C. 2008) ("Courts distinguish 'true supplementation' (e.g., correcting inadvertent errors or omissions) from gamesmanship, and have therefore repeatedly rejected attempts to avert summary judgment by 'supplementing' an expert report with a 'new and improved' expert report.").

Yet, Plaintiff suggests that there was "no surprise" to Compass arising from the Second Supplemental Report because Dr. Kriegler's Opening Report included language purporting to reserve the right to apply the vague methodologies therein to additional data. *But see Raszkiewicz v. Progressive Max Ins. Co.*, No. 5:21-CV-38, 2023 U.S. Dist. LEXIS 117331, at *5-6 (N.D.W. Va. May 23, 2023) ("[T]he tactic of providing a 'preliminary opinion' only to provide a final opinion after having the benefit of reviewing a defendant's expert disclosures is a cheap tactic, which amounts to nothing more than sandbagging.") (citation omitted). In fact, Plaintiff does not

13
Case 3:23-cv-00818-JAG-DCK   Document 305   Filed 05/24/24   Page 13 of 18

even argue that the supplemental opinions set forth in Dr. Kriegler's Second Supplemental Report were intended to correct inadvertent errors or omissions.

Plaintiff's Response also confirms that the Second Supplemental Report operates as a *de facto* reply brief to the September 18, 2023 expert report of Compass's expert, Mr. Kalat. According to Plaintiff, however, Compass "cannot have been surprised that Dr. Kriegler included that rebuttal in his Second Supplemental Report," pointing to the Fourth Amended Case Management Order issued on January 12, 2023. (Resp. 9-10.) That Order required Plaintiff to serve its expert reports by no later than May 5, 2023, required Compass to serve its expert reports by July 7, 2023, and allowed Plaintiff to disclose any "rebuttal expert witnesses" by no later than ***August 18, 2023***. (Doc. No. 198 at 1-2.) The Order did not, however, authorize Plaintiff to serve the Second Supplemental Report of Dr. Kriegler a couple hours before Plaintiff's prior Motion for Class Certification was filed on ***October 13, 2023***, long after the deadline contemplated by the January 12, 2023 Fourth Amended Case Management Order.

        ii.        *Compass Was Unable to Cure the Surprise*

As detailed in the Memorandum of Law in Support of the Motion, Compass was unable to cure the surprise arising out of Dr. Kriegler's Second Supplemental Report. *See S. States Rack & Fixture*, 318 F.3d at 597. The Second Supplemental Report was not served until weeks after Dr. Kriegler's deposition. It was also served long after Compass's own expert, David Kalat, finalized his expert report, which Compass timely served on September 18, 2023. As an initial matter, Plaintiff completely fails to respond to the argument that Compass was unable to test the opinions set forth in Dr. Kriegler's Second Supplemental Report through its own rebuttal expert report. *Cf. GenoSource, LLC v. Secura Ins.*, 637 F. Supp. 3d 633, 639 (N.D. Iowa 2022) (striking the plaintiff's untimely supplemental expert report where the "new opinions are such that [defendant]

14

Case 3:23-cv-00818-JAG-DCK   Document 305   Filed 05/24/24   Page 14 of 18

may wish to obtain its own expert to analyze the data in rebuttal, necessitating a continuation of the discovery deadline and trial date, as well as perhaps re-briefing the dispositive motion. This delay would prejudice [defendant] and disrupt the court's schedule").

Nevertheless, Plaintiff argues that, after this case was transferred to the Western District of North Carolina, "nothing stopped Compass from asking to take Dr. Kriegler's supplemental deposition about" the Second Supplemental Report. (Resp. 10.) Tellingly, Plaintiff stops short of arguing that Compass could have *actually* re-deposed Dr. Kriegler during this time. *Cf. Petersen v. Midgett*, 140 F. Supp. 3d 490, 502-03 (E.D.N.C. 2015) (striking untimely supplemental expert report, concluding the "late submission was prejudicial to the defendants because it denied defendants the opportunity to redepose [the expert] on his supplemental opinions," and declining to "reopen the discovery period for this long-pending case to cure [plaintiff's] failure to timely disclose the [report]").

### iii. Disruption of Trial

Turning to the next *Southern States* factor, "the extent to which allowing the evidence would disrupt the trial" (*S. States Rack & Fixture*, 318 F.3d at 597), allowing Plaintiff's belated introduction of the First Supplemental Report and Second Supplemental Report would require a significant extension of all remaining deadlines in the case. To mitigate the unfair prejudice, Compass would require the opportunity to test the opinions set forth in Dr. Kriegler's Second Supplemental Report through a supplemental deposition of Dr. Kriegler and through Compass's own supplemental expert reports, thus disrupting the order and efficiency of the trial.

That no trial date has been set in stone does not, as Plaintiff suggests, mean that "there's nothing to disrupt." (Resp. 10.) *See Gallagher*, 568 F. Supp. 2d at 630-31 (excluding untimely expert report where prejudice to opposing party could not be cured "without further delay and

further discovery, including another deposition" of the expert and noting that, "[a]lthough a trial date ha[d] not been set, this case has been pending [for two years], and reopening discovery would trample the Scheduling Order and disrupt proceedings").

### iv. *Importance of the Evidence*

The final *Southern States* factor, "the importance of the evidence," *S. States Rack & Fixture*, 318 F.3d at 597, also weighs against Plaintiff. While Plaintiff represents that some of the untested testimony contained within Dr. Kriegler's Second Supplemental Report might be important to Plaintiff's case for damages, had Plaintiff litigated his case with reasonable diligence, the same "important" evidence underlying Dr. Kriegler's Second Supplemental Report could have been sought and obtained in June 2021, when Plaintiff first learned of its existence.

At a more basic level, however, the purported importance of Dr. Kriegler's Second Supplemental Report only highlights the prejudice that Plaintiff seeks to force upon Compass. As this Court recently noted, "if the Court adopts Plaintiff's view of the importance of this testimony it only reinforces the prejudice caused by the untimely nature of its filing." *Morgan*, 2023 U.S. Dist. LEXIS 103888, at *16. The same holds true here.

## CONCLUSION

For the foregoing reasons, Compass respectfully requests that the Court strike Dr. Kriegler's First, Second, and Third Supplemental Reports.

16
Case 3:23-cv-00818-JAG-DCK    Document 305    Filed 05/24/24    Page 16 of 18

Dated: May 24, 2024						Respectfully submitted,


							By: */s/ Joseph C. Wylie II*
								Joseph C. Wylie II, 6270852IL *(Pro Hac Vice)*
								Nicole C. Mueller 6309735IL *(Pro Hac Vice)*
								Kenn Brotman 6236771IL *(Pro Hac Vice)*
								**K&L GATES LLP**
								70 West Madison Street, Suite 3300
								Chicago, IL 60602-4207
								Tel:	(312) 372-1121
								Fax:	(312) 827-8000
								joseph.wylie@klgates.com
								Nicole.Mueller@klgates.com
								Kenn.Brotman@klgates.com

								Paul W. Sweeney Jr., 112511CA
								*(Pro Hac Vice)*
								**K&L GATES LLP**
								10100 Santa Monica Blvd., 8th Floor
								Los Angeles, CA 90067
								paul.sweeney@klgates.com
								Secondary:  litigation.docketing@klgates.com

								Daniel D. McClurg
								N.C. Bar Number 53768
								**K&L Gates LLP**
								300 South Tryon Street, Suite 1000
								Charlotte, North Carolina 28202
								Phone: (704) 331-7400
								Fax:	(704) 353-3114
								Email: daniel.mcclurg@klgates.com

								*Attorneys for Compass Group USA, Inc.*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing was electronically filed with the Clerk of Court via the Court's CM/ECF system on May 24, 2024, which will serve all counsel of record.

*/s/ Joseph C. Wylie II*