# Exhibit 1

```
 1              UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF MISSOURI
 2                    EASTERN DIVISION

 3

 4   GEORGE MOORE and VIRGINIA   )
     CARTER, et al., on behalf of)
 5   themselves and all others   )
     similarly situated,         )
 6                               )
                 Plaintiffs,     )
 7                               )
     VS.                         )         Cause No.
 8                               )    4:18-cv-01962-SEP
     COMPASS GROUP USA, INC.,    )
 9   d/b/a CANTEEN,              )
                                 )
10              Defendant.       )
11                        VOLUME I
12   VIDEOTAPED VIDEOCONFERENCE (30)(b)(6) DEPOSITION OF
13                      DAVID GOLDRING
14      TAKEN REMOTELY ON BEHALF OF THE PLAINTIFFS
15               IN OKLAHOMA CITY, OKLAHOMA
16                   ON JUNE 9, 2021
17
18            REPORTED BY:  DAVID BUCK, CSR
19
20
21
22
23
24
25
```

Veritext Legal Solutions
866 299-5127

```
1                   A P P E A R A N C E S
2
3    For the Plaintiffs:        Robert Partain
     (By Videoconference)       ARIAS SANGUINETTI WANG
4                               & TORRIJOS, LLP
                                6701 Center Drive West
5                               14th Floor
                                Los Angeles, CA 90045
6                               (310)844-9696
                                robert@aswtlawyers.com
7
8
     For the Plaintiffs:        Daniel S. Levy
9    (By Videoconference)       CORNFELD LEGAL
                                1010 Market Street
10                              Suite 1645
                                St. Louis, MO 63101
11                              (314)241-5799
                                dlevy@cornfeldlegal.com
12
13
     For the Defendants:        Joseph C. Wylie, II
14   (By Videoconference)       K&L GATES, LLP
                                70 West Madison Street
15                              Suite 3300
                                Chicago, IL 60602-4207
16                              (312)372-1121
                                joseph.wylie@klgates.com
17
18
     Also Present:              Jeff Henry
19   (By Videoconference)
20
     The Videographer:          Grant Cihlar
21   (By Videoconference)
22
23
24
25
```

Veritext Legal Solutions
866 299-5127

```
 1    that.  Let me take a step back.  You're not going to
 2    hear that from me very often, but when I agree I
 3    agree.
 4        Q.  (By Mr. Partain) How was the data collected in
 5    the field?  Was -- and by that I mean if it was a
 6    route driver, for instance, that was doing the survey
 7    on a particular day on a particular machine, how did
 8    that route driver collect the data and transmit that
 9    data to -- to you and your group?
10        A.  It was done via an app.  So, whoever was doing
11    the survey had to have a phone that had picture taking
12    capability and the ability to use the app that we
13    developed specifically for this project.
14        Q.  Okay.  So, I assume you hired a vendor to
15    create this app or was it done in-house?
16        A.  We did it in-house.
17        Q.  Okay.  So you in-house created an app that
18    could be downloaded and used on a phone for -- for
19    someone that was at a particular machine.  Is that
20    right?
21        A.  That's correct.
22        Q.  And the app would guide that person through
23    the process of gathering the data for that machine.
24    Is that right?
25        A.  Yes.  It had a series of specific questions
```

Veritext Legal Solutions
866 299-5127

1  that they had to either answer or do something before
2  they could proceed through the survey.
3      Q.  And were the folks doing the survey in the
4  field required to physically take pictures of each
5  machine?
6      A.  Yes.
7      Q.  Specifically were they required to take
8  pictures of where the labeling either was or should
9  be?
10     A.  Yes.
11     Q.  And those pictures along with the data
12  collected for that machine were then transmitted back
13  to North Carolina.  Is that right?
14     A.  Yes.
15     Q.  And when they were transmitted back to North
16  Carolina, where did they go?  Like I'm asking this the
17  wrong way because I'm just so bad with computers and I
18  apologize.  But was there a database, for instance,
19  that all this data was uploaded to?
20     A.  Yeah.  It would have gone into our data
21  warehouse, our data lake.
22     Q.  You called it a data warehouse or a data lake.
23  Is that right?
24     A.  Correct.
25     Q.  And was some sort of software program or

Veritext Legal Solutions
866 299-5127

```
 1   application created specifically for the survey to
 2   process all this data?
 3       A.  So we developed an app.  The app was designed
 4   so that, again, to your earlier point, that the data
 5   would be uploaded into this data warehouse and then we
 6   could download information from that data warehouse
 7   into Excel or other software so that they could look
 8   at the data and get whatever information we needed
 9   from that based on the information collected.
10       Q.  Okay.  So, I think I have a basic
11   understanding.  So let's go back to Exhibit 11 here.
12   Do you know how it was that the -- what appears to be
13   the data from the survey for the State of Alabama, and
14   again there appear to be 3,184 entries, do you know
15   how that data was transferred from your data warehouse
16   to this spreadsheet?
17       A.  I don't know specifically, but again, it
18   was -- we had the capability to download the
19   information so that it could be sorted and -- and
20   reviewed.
21       Q.  Okay.  Do you know who the person or persons
22   at Canteen were that were responsible in our case here
23   for take -- for creating these spreadsheets and
24   transmitting them to the attorneys to give to us, do
25   you know who those people were?
```

Veritext Legal Solutions
866 299-5127

1     A.   There's a lady named Martha Morgan and she was

2     the individual that was tasked with developing the app

3     in conjunction Canteen's IT group and making sure that

4     it all functioned and gave us the information that we

5     believed would be relevant.

6     Q.   Okay.  And so looking at this particular

7     spreadsheet, there are a number of columns up here

8     that are -- that contain redacted information.  The

9     first one says survey instance ID.

10          Do you see that?

11    A.   Yes.

12    Q.   Do you know what that refers to?

13    A.   I don't, but I believe that every survey had

14    an ID number and that that's that was.

15    Q.   So, for instance, this particular machine here

16    at -- or I'm sorry, Machine 21007 would have had its

17    own, at least for this survey, it's own unique

18    identifier.  Is that right?

19    A.   Correct, because we could identify it back to

20    the individual that actually took the survey.

21    Q.   And do you know whether there were any

22    attorneys directing you to specifically provide unique

23    identifiers for each and every machine?

24    A.   No, I don't.

25    Q.   Same thing about survey date here, that seems

```
 1   hour good for you?

 2        THE WITNESS:  Yeah, that's plenty.

 3        MR. PARTAIN:  That's fine with me.  We'll come

 4   back, let's just make it 11:15 my time which is, what,

 5   1:15 and 2:15 your guys' time.  Okay?

 6        THE WITNESS:  Okay.

 7        MR. PARTAIN:  All right, we'll see you then.

 8        THE WITNESS:  Thank you.

 9        THE VIDEOGRAPHER:  We're going off the record.

10   The time is 1:38 p.m. eastern and this is the end of

11   media unit two.

12          (A recess was here had 1:38 to 2:17.)

13        THE VIDEOGRAPHER:  We're going back on the record.

14   The time is 2:17 p.m. eastern and this is the

15   beginning of media unit three.

16            Please continue.

17        Q.  (By Mr. Partain)  Sir, are you ready to

18   continue?

19        A.  Yes.

20        Q.  After the survey was completed in or around

21   February of 2020, did you and your team do anything to

22   audit the results of the survey?

23        A.  No.  We were really primarily focused on

24   trying to make sure that we had covered all of the two

25   tier designated machines.
```

Page 102

1    Q.   Okay.  Well, for instance, you told me that
2  the app that was being used by the folks out in the
3  field required the person gathering the data to take a
4  photograph of where the labeling should be.  Is that
5  right?
6    A.   Yes.
7    Q.   Did anyone go back and take a sample of 500 or
8  a thousand or 5,000 of the results to compare the
9  photographs with the actual data that was recorded?
10    A.   I looked through some of the photographs just
11  to kind of see what the -- what kind of the visual
12  results were, but I didn't look at anywhere near a
13  thousand or anything like that.
14    Q.   Okay.  Well, I guess what I'm saying is or
15  what I'm asking I should say is that is it possible
16  that data was either input incorrectly or that someone
17  in the field checked yes when it should have been no
18  and -- and -- and there's some error rate in there
19  that you don't know about?
20    A.   It's certainly possible, it is when you're
21  going through this many machines and the -- and a
22  number of different people coming in and out of the
23  project, yes, I'm sure there could be errors.  As to
24  the error rate, I have no idea.
25    Q.   Okay.  With respect to the universe of

Veritext Legal Solutions
866 299-5127

1   machines that were included in the survey, you told me
2   earlier I think that the only machines which were sent
3   to each branch to be surveyed were those that had two
4   tier activated at the time the survey began.  Is that
5   right?
6       A.  Yes.
7       Q.  So, if two tier had been activated for a time
8   but then deactivated prior to the survey, the survey
9   necessarily wouldn't have included that particular
10  machine in the survey.  Right?
11      A.  No, that's incorrect.  It would have come back
12  in and shown up as an exception and then they went
13  through those exceptions because we have machines that
14  there's quite a bit of machine movement whether it's
15  being pulled out of the field or put into the field.
16  So we needed to make sure that during the survey time
17  we were covering that up.
18      Q.  And when you say that -- a particular machine
19  that had been deactivated, the two tier had been
20  deactivated prior to the survey was an exception, what
21  does that mean?
22      A.  Well, you asked if machines that were not
23  active at the start but were activated during --
24      Q.  No, no.  That's not what I asked.
25      A.  -- they would have been included.  So --

Page 104

```
 1              C E R T I F I C A T E
 2

   STATE OF OKLAHOMA  )
 3                    )  SS:
   COUNTY OF OKLAHOMA )

 4

 5              I, David Buck, Certified Shorthand Reporter
 6    within and for the State of Oklahoma, do hereby
 7    certify that DAVID GOLDRING was by me first duly sworn
 8    to testify the truth, the whole truth and nothing but
 9    the truth, in the case aforesaid; that the above and
10    foregoing deposition was taken in shorthand and
11    thereafter transcribed; that the same was taken on
12    June 9th, 2021, in Oklahoma City, Oklahoma; that I am
13    not an attorney for nor a relative of any said
14    parties, or otherwise interested in said action.
15              IN WITNESS WHEREOF, I have hereunto set my
16    hand and official seal this 15th day of June, 2021.
17
18
19
20
21
22    David Buck, CSR #1585
23
24
25
```

Veritext Legal Solutions
866 299-5127